**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC., CAPITOL RECORDS,
LLC, UNIVERSAL MUSIC CORP., UNIVERSAL
MUSIC – MGB NA LLC, UNIVERSAL MUSIC
PUBLISHING INC., UNIVERSAL MUSIC
PUBLISHING AB, UNIVERSAL MUSIC
PUBLISHING LIMITED, UNIVERSAL MUSIC
PUBLISHING MGB LIMITED, UNIVERSAL
MUSIC – Z TUNES LLC, POLYGRAM
PUBLISHING, INC., SONGS OF UNIVERSAL,
INC., WARNER BROS. RECORDS INC.,
ATLANTIC RECORDING CORPORATION, BAD
BOY RECORDS LLC, ELEKTRA
ENTERTAINMENT GROUP INC., FUELED BY
RAMEN LLC, NONESUCH RECORDS INC.,
RHINO ENTERTAINMENT COMPANY,
ROADRUNNER RECORDS, INC., WEA
INTERNATIONAL INC., WARNER/CHAPPELL
MUSIC, INC., WARNER-TAMERLANE
PUBLISHING CORP., WB MUSIC CORP., W.B.M.
MUSIC CORP., UNICHAPPELL MUSIC INC.,
RIGHTSONG MUSIC INC., COTILLION MUSIC,
INC., INTERSONG U.S.A., INC., SONY MUSIC
ENTERTAINMENT, ARISTA MUSIC, ARISTA
RECORDS LLC, LAFACE RECORDS LLC,
PROVIDENT LABEL GROUP, LLC, SONY MUSIC
ENTERTAINMENT US LATIN, VOLCANO
ENTERTAINMENT III, LLC, ZOMBA
RECORDINGS LLC, SONY/ATV MUSIC
PUBLISHING LLC, EMI AL GALLICO MUSIC
CORP., EMI APRIL MUSIC INC., EMI
BLACKWOOD MUSIC INC., COLGEMS-EMI
MUSIC INC., EMI CONSORTIUM MUSIC
PUBLISHING INC. D/B/A EMI FULL KEEL
MUSIC, EMI CONSORTIUM SONGS, INC.,
INDIVIDUALLY AND D/B/A EMI LONGITUDE
MUSIC, EMI ENTERTAINMENT WORLD INC.

**Case No.**

**COMPLAINT AND JURY DEMAND**

6AF7430.DOCX

D/B/A EMI FORAY MUSIC, EMI JEMAXAL
MUSIC INC., EMI FEIST CATALOG INC., EMI
MILLER CATALOG INC., EMI MILLS MUSIC,
INC., EMI U CATALOG INC., JOBETE MUSIC CO.
INC., STONE AGATE MUSIC, SCREEN GEMS-EMI
MUSIC INC., AND STONE DIAMOND MUSIC
CORP.

       Plaintiffs,

  v.

BRIGHT HOUSE NETWORKS, LLC,

       Defendant.

Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, Universal Music Corp.,

Universal Music – MGB NA LLC, Universal Music Publishing Inc., Universal Music Publishing

AB, Universal Music Publishing Limited, Universal Music Publishing MGB Limited, Universal

Music – Z Tunes LLC, Polygram Publishing, Inc., and Songs of Universal, Inc. (collectively, the

"Universal Plaintiffs"); and Plaintiffs Warner Bros. Records Inc., Atlantic Recording

Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC,

Nonesuch Records Inc., Rhino Entertainment Company, Roadrunner Records, Inc., WEA

International Inc., Warner/Chappell Music, Inc., Warner-Tamerlane Publishing Corp., WB

Music Corp., W.B.M. Music Corp., Unichappell Music Inc., Rightsong Music Inc., Cotillion

Music, Inc., and Intersong U.S.A., Inc. (collectively, the "Warner Plaintiffs"); and Plaintiffs

Sony Music Entertainment, Arista Music, Arista Records LLC, LaFace Records LLC, Provident

Label Group, LLC, Sony Music Entertainment US Latin, Volcano Entertainment III, LLC, and

Zomba Recordings LLC (collectively, the "Sony Music Plaintiffs"); and Plaintiffs Sony/ATV

6AF7430.DOCX

Music Publishing LLC, EMI Al Gallico Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., Colgems-EMI Music Inc., EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music, EMI Entertainment World Inc. d/b/a EMI Foray Music, EMI Jemaxal Music Inc., EMI Feist Catalog Inc., EMI Miller Catalog Inc., EMI Mills Music, Inc., EMI U Catalog Inc., Jobete Music Co. Inc., Stone Agate Music, Screen Gems-EMI Music Inc., and Stone Diamond Music Corp. (collectively, the "Sony/ATV and EMI Plaintiffs" and with the Universal Plaintiffs, Warner Plaintiffs, and Sony Music Plaintiffs, the "Plaintiffs"), for their Complaint against Bright House Networks, LLC ("Bright House" or "Defendant"), allege, on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as set forth below:

## <u>INTRODUCTION</u>

1.      Plaintiffs are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, and music publishers that acquire, license, and otherwise exploit musical compositions, both in the United States and internationally.   Through their enormous investments of money, time, and exceptional creative efforts, Plaintiffs and their representative recording artists and songwriters have developed and marketed some of the world's most famous and popular music.  Plaintiffs own and/or control exclusive rights to the copyrights to some of the most famous sound recordings performed by classic artists and contemporary superstars, as well as the copyrights to large catalogs of iconic musical compositions and modern hit songs.  Their investments and creative efforts have shaped the musical landscape as we know it, both in the United States and around the world.

2.      As one of the largest Internet service providers ("ISPs") in the country, Bright House has marketed and sold high-speed Internet services to consumers nationwide.  Through

6AF7430.DOCX

the provision of those services, Bright House has knowingly contributed to, and reaped substantial profits from, massive copyright infringement committed by thousands of its subscribers, causing great harm to Plaintiffs, their recording artists and songwriters, and others whose livelihoods depend upon the lawful acquisition of music.  Bright House's contribution to its subscribers' infringement is both willful and extensive, and renders Bright House equally liable.  Indeed, for years, Bright House deliberately refused to take reasonable measures to curb customers from using its Internet services to infringe on others' copyrights, including Plaintiffs' copyrights—even after Bright House became aware of *particular customers* engaging in *specific, repeated acts* of infringement.  Plaintiffs' representatives (as well as others) sent hundreds of thousands of statutory infringement notices to Bright House, under penalty of perjury.  Those notices advised Bright House of its subscribers' blatant and systematic use of Bright House's Internet service to illegally download, copy, and distribute Plaintiffs' copyrighted music through BitTorrent and other online file-sharing services.  Rather than working with Plaintiffs to curb this massive infringement, Bright House did nothing, choosing to prioritize its own profits over its legal obligations.

3.      It is well-established law that a party may not assist someone it knows is engaging in copyright infringement.  Further, when a party has a direct financial interest in the infringing activity, and the right and practical ability to stop or limit it, that party must act.  Ignoring and flouting those basic responsibilities, Bright House deliberately turned a blind eye to its subscribers' infringement.  Bright House failed to terminate or otherwise take meaningful action against the accounts of repeat infringers of which it was aware.  Despite its professed commitment to taking action against repeat offenders, Bright House routinely thumbed its nose at Plaintiffs by continuing to provide service to subscribers it knew to be serially infringing

6AF7430.DOCX

copyrighted sound recordings and musical compositions.  In reality, Bright House operated its service as an attractive tool and safe haven for infringement.

4.      Bright House has derived an obvious and direct financial benefit from its customers' infringement.  The unlimited ability to download and distribute Plaintiffs' works through Bright House's service has served as a draw for Bright House to attract, retain, and charge higher fees to subscribers.  By failing to terminate the accounts of specific recidivist infringers known to Bright House, Bright House obtained a direct financial benefit from its subscribers' continuing infringing activity.  That financial benefit included improper revenue that it would not have received had it appropriately shut down those accounts.  Bright House decided not to terminate infringers because it wanted to maintain the revenue that is generated from their accounts.

5.      The infringing activity of Bright House's subscribers that is the subject of Plaintiffs' claims, and for which Bright House is secondarily liable, occurred *after* Bright House received multiple notices of each subscriber's infringing activity.  Specifically, Plaintiffs seek relief for claims that accrued between March 24, 2013 and May 17, 2016 for infringement of works by Bright House subscribers after those particular subscribers were identified to Bright House in multiple infringement notices.[1]  These claims have been preserved through tolling agreements entered into with Bright House in March, April, and June 2016, as applicable.

## NATURE OF ACTION

6.      This is a civil action in which Plaintiffs seek damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*

---

[1]  Specifically, the Universal Plaintiffs seek relief for claims that accrued on or after March 24, 2013; the Sony Music Plaintiffs and Warner Plaintiffs seek relief for claims that accrued on or after April 18, 2013; and the Sony/ATV and EMI Plaintiffs seek relief for claims that accrued on or after June 15, 2013.

6AF7430.DOCX

7.     This Court has original subject matter jurisdiction over Plaintiffs' copyright infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.     This Court has personal jurisdiction over Bright House pursuant to Fla. Stat. § 48.193.  Bright House has continuously and systematically transacted business in Florida and maintained sizable operations in the state—employing thousands of people, and providing an array of services to customers, within the state during the relevant time period.  Bright House has engaged in substantial activities purposefully directed at Florida from which Plaintiffs' claims arise, including establishing significant network management operations in Florida; employing individuals within Florida with responsibility for overseeing its network and subscriber use policies; providing Internet service to Florida subscribers who used Bright House's network to directly and repeatedly infringe Plaintiffs' copyrights; continuing to provide Internet service to, and failing to suspend or terminate the accounts of Florida customers, even after receiving multiple notices of their infringing activity; advertising its high-speed Internet services in Florida to serve as a draw for subscribers who sought faster download speeds to facilitate their direct and repeated infringements; and/or responding or failing to respond to repeated notices of copyright infringement directed to infringing subscribers located in the state.

9.     Much of the misconduct complained of herein arises directly from Bright House's forum-directed activities—including specific and continuing acts of infringement by specific subscribers using Bright House's network; Bright House's awareness of those activities; Bright House's receipt of and failure to act in response to Plaintiffs' notices of infringement activity; and Bright House's failure to take reasonable measures to terminate repeat infringers.

6AF7430.DOCX

10.     Many of the acts complained of herein occurred in Florida and in this judicial district.   For example, a number of egregious repeat infringers, who are Bright House subscribers, reside in and infringed Plaintiffs' rights in Florida and this judicial district using Internet service provided by Bright House in the state.   Indeed, Plaintiffs have identified thousands of Bright House subscribers who appear to reside in Florida and who have repeatedly infringed Plaintiffs' copyrighted works.  For example, one Bright House subscriber believed to be located in this district, with IP address 75.115.37.74 at the time of infringement, was identified in infringement notices 174 times between August 13, 2013 and September 24, 2014.  A different Bright House subscriber believed to be located in this district, with IP address 75.115.115.76, was identified in infringement notices 88 times between August 20, 2013 and September 24, 2014.  Yet another Bright House subscriber believed to be located in this district, with IP address 75.115.227.25, was identified in infringement notices 87 times between August 22, 2013 and November 27, 2014.  Still another Bright House subscriber believed to be located in this district, with IP address 71.47.207.198, was identified in infringement notices 146 times between March 5, 2014 and February 27, 2015.  Yet another Bright House subscriber believed to be located in this district, with IP address 142.196.247.23 at the time of the infringing conduct, was identified in infringement notices 203 times between December 21, 2012 and November 27, 2014.

11.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), and 1400(a). A substantial part of the acts of infringement, and other events and omissions complained of herein, occur or have occurred in this district, and this is a district in which Bright House resides or may be found.

## PLAINTIFFS AND THEIR COPYRIGHTED MUSIC

12.     Plaintiffs are the copyright owners of, and/or control exclusive rights with respect to, millions of sound recordings (*i.e.*, recorded music) and/or musical compositions (*i.e.*, the songs embodied in the sound recordings), including many written and recorded by some of the most prolific and well-known songwriters and recording artists throughout the world.

13.     Plaintiff UMG Recordings, Inc. ("UMG") is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

14.     Plaintiff Capitol Records, LLC ("Capitol Records") is Delaware Limited Liability Company with its principal place of business at 1750 N. Vine Street, Los Angeles, California 90068.

15.     Plaintiff Warner Bros. Records Inc. ("WBR") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

16.     Plaintiff Atlantic Recording Corporation ("Atlantic") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

17.     Plaintiff Bad Boy Records LLC ("Bad Boy") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

18.     Plaintiff Elektra Entertainment Group Inc. ("Elektra") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

19.     Plaintiff Fueled By Ramen LLC ("FBR") is a Delaware Limited Liability Company with its principal place of business at 1633 Broadway, New York, New York 10019.

20.     Plaintiff Nonesuch Records Inc. ("Nonesuch") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

21.     Plaintiff Rhino Entertainment Company ("Rhino") is a Delaware corporation,

with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

22.     Plaintiff Roadrunner Records, Inc. ("Roadrunner") is a New York corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

23.     Plaintiff WEA International Inc. ("WEA") is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

24.     Plaintiff Sony Music Entertainment ("Sony") is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  Sony's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.

25.     Plaintiff Arista Music ("Arista Music") is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.

26.     Plaintiff Arista Records LLC ("Arista Records") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

27.     Plaintiff LaFace Records LLC ("LaFace") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

28.     Plaintiff Provident Label Group, LLC ("Provident") is a Delaware Limited Liability Company with its principal place of business at 741 Cool Springs Boulevard, Franklin, Tennessee 37067.

29.     Plaintiff Sony Music Entertainment US Latin ("Sony Latin") is a Delaware Limited Liability Company with its principal place of business at 3390 Mary Street, Suite 220, Coconut Grove, Florida 33133.

30.     Plaintiff Volcano Entertainment III, LLC ("Volcano") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

31.     Plaintiff Zomba Recording LLC ("Zomba") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

32.     Plaintiffs UMG, Capitol Records, WBR, Atlantic, Bad Boy, Elektra, FBR, Nonesuch, Rhino, Roadrunner, WEA, Sony, Arista Music, Arista Records, LaFace, Provident, Sony Latin, Volcano, and Zomba are referred to herein collectively as the "Record Company Plaintiffs."

33.     The Record Company Plaintiffs are some of the largest record companies in the world, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise exploiting sound recordings in the United States through various media.  They invest substantial money, time, effort, and talent in creating, advertising, promoting, selling, and licensing unique and valuable sound recordings embodying the performances of their exclusive recording artists.

34.     Plaintiff Universal Music Corp. ("UMC") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

35.     Plaintiff Universal Music – MGB NA LLC ("MGB") is a California Limited Liability Company with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

36.     Plaintiff Universal Music Publishing Inc. ("Universal Music Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa

6AF7430.DOCX

Monica, California 90404.

37.    Plaintiff Universal Music Publishing AB ("AB") is a company organized under the laws of Sweden.

38.    Plaintiff Universal Music Publishing Limited ("Publishing Limited") is a company incorporated under the laws of England and Wales.

39.    Plaintiff Universal Music Publishing MGB Limited ("MGB Limited") is a company incorporated under the laws of England and Wales.

40.    Plaintiff Universal Music – Z Tunes LLC ("Z Tunes") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

41.    Plaintiff Polygram Publishing, Inc. ("Polygram Publishing") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

42.    Plaintiff Songs of Universal, Inc. ("Songs of Universal") is a California corporation with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404.

43.    Plaintiff Warner/Chappell Music, Inc. ("Warner/Chappell") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

44.    Plaintiff Warner-Tamerlane Publishing Corp. ("Warner-Tamerlane") is a California corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

45.    Plaintiff WB Music Corp. ("WB Music") is a California corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

6AF7430.DOCX

46.     Plaintiff W.B.M. Music Corp. ("W.B.M.") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

47.     Plaintiff Unichappell Music Inc. ("Unichappell") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

48.     Plaintiff Rightsong Music Inc. ("Rightsong Music") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

49.     Plaintiff Cotillion Music, Inc. ("Cotillion") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

50.     Plaintiff Intersong U.S.A., Inc. ("Intersong") is a Delaware corporation with its principal place of business at 777 South Santa Fe Avenue, Los Angeles, California 90021.

51.     Plaintiff Sony/ATV Music Publishing LLC ("Sony/ATV") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

52.     Plaintiff EMI Al Gallico Music Corp. ("EMI Al Gallico"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

53.     Plaintiff EMI April Music Inc. ("EMI April"), an affiliate of Sony/ATV, is a Connecticut corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

54.     Plaintiff EMI Blackwood Music Inc. ("EMI Blackwood"), an affiliate of Sony/ATV, is a Connecticut corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

6AF7430.DOCX

55.     Plaintiff Colgems-EMI Music Inc. ("EMI Colgems"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

56.     Plaintiff EMI Consortium Music Publishing Inc. d/b/a EMI Full Keel Music ("EMI Full Keel"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

57.     Plaintiff EMI Consortium Songs, Inc., individually and d/b/a EMI Longitude Music ("EMI Longitude"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

58.     EMI Entertainment World Inc. d/b/a EMI Foray Music ("EMI Entertainment"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

59.     EMI Jemaxal Music Inc. ("EMI Jemaxal"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

60.     Plaintiff EMI Feist Catalog Inc. ("EMI Feist"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

61.     Plaintiff EMI Miller Catalog Inc. ("EMI Miller"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

62.     Plaintiff EMI Mills Music, Inc. ("EMI Mills"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York,

New York 10010.

63.     Plaintiff EMI U Catalog Inc. ("EMI U"), an affiliate of Sony/ATV, is a New York corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

64.     Plaintiff Jobete Music Co. Inc. ("Jobete"), an affiliate of Sony/ATV, is a Michigan corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Plaintiff Stone Agate Music ("Stone Agate") is a division of Jobete.

65.     Plaintiff Screen Gems-EMI Music Inc. ("Gems-EMI"), an affiliate of Sony/ATV, is a Delaware corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

66.     Plaintiff Stone Diamond Music Corp. ("Stone"), an affiliate of Sony/ATV, is a Michigan corporation with its principal place of business at 25 Madison Avenue, New York, New York 10010.

67.     Plaintiffs UMC, MGB, Universal Music Publishing, AB, Publishing Limited, MGB Limited, Z Tunes, Polygram Publishing, Songs of Universal, Warner/Chappell, Warner-Tamerlane, WB Music, W.B.M., Unichappell, Rightsong Music, Cotillion, Intersong, Sony/ATV, EMI Al Gallico, EMI April, EMI Blackwood, EMI Colgems, EMI Full Keel, EMI Longitude, EMI Entertainment, EMI Jemaxal, EMI Feist, EMI Miller, EMI Mills, EMI U, Jobete, Stone Agate, Gems-EMI, and Stone are referred to herein collectively as the "Music Publisher Plaintiffs."

68.     The Music Publisher Plaintiffs are leading music publishers engaged in the business of acquiring, owning, publishing, licensing, and otherwise exploiting copyrighted musical compositions.  Each invests substantial money, time, effort, and talent to acquire,

6AF7430.DOCX

administer, publish, license, and otherwise exploit such copyrights, on its own behalf and on

behalf of songwriters and others who have assigned exclusive copyright interests to the Music

Publisher Plaintiffs.

69.     Plaintiffs own and/or control in whole or in part the copyrights and/or exclusive

rights in innumerable popular sound recordings and musical compositions, including the sound

recordings listed on Exhibit A and musical compositions listed on Exhibit B, both of which are

illustrative and non-exhaustive.  All of the sound recordings and musical compositions listed on

Exhibits A and B have been registered with the U.S. Copyright Office.

## BRIGHT HOUSE AND ITS ACTIVITIES

70.     Bright House is a Delaware Limited Liability Company with its principal place

of business at 12405 Powerscourt Drive, St. Louis, Missouri 63131.  Bright House maintains,

and at all pertinent times has maintained, substantial operations and offices in Florida.

71.     Bright House's customers have paid substantial subscription fees for access to

its high-speed Internet network, with Bright House offering a range of options that allow

subscribers to purchase Internet service based on different downloading speeds.

72.     Many of Bright House's subscribers are primarily drawn to its service because it

allows them to use Bright House's network to download music and other copyrighted

content—including unauthorized content—as efficiently as possible.   Accordingly, in its

consumer marketing material, Bright House has touted how its service enables subscribers to

download and upload large amounts of content, including music, in seconds.  In exchange for

this service, Bright House charges its customers monthly fees ranging in price based on the

type of service.

73.     At the same time, Bright House has consistently and actively engaged in

network management practices to suit its own purposes. This includes monitoring for, and taking action against, spam and other unwanted activity that might otherwise interfere with its provision of Internet service to its subscribers. But Bright House has gone out of its way not to take action against subscribers engaging in repeated copyright infringement, at the expense of copyright owners, ultimately forcing Plaintiffs to bring this litigation.

74.     At all pertinent times, Bright House knew that its subscribers routinely used its networks for illegally downloading and uploading copyrighted works, especially music. As described below, Plaintiffs repeatedly notified Bright House that many of its subscribers were actively utilizing its service to infringe their works. Those notices gave Bright House the specific identities of its subscribers engaged in copyright infringement, referred to by their unique Internet Protocol or "IP" addresses. Yet Bright House persistently turned a blind eye to the massive infringement of Plaintiffs' works occurring over its network. Bright House condoned the illegal activity because it was popular with subscribers and acted as a draw to attract and retain new and existing subscribers. Bright House's customers, in turn, continued using Bright House's services to infringe Plaintiffs' copyrights. Bright House undoubtedly recognized that if it terminated or otherwise prevented its repeat infringer subscribers from using its service to infringe, or made it less attractive for such use, Bright House would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue. For those account holders and subscribers who wanted to download files illegally at faster speeds, Bright House obliged them in exchange for higher rates. In other words, the greater the bandwidth its subscribers required for pirating content, the more money Bright House made.

## THE GLOBAL P2P PIRACY PROBLEM

### General Landscape

75.     While the digital age has brought many benefits, one notable exception is its facilitation of unprecedented online piracy of music and other copyrighted works.   As the Supreme Court has recognized, the level of copyright infringement on the Internet is "staggering."   *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005).

76.     Use of peer-to-peer ("P2P") distribution systems has dominated unauthorized downloading and distribution of copyrighted music.   P2P is a generic term used to refer to a decentralized network of users whereby each Internet-connected participant (i.e., a "peer" or a "node") can act as both a supplier and consumer of content files.   Early P2P services, such as Napster and KaZaA, have been replaced by even more robust and efficient systems, most notably a protocol called "BitTorrent."   The online piracy committed via BitTorrent is stunning in nature, speed, and scope.   Utilizing a BitTorrent client—essentially a tool that manages the uploading and downloading of files through BitTorrent technology—persons connected to the Internet can locate, access, and download copyrighted content from other peers in the blink of an eye.   They download copyrighted music from other network users, usually total strangers, and end up with complete digital copies of any music they desire—without payment to copyright owners or creators.

77.     BitTorrent is uniquely efficient in the way it facilitates illegal file transfers.   On earlier P2P networks, a user wanting to download a music file would have to locate another Internet-connected peer with the desired file and download the entire file from that peer. BitTorrent facilitates much faster downloading by breaking each file into pieces, allowing users to download different pieces of content simultaneously from different peers.   At the same time,

6AF7430.DOCX

the system allows users to begin disseminating the copyrighted content before the complete file has even downloaded.  This means that, at any given time, each user connected to the Internet can be both downloading and uploading different pieces of a file from, and to, multiple other users.  Once a user has downloaded all the pieces, the file is automatically reassembled into its complete form and available for playback by the user.  Needless to say, acquiring copyrighted music in this fashion eliminates the need to obtain it through legitimate channels and eliminates the requirement of paying a fee.

78.     Not surprisingly, then, during the time period in which the claims in this action arose, BitTorrent was used widely as a vehicle to infringe content online.  In a report from January 2011, a survey conducted by the firm Envisional estimated that 11.4 percent of all Internet traffic involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent.  In a report from September 24, 2013, another company, NetNames, estimated that 99.97 percent of non-pornographic files distributed via BitTorrent systems infringe copyrights.  To illustrate, in one well-publicized incident in 2015, millions of individual BitTorrent users downloaded an episode of HBO's "Game of Thrones" within just 24 hours of its airing.

### Plaintiffs' Enforcement Activities and Bright House's Efforts to Thwart Them

79.     Over the past two decades, as P2P piracy became widespread, music and other copyright owners have employed litigation and other means to attempt to curtail the massive theft of their copyrighted works.  Bright House has been keenly aware of those efforts and the use of its network for P2P piracy.

80.     The Record Company Plaintiffs began sending notices to Bright House (and other ISPs) identifying specific instances of its subscribers' infringement through P2P

6AF7430.DOCX

activities.   From 2012 through 2015, Bright House received *over one hundred thousand notices*, provided under penalty of perjury, detailing specific instances of its subscribers using P2P protocols on its network to distribute and copy Plaintiffs' copyrighted content unlawfully both within, and beyond, the Bright House network.

81.     The infringement notices provided to Bright House identify the unique IP address assigned to each user of Bright House's network, and the date and time the infringing activity was detected.  Only Bright House, as the provider of the technology and system used to infringe, had the information required to match the IP address to a particular subscriber, and to contact that subscriber or terminate that subscriber's service.

82.     Plaintiffs' infringement notices notified Bright House of clear and unambiguous infringing activity by Bright House subscribers—that is, unauthorized downloading and distribution of copyrighted music.   Bright House's subscribers had no legal basis or justification for downloading or distributing digital copies of Plaintiffs' sound recordings and musical compositions to thousands or millions of strangers over the Internet.  Tellingly, to the extent that Bright House forwarded Plaintiffs' infringement notices to subscribers accused of using Bright House's network to infringe, those subscribers did not challenge the claims of infringement by sending counter-notices to Bright House contesting those claims (a process that Bright House outlined and made available to its users).

83.     Apart from attesting to the sheer volume of the infringing activity on its network, the infringement notices sent to Bright House pointed to specific subscribers who were flagrant and serial infringers.  The infringement notices identified tens of thousands of Bright House subscribers engaged in blatant and repeated infringement of Plaintiffs' copyrighted works.  To cite just a few specific examples:

- During an 827-day period, Bright House subscriber with IP address 75.114.183.231 was identified in 340 infringement notices, sent on at least 232 separate days.

- During a 706-day period, Bright House subscriber with IP address 142.196.247.23 was identified in 203 infringement notices, sent on at least 154 separate days.

- During a 609-day period, Bright House subscriber with IP address 50.90.203.155 was identified in 182 infringement notices, sent on at least 164 separate days.

- During an 827-day period, Bright House subscriber with IP address 50.89.138.87 was identified in 131 infringement notices, sent on at least 119 separate days.

- During a 576-day period, Bright House subscriber with IP address 174.134.133.106 was identified in 126 infringement notices, sent on at least 105 separate days.

- During a 447-day period, Bright House subscriber with IP address 50.89.140.125 was identified in 114 infringement notices, sent on at least 90 separate days.

These examples and countless others amply illustrate that, rather than terminating repeat infringers—and losing subscription revenues—Bright House simply looked the other way.

84.     During all pertinent times, Bright House had the full legal right, obligation, and technical ability to prevent or limit the infringements occurring on its network.  Under Bright House's terms of service and acceptable use policies, which its subscribers agreed to as a condition of using its Internet service, Bright House was empowered to exercise its right and ability to suspend or terminate a customer's Internet access.  Bright House could do so for a variety of reasons, including a subscriber's copyright infringement activity.

85.     Despite these alleged policies, and despite receiving over one hundred thousand infringement notices from Plaintiffs, as well as thousands of  similar notices from other copyright owners, Bright House knowingly permitted specifically identified repeat infringers to continue to use its network to infringe.  Rather than disconnect the Internet access of blatant repeat infringers to curtail their infringement, Bright House knowingly continued to provide these subscribers with the Internet access that enabled them to continue to illegally download or distribute Plaintiffs' copyrighted works unabated.  Bright House's provision of high-speed

6AF7430.DOCX

Internet service to known infringers materially contributed to these direct infringements. Bright House's failure to act is entirely consistent with its hollow "graduated response" program for copyright violators, which, as Bright House stated and reinforced to subscribers, was meant only "to educate consumers about copyright infringement" and "not to punish them."

86.     Bright House's motivation for refusing to terminate or suspend the accounts of blatant infringing subscribers is simple:  it valued corporate profits over its legal responsibilities.  Bright House did not want to lose subscriber revenue by terminating accounts of infringing subscribers.  Retaining infringing subscribers provided a direct financial benefit to Bright House.  Nor did Bright House want to risk the possibility that account terminations would make its service less attractive to other existing or prospective users.  Moreover, Bright House was simply disinterested in devoting sufficient resources to tracking repeat infringers, responding to infringement notices, and terminating accounts in appropriate circumstances. Considering only its own pecuniary gain, Bright House ignored and turned a blind eye to flagrant, repeat violations by known specific subscribers using its service to infringe, thus facilitating and multiplying the harm to Plaintiffs.  And Bright House's failure to police its infringing subscribers adequately drew subscribers to purchase Bright House's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights. The specific infringing subscribers identified in Plaintiffs' notices, including the egregious infringers identified herein, knew Bright House would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Bright House subscribers to continue illegally downloading copyrighted works.

87.     The consequences of Bright House's support of and profit from infringement are

obvious and stark.  When Bright House's subscribers use Bright House's network to obtain infringing copies of Plaintiffs' copyrighted works illegally, that activity undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license of the compensation to which they are entitled.  Without such compensation, Plaintiffs, and their recording artists and songwriters, have fewer resources available to invest in the further creation and distribution of high-quality music.

## CLAIMS FOR RELIEF

### Count I – Contributory Copyright Infringement

88.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 87 as if fully set forth herein.

89.     Bright House and its subscribers do not have any authorization, permission, license, or consent to exploit the copyrighted sound recordings or musical compositions at issue.

90.     Bright House's subscribers, using Internet access and services provided by Bright House, have unlawfully reproduced and distributed via BitTorrent, or other P2P networks, thousands of sound recordings and musical compositions for which Plaintiffs are the legal or beneficial copyright owners or exclusive licensees.  The copyrighted works infringed by Bright House's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B, and many others.  The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501, *et seq*.

91.     Bright House is liable as a contributory copyright infringer for the direct infringements described above.  Through Plaintiffs' infringement notices and other means, Bright House had knowledge that its network was being used for infringement of Plaintiffs'

6AF7430.DOCX

copyrighted works on a massive scale, and also knew of specific subscribers engaged in such repeated and flagrant infringement. Nevertheless, Bright House facilitated, encouraged, and materially contributed to such infringement by continuing to provide its network and the facilities necessary for its subscribers to commit repeated infringements. Bright House had the means to withhold that assistance upon learning of specific infringing activity by specific users but failed to do so.

92. By purposefully ignoring and turning a blind eye to its subscribers' flagrant and repeated infringements, Bright House knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

93. Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Bright House are timely pursuant to tolling agreements.

94. The foregoing acts of infringement by Bright House have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights. Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B represent works infringed by Bright House's subscribers after those particular subscribers were identified to Bright House in multiple infringement notices.

95. As a direct and proximate result of Bright House's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amount as may be proper under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election,

Plaintiffs shall be entitled to their actual damages pursuant to 17 U.S.C. § 504(b), including Bright House's profits from the infringements, as will be proven at trial.

96.     Plaintiffs also are entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

### Count II – Vicarious Copyright Infringement

97.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 87  as if fully set forth herein.

98.     Bright House and its subscribers have no authorization, license, or other consent to exploit the copyrighted sound recordings or musical compositions at issue.

99.     Bright House's subscribers, using Internet access and services provided by Bright House, have unlawfully reproduced and distributed via BitTorrent or other P2P services thousands of sound recordings and musical compositions of which Plaintiffs are the legal or beneficial copyright owners or exclusive licensees.  The copyrighted works infringed by Bright House's subscribers, which have been registered with the U.S. Copyright Office, include those listed on Exhibits A and B, and many others.   The foregoing activity constitutes direct infringement in violation of 17 U.S.C. §§ 106 and 501, *et seq.*

100.     Bright House is liable as a vicarious copyright infringer for the direct infringements described above.  Bright House has the legal and practical right and ability to supervise and control the infringing activities that occur through the use of its network, and at all relevant times has had a financial interest in, and derived direct financial benefit from, the infringing use of its network.  Bright House has derived an obvious and direct financial benefit from its customers' infringement.  The ability to use Bright House's high-speed Internet facilities to illegally download Plaintiffs' copyrighted works has served to draw, maintain, and

generate higher fees from paying subscribers to Bright House's service. Among other financial benefits, by failing to terminate the accounts of specific repeat infringers known to Bright House, Bright House has profited from illicit revenue through user subscription fees that it would not have otherwise received from repeat infringers, as well as new subscribers drawn to Bright House's services for the purpose of illegally downloading copyrighted works. The specific infringing subscribers identified in Plaintiffs' notices, including the egregious infringers identified herein, knew Bright House would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Bright House subscribers to continue illegally downloading copyrighted works.

101. Bright House is vicariously liable for the unlawful reproduction and distribution of Plaintiffs' copyrighted works, including but not limited to those listed on Exhibits A and B hereto, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

102. Each infringement of Plaintiffs' copyrighted sound recordings and musical compositions constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Bright House are timely pursuant to tolling agreements.

103. The foregoing acts of infringement by Bright House have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights. Indeed, the sound recordings on Exhibit A and the musical compositions on Exhibit B are works infringed by Bright House's subscribers *after* those particular subscribers were identified to Bright House in multiple prior infringement notices.

104. As a direct and proximate result of Bright House's willful infringement of Plaintiffs' copyrights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other

6AF7430.DOCX

amount as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, Plaintiffs shall be entitled to their actual damages pursuant to 17 U.S.C. § 504(b), including Bright House's profits from the infringements, as will be proven at trial.

105.    Plaintiffs are further entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment from this Court against Bright House as follows:

a.  For a declaration that Bright House willfully infringed Plaintiffs' copyrights;

b.  For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Bright House's willful violations of Plaintiffs' rights under the Copyright Act or, in the alternative, at Plaintiffs' election, Plaintiffs' actual damages pursuant to 17 U.S.C. § 504(b), including Bright House's profits from infringement, in an amount to be proven at trial;

c.  For an award of Plaintiffs' costs in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

d.  For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Bright House; and

e.  For such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury of all issues that are so triable.

6AF7430.DOCX

Dated:  March 22, 2019                  Respectfully submitted,

*/s/ Bryan D. Hull*
David C. Banker
Florida Bar No. 352977
Bryan D. Hull
Florida Bar No. 20969
BUSH ROSS, P.A.
1801 North Highland Avenue
P.O. Box 3913
Tampa, FL 33601-3913
Telephone: (813) 224-9255
dbanker@bushross.com
bhull@bushross.com

Matthew J. Oppenheim (*pro hac vice forthcoming*)
Scott A. Zebrak (*pro hac vice forthcoming*)
Jeffrey M. Gould (*pro hac vice forthcoming*)
Kerry M. Mustico (*pro hac vice forthcoming*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

Mitchell A. Kamin (*pro hac vice forthcoming*)
Neema T. Sahni (*pro hac vice forthcoming*)
Rebecca Van Tassell (*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com
rvantassell@cov.com

Jonathan M. Sperling (*pro hac vice forthcoming*)
Jacqueline C. Charlesworth (*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com
jcharlesworth@cov.com

*Attorneys for Plaintiffs*

6AF7430.DOCX