# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UMG RECORDINGS, INC., *et al.*,

    Plaintiffs,

v.

                                      Case No. 8:19-cv-00710-MSS-TGW

BRIGHT HOUSE NETWORKS, LLC,

    Defendant.

## DEFENDANT BRIGHT HOUSE NETWORKS, LLC'S MOTION TO DISMISS PLAINTIFFS' CLAIM FOR VICARIOUS LIABILITY

William J. Schifino Jr.
Florida Bar No. 564338
John A. Schifino
Florida Bar No. 72321
Giovanni P. Giarratana
Florida Bar No. 125848
GUNSTER, YOAKLEY & STEWART, P.A.
401 East Jackson Street, Suite 2500
Tampa, Florida 33602
Email: wschifino@gunster.com
Email: jschifino@gunster.com
Email: ggiarratana@gunster.com

Michael S. Elkin *(pro hac vice)*
Thomas Patrick Lane *(pro hac vice)*
Seth E. Spitzer *(pro hac vice)*
Stacey Foltz Stark *(pro hac vice)*
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166-4193
E-mail: melkin@winston.com
E-mail: tlane@winston.com
E-mail: sspitzer@winston.com
E-mail: sfstark@winston.com

Jennifer A. Golinveaux *(pro hac vice)*
Winston & Strawn LLP
101 California Street
Fax: 415.591.1400
E-mail: jgolinveaux@winston.com

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 3

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

    1.     Plaintiffs seek to stretch the doctrine of vicarious liability far beyond the narrow construction applied by courts. ........................................................................... 7

    2.     Plaintiffs fail to allege a causal connection between the alleged infringement and Bright House's profits; any benefit is, therefore, too indirect to state a claim. ...... 9

    3.     Plaintiffs also fail to plausibly allege Bright House maintained the right and ability to control infringement by its subscribers. ............................................... 15

CONCLUSION ................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) .......................................................................14

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc*,
  149 F. Supp. 3d 634 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293
  (4th Cir. 2018)..................................................................................................17

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  881 F.3d 293 (4th Cir. 2018) ...........................................................................17

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.*,
  489 F.3d 1129 (11th Cir. 2007) .......................................................................6, 9

*Coach, Inc. v. Swap Shop, Inc.*,
  2012 WL 12887010 (S.D. Fla. Sept. 21, 2012) .......................................................8

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) .......................................................................9, 11

*Equal Employment Opportunity Comm'n v. STME, LLC*,
  309 F. Supp. 3d 1207 (M.D. Fla. 2018)...........................................................6, 15

*Io Grp., Inc. v. Veoh Networks, Inc.*,
  586 F. Supp. 2d 1132 (N.D. Cal. 2008) .............................................................17

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017).....................................................................................13

*Perfect 10, Inc. v. Amazon.com*,
  508 F.3d 1146 .................................................................................15, 16, 17, 18

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ...........................................................................9

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 504, 199 L. Ed. 2d 385
  (2017).................................................................................................9, 10, 11

*Perfect 10, Inc. v. Visa Intern. Service Ass'n.*,
  494 F.3d 788 (9th Cir. 2007) ...........................................................................17

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
  316 F.2d 304 (2d Cir. 1963)..............................................................................7

*Sony Corp. of Am. v. Universal City Studios*,
464 U.S. 417 (1984) .............................................................................................7, 13

*Sony Music Entm't v. Cox Comm. Inc.*,
2018 WL 6059386 (E.D. Va. Nov. 19, 2018) ...........................................................1

*Thomson v. HMC Grp.*,
2014 WL 12589313 (C.D. Cal. July 25, 2014) ....................................................9, 10

*UMG Recordings Inc., et al. v. Grande Comm.*,
2018 WL 1096871 (W.D. Tex. Feb. 28, 2018) ............................................. *passim*

*UMG Recordings, Inc. v. Veoh Networks Inc.*,
2009 WL 334022 (C.D. Cal. Feb. 2, 2009), *aff'd sub nom. UMG Recordings,
Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011), *opinion
withdrawn, superseded, and aff'd on reh'g*, 718 F.3d 1006 (9th Cir. 2013) ...........................9

*Warner Bros. Records, et al. v. Charter Comm., Inc.*,
No. 19-cv-00874-MSK-MEH (D. Colo. Mar. 3, 2019) ...........................................1

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ........................................................................6

Aaron Smith, "Searching for Work in the Digital Era," Pew Research Center
(Nov. 19, 2015), https://www.pewinternet.org/2015/11/19/1-the-internet-and-
job-seeking/ .................................................................................................................5

Economic Advisers Issue Brief, "The Digital Divide and Economic Benefits of
Broadband Access," (March 2016),
https://obamawhitehouse.archives.gov/sites/default/files/page/files/20160308_
broadband_cea_issue_brief.pdf ................................................................................5

*In re Inquiry Concerning Deployment of Advanced Telecommunications Capabil-
ity to All Americans in a Reasonable and Timely Fashion*, 2018 Broadband
Deployment Report, 33 FCC Rcd 1660 ¶ 1 (Feb. 2, 2018) .....................................5

*In re Promoting Telehealth for Low-Income Consumers*,
Notice of Inquiry, 33 FCC Rcd 7825 ......................................................................5

Remarks of Commissioner Jessica Rosenworcel, Federal Communications
Commission, 20 Years of Connecting Schools and Libraries: Policy Summit,
(Jan. 24, 2018), https://docs.fcc.gov/public/attachments/DOC-320122A1.pdf .....................5

## **INTRODUCTION**

This suit is the latest effort in the music industry's campaign to hold Internet Service Providers ("ISPs") liable for copyright infringement, allegedly carried out by internet subscribers, for merely providing internet access. *See, e.g.*, *Sony Music Entm't v. Cox Comm. Inc.*, 2018 WL 6059386 (E.D. Va. Nov. 19, 2018); *UMG Recordings Inc., et al. v. Grande Comm.*, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018); *Warner Bros. Records, et al. v. Charter Comm., Inc.*, No. 19-cv-00874-MSK-MEH (D. Colo. Mar. 3, 2019). ISPs such as Bright House Networks, LLC ("Bright House") provide access to the internet, enabling subscribers to access the vast array of information available on the world wide web, including critical information during storms or national emergencies, job search sites, educational resources, news sites, as well as entertainment. There are a variety of threats involved with internet access, including hackers, spammers, and infringers who utilize evolving technology to facilitate illegal activity. Rather than view ISPs as other victims of these abusers—or allies in the fight against them—Plaintiffs accuse ISPs like Bright House of infringement for merely providing access to the internet.

Plaintiffs assert two claims for secondary liability against Bright House—contributory infringement and vicarious liability, each having separate elements. Both claims will ultimately fail for many reasons, including the fact that Plaintiffs cannot establish the predicate direct infringement of their copyrights. In this motion, however, Bright House seeks only to dismiss the vicarious liability claim. Vicarious liability requires a defendant to profit directly from infringement that it has both a right and ability to control. Plaintiffs' effort to hold the wrong party accountable for vicarious liability out of convenience—seeking

1

vast windfalls in statutory damages—is inherently flawed in this context. Specifically, Plaintiffs' vicarious liability claim is foreclosed as a matter of law by Plaintiffs' failure to make plausible allegations that Bright House has directly enjoyed a financial benefit from the allegedly infringing activity or has the ability to control subscribers allegedly infringing activity in the first place. That claim must therefore be dismissed.

First, Plaintiffs fail to make plausible allegations that Bright House received any financial benefit *directly* from the alleged infringements of its subscribers. For example, Plaintiffs do not allege that Bright House itself owns or operates any file-sharing service, that Bright House encourages or directs traffic to BitTorrent or other peer-to-peer file sharing protocols, that Bright House receives any compensation from the use of such protocols, or that the revenue that Bright House receives from allegedly infringing subscribers varies in any way based on whether they infringe while using the internet—which, of course, has a host of important noninfringing uses. Nor do Plaintiffs allege that Bright House specifically targets subscribers who infringe, that to infringe copyrights more easily infringers seek out Bright House over competing providers, or that, but for Bright House's conduct, its subscribers would not use its internet services. Even crediting Plaintiffs' allegations that subscribers can use Bright House's internet access service for allegedly infringing purposes, Plaintiffs do not, and cannot, allege that such allegedly infringing purposes act as a draw for subscribers to purchase Bright House's internet access service. Indeed, as other courts have recognized in distinguishing between general-purpose ISPs like Bright House and file-sharing protocols like BitTorrent or Napster, Plaintiffs' profit theory is far too attenuated to support imposing vicarious liability here.

Second, Plaintiffs do not plausibly allege that Bright House maintains the right and ability to stop users from engaging in infringing activity. Bright House cannot monitor and control its subscribers' use of the internet, and its ability to terminate subscribers altogether does not prevent them from committing acts of infringement from other connections. Nor do Plaintiffs allege that Bright House can block access to peer-to-peer file sharing protocols, which can be used for both infringing and non-infringing purposes.

In sum, Plaintiffs' claim that Bright House is complicit in copyright infringement stretches vicarious liability beyond the breaking point. That claim should be dismissed with prejudice.

## FACTUAL BACKGROUND

Plaintiffs, some of the largest labels and publishers in the music industry, have regularly engaged in litigation alleging the unauthorized distribution of their works. Compl. ¶¶ 12, 33, 79. Plaintiffs' allegations here stem from internet users' alleged proliferation of infringing material using "peer-to-peer ("P2P") distribution systems" and "most notably a protocol called 'BitTorrent.'" Compl. ¶ 76. BitTorrent is a file-sharing service that permits users to upload and download content. *Id.* ¶¶ 76-78.

Plaintiffs' agents regularly send auto-generated copyright notices to ISPs regarding subscriber activity in droves. *Id.* ¶ 80. A typical notice indicates the ISP associated with the IP address involved in the alleged infringing activity, the work allegedly infringed, and the date and time of the alleged infringement. *Id.* ¶ 81. Notably, however, a notice does not amount to a finding or proof of infringement—it is merely an allegation that infringement has occurred. That is why Plaintiffs carefully plead that notices identify when activity has been

3

"detected" rather than "confirmed." *Id.* Plaintiffs do not provide any further details concerning that detection, how any infringement occurred, and most importantly, how it was authenticated. *See id.*; ¶ 83 (alleging only that specific IP addresses were "identified" in various notices without further detailing the alleged infringement or verification thereof).

During the period alleged in the Complaint, Bright House was one of the nation's largest providers of high-speed internet access. *Id.* ¶ 2. It has since merged with Charter Communications, Inc. and offers services under the Spectrum brand. Bright House has never charged its subscribers based on the amount of downloaded content; Bright House utilizes flat-fee subscription rates with graduated rate tiers for faster connections. *Id.* ¶ 71. Importantly, Plaintiffs do not allege—because they cannot—that Bright House has any connection to any file-sharing websites or technology. Plaintiffs do not allege that Bright House has had any corporate relationship with, or financial interest in, BitTorrent at any point. Nor do Plaintiffs allege that Bright House has ever promoted or offered any file-sharing services to subscribers—services freely available on the internet.

Plaintiffs acknowledge that Bright House utilizes a DMCA program to track, catalog, and respond to the notices it receives in an effort to curtail infringement. *Id.* ¶ 73. Nonetheless, Plaintiffs claim that Bright House "turns a blind eye" to the alleged infringement because its "failure to police its infringing subscribers adequately was a draw to subscribers to purchase Bright House's services." *Id.* ¶ 86. Notably, however, Plaintiffs' "draw" theory lacks allegations that competing ISPs were terminating subscribers such that Bright House's supposed failure to do so attracted them. As pled, Plaintiffs also assume that P2P abuses are committed by the account holder who subscribed to Bright House's services instead of other

household members, visitors, or people who have accessed Bright House's service in an un-

authorized manner (or, with commercial accounts, those who use the service without having

decision-making authority over the account).[1]

Further, Plaintiffs recognize that Bright House's only ability to prevent or limit any

infringement occurring on its network stems from its technical ability to "suspend or termi-

nate a customer's [i]nternet access." *Id.* ¶ 84.[2] But as discussed below, the ability to terminate

does not give Bright House the ability to control infringing activity on the internet.

---

[1] If the allegedly infringing activity is committed by a person other than the individual in a household who makes the decision regarding to which ISP service the household subscribes, then it goes without saying that such activity cannot be a draw to subscribe to Bright House's service.

[2] It goes without saying that in the modern world disconnecting a subscriber's internet access is a drastic remedy. The federal government has recognized that having internet access is critical for people to participate in the modern world economy. *See, e.g.*, *In re Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2018 Broadband Deployment Report, 33 FCC Rcd 1660 ¶ 1 (Feb. 2, 2018) ("Fixed and mobile broadband services provide Americans, especially those in rural and remote areas of the country, access to numerous employment, education, entertainment, and health care opportunities."); Council of Economic Advisers Issue Brief, "The Digital Divide and Economic Benefits of Broadband Access," at 1 (March 2016), https://obamawhitehouse.archives.gov/sites/default/files/page/files/20160308_broadband_cea_issue_brief.pdf) ("Broadband provides numerous socio-economic benefits to communities and individuals, improving labor market outcomes for subscribers, increasing economic growth, providing access to better health care, and enhancing civic participation."); Aaron Smith, "Searching for Work in the Digital Era," Pew Research Center (Nov. 19, 2015), https://www.pewinternet.org/2015/11/19/1-the-internet-and-job-seeking/ ("Digital resources are now more important than ever to Americans' ability to research and apply for jobs," and "the proportion of Americans who research jobs online has doubled in the last ten years."); Remarks of Commissioner Jessica Rosenworcel, Federal Communications Commission, 20 Years of Connecting Schools and Libraries: Policy Summit, (Jan. 24, 2018), https://docs.fcc.gov/public/attachments/DOC-320122A1.pdf (noting "seven in ten teachers now assign homework that requires access to broadband" and raising concern that the lack of access is creating a "Homework Gap"); *In re Promoting Telehealth for Low-Income Consumers*, Notice of Inquiry, 33 FCC Rcd 7825 ¶ 1 (Aug. 3, 2018) ("High-quality health care has become increasingly reliant on the widespread availability of high-speed

## **LEGAL STANDARD**

A claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) where the plaintiff has failed to state a claim for which relief can be granted. While a plaintiff need plead only sufficient facts to state a claim to relief that is plausible on its face, plaintiffs are nonetheless "obligated to provide the grounds for his entitlement to relief, and a formula-ic recitation of the elements of a cause of action will not do." *Equal Employment Opportunity Comm'n v. STME, LLC*, 309 F. Supp. 3d 1207, 1210 (M.D. Fla. 2018), citing *Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361, 1364 (S.D. Fla. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553-554 (2007)). While the Court must look on the Com-plaint in a light favorable to Plaintiffs, the Court "should not assume that the plaintiff can prove facts that were not alleged." *Id.* (citing *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al.*, 711 F.2d 989, 994-995 (11th Cir. 1983)). Dismissal is appropriate if "there is a dispositive legal issue which precludes relief." *Id.*

Vicarious liability is one of two theories of secondary copyright infringement for which a third party can be held liable for the actions of another. Vicarious liability arises only "when the defendant profits directly from the infringement and has a right and ability to su-pervise the direct infringer, even if the defendant initially lacks knowledge of the infringe-ment." *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1151 n.19 (11th Cir. 2007) (quoting *MGM Studios, Inc. v. Grokster*, 545 U.S. 930, 931 n. 9 (2005)).

---

connectivity, and broadband-enabled telehealth services are assuming an increasingly vital role in providing care.").

## ARGUMENT

Plaintiffs fail to adequately plead vicarious liability:  the Complaint lacks plausible allegations that Bright House (1) received a direct financial benefit from the alleged infringement, or (2) had the practical ability to stop it. Thus, their claim for vicarious liability must be dismissed.

**1.      Plaintiffs seek to stretch the doctrine of vicarious liability far beyond the narrow construction applied by courts.**

Vicarious copyright liability is a theory of *implied secondary liability* that must be narrowly construed. *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 431 (1984) (citing several Supreme Court decisions reflecting the "recurring theme" that courts "must be circumspect in construing the scope of [the] rights" created by implied copyright liability and "reluctan[t] to expand the[ir] protections … without explicit legislative guidance"). The doctrine originated in *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963), a Second Circuit decision that distinguished between two lines of cases detailing agency-type relationships:  landlord-tenant situations and "dance hall" cases. *Id*. at 307; *see Sony*, 464 U.S. at 437 n.18 (discussing *Shapiro*). The court there explained that if a "landlord lets his premises without knowledge of the impending infringement by his tenant, exercises no supervision over him, charges a fixed rental and receives no other benefit from the infringement, and contributes in no way to it, it has been held that the landlord is not liable for his tenant's wrongdoing." *Shapiro*, 316 F.2d at 304. By contrast, the court explained, dance hall operators would be "liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income." *Id*. at 307.

The reason is obvious:  When a landlord leases premises to someone, it is understood that the lessee will use the property for various purposes, at least some of which are plainly lawful, so it makes little sense to attribute the financial benefit that the landlord receives from the tenant directly to the lessee's infringing activity as opposed to the lessee's general use of the premises. By contrast, a dance-hall operator is directly benefitting financially not from general use of the premises, many of the uses of which are lawful, but from dance-hall activities involving copyright infringement. And this case—where Bright House provides general internet services which all subscribers will use for plainly lawful purposes—is akin to the former, not the latter.

More recently in *Coach, Inc. v. Swap Shop, Inc.*, a Southern District of Florida court expounded upon this direct/indirect distinction in the context of a swap meet. 2012 WL 12887010, at *8 (S.D. Fla. Sept. 21, 2012). The plaintiff there brought direct infringement claims against retailers selling knock-off Coach bags at a swap meet and secondary claims against the swap meet operator and the landlord of the property where the swap meet was held. *Id*. Drawing a distinction between the defendants, the court held that the swap meet operator had "a direct financial interest in the infringing activities because [the operator] receive[d] rents from [its] vendors, including those selling fake Coach products, along with parking and concession fees, which are fueled in large part by the draw created by the widespread availability of fake Coach products at the Flea Market," whereas the landlord merely received the rent of the operator and therefore experienced no direct financial benefit. *Id.*

**2.      Plaintiffs fail to allege a causal connection between the alleged infringe-ment and Bright House's profits; any benefit is, therefore, too indirect to state a claim.**

To adequately plead vicarious liability, Plaintiffs must allege that Bright House re-ceived a direct financial benefit in the exploited copyrighted materials. *BUC Int'l Corp.*, 489 F.3d at 1151 n.19. Critically, the infringing activity must be more than an "added benefit" to a subscription; it must be the attracting factor, the "draw" for subscribers. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 504, 199 L. Ed. 2d 385 (2017); *see also Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (plaintiff must establish that an ISP attracted subscriptions "because of" the infringement to establish a direct financial benefit); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (finding no vicarious liability because evidence that "[defendant] hosts websites for a fee" was too sparse to show a direct financial benefit and thus not "a draw" to subscribers); *UMG Recordings, Inc. v. Veoh Networks Inc.*, 2009 WL 334022, at *6 (C.D. Cal. Feb. 2, 2009), *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011), *opinion withdrawn, superseded, and aff'd on reh'g*, 718 F.3d 1006 (9th Cir. 2013) (dismissing vicarious liability claim where financial benefit was too attenuated to be direct); *Thomson v. HMC Grp.*, 2014 WL 12589313, at *4 (C.D. Cal. July 25, 2014) (dis-missing vicarious liability claim where infringing content was not the draw for defendant's patients).

This case presents the digital version of Coach's physical-world analog. As pled, the P2P technologies and related websites at issue function as a digital swap meet. *Id.* Allegedly infringing subscribers act as the directly infringing retailers by exchanging infringing materi-

al using the swap meet (P2P technology) as the vehicle for such exchange. Bright House, however, is akin to the landlord—not the operator—as it merely provides the digital space—internet access—in which the alleged direct infringers operate. Just as the landlord-defendant in *Coach* could not be held vicariously liable for the swap meet, Bright House cannot, as a matter of law, be held vicariously liable for the acts of the alleged infringers—in both cases the financial benefit is too attenuated. *See id*. Bright House is even further removed from the alleged direct infringers than the landlord at issue in *Coach*, as it merely provides a means of *access* to the internet and does not in any manner control the "premises" of the internet. Any direct financial benefit from the alleged infringement would pass to providers of unlawful services, while only indirect benefits—subscription fees instead of rent, and flat-fee rates at that—would flow to Bright House. Such indirect benefits are insufficient to support vicarious liability as a matter of law.

Consider *Giganews*, for example, where a copyright owner sued an operator of Usenet servers, an online distributed discussion system enabling user-generated content, for infringement of images posted by users onto online bulletin boards. 847 F.3d at 674. As the Ninth Circuit recognized, Giganews could not be held vicariously liable unless the plaintiff established that "Giganews attracted subscriptions *because of* the infringing Perfect 10 material." *Id.* (emphasis added). Perfect 10 failed to do so, offering only evidence that some subscribers joined Giganews to access infringing materials generally. *Id.* Thus, the fact that a user may have accessed the copyrighted material was as best an added benefit to the subscription, not the draw sufficient to support a finding of vicarious liability. *Id.*

Likewise, here Plaintiffs fail to allege a plausible causal connection between any alleged direct infringement and the subscription fees received by Bright House. For example, Plaintiffs do not allege that infringers specifically chose Bright House over other providers so they could infringe Plaintiffs' copyrights, or that other ISPs were terminating subscribers, leading them to seek out Bright House as a safe haven. Nor do they, or can they, allege that Bright House itself owns or operates any file-sharing service, that Bright House promotes or directs traffic to BitTorrent, or that Bright House receives any compensation from peer-to-peer file sharing services. The only financial benefit that Bright House receives is a flat fee for the provision of internet services, which is insufficient to state a claim. *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (holding that "flat periodic payments for service" cannot establish a direct financial benefit for vicarious liability).

At most, Plaintiffs assert that subscribers are able to utilize their internet connection for illegal activity as an added benefit to the subscribers, not the draw. *Giganews*, 847 F.3d at 674; *Ellison*, 357 F.3d at 1079; *see also Grande*, 2018 WL 1096871, at *10. Plaintiffs allege that "[m]any of Bright House's subscribers are primarily drawn to its service because it allows them to use Bright House's network to download music and other copyrighted content—including unauthorized content—as efficiently as possible." Compl. ¶ 72. Without more, however, it is not plausible that subscribers subscribe to Bright House's internet ser-

vice—as compared to many other sources of internet service available to them—for the primary purpose of committing infringement.[3]

This is precisely why another district court found the allegations of vicarious liability deficient in a recent case that many of the same Plaintiffs brought against a smaller regional ISP, Grande Communications. *See Grande Comm.*, 2018 WL 1096871. As the court in *Grande* recognized in dismissing the plaintiffs' vicarious liability claim with prejudice on the pleadings, allegations of "the existence of music and the BitTorrent protocol" were insufficient to plead a draw, because "that would impose liability on every ISP, as the music at issue is available on the [i]nternet generally, as is the BitTorrent protocol, and is not something exclusively available through Grande's services." *Id.* at *10. Absent more particularized allegations of a causal connection between the ISPs' alleged conduct and the alleged direct infringement, the plaintiffs failed to adequately plead that "the availability of infringing material act[ed] as a draw for customers." *Id.*

Plaintiffs make substantially the same allegations here. They do not allege that Bright House specifically targeted infringing subscribers, or that Bright House's flat-rate revenues depend on whether its subscribers use its internet services for infringing activity versus lawful purposes. Plaintiffs do allege that Bright House offers a tiered pricing structure based on the speed of the internet service. However, such allegations are immaterial. First, Plaintiffs fail to plead with specificity that Bright House encourages subscribers to purchase a faster package for the purpose of infringing or markets its faster tiers to those who infringe Plain-

---

[3] Amendment cannot cure this defect because Plaintiffs' theory that infringing activity is the draw is factually implausible in light of the multitude of noninfringing uses of the internet, access to which is critical for individuals in contemporary society. *See, e.g.*, *infra.*, note 2.

tiffs' copyrights. *See* Compl. ¶¶ 71-72 (failing to suggest Bright House markets its services for unlawful purposes). Nor do Plaintiffs plead that infringing subscribers disproportionately subscribe to higher speed tiers as compared to noninfringing subscribers. *Cf.* ¶ 74 (noting only that Bright House provided faster speeds to customers who wanted them—not that Bright House marketed its higher tiers to infringers). Moreover, Plaintiffs do not, and cannot, allege that those who illegally download music want faster speeds than those who do so legally, much less than those who download considerably larger movie or other files. Such allegations would be implausible, as subscribers paying for higher tiers of service for lawful uses want to download content just as fast as those doing so illegally. In any event, the financial benefit must be *direct*, and the theory here would not be that Bright House directly charges more to those who access file-sharing sites like BitTorrent or even to those who download more material, but rather that Bright House, at most, indirectly benefits from the possibility that those who illegally share music may want faster internet speeds.

Instead, Plaintiffs allege generally that Bright House's high-speed internet service facilitates the downloading of copyrighted materials, which in turn "has served to draw, maintain, and generate higher fees from paying subscribers to Bright House's service." Compl. ¶¶ 4, 72, 100. But if those allegations were enough to support vicarious liability, such a view "would impose liability on every ISP," as the cited technological capabilities are "available on the [i]nternet generally"—not "exclusively available through [Bright House's] services." *Grande*, 2018 WL 1096871, at *10. As pled, therefore, the allegations would allow a copyright holder to sue ISPs for the mere provision of internet access—services which provide "the principal sources for knowing current events, checking ads for employment, speaking

and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017); *see also supra* n.2. Such allegations are insufficient to support vicarious liability. *Grande*, 2018 WL 1096871, at *10; *Sony*, 464 U.S. at 431.

Plaintiffs attempt to cure the pleading defect highlighted by the court in *Grande*; however, this effort is futile because Plaintiffs cannot establish any plausible causal connection between the alleged infringement and any financial benefit received by Bright House. *Compare Grande*, 2018 WL 1096871, at *10 *with* Compl. ¶ 86. Specifically, Plaintiffs allege that "Bright House's failure to police its infringing subscribers adequately drew subscribers to purchase Bright House's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights." Compl. ¶ 86. Yet, Plaintiffs allege no facts that plausibly assert *how* subscribers knew, learned, or had reason to believe that Bright House was not terminating subscribers, or, equally importantly, how Bright House received any more of a benefit from these subscribers than others. Plaintiffs also fail to plead that other ISPs were terminating subscribers based upon notifications alleging that such subscribers were committing copyright infringement, such that Bright House's failure to do so (implausibly assuming such failure was known by consumers selecting an ISP service and that such knowledge guided their purchase decision, neither of which is alleged – nor could they be – by Plaintiffs) was material to its subscribers' purchasing decisions.

Absent such allegations, the notion that Bright House received a "direct financial benefit" by merely providing internet service is not plausible, as Plaintiffs do not assert how an alleged failure to terminate account holders plausibly served as the draw for new subscrib-

14

ers. *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (Although the "plausibility standard is not akin to a probability requirement at the pleading stage . . . the standard calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the claim.") (citing *Twombly*, 550 U.S. at 545) (internal quotations omitted). These deficiencies are fatal since the court cannot assume Plaintiffs can prove facts not alleged. *See Equal Employment Opportunity*, 309 F. Supp. 3d at 1210.

### 3.   Plaintiffs also fail to plausibly allege Bright House maintained the right and ability to control infringement by its subscribers.

Dismissal is independently warranted because Plaintiffs also fail to plausibly allege that Bright House had the right and ability to control the alleged infringing activity of its subscribers. "[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1173 (citing *Grokster*, 545 U.S. 930). Plaintiffs have failed to allege that Bright House exercises any practical ability to control the online activity of the allegedly infringing subscribers here, and that too warrants dismissal of their vicarious liability claim.

Plaintiffs allege in conclusory fashion that Bright House's "ability to control and supervise" its subscribers arises from its ability to terminate customers. *See, e.g.*, Compl. ¶ 84. But the fact that Bright House has the general capability to terminate subscriber accounts *altogether* does not mean it has the ability to halt infringement in particular. Indeed, Plaintiffs do not (and cannot) allege that outright terminating access from Bright House would restrict that subscriber's access to the infringing content. Such an allegation would be farfetched given the availability of other networks and providers of internet access to the same material.

15

The Complaint does not allege that Bright House has the "right and ability to control and supervise" its subscribers conduct online generally, or that Bright House can "stop or limit [subscribers] from reproducing, displaying, and distributing infringing copies of [Plaintiffs' works] on the [i]nternet." *See Amazon.com*, 508 F.3d at 1175.

The Complaint's deficiency in this regard confirms that Plaintiffs are leveling their claims at the wrong entity. Courts have specifically distinguished between general-purpose ISPs like Bright House or Google and file-sharing protocols and websites like BitTorrent or Napster. *Id.* For instance, in *Amazon.com*, the Ninth Circuit held that because "Napster had a closed system requiring user registration, and could terminate its users' accounts and block their access to the Napster system, Napster had the right and ability to prevent its users from engaging in the infringing activity of uploading file names and downloading Napster users' music files through the Napster system." *Id.* at 1174. As it further explained, however, Google had no such ability—and therefore no liability. As the court recognized, although Google could curtail some infringement indirectly by terminating accounts, that was insufficient to establish vicarious liability as it did not exercise the supervisory powers required to establish the claim. *Id.* ("Google cannot stop any of the third-party websites from reproducing, displaying, and distributing unauthorized copies of Perfect 10's images because that infringing conduct takes place on the third-party websites. Google cannot terminate those third-party websites or block their ability to host and serve infringing full-size images on the [i]nternet.") (internal quotation omitted). As the court explained, this distinguished Google's service from both Napster (which had the ability to control infringing conduct by searching its own index for infringing files) and the swap meet operator in *Fonovisa* (which had the

ability to identify and police infringing activity on its own premises). *Id.* at 1174. In contrast to these closed systems, Plaintiffs cannot plausibly allege that Bright House has the ability to identify and police infringing activity on the internet at large.

The Ninth Circuit reaffirmed this reasoning in *Perfect 10, Inc. v. Visa Intern. Service Ass'n.*, 494 F.3d 788 (9th Cir. 2007). There, Perfect 10 sued credit card companies for failing to terminate member merchant accounts that were profiting from alleged copyright infringement. *Id.* at 803. Relying on *Amazon.com*, the court held that although the credit card companies had the authority to terminate merchant accounts that engaged in illegal activity, such termination did not equate to the right and ability to control required for vicarious infringement. *Id.* The court reasoned that while terminating such member accounts could have some "indirect effect on the infringing activity," a "defendant must have the right and ability to *supervise and control the infringement*, not just affect it." *Id.* at 805[4]; *see also Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) ("[T]he pertinent inquiry is not whether [the defendant] has the right and ability to control [its] system, but rather, whether it has the right and ability to control the infringing activity."). Plaintiffs' theory is further attenuated on this prong because, unlike Veoh, which operates a closed system net-

---

[4] Although in *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc*, 149 F. Supp. 3d 634, 674–75 (E.D. Va. 2015), aff'd in part, rev'd in part, 881 F.3d 293 (4th Cir. 2018), the court declined to grant summary judgment to Cox on vicarious liability, ultimately the jury found no such liability. *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 300 (4th Cir. 2018). Moreover, that court's conclusion that the ability to terminate subscribers could give Cox the ability to control infringing activity is fundamentally faulty because it presumes that terminating subscribers would halt infringement. *Id.* Here, Plaintiffs cannot plausibly allege that Bright House has the ability to control its subscriber's allegedly infringing activity, or that terminating subscribers will stop infringement.

work requiring user registration, Bright House merely provides a pipeline to the internet and has no control over activity on the internet.

Like Google and Visa, Bright House has no practical ability to control subscribers' general access to infringing content available using P2P protocols or the allegedly infringing conduct online. Moreover, Plaintiffs' termination remedy suffers from "imprecision and overbreadth" based on the inability to confirm allegations in a notice, the extremity of the measure, and the failure to halt infringing activity from another source. *See Amazon.com*, 508 F.3d at 1175. Bright House's terminations may have some indirect effect on copyright infringement, but indirect effects do not satisfy the standard. Plaintiffs' vicarious liability claim should thus be dismissed.

## CONCLUSION

For the foregoing reasons, Bright House respectfully requests that Plaintiffs' vicarious liability claim be dismissed. Because Plaintiffs cannot remedy the defects in that claim with further allegations, amendment would be futile and dismissal should be with prejudice.

Respectfully submitted,

By: */s/William J. Schifino, Jr.*
William J. Schifino Jr.
Florida Bar No. 564338
John A. Schifino
Florida Bar No. 72321
Giovanni P. Giarratana
Florida Bar No. 125848
GUNSTER, YOAKLEY & STEWART, P.A.
401 East Jackson Street, Suite 2500
Tampa, Florida 33602
Phone: 813.228.9080
Fax: 813.228.6739
Email: wschifino@gunster.com
Email: jschifino@gunster.com

Email: ggiarratana@gunster.com
Secondary Email: cmarlowe@gunster.com
Secondary Email: adavis@gunster.com

Michael S. Elkin *(pro hac vice)*
Thomas Patrick Lane *(pro hac vice)*
Seth E. Spitzer *(pro hac vice)*
Stacey Foltz Stark *(pro hac vice)*
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166-4193
Phone: 212.294.6700
Fax: 212.294.4700
E-mail: melkin@winston.com
E-mail: tlane@winston.com
E-mail: sspitzer@winston.com
E-mail: sfstark@winston.com

Jennifer A. Golinveaux *(pro hac vice)*
Winston & Strawn LLP
101 California Street
San Francisco, California 94111
Phone: 415.591.1000
Fax: 415.591.1400
E-mail: jgolinveaux@winston.com

*Counsel for Defendant*
*Bright House Networks, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 28, 2019, I electronically filed the foregoing with the Clerk of

the Court by using the CM/ECF system which will send a notice of electronic filing to the

parties of record.

/s/ *William J. Schifino, Jr.*
Attorney