**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC., *et al.*,

      Plaintiffs,

v.

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.

Case No. 8:19-cv-710-MSS-TGW

**DEFENDANT BRIGHT HOUSE NETWORKS, LLC'S OPPOSITION TO**
**PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

## I.    INTRODUCTION

Plaintiffs' Motion to Compel Discovery (Dkt. 74) ("Motion") is premature and unnecessary. Despite Bright House Networks, LLC's ("BHN's") willingness to produce documents responsive to *all* of the categories of discovery at issue, rather than awaiting the production of responsive materials that BHN committed to make in December, Plaintiffs are apparently more interested in getting a motion on file than exhausting the opportunity to resolve these disputes. While Plaintiffs have baselessly accused BHN of stonewalling discovery, the so-called "delay" is largely of Plaintiffs' own making—as Plaintiffs just produced the notices that will allow BHN to analyze available information triggered from those notices and complete its production.

Plaintiffs have also advanced several arguments in their Motion that are specious, unsupported by the law, and, in some cases, were flatly rejected by the court in the similar case Plaintiffs brought against Cox Communications, Inc. in the Eastern District of

1

Virginia. *Sony Music Entm't v. Cox Comm. Inc.*, 2018 WL 6059386 (E.D. Va. Nov. 19,

2018) ("*Cox*"). As it is Plaintiffs' burden to demonstrate why the sought-after discovery is

relevant and necessary, BHN respectfully requests that the Court deny Plaintiffs' Motion.

## II.    RELEVANT BACKGROUND

### A.  Defendant BHN

During the relevant period, BHN operated in the southeast United States providing

cable, internet and other services to residential and business consumers. Since merging

with Charter on May 18, 2016, BHN is now a subsidiary of Charter Communications, Inc.

and a legacy company that no longer operates as a standalone business.  Rather than simply

sue Charter, Plaintiffs chose to sue Charter in Colorado and bring this suit against a now-

defunct entity, BHN. During the integration of the two companies, many of the systems for

tracking the types of data Plaintiffs now seek became "legacy" systems that reflected the

historical archives of the individual entities.

### B.  This Action

Plaintiffs brought the present action against BHN for conduct occurring during the

period of March 24, 2013 to May 17, 2016 (the "Claim Period"), a timeframe that is

delineated in agreements between the parties tolling the time for Plaintiffs to bring action

against BHN for alleged infringement occurring in this window. This suit is the latest effort

in the music industry's campaign to hold internet service providers ("ISPs") liable for

copyright infringement, allegedly carried out by internet subscribers, for merely providing

internet access to those subscribers.  *See, e.g., Sony Music Entm't v. Cox Comm. Inc.*, 2018

WL 6059386 (E.D. Va. Nov. 19, 2018); *UMG Recordings Inc., et al. v. Grande Comm.*,

2018 WL 1096871 (W.D. Tex. Feb. 28, 2018); *Warner Bros. Records, et al. v. Charter Comm., Inc.*, No. 19-cv-00874-MSK-MEH (D. Colo. Mar. 3, 2019).

ISPs such as BHN provide access to the internet, for both businesses and families, through which subscribers and users of those accounts used BHN's high speed internet services for a countless number of legitimate reasons that are vital to how our society functions—from information gathering, to work purposes, to education, to emergency services, to social media communications and other entertainment, including the lawful use of music downloads that proliferate today. Plaintiffs have declined to sue any of the individual infringers responsible for any direct infringement, and instead have embarked on a campaign to sue ISPs like BHN on secondary theories of liability for copyright infringement for merely providing access to the internet (which Plaintiffs presumably expect to be more lucrative, and less of a public relations concern, than suing the individuals they claim are responsible for any direct copyright infringement). Plaintiffs assert two claims for secondary copyright infringement liability against BHN— contributory infringement and vicarious liability.[1]

For both claims, Plaintiffs will have to prove underlying direct infringement by BHN's customers.  Further, to establish contributory copyright infringement against BHN, Plaintiffs will have to prove BHN's (i) knowledge of the infringing activity and (ii) "material contribution" to the infringing activity.  *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987) (quoting *Gershwin Publishing Corp. v. Columbia Artists Management,*

---

[1] BHN's motion to dismiss the vicarious liability claim (Dkt. 32) remains pending.

*Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).  For vicarious liability, Plaintiffs will have to prove that BHN "profits directly from the infringement and has a right and ability to supervise the direct infringer…" *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1151 n.19 (11th Cir. 2007) (quoting *MGM Studios, Inc. v. Grokster*, 545 U.S. 930, 931 n. 9 (2005)).

### C.  Relevant Discovery and Efforts to Resolve these Disputes

Plaintiffs served the relevant discovery requests on June 10, 2019, and BHN timely responded on July 10, 2019.  Sahni Decl., (Dkt. 75) Exs. A, B, C, D.  Over a month later, on August 15, 2019, Plaintiffs first raised what they believed to be "deficiencies" with BHN's responses.  *Id.* at Ex. E.  After internal investigations, BHN responded on August 27, 2019, setting forth its positions as to several of the issues raised by this Motion.  *Id.* at Ex. F.  The parties held their first meet and confer on these issues on September 9, 2019, at which time BHN represented that it was in the process of further investigating what types of available information was responsive to Plaintiffs' requests. Declaration of Erin Ranahan ("Ranahan Decl.") at ¶ 2. Because BHN no longer operates as a standalone company, available information related to BHN is now stored on "legacy" systems that are not in regular operation.  Ranahan Decl., ¶ 2.

The parties continued to meet and confer on these issues during October and November. *Id.* at ¶ 4. Indeed, BHN proposed that the parties agree to substantially complete document production by December—a proposal that Plaintiffs flatly ignored.  *Id.* at ¶ 3 and Ex. 1.  For several of the requests at issue in this Motion, including Requests for Production ("RFPs") 11, 12, 19, and the ticket log data, RFPs 2, 4, & 15, BHN's counsel repeatedly

explained to Plaintiffs' counsel that it would be helpful to obtain and analyze the universe of "notices" of alleged copyright infringement that Plaintiffs claimed were at issue in this case in order to appropriately determine the nature and scope of the materials in BHN's possession that are responsive to Plaintiffs' requests. *Id.* at ¶¶ 4-7, Exs. 2-5. Indeed, these alleged infringement notices were not sent to BHN from Plaintiffs; but from a third party (the RIAA) on Plaintiffs' behalf. Given that Plaintiffs had agreed to produce the notices in this case, and presumably had reviewed them in connection with their good faith investigation into the allegations made in the Complaint,[2] BHN explained that it would serve to expedite BHN's analysis and production to have these notices.

On November 19, 2019, the parties held a telephonic meet and confer about various issues, including the ticket log data. Ranahan Decl. ¶ 5. As part of this discussion, the parties talked about the sample ticket log data that BHN had provided to Plaintiffs on November 16, 2019 as part of ongoing discussions on producing that information. *Id., Ex.* 2. During the parties November 19 discussion, Plaintiffs' counsel first raised questions about what some of the codes meant on the sample BHN provided, and BHN responded that BHN would re-produce the sample with the key to ensure that it provided adequate information for Plaintiffs' purposes. *Id.* Plaintiffs' counsel appeared to accept that representation, and did not ask that it be provided within a certain time, or that they would be moving to compel within the next few days regardless of what the codes meant. *Id.* BHN provided this information to Plaintiffs on December 6. *Id.* at ¶ 5 and Ex. 3.

---

[2] See Plaintiffs' Complaint, ¶ 2: "Plaintiffs' representatives (as well as others) sent hundreds of thousands of statutory infringement notices to [BHN]." (Dkt. 1).

Plaintiffs declined to engage in any discussion about agreeing to even a rough date for a mutual exchange date for documents, and have declined to commit to any time frame for producing any documents.   *Id.* at ¶ 3 and Ex. 1. Without ever specifically indicating that the production of the alleged infringement notices was forthcoming or complete until referencing it in their Motion, Plaintiffs did include approximately 170,000 notices as part of their production on or about November 15, 2019. *Id.* at ¶ 7. Without providing sufficient time for BHN to analyze such notices, and without even noting to BHN that they had made the production or inquiring how long BHN needed to analyze the information for purposes of BHN's intended production, Plaintiffs filed this Motion on November 22, 2019.

BHN made its revised first production of documents on December 3, 2019.[3]  *Id.* at ¶ 5.  This production contains documents responsive to at least two of the requests reflected herein, financial (RFP 18) and policy information (RFP 8).   BHN made a second production on December 6, which contained audited financials, responsive to RFP 20.  *Id.* at ¶ 8 and Ex. 5. And BHN intends to continue to make more productions in December, consistent with its prior representations to Plaintiffs.[4] *Id.* at ¶ 3 and Ex. 1. Rather than review these productions to determine if and to the extent disputes remain, Plaintiffs have wasted the resources of the Court and the parties by bringing this Motion.

---

[3] BHN first produced documents to Plaintiffs on November 25, 2019, but issued a revised first production due to technical issues and additional information on December 3, 2019.

[4] Discovery in this matter is not set to close until June 11, 2020.

### III.    LEGAL STANDARD

The initial burden is on the proponent of a motion to compel is to prove that the information is relevant. *Wright v. Dyck-O'Neal, Inc.*, 2016 WL 11423536, at *2 (M.D. Fla. July 22, 2016) quoting *Moore v. Lender Processing Servs. Inc.*, No. 3:12-CV-205-J, 2013 WL 2447948, at *2 (M.D. Fla. June 5, 2013).  If the relevancy of the information sought cannot be discerned from the discovery request itself, then the party seeking to compel discovery must demonstrate relevancy.  *Sanchez v. Cardon Healthcare Network, LLC*, No. 3:12-CV-902-J-34JBT, 2013 WL 2352142, at *2 (M.D. Fla. May 29, 2013).

For example, in *Josendis v. Wall to Wall Residence Repairs, Inc.*, the 11th Circuit found that the district court did not abuse its discretion by denying a motion to compel that sought the production of discovery that the district court deemed "overbroad, irrelevant, or redundant to other discovery requests already allowed." 662 F.3d 1292 (11th Cir. 2011).  Ultimately, a motion to compel will be denied if a party fails to meet their relevance burden.  *See Benz v. Crowley Logistics, Inc.*, 2016 WL 11587289, at *4 (M.D. Fla. June 17, 2016) (where the court found that plaintiff "failed to show how the information is relevant and proportional to the needs of the case"); see also *Commercial Union Ins. Co. v. Westrope*, 730 F.2d 729, 732 (11th Cir. 1984) (holding that a court can deny a motion to compel any further discovery if it finds questions are irrelevant).

## IV.   ARGUMENT

### A.  Plaintiffs' Interrogatories Nos. 11 and 12

#### i.   Plaintiffs Interrogatory No. 11

Plaintiffs' Interrogatory No. 11 asks for data related to the total number of BHN subscribers from 2010 to 2016. In grasping at straws to find relevancy, Plaintiffs have articulated theories that overreach the bounds of law and misconstrues BHN's defenses. Even if subscribership relates to "BHN's core business," it does not make the total number of subscribers by month relevant to Plaintiffs' claims or BHN's defenses, to the extent any historical subscriber data from many years ago is even available given that BHN no longer operates as a stand-alone company.

Plaintiffs' three arguments in support of this claim fail to establish the proportional relevance to obtain this information. First, the total number of BHN subscribers does not define the "scope of infringement occurring," which would necessarily be measured by how many of Plaintiffs' works have been infringed, not what percentage of BHN's subscribers were implicated in allegedly infringing Plaintiffs' works notwithstanding other legitimate uses occurring through those accounts. These raw numbers also cannot possibly speak to the reasonableness of BHN's actions, as they provide no context about how BHN dealt with notices relating to Plaintiffs, the only relevant subscribers at issue in this case. The overall size of BHN's now-defunct business is not relevant to any issues in this case.

Second, Plaintiffs insist that total monthly BHN subscriber data, not just for the claim period but three years' prior, is relevant to the draw analysis for vicarious liability. But such information does not provide information relevant to any "draw" analysis. *Perfect*

*10, Inc*. v. *CCBill LLC*, 488 F.3d 1102, 1117-18 (9th Cir. 2007) (finding no vicarious liability because evidence that "[defendant] 'hosts' websites for a fee" was too sparse to show a direct financial benefit and thus not "a draw" to subscribers); *Coach, Inc. v. Swap Shop, Inc.*, 2012 WL 12887010, at *8 (S.D. Fla. Sept. 21, 2012)*.* To show a draw, it would be necessary to show that customers either subscribed *because of* the available infringing material *or canceled subscriptions because it was no longer available.*  *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004). Total aggregate subscriber data, including non-implicated subscribers, does not provide information about either of these inquiries. A total number of the vast majority of which are non-infringing uses cannot possibly bear that out, and as such this request is overbroad and irrelevant to the claims and defenses of either party.  The data of how many subscribers BHN had at a given time does not demonstrate whether the availability of infringing material on the internet at large acted as a draw for any of those subscribers

Third, Plaintiffs argue that total monthly subscriber count is relevant to "test BHN's theory" that the termination would have a "dramatic impact" on many of its customers. But the draconian measure of terminating access to the internet cannot be determined by mere changes to the monthly number of BHN subscribers. The "dramatic impact" is instead focused on the human cost of losing access to a basic utility, internet access, that is fundamental to how we function in society. This includes entire communities of users when the subscriber is a business, innocent family members when the infringer might have been a guest or a teenager, or individuals that Plaintiffs themselves have no interest in suing or

taking direct action against. Plaintiffs' Motion with respect to Interrogatory 11 should be denied.

### ii.  Plaintiffs Interrogatory No. 12

Though BHN has already agreed to provide termination information numbers for alleged copyright infringement, Plaintiffs' Interrogatory No. 12 seeks the total number of subscribers terminated for non-payment. Plaintiffs have failed to articulate a theory of relevance for this information as it relates to vicarious liability.  Plaintiffs' theory that whether BHN exercised its right to terminate paid subscription internet services for customers who were not paying constitutes evidence of whether BHN controlled its subscribers access to allegedly infringing content is equating apples to oranges.

As a preliminary matter, terminating for non-payment is a black and white inquiry—BHN does not provide free internet services—but charges its customers for its services. BHN is merely charging a flat fee for providing a pipe to access the internet, and would deny access to those who have not paid the price of admission. The standard Plaintiffs are attempting to invoke against BHN through this lawsuit is far more complicated, suggesting that BHN should have terminated a substantial number of paying customers for allegations before they were proven in court, even where such alleged infringement was by users that were not the subscribers, such as where an account that services a library, an airport, a military base or even a family. BHN does not control what its customers do on the internet. BHN is not in any position to view or disable access to the alleged infringing conduct, and even if technically feasible (which it is not), BHN is not in the business of spying on its customers. Terminating for non-payment would not require

the judgment calls and invasion of privacy that terminations based on alleged copyright violations involve.[5]

Plaintiffs' argument on contributory liability similarly overreaches. Whether or not BHN terminated subscribers for failing to pay does not bear on whether BHN "materially contributed" to the alleged infringement of its subscribers. Indeed, this test requires more than bald allegations that BHN merely provided the means to accomplish some infringing activity. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, 545 U.S. 913, 937 (2005). Despite Plaintiffs' best efforts to rewrite the law to suit their apparent fishing expedition, this information is irrelevant to whether BHN "materially contributed" to the alleged infringements of its subscribers. Thus, how many subscribers were terminated for non-payment has nothing to do with the claims and defenses in this case.

Because Plaintiffs have not met the burden of demonstrating how such materials are relevant, Plaintiffs' Motion with respect to Interrogatory 12 should be denied.

### B. Plaintiffs' Requests for Financial Information Are Moot, Premature and/or Overbroad

During the course of the Parties meet and confer discussions, BHN agreed to produce available financial data responsive to Plaintiffs' requests from 2012-2016. *See supra* at pp. 3-4.[6] BHN proposed that Plaintiffs' counsel evaluate that financial production and then come back to BHN if Plaintiffs still believe more information was necessary.

---

[5] Indeed, many of the Plaintiffs in this case entered into an inter-industry agreement with the five major ISPs during the relevant claim period, the Copyright Alert System ("CAS") that *did not require terminations at all.  See* Copyright Alert System Memorandum of Understanding (July 6, 2011), https://info.publicintelligence.net/CCI-MOU.pdf.

[6] Plaintiffs themselves have yet to produce any non-public financial information.

However, rather than await BHN's production of such information—or indeed even *alert* BHN that Plaintiffs believed such production to be overdue—Plaintiffs have sought the Court's intervention where, for the majority of Plaintiffs' requests, none is necessary. With the exception of a few limited issues described herein, BHN has produced available information responsive to Plaintiffs' requests for the Claim Period plus one-year prior (March 1, 2012 to May 17, 2016, or the "Discovery Period"), meaning Plaintiffs should have sufficient data to make the determinations they purportedly wish to make through analyzing BHN's financial records. Each request is substantively addressed in turn below.

### i.  Plaintiffs RFP No. 18

Plaintiffs seek documents sufficient to show BHN's total and average revenues and profits by month and year, per service provided. On December 3, 2019, BHN produced a financial filing related to the merger of BHN and Charter that is responsive to Plaintiffs' request, and on December 6, 2019, the available audited financials for BHN from 2012-2015. Ranahan Decl., ¶ 8 and Ex. 3.

Plaintiffs have not articulated why they specifically need data that predates 2012, or why they need monthly data by service, which would include services that have nothing to do with the internet access (e.g., cable, home security, and telephonic). The relevant time period for this case is the Claim Period, 2013-2016, and BHN has agreed to search for and produce available data for the Claim Period *and* an additional year prior, 2012, which is more than sufficient, as was precisely what was ordered in the similar *Cox* matter. Indeed, with respect to financial requests, the *Cox* Court found that the Claim Period there plus one-year prior was a sufficient time period to meet Plaintiffs' discovery needs. *Id.* at ¶ 9

and Ex. 5.  BHN's proposed Discovery Period—which mirrors the time period found to be relevant in *Cox*—beyond recycling general statements that they need prior years' data to "analyze trends in BHN's financial performance over time." One year prior to the Claim Period should provide Plaintiffs with sufficient data to complete any "trend" analysis they wish to complete.  There are no "trends" that are remotely relevant to this case that are from years or more before the Claim Period began.

### ii.  Plaintiffs' Request for Production No. 19

Plaintiffs seek subscriber level financial data for any subscriber accused by Plaintiffs of committing copyright infringement. In doing so, again, Plaintiffs mischaracterize the standards for vicarious and contributory liability, equating receipt of any monies from subscribers to (1) right and ability to control, and (2) knowledge and material contribution. Plaintiffs' arguments on vicarious liability are not only premature, but legally specious.

As detailed in BHN's motion to dismiss (Dkt. 74, p. 7), the receipt of a subscription fee for internet services is insufficient to demonstrate a direct financial benefit, as such receipt is not *directly* tied to the alleged infringement. *See Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (plaintiff must establish that an ISP attracted subscriptions "because of" the infringement to establish a direct financial benefit). Plaintiffs' arguments with regard to contributory liability are similarly without merit—receipt of subscription fees cannot demonstrate any material contribution to copyright infringement where the product being provided is the internet. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, 545 U.S. 913, 937 (2005).

Plaintiffs insist that this subscriber level financial data is "directly relevant to the financial-benefit element of Plaintiffs' vicarious infringement claim", for which they cite *Capitol Records, LLC v. Escape Media Grp*., 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015) as "holding that financial benefit exists 'as long as the service provider has an economic incentive to tolerate infringing conduct."

The facts here are a far cry from *Escape*.  As a preliminary matter, in *Escape*, the defendant *hosted the infringing content*, which resided on its servers.  *Id*. at *43.  Here, BHN did not host any of the allegedly infringing content. BHN provided only a pipe to access the internet; it does not control what its customers do on the internet. There are no allegations to suggest otherwise. Further, in *Escape*, the defendant advertised its "library" of largely unauthorized content, and accordingly, the court found that:

> the infringing content is a substantial draw to Grooveshark.com, as demonstrated by the fact that approximately 84.5% of the website's streams are of works belonging to major labels with whom Escape has no license. Approximately 80% of Escape's revenue is derived from website advertisements, and the more visitors Grooveshark attracts, the more advertising revenue Escape will earn.

*Id*.

There is no allegation here that BHN promoted or advertised any infringing content (let alone a massive library of mostly (85%) infringing content, as in *Escape*). *Id.* There are also no allegations of any scheme where BHN's revenue increases through more visitors seeking out a massive infringing library as in *Escape. Escape* also notes that a direct financial benefit should be an "obvious and direct financial interest in the exploitation of copyrighted materials" which is not present in this case. *Id.* at *41. Plaintiffs' allegations against BHN present nothing close to the offerings of 85% infringing

content in Grooveshark and 90%+ infringing content in Napster. *Ellison v. Robertson*, 357 F.3d 1072, 1078 (2004); *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) ("*Napster II*") (finding draw where "virtually all of Napster's 'draw' of customers resulted from Napster's providing access to infringing material.").:

As courts have noted, *Congress* has cautioned courts:

that 'receiving a one-time set-up fee and flat periodic payments for service… [ordinarily] would not constitute receiving a 'financial benefit directly attributable to the infringing activity.' S Rep. 105-190, at 44. But 'where the value of the service lies in providing access to infringing material,' courts might find such a 'one-time set-up and flat periodic' fees to constitute a direct financial benefit. *Id*. at 44-45. Thus, the central question of the 'direct financial benefit' inquiry in this case is whether infringing activity constitutes a draw for subscribers, not just an added benefit.

*Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).

This case is precisely the type that Congress cautioned about, and Plaintiffs should not be entitled to seek discovery on these attenuated theories. Any infringement would be an "added benefit" to the value of internet access for consumers—not a draw. *Ellison* also discusses a distinction highly pertinent to this case between the "draw" of customers to Napster and AOL. Distinguishing *A & M Records v. Napster, Inc*., 239 F.3d 1004, 1013 (9th Cir. 2001) (Napster II)—*Ellison* noted that virtually "all of Napster's 'draw' of customers resulted from Napster providing access to infringing material" and the "relatively insignificant draw" present when considering the "vast array of products and services" offered by the defendant AOL. 357 F.3d at 1078. Because there was nothing to support the allegation that "AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement," the plaintiffs' vicarious liability claim failed. *Id*. at 1079. Similarly, here,

the vast array of uses and services available to BHN's customers through its high speed internet offerings likewise renders any "draw" from infringement "relatively insignificant." *Id*. at 1078.

Notwithstanding the foregoing, BHN continues to investigate this with respect to subscribers identified in Plaintiffs' newly produced notices from the Discovery Period to determine the extent that responsive information is available.

### iii.  Plaintiffs Request for Production No. 20

Plaintiffs' also seek "audited" financial records.  BHN has already produced to Plaintiffs the available audited financial records for the relevant periods in which this information is available—2012, 2013, 2014 and 2015. Ranahan Decl. ¶ 8 and Ex. 3. And as BHN has informed Plaintiffs' counsel, BHN does not have the financial records they seek from BHN for the period of 2010-2011 or 2016 (when BHN merged with Charter). *Id.*

### C.  Plaintiffs' Requests for Documents from an Irrelevant Time Period

Plaintiffs have served a number of facially overbroad discovery requests that seek documents beyond the relevant time period. Indeed, for reasons already discussed herein, Plaintiffs' requests for documents extending past 2012 is irrelevant, as in reality only that information related to the Claim Period is relevant to the claims or defenses of either party.[7] Indeed, all of Plaintiffs' cited cases, both in the body of their brief and FN 2, reflect discovery periods that mirror the statute of limitations in those cases.

---

[7] The statute of limitations in copyright cases is three years from the date of the infringement. Here, the Tolling Agreements, discussed *supra* at p. 12 establish those three years as March 24, 2013 to May 17, 2016.

In an effort to meet and confer in good faith, BHN has proposed a Discovery Period that provides Plaintiffs with an extra year of documents and information, predating the Claim Period.[8]   That this is somehow insufficient defies reason—indeed, as discussed *supra*, the *Cox* court found that this was the relevant time period for that matter in connection with similar requests on which Plaintiffs now move.   Ranahan Decl. ¶ 9, Ex. 6. Plaintiffs assert that they need data predating the Claim Period to "inform Plaintiffs' claims based on infringement occurring during the period." Yet Plaintiffs provide no argument as to why BHN's proposed Discovery Period, which includes an extra year, is insufficient. As such, Plaintiffs' arguments should be rejected as Plaintiffs have failed to demonstrate the relevance or proportionality of this time period. *See Benz v. Crowley Logistics, Inc.*, 2016 WL 11587289, at *4 (M.D. Fla. June 17, 2016) (where the court found that plaintiff "failed to show how the information is relevant and proportional to the needs of the case.").

Similarly, Plaintiffs may only recover for claims for their copyrighted works. 17 U.S.C.A. § 507(b); *see also Grove Fresh Distributors, Inc. v. Everfresh, Inc.*, No. 89 C 1113, 1990 WL 250416, at *3 (N.D. Ill. Dec. 17, 1990) (where the court, looking at whether the proposed discovery period was reasonable, held that the discovery period should "balance [both] . . . the plaintiff's interest in being able to pursue damages for the entire period of alleged wrongdoing and the defendants' interest in a set, manageable time frame for which they are responsible"). That a subscriber received a notice from a non-party is of

---

[8] The balancing approach as recommended by BHN in adopting the Discovery Period has been adopted in similar cases in this district. *See, e.g., Alticor Inc. v. UMG Recordings, Inc.*, No. 614CV542ORL37DAB, 2015 WL 13792333, at *4 (M.D. Fla. Apr. 24, 2015) (setting discovery period predating statute of limitations for two years prior to statute of limitations where conduct alleged dated back five years prior). Such a balance is exactly what BHN, and likewise the *Cox* court, have reached with the Discovery Period.

no moment. Plaintiffs' claims are not grounded in those notices. Plaintiffs' attempt to expand the relevant time period from beyond the Claim Period delineated in the tolling agreements is improper.

In addition to the foregoing, BHN provides the following specific responses to each of Plaintiffs' arguments.

### iv.   Plaintiffs' Request No. 8[9]

BHN has already produced all responsive documents it could reasonably locate reflecting BHN's policies that were enacted during the Discovery Period. Ranahan Decl. ¶ 8.  Plaintiffs have not provided any argument as to why documents and information relating to BHN's policies predating BHN's proposed Discovery Period is necessary or relevant. The only policy enacted by BHN that is relevant to Plaintiffs' claims is the one that was in place during the claims period; this is the policy under which Plaintiffs' allegations took place. BHN's responses to the notices were therefore guided exclusively by this policy. Indeed, Plaintiffs make no claims that BHN's policies changed from more reasonable to less reasonable over time, nor vice versa. As Plaintiffs have failed to demonstrate why materials predating the Discovery Period are relevant, their motion to compel should be denied.

---

[9] Plaintiffs Requests Nos. 8 and 4 contravene the guidance set forth in the Court's October 30, 2019 Order as to the use of RFPs asking for all documents "concerning" a subject. (Dkt. 66.) Plaintiffs' motion should therefore be denied as to Requests 8 and 4, as they are facially overbroad.

### v.   Plaintiffs Requests Nos. 2, 4 and 15

Plaintiffs' remaining requests generally relate to ticket log data maintained by BHN in the regular course of business. BHN has been actively negotiating with Plaintiffs about this data, and has always maintained that it is willing to produce such available data for notifications sent to subscribers by Plaintiffs. Ranahan Decl. ¶ 6 and Exs. 3-4. It is thus unclear why these requests are included in Plaintiffs' Motion. As Plaintiffs only recently (in mid-November) produced notice data against which will assist BHN in ascertaining the universe of potential available records (following repeated requests from BHN), BHN is finally in a position to assess the full level of available information. BHN intends to produce the available information Plaintiffs seek for these request for the Discovery Period, but needed Plaintiffs data in order to confirm the available universe. Ranahan Decl. ¶ 4-7 and Exs. 2-5.

Furthermore, Plaintiffs have not provided adequate bases for seeking discovery prior to the Discovery Period, and have not explained why 2010 is sufficient, but records dating back to 2012 are not. Only the notifications and actions taken during the Claim Period are relevant to Plaintiffs' claims. Indeed, Plaintiffs cannot rely on notices sent by non-parties to effectively widen the statute of limitations beyond its natural bounds. While BHN has attempted to compromise and offer documents for the Discovery Period, the fact remains that prior notices by non-Plaintiffs bear little relevance to Plaintiffs' allegations. Indeed, nowhere in the Complaint do Plaintiffs' claim that the allegedly infringing subscribers also received notices from third-parties that predated Plaintiffs' notices. *See*

*generally* Compl. As Plaintiffs have failed to demonstrate the relevancy of these materials,

Plaintiffs' Motion should be denied.

## V.    CONCLUSION

For the foregoing reasons, BHN respectfully requests that the Court deny Plaintiffs'

Motion as premature, moot and/or on the substantive grounds discussed herein.

Dated: December 6, 2019

Michael S. Elkin (pro hac vice)
Thomas Patrick Lane (pro hac vice)
Seth E. Spitzer (pro hac vice)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
(212) 294-4700 (facsimile)
E-mail: melkin@winston.com
E-mail: tlane@winston.com
E-mail: sspitzer@winston.com

Jennifer A. Golinveaux (pro hac vice)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111-5840
(415) 591-1506 (telephone)
(415) 591-1400 (facsimile)
E-mail: jgolinveaux@winston.com

Respectfully submitted,

*s/ Erin R. Ranahan*
Erin R. Ranahan (*pro hac vice*)
Shilpa A. Coorg (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1933 (telephone)
(213) 615-1750 (facsimile)
E-mail: eranahan@winston.com
E-mail: scoorg@winston.com

GUNSTER, YOAKLEY & STEWART, P.A.
William J. Schifino, Jr.
Florida Bar Number 564338
401 E. Jackson St., Ste. 2500
Tampa, FL 33602
(813) 228-9080 (telephone)
(813) 228-6739 (facsimile)

E-mail: wschifino@gunster.com
*Attorneys for Defendant*
*Bright House Networks, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on December 6, 2019, a true and correct copy of the foregoing was filed with the Court via CM/ECF which will send a notice of electronic filing to the parties of record.

*s/ Erin R. Ranahan*
Erin R. Ranahan
