**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC., *et al*.,

      Plaintiffs,

v.

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.

Case No. 8:19-cv-00710-MSS-TGW

**DEFENDANT BRIGHT HOUSE NETWORKS, LLC'S MOTION**
**TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AS TO THE CLAIM**
**FOR VICARIOUS LIABILITY**

## **INTRODUCTION**

This lawsuit is the music industry's latest campaign to hold Internet Service Providers ("ISPs") liable for copyright infringement allegedly carried out by internet subscribers. Plaintiffs assert two claims for secondary liability for copyright infringement against Defendant Bright House Networks, LLC ("BHN")—contributory and vicarious.  While BHN expects to defeat both claims, in this motion, BHN seeks only to dismiss the vicarious liability claim.  Pursuant to Rule 12(b)(6),[1] Plaintiffs' vicarious claim fails as a matter of law on two independent grounds: Plaintiffs do not plausibly allege that BHN (i) profited *directly* from infringement that it (ii) had a right *and ability* to supervise and control.

First, Plaintiffs fail to plausibly allege that BHN received a direct financial benefit from the alleged infringement.  ISPs such as BHN enable subscribers to access the internet for a wide range of indisputably legitimate purposes, including for news, work, job searches, education, healthcare, emergencies, entertainment, social interactions, shopping, and to find infinite additional sources of information.  Plaintiffs' First Amended Complaint ("FAC") is bereft of any specific, plausible allegation that users were drawn to subscribe to BHN's internet service to infringe Plaintiffs' copyrights, as opposed to being drawn to BHN in order to efficiently access the internet—including in some cases to access music, which of course, users can do lawfully.  Under long-standing precedent, this renders any financial benefit from any alleged infringement incidental, not direct, and thus insufficient to satisfy the financial benefit prong of vicarious liability.  As courts have recognized in distinguishing general-purpose ISPs

---

[1] This and all further statutory references are to the Federal Rules of Civil Procedure unless otherwise noted.

1

like BHN from file-sharing protocols like BitTorrent or Napster, Plaintiffs' allegations are too attenuated to support holding BHN vicariously liable for its subscribers' alleged actions.

Second, Plaintiffs do not plausibly allege that BHN has the ability to supervise or control its subscribers' actions on the internet.  BHN cannot plausibly supervise subscribers' internet activity that it cannot practically or technically monitor.  BHN does not host the allegedly infringing content, and thus cannot view, access, or disable it.  Plaintiffs implausibly allege that BHN has the practical ability to supervise and halt the alleged infringements based solely on its policies prohibiting infringement and its ability to terminate internet access for violation of its policies.  But termination of internet access is a drastic measure that cuts off all internet access for everyone using the internet through the same account, and it would not necessarily deter the actual alleged direct infringer (who may not be the subscriber) at all.  Furthermore, under Plaintiffs' model, such termination would occur *before* any legal findings that a subscriber has committed direct copyright infringement, regardless of the extent to which legitimate use occurs through that same account.  Indeed, BHN provides internet service to schools, libraries, military bases, businesses, and families, where only one or a small fraction of affected users (e.g., those who would have their internet access terminated) might have used the internet to infringe copyrights.  Termination of internet access is a blunt tool; it is imprecise and overbroad in its application, and would not prevent alleged infringers from continuing to infringe through alternate internet access.

To allow Plaintiffs' vicarious liability claim to proceed based upon the allegations in Plaintiffs' FAC would vastly expand copyright law to expose every ISP to liability for merely providing access to the Internet.  Plaintiffs' vicarious claim should be dismissed with prejudice.

## PLAINTIFFS' ALLEGATIONS

Plaintiffs, a group of record labels and music publishers, regularly initiate massive copyright litigation alleging the unauthorized distribution of their works and seeking windfall recoveries. First Amended Compl. ("FAC") ¶¶ 12, 37, 81. While Plaintiffs currently enjoy vast revenues from legal streaming of music on the internet (through ISPs like BHN), Plaintiffs' FAC seeks to capitalize on an earlier time, asserting a claims period from several years ago, specifically from March 24, 2013 through May 17, 2016. *Id.* ¶ 5. During that time period, Plaintiffs allege that BHN was "one of the" nation's "largest" providers of high-speed internet access. *Id*. ¶ 2. It has since merged with Charter Communications, Inc. (which has been separately sued by Plaintiffs in a concurrent action in Colorado for the same 2013-2016 time period) and offers services under the Spectrum brand.

Plaintiffs' allegations here stem from internet users' alleged proliferation of infringing material using "peer-to-peer ("P2P") distribution systems" and a protocol called "BitTorrent" during the 2013—2016 time period. *Id.* ¶ 78. BitTorrent is a file-sharing protocol that permits users to upload and download content. *Id*. Plaintiffs do not (and cannot) allege that BHN: (i) has any connection to any file-sharing websites or technology; (ii) receives any compensation from the use of such protocols; or (iii) has had any corporate relationship with, or financial interest in, BitTorrent at any point. Plaintiffs do not allege that BHN can or should block access to peer-to-peer file sharing protocols, which can be used for numerous non-infringing purposes. Nor do Plaintiffs allege that BHN has ever promoted or offered any file-sharing services to subscribers—services freely available on the internet. Plaintiffs do not allege that BHN encourages or directs traffic to BitTorrent or other peer-to-peer file sharing protocols.

Plaintiffs do not allege that the revenue that BHN receives from allegedly infringing subscribers varies in any way based upon how subscribers use the internet, or whether they infringe copyright while doing so.  Nor do Plaintiffs allege that BHN specifically targets subscribers who infringe copyrights, or that to infringe copyrights more easily, would-be infringers seek out BHN over competing service providers.

Plaintiffs allege that BHN "has touted how its service enables subscribers to download and upload large amounts of content, including music, in seconds." *Id*. ¶ 74.  Plaintiffs further allege that subscribers "are primarily drawn to its service because it allows them to use [BHN's] network to download music and other copyrighted content—including unauthorized content—as efficiently as possible." *Id*.  Notably, Plaintiffs *do not* allege that users are *drawn* to BHN's service to download unauthorized content, but merely that BHN's service would "allow" the downloading of music, which could "include[e][] unauthorized content." *Id*.  Of course, being drawn to BHN's internet to "download music" as "efficiently as possible" does not equate to being "drawn" to BHN to infringe, as there are many lawful means to download copyrighted music—such as through authorized services like iTunes.  And there is no allegation that users are drawn to BHN to specifically infringe *Plaintiffs'* content.  Plaintiffs do not allege that BHN has offered services that are distinct from any other ISP, all of which compete on offering the fastest and most efficient internet.

Plaintiffs also allege that BHN "turn[ed] a blind eye" to the alleged infringement, and have sued BHN on the theory that it should have increased how often it would "suspend or terminate a customer's [i]nternet access." *Id*. ¶¶ 8, 86, 88.  Plaintiffs' agents sent auto-generated copyright notices to BHN regarding alleged subscriber activity during the claim

period. *Id.* ¶ 82.  A notice of alleged copyright infringement, however, does not amount to a finding or proof of infringement—it is merely an allegation that infringement has occurred. *Id.*  That direct infringement would have to be proven by Plaintiffs—including in this lawsuit— before any secondary liability can flow from it.  And such an allegation in the ISP context cannot reliably purport to know which individual was actually responsible for the alleged direct infringement.  As pled, Plaintiffs assume that P2P abuses are committed by the account holder who subscribed to BHN's services instead of other household members, visitors, neighbors or people who have accessed the subscriber's service in an unauthorized manner—or, in the case of commercial accounts, those who use the service without having decision-making authority.[2] Many accounts are paid for by businesses, schools, libraries, military facilities, or the decision-maker in a family.  Subscribers and users of those accounts used BHN's high speed internet service for countless legitimate purposes that are vital to how our society functions today: from information gathering, to work purposes, to education, to emergency services, to entertainment and social interaction.[3]

---

[2] If the allegedly infringing activity is committed by a person other than the individual in a household who makes the decision regarding to which ISP service the household subscribes, such activity of course cannot be a draw to subscribe to BHN's service.

[3] In ruling on a motion to dismiss, a district court may consider judicially noticed facts, including public records, without converting the motion into one for summary judgment.  See *Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010) (per curiam) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999); *Telltabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)); *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010).  BHN respectfully requests that the Court consider its Request for Judicial Notice ("RJN") here. Disconnecting a subscriber's internet access is a drastic remedy.  (See RJN at Exhibits 7-10: The government has recognized that having internet access is critical for people to participate in the modern world economy. *See, e.g.*, *In re Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2018 Broadband Deployment Report, 33 FCC Rcd 1660 ¶ 1 (Feb. 2, 2018) ("Fixed and mobile broadband services provide Americans, especially those in rural and remote areas of the country, access to numerous employment, education,

Notably, Plaintiffs' "draw" theory lacks allegations that competing ISPs were terminating subscribers such that BHN's supposed failure to do so attracted would-be infringers to BHN's service.[4] In reality, what is plausible is that decisions by internet subscribers about which internet service to use are based upon what carriers cover their geographic region, and the price of service or bundled package that is available, as opposed to any mistaken belief by subscribers that BHN has more permissive policies on infringement than other ISPs. As explained herein, Plaintiffs' allegations are insufficient to state a claim for vicarious liability.

## LEGAL STANDARD

To survive this motion Plaintiffs' FAC "must contain sufficient factual matter, accepted

---

entertainment, and health care opportunities."); Council of Economic Advisers Issue Brief, *The Digital Divide and Economic Benefits of Broadband Access*, at 1 (March 2016), https://obamawhitehouse.archives.gov/sites/default/files/page/files/20160308 broadband cea issue brief.pdf) ("Broadband provides numerous socio-economic benefits to communities and individuals, improving labor market outcomes for subscribers, increasing economic growth, providing access to better health care, and enhancing civic participation."); Aaron Smith, *Searching for Work in the Digital Era*, Pew Research Center (Nov. 19, 2015), https://www.pewinternet.org/2015/11/19/1-the-internet-and-job-seeking/ ("Digital resources are now more important than ever to Americans' ability to research and apply for jobs," and "the proportion of Americans who research jobs online has doubled in the last ten years."); Remarks of Commissioner Jessica Rosenworcel, Federal Communications Commission, *20 Years of Connecting Schools and Libraries: Policy Summit*, (Jan. 24, 2018), https://docs.fcc.gov/public/attachments/DOC-320122A1.pdf (noting "seven in ten teachers now assign homework that requires access to broadband" and raising concern that the lack of access is creating a "Homework Gap"); *In re Promoting Telehealth for Low-Income Consumers*, Notice of Inquiry, 33 FCC Rcd 7825 ¶ 1 (Aug. 3, 2018) ("High-quality health care has become increasingly reliant on the widespread availability of high-speed connectivity, and broadband-enabled telehealth services are assuming…vital role in providing care.").)

[4] Nor could Plaintiffs plausibly allege that other ISPs were known to be terminating alleged infringers, as Plaintiffs had entered a widely publicized agreement with the country's five largest ISPs, Comcast, TimeWarner, CableVision, AT&T, and Verizon called the Copyright Alert System ("CAS") which outlined how those ISPs would respond to allegations of subscriber infringement, and, most notably, did not require ISPs to do any terminations in response to copyright notices. *See* RJN at Exs. 1-6. This makes the notion that BHN's service somehow drew would-be infringers over other ISPs even more implausible, because the major service providers were, at least publicly, not terminating customers.

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Sanchez v. Fed. Bureau of Prisons*, 493 F. App'x 14, 15 (11th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A claim should be dismissed pursuant to Rule 12(b)(6) where the plaintiff has failed to state a claim for which relief can be granted. While a plaintiff need only plead facts sufficient to state a claim for relief that is plausible on its face, a plaintiff is nonetheless "obligated to provide the grounds for his entitlement to relief, and a formulaic recitation of the elements of a cause of action will not do." *Equal Employment Opportunity Comm'n v. STME, LLC*, 309 F. Supp. 3d 1207, 1210 (M.D. Fla. 2018) (citing *Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361, 1364 (S.D. Fla. 2007)) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). While for purposes of this motion the Court must look on the FAC in a light favorable to Plaintiffs, the Court "should not assume that the plaintiff can prove facts that were not alleged." *Id.* at 1211 (citing *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al.*, 711 F.2d 989, 994-995 (11th Cir. 1983)). Dismissal is appropriate if "there is a dispositive legal issue which precludes relief." *Id.*

## ARGUMENT

I.      **The Court Should Dismiss Plaintiffs' Vicarious Liability Claim**

Vicarious liability, by which a third party can be held liable for the actions of another, arises only "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer…" *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1138 n.19 (11th Cir. 2007) (quoting *MGM Studios, Inc. v. Grokster*, 545 U.S. 930, 931 n. 9 (2005)).  Vicarious copyright liability is a theory of implied secondary liability that must be narrowly construed. *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 431 (1984) (citing several Supreme Court decisions reflecting the "recurring theme" that courts "must be circumspect in construing the scope of [the] rights" created by implied copyright liability and "reluctan[t] to expand . . . protections . . . without explicit legislative guidance.")

As explained below, Plaintiffs have not plausibly alleged that BHN received either a direct financial benefit from infringing activity, or had the ability to supervise or control it.

A.  **Plaintiffs Fail to Adequately Allege That BHN Obtained a Direct Financial Benefit from Alleged Infringement of Plaintiffs' Works**

To plead vicarious liability, Plaintiffs must adequately allege that BHN received a direct financial benefit from the infringing activity. *BUC Int'l Corp.*, 489 F.3d at 1151 n.19. Liability for vicarious copyright infringement arises "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer."  *Id.*  Critically, the infringing activity must be more than an "added benefit" to a subscription; it must be the attracting factor, or the "draw" for subscribers. *Klein & Heuchan, Inc. v. Costar Realty Info., Inc.*, 707 F. Supp. 2d 1287, 1299 (M.D. Fla. 2010), aff'd, 425 F. App'x 833 (11th Cir. 2011) (rejecting vicarious liability claim because no direct financial benefit where customers not

drawn to the defendant real estate brokerage because of former employee's access to unauthorized information); *UMG Recordings, Inc. v. Grande Commc'ns Networks*, LLC, No. A-17-CA-365-LY, 2018 WL 4501535, at *3 (W.D. Tex. Sept. 20, 2018), *report and recommendation adopted*, No. A-17-CV-365-LY, 2018 WL 6588575 (W.D. Tex. Oct. 15, 2018) (recommending denial of plaintiffs' request to amend complaint to re-plead vicarious infringement claim because "Plaintiffs still fail to plead facts showing the defendant Grande gained or lost customers *because of* its failure to terminate infringers"); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 674 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 504, 199 L. Ed. 2d 385 (2017) ("*Giganews*") (noting that the direct financial benefit prong of the vicarious infringement test "demands more than evidence that customers were 'drawn' to [the defendant ISP] to obtain access to infringing material in general," but for a "specific copyrighted" work owned by the plaintiff); *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (agreeing that plaintiff's claim for vicarious copyright infringement failed because "[t]he record lacks evidence that AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement" and "no jury could reasonably conclude that AOL received a direct financial benefit from providing access to the infringing material"); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (finding no vicarious liability because evidence that "[defendant] hosts websites for a fee" was too sparse to show a direct financial benefit and thus not "a draw" to subscribers); *Sarvis v. Polyvore, Inc.*, No. CIV.A. 12-12233-NMG, 2013 WL 4056208, at *11 (D. Mass. Aug. 9, 2013) (dismissing Plaintiffs' vicarious infringement claim for failing to plead the direct financial benefit prong because plaintiff did not allege that users subscribed to defendant's

website in order to specifically infringe the works at issue); *UMG Recordings, Inc. v. Veoh Networks Inc*., 2009 WL 334022, at *6 (C.D. Cal. Feb. 2, 2009), *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011), *opinion withdrawn, superseded, and aff'd on reh'g*, 718 F.3d 1006 (9th Cir. 2013) (dismissing vicarious liability claim where financial benefit was too attenuated to be direct); *Zagorsky-Beaudoin v. Rhino Entertainment Company*, 2019 WL 4259788, at *9 (D. Ariz. Sept. 9, 2019) (finding that "[t]he Complaint includes no factual allegations that the listing of the *All Night Long* track on Defendant eBay's site affected Defendant eBay's user base in any way, and thus, Plaintiff has not alleged facts that Defendant eBay had a direct financial interest in others' alleged direct infringement of her copyright"); *Tomelleri v. Zazzle, Inc*., 2015 WL 8375083, at 15 (D. Kan. Dec. 9, 2015) (rejecting vicarious infringement claim).

Courts have long held that in order to satisfy the first prong of vicarious liability, a defendant must profit directly, rather than incidentally, from the alleged infringement. The fundamental principles from which vicarious liability originated are articulated in "swap meet" and "dance hall" cases that show that courts have consistently applied these same principles over the last fifty years. Those cases began with *Shapiro, Bernstein & Co. v. H. L. Green Co*., 316 F.2d 304, 309-310 (2d Cir. 1963), where the court distinguished landlord cases from the facts of the case finding that in landlord cases, there was no sufficient direct financial benefit for a landlord who provided the space and access to property, yet collected the same amount of rent from tenants regardless of the allegedly infringing activity taking place on the premises. Conversely, this was distinct from dance hall operators who were directly hiring and promoting bands who performed infringing compositions. *Id.* at 307. The courts found such dance hall

operators to have obtained a direct financial benefit from the infringing activities because customers were drawn to the shows for these infringing performances, thus directly enhancing the dance hall operators' income. *Id.*

More recently, in *Coach, Inc. v. Swap Shop, Inc.*, 916 F. Supp. 2d 1271, 1283 (S.D. Fla. 2012), the court analyzed the difference between a direct financial benefit and an indirect one.  The *Swap Shop* court found on the one hand that a swap meet operator who organized the retailers selling knock-off purses was sufficiently alleged to have a direct financial benefit from infringement through obtaining rents directly from the known infringer vendors, and from increased parking and concession fees fueled by the sale of known infringing purses.  *Id.*  On the other hand, the landlord of the swap meet—who earned the same amount of money in rent for infringing and non-infringing uses, and was not directly supervising the infringing activities—was found to *not* have a direct financial benefit from the infringing activity. *Id*.

An ISP charging for high speed internet—or digital access—is analogous to the landlords in *Shapiro* and *Coach,* who are paid for the commensurate amount of physical space that they provide regardless of whether copyright infringement occurs in that space, and are in no position to supervise alleged infringing activity.  Likewise, BHN earns the same amount from subscribers, including "higher rates" for "faster speeds" (FAC ¶ 76) (analogous to higher rent for larger physical space), regardless of whether the customer uses BHN internet access to infringe.[5]  It does not affect BHN's revenues whether a subscriber (or others using that subscriber's internet) uses the internet to infringe copyrights, and/or for legitimate purposes.

---

[5] Notwithstanding the fact that it makes no sense that someone illegally downloading a song for free would rather pay for high speed internet than the dollar that song would cost or the minimal monthly fee for a paid streaming service, or listen to an ad via a free-to-the-user streaming service.

As set forth in *Ellison,* which analyzed the financial benefit prong in the vicarious liability context:

> There are, however, cases in which customers value a service that does 'not act as a draw.' **Accordingly, Congress cautions courts that 'receiving a one-time set-up fee and flat periodic payments for service… [ordinarily] would not constitute receiving a 'financial benefit directly attributable to the infringing activity.'** S Rep. 105-190, at 44. But 'where the value of the service lies in providing access to infringing material,' courts might find such a 'one-time set-up and flat periodic' fees to constitute a direct financial benefit. *Id.* at 44-45. **Thus, the central question of the 'direct financial benefit' inquiry in this case is whether infringing activity constitutes a draw for subscribers, not just an added benefit.**

357 F.3d at 1079 (emphasis added).

This case is precisely the type of case that Congress cautioned about when discussing one-time set up and flat periodic fees.  There are no plausible allegations that the value of BHN's high speed internet access lies in infringing activity.  Any infringement would be at most an "added benefit" to the value of internet access for consumers—not a draw.  *Ellison* also discusses a distinction highly pertinent to this case between the "draw" of customers to Napster and AOL.  Distinguishing *A & M Records v. Napster, Inc.,* 239 F.3d 1004, 1023 (9th Cir. 2001), *Ellison* noted that virtually "all of Napster's 'draw' of customers resulted from Napster providing access to infringing material", in contrast to the "relatively insignificant draw" present when considering the "vast array of products and services" offered by the defendant AOL. *Ellison*, 357 F.3d at 1078.  Because there was nothing to support the allegation that "AOL attracted or retained subscriptions *because of* the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement," the plaintiffs' vicarious liability claim failed. *Id.* at 1079 (emphasis added).

Similarly, here, the vast array of uses and services available to BHN's customers

12

through its high speed internet offerings likewise renders any "draw" from infringement "relatively insignificant." *Id.* at 1078. The FAC contains no plausible allegation that subscribers are drawn to BHN's high speed internet service to infringe Plaintiffs' copyrights; they are drawn to BHN's internet service to obtain high speed internet that assists with nearly every facet of life. The fact that such access could also make music downloading faster in general, which could incidentally make infringement occur faster (as it would make nearly everything online operate faster), is not enough to plausibly allege that the financial benefit to BHN from any infringement is direct. Instead, any such alleged benefit is merely an incidental, added benefit that flows from the general draw of high speed internet access. And even if Plaintiffs had alleged a plausible "draw" (which they have not), once again, the "use of the product"—BHN's high speed internet—"for infringement" does not "financially benefit[] the defendant," as BHN's receipt of monthly subscription fees is the same regardless of whether the access it provides is used in part to infringe. *Tomelleri,* 2015 WL 8375083 at *15. The *Ellison* court found it would have been necessary to show that AOL customers either subscribed *because of* the available infringing material or canceled subscriptions *because it was no longer available. Ellison*, 357 F.3d at 1079 (emphasis added). Here, Plaintiffs do not allege either of those circumstances at all, let alone in a non-conclusory fashion.

In *UMG Recordings, Inc. v. Grande*, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018) ("*Grande*")—which included over a dozen of the same Plaintiffs here—the court dismissed the music company plaintiffs' vicarious liability claim, explaining that when considering the "plausible, non-conclusory allegations" of the complaint, the plaintiffs did not plausibly allege the direct financial benefit prong of vicarious liability:

> The closest that the Complaint comes is the allegation that 'the availability of music, and particularly UMG's music—acts as a powerful draw for users of Grande's service, who use that service to download infringing music files using BitTorrent protocols…' This is not sufficient to show the 'direct financial interest' necessary to support a vicarious infringement claim. There are no allegations that Grande's actions in failing to adequately police their infringing subscribers is a draw to subscribers to purchase its services, so that they can use those services to infringe on UMG's (and others) copyrights. Instead UMG only alleges that the existence of music and the BitTorrent protocol is the draw. **But that would impose liability on every ISP, as the music at issue is available on the Internet generally, as is the BitTorrent protocol, and it is not something exclusively available through Grande's services.**

*Id*. at *10 (emphasis added).

Similarly, the Plaintiffs here merely allege generally that BHN's high-speed internet service facilitates the downloading of copyrighted materials, which in turn "has served to draw, maintain, and generate higher fees from paying subscribers to BHN's service." FAC ¶ 102. But if those allegations were enough to support vicarious liability, such a view "would impose liability on every ISP," as the cited technological capabilities are "available on the [i]nternet generally"—not "exclusively available through [BHN's] services." *Grande*, 2018 WL 1096871, at *10.  As pled, therefore, the allegations amazingly and improperly would allow a copyright holder to sue ISPs for merely providing internet access—a service which provide "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017); *see also supra* n.2.  Such allegations are insufficient to support vicarious liability. *Grande*, 2018 WL 1096871, at *10; *Sony*, 464 U.S. at 431.

Plaintiffs attempt to cure the pleading defect highlighted by the court in *Grande*, but this effort is futile; Plaintiffs cannot establish any plausible causal connection between the alleged infringement and any financial benefit to BHN. *Compare Grande*, 2018 WL 1096871,

at *10 *with* FAC ¶ 88.  Specifically, Plaintiffs allege that "BHN's failure to police its infringing subscribers adequately drew subscribers to purchase BHN's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights." FAC ¶ 88.  Yet, Plaintiffs allege no facts that plausibly assert *how* subscribers knew, learned, or had reason to believe that BHN was not terminating subscribers, or how BHN received any more of a benefit from these subscribers than others.  Plaintiffs also fail to plead that other ISPs were terminating subscribers based upon Plaintiffs' allegations of infringement—a necessary allegation to render BHN's failure to terminate material to its subscribers' purchasing decisions.

Absent such allegations, the notion that BHN received a "direct financial benefit" by merely providing internet service is not plausible, as Plaintiffs do not assert how an alleged failure to terminate account holders plausibly served as a draw for subscribers.  These deficiencies are fatal since the court cannot assume Plaintiffs can prove facts not alleged. *See Equal Employment Opportunity*, 309 F. Supp. 3d at 1211.

Plaintiffs also do not (and could not) allege that BHN specifically targeted infringing subscribers, or that BHN's flat-rate revenues depend on whether its subscribers use its internet services for infringing activity versus lawful purposes.  While Plaintiffs do allege that BHN charged "higher rates" for internet service with "faster speeds" (FAC ¶ 74), such allegations are immaterial.  First, Plaintiffs fail to plead with specificity that BHN encourages subscribers to purchase a faster package for the purpose of infringing, or markets its faster tiers to those who infringe Plaintiffs' copyrights. *See* FAC ¶¶ 73-74 (failing to suggest BHN markets its services for unlawful purposes).  Nor do Plaintiffs plead that infringing subscribers disproportionately subscribe to faster speeds as compared to non-infringing subscribers.

15

*Cf.* ¶ 76 (noting only that BHN provided faster speeds to customers who wanted them, not that BHN marketed its higher tiers to infringers).  Moreover, Plaintiffs do not, and cannot, allege that those who illegally download music want faster speeds than those who do so legally— much less than those who download anything else, including considerably larger content, like movies or other multimedia files.  Such allegations would be implausible, as subscribers paying for faster service for lawful uses want to download content as efficiently as alleged infringers.

While Plaintiffs allege that "11.4 percent of all Internet traffic involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent." (FAC ¶ 80), that is a stale statistic from 2011, before the claim period (2013-2016), and before the proliferation of legal channels to download copyrighted music (and the massive profitability of streaming for Plaintiffs).  Even if presumed to be true, that allegation has nothing to do with content hosted or promoted by BHN, and nothing remotely close to the offerings of 85% infringing content found on Grooveshark and the 90%+ infringing content found on Napster. *See Escape Media* 2015 WL 1402049 at *3 (addressing high percentage of infringing content found on Grooveshark constituted a "substantial draw" for users); *Ellison v. Robertson*, 357 F.3d 1072, 1078 (2004); *A&M Records v. Napster, Inc*., 239 F.3d 1004, 1013 (9th Cir. 2001) (finding draw where "virtually all of Napster's 'draw' of customers resulted from Napster's providing access to infringing material.").

In *Giganews*, a copyright owner sued an operator of Usenet servers, an online distributed discussion system enabling user-generated content, for infringement of images posted by users to online bulletin boards. 847 F.3d at 663.  As the Ninth Circuit recognized, Giganews could not be held vicariously liable unless the plaintiff established that "Giganews

attracted subscriptions *because of* the plaintiff's infringing material." *Id.* at 674 (emphasis added).  The plaintiff, Perfect 10, failed to do so, offering evidence only that some subscribers joined Giganews to access infringing materials generally. *Id.*  The court explained that the direct financial benefit prong of the vicarious infringement test "demands more than evidence that customers were 'drawn' to [the defendant ISP] to obtain access to infringing material in general," but for a "specific copyrighted" work owned by the plaintiff. *Id.* at 673.  Thus, the fact that a user may have accessed the copyrighted material was at best an added benefit to the subscription, not the draw sufficient to support a finding of vicarious liability. *Id.* at 674.

Plaintiffs' failure to allege a plausible causal connection between any alleged direct infringement of any of Plaintiffs' alleged works and the subscription fees received by BHN means the Complaint falls well short of alleging vicarious liability.  Plaintiffs do not allege that infringers specifically chose BHN over other providers so they could infringe Plaintiffs' copyrights, or that other ISPs were terminating subscribers, leading them to seek out BHN as a safe haven.[6]  Nor do they, nor could they, allege that BHN itself owns or operates any file-sharing service, that BHN promotes or directs traffic to BitTorrent, or that BHN receives any compensation from peer-to-peer file sharing services. The only financial benefit that BHN receives is a flat fee for the provision of internet services, which is insufficient to state a claim. *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (holding that "flat periodic payments for service" *cannot* establish a direct financial benefit for vicarious liability *unless* the value of the service lies in providing access to infringing material).

---

[6] See *supra* note 4.

At most, Plaintiffs allege that subscribers are able to utilize their internet connection for illegal activity as an added benefit to the subscribers.  That is not enough. *Giganews*, 847 F.3d at 674; *Ellison*, 357 F.3d at 1079; *see also Grande*, 2018 WL 1096871, at *10; FAC ¶ 74. Without more, it is not plausible that subscribers subscribe to BHN's internet service—as compared to other sources of internet service available to them—for the primary purpose of committing infringement.[7]  Indeed, Plaintiffs seem to concede they have not sufficiently alleged a draw, and instead advocate for a lesser standard that would only require a finding that an ISP had an "economic incentive" to permit alleged infringers to use its service. *See* Dkt. 39 at 10.  *Capitol Records, LLC v. Escape Media Grp.* is the only case that Plaintiffs cite for their concocted theory that "economic incentives" alone support a finding of direct financial benefit. 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015).  But Plaintiffs' reading ignores the important fact that the *Escape* court *still tied such incentives to a theory of draw*. *Id.* Plaintiffs cannot cure their deficient allegations by sidestepping the stringent requirements of the vicarious liability standard in favor of a novel theory unsupported by the very case law they cite.

Plaintiffs can also be expected to rely upon the October 21, 2019 recommendation by Magistrate Judge Hegarty the District of Colorado action against Charter Communications, Inc. (the "Recommendation"). *See Warner Music Group, et al. v. Charter Communications Inc.*, Case No. 1:19-cv-00874-RBJ-MEH, (Dkt. 71).  This Recommendation, however, has not been adopted by the District Court, and on November 4, 2019, Charter timely filed objections

---

[7] Amendment cannot cure this defect because Plaintiffs' theory that infringing activity is the draw is factually implausible in light of the multitude of non-infringing uses of the internet, access to which is critical for individuals in contemporary society. *See, e.g., infra.*, note 2.

to the Recommendation (the "Objections"). *Id.* Dkt. 81.  The Objections received the support

of twenty-three law professor amici in a separately filed amicus brief, which the District Court

accepted. (Dkt. Nos. 83 (Mot. to file Amicus Brief), 103 (court granting request to file Amicus

Brief).).[8]  The Recommendation should also be discounted because it misapplies relevant law,

and would expand the vicarious liability standard beyond the bounds of any relevant precedent.

(Objections at Dkt. 81 at 7-21; Amicus brief at Dkt. 83 at 1-9.)  Further, the Recommendation

relies entirely upon Plaintiffs' characterization of their allegations in their opposition to the

motion to dismiss, rather than the underlying allegations as actually alleged in the Complaint.

*See id.* at Dkt. 81, 7-9 and n. 1.  In doing so, the Recommendation accepts as true not Plaintiffs'

actual allegations, but Plaintiffs' attempt to rehabilitate their otherwise deficient allegations.

*Id.*  For at least these and those additional reasons set forth in Charter's Objections, the

Recommendation should not be adopted here.

Because Plaintiffs have only alleged implausible, conclusory allegations that do not

support what is at most an incidental—not direct—financial benefit, the Court should dismiss

Plaintiffs' vicarious liability claim here on this ground alone.

**B.      Plaintiffs Fail to Plausibly Allege That BHN Had the Ability to Supervise or Control Infringement Allegedly Occurring on Subscriber Accounts**

The second prong of vicarious liability requires Plaintiffs to plead that BHN had the

right and ability to supervise the allegedly infringing activity. *BUC Int'l Corp. v. Int'l Yacht*

*Council Ltd.*, 489 F.3d 1129, 1151 n.19 (11th Cir. 2007) (quoting *MGM Studios, Inc. v.*

---

[8] The Recommendation may ultimately be moot in light of Plaintiffs' recently-filed Motion to Amend the Complaint in that case, though similar objections would be lodged to any similar Recommendation with respect to the FAC.  Dkt. 111.

*Grokster*, 545 U.S. 930, 931 n. 9 (2005)) (vicarious liability arises only "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer…"). "[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1173 (citing *Grokster*, 545 U.S. 930); *see also Pegasus Imaging Corp. v. Northrop Grumman Corp*., No. 807-CV-1937-T-27EAJ, 2008 WL 5099691, at *2 (M.D. Fla. Nov. 25, 2008) (finding vicarious infringement claim failed because allegations were too conclusory to satisfy the requirement that "[t]he defendant must have the right and ability to supervise the infringing activity").

Dismissal is independently warranted because Plaintiffs also fail to plausibly allege this prong.  Plaintiffs have failed to allege that BHN exercises any practical ability to supervise or control the online activity of allegedly infringing subscribers, and that too warrants dismissal of their vicarious liability claim.  BHN cannot view, access, monitor its customers' internet activity, including any infringing activity.  Thus, BHN is not in the practical position to supervise such activity.  Plaintiffs allege, in completely conclusory fashion, that BHN's "ability to control and supervise" its subscribers arises from its ability to terminate customers. *See, e.g.*, FAC ¶ 102.  But the fact that BHN has the general capability to terminate subscriber accounts *altogether* does not mean it has the ability to supervise its subscribers; infringing activity or to halt infringement in particular.  Indeed, Plaintiffs do not (and cannot) allege that termination by BHN would restrict that subscriber's access to the infringing content. Such an allegation would be farfetched given the availability of other networks and providers of internet access to the same material.  The FAC does not allege that BHN has the "ability to control and

supervise" its subscribers conduct online generally, or that BHN can "stop or limit [subscribers] from reproducing, displaying, and distributing infringing copies of [Plaintiffs' works] on the [i]nternet." *See Amazon.com*, 508 F.3d at 1173.

Courts have analyzed this element and specifically distinguish between general-purpose ISPs like BHN or Google and "closed system" file-sharing protocols and websites like BitTorrent or Napster. *See, e.g., Perfect 10 v. Amazon.com*, 508 F.3d 1146, 1174 (9th Cir. 2007). For instance, in *Amazon.com*, the Ninth Circuit recognized that Napster had a closed system requiring user registration, and could terminate its users' accounts and block their access to the Napster system. Under those circumstances, Napster had the right and ability to prevent its users from engaging in the infringing activity of uploading file names and downloading Napster users' music files through the Napster system. *Id.*

In contrast, the court found that an ISP like Google that simply offers internet service and provides users the freedom to use that access as they see fit, had no such ability—and therefore no liability. *Id.* at 1174-1175. While the court recognized that Google had the ability to curtail some infringement indirectly by terminating accounts, that ability was insufficient to establish vicarious liability as it did not have the supervisory powers required to establish the claim. *Id.* at 1174 ("Google cannot stop any of the third-party websites from reproducing, displaying, and distributing unauthorized copies of Perfect 10's images because that infringing conduct takes place on the third-party websites. Google cannot terminate those third-party websites or block their ability to 'host and serve infringing full-size images' on the [i]nternet.")

The Ninth Circuit reaffirmed this reasoning in *Perfect 10, Inc. v. Visa Intern. Service Ass'n.*, 494 F.3d 788 (9th Cir. 2007). There, Perfect 10 sued credit card companies for failing

to terminate member merchant accounts that were profiting from alleged copyright infringement. *Id.* at 793. Relying on *Amazon.com*, the court held that although the credit card companies had the authority to terminate merchant accounts that engaged in illegal activity, such termination did not equate to the right and ability to supervise and control the infringement required for vicarious infringement. *Id.* at 803. The court reasoned that while terminating such member accounts could have some "indirect effect on the infringing activity," a "defendant must have the right and ability to *supervise and control the infringement*, not just affect it." *Id.* at 805 (emphasis added);[9] *see also Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) ("[T]he pertinent inquiry is not whether [the defendant] has the right and ability to control [its] system, but rather, whether it has the right and ability to control the infringing activity."). Plaintiffs' theory is further attenuated on this prong because, unlike Veoh—which operates a closed system—BHN merely provides a pipeline to the internet and cannot supervise or control activity on the internet.

Like *Google* and *Visa*, BHN has no practical ability to supervise or control subscribers' general access to infringing content available using P2P protocols or the allegedly infringing conduct online. Moreover, Plaintiffs' termination remedy suffers from both "imprecision and overbreadth" based on BHN's inability to confirm allegations in a notice, the extremity of the measure, and the inability to halt infringing activity from another source. *See Amazon.com*,

---

[9] Although in *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc*, 149 F. Supp. 3d 634, 674–75 (E.D. Va. 2015), aff'd in part, rev'd in part, 881 F.3d 293 (4th Cir. 2018), the court declined to grant summary judgment to Cox on vicarious liability, ultimately the jury found no such liability. *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 300 (4th Cir. 2018). Moreover, that court's conclusion that the ability to terminate subscribers could give Cox the ability to control infringing activity is fundamentally faulty because it presumes that terminating subscribers would halt infringement. *Id.* Here, Plaintiffs cannot plausibly allege that BHN has the ability to control its subscriber's allegedly infringing activity, or that terminating subscribers will stop infringement.

508 F.3d at 1174.  Terminating allegedly infringing subscribers may have some indirect effect on copyright infringement, but indirect effects do not satisfy the standard.

BHN plainly cannot supervise alleged infringing activity, as there are no (and could be no) allegations that BHN could have accessed or disabled the infringing content, or prevented those using its internet services from simply infringing on another internet service.  Even crediting Plaintiffs' allegations that BHN has the "right" to terminate subscriber's access to BHN's service, that does not mean that BHN has the practical ability to supervise or control infringing activity, as required to state a claim for vicarious liability. It is not possible for BHN to supervise or control infringing activity involving content that it never touches, cannot see, cannot disable, and cannot track.  With internet service being widely available for a multitude of sources, BHN is clearly unable to prevent any former customer—or one user or some subset of users on that customer's account—from simply finding another source of internet access to continue infringing Plaintiffs' works.  Plaintiffs' vicarious liability claim should thus be dismissed for this independent reason.

Courts are not bound to accept as true a legal conclusion couched as a factual allegation. There is no plausible theory that BHN has the practical ability to supervise and control the allegedly infringing activity of its subscribers, offering an independent basis to grant BHN's motion to dismiss.

## **CONCLUSION**

To allow Plaintiffs' claim for vicarious liability to proceed would improperly and vastly expand the reach of vicarious liability for copyright infringement, and expose ISPs to such claims for merely advertising and making available high speed internet access.  For the

foregoing reasons, BHN respectfully requests that Plaintiffs' vicarious liability claim be dismissed. Because Plaintiffs cannot remedy the defects in that claim with further allegations, amendment would be futile and dismissal should be with prejudice.

Dated: January 21, 2020                    Respectfully submitted,

Michael S. Elkin (*pro hac vice*)          s/ Erin R. Ranahan
Thomas Patrick Lane (*pro hac vice*)       Erin R. Ranahan (*pro hac vice*)
Seth E. Spitzer (*pro hac vice*)           Shilpa A. Coorg (*pro hac vice*)
WINSTON & STRAWN LLP                        WINSTON & STRAWN LLP
200 Park Avenue                            333 S. Grand Avenue
New York, NY 10166                         Los Angeles, CA 90071
(212) 294-6700 (telephone)                 (213) 615-1933 (telephone)
(212) 294-4700 (facsimile)                 (213) 615-1750 (facsimile)
E-mail: melkin@winston.com                 E-mail: eranahan@winston.com
E-mail: tlane@winston.com                  E-mail: scoorg@winston.com
E-mail: sspitzer@winston.com

GUNSTER, YOAKLEY &                         Jennifer A. Golinveaux (*pro hac vice*)
STEWART, P.A.                              WINSTON & STRAWN LLP
William J. Schifino, Jr.,                  101 California Street, 35th Floor
Florida Bar Number 564338                  San Francisco, CA  94111-5840
John Schifino                              (415) 591-1506 (telephone)
Florida Bar Number 72321                   (415) 591-1400 (facsimile)
Ryan Lee Hedstrom,                         E-mail: jgolinveaux@winston.com
Florida Bar Number 124724
401 E. Jackson St., Ste. 2500              *Attorneys for Defendant*
Tampa, FL 33602                            *Bright House Networks, LLC*
(813) 228-9080 (telephone)
(813) 228-6739 (facsimile)
E-mail: wschifino@gunster.com
E-mail: RHedstrom@gunster.com
E-mail: JSchifino@gunster.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 21, 2020, a true and correct copy of the foregoing was filed with the Court via CM/ECF which will send a notice of electronic filing to the parties of record.

s/ Erin R. Ranahan
Erin R. Ranahan

24