**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC., *et al.*,

    Plaintiffs,

v.                                       Case No. 8:19-cv-710-MSS-TGW

BRIGHT HOUSE NETWORKS, LLC,

    Defendant.

**PLAINTIFFS' MOTION FOR NARROW RECONSIDERATION OF TWO DISCRETE ISSUES FROM THIS COURT'S JANUARY 9, 2020 DISCOVERY ORDER**

On January 8, 2020, the Court held a hearing on 18 separate issues raised in Plaintiffs' and Bright House Network's ("BHN") respective motions to compel. Ex. A (Hr'g Tr.); ECF Nos. 74, 80. On January 9, 2020, the Court issued an order granting-in-part and denying-in-part both motions, with rulings on all 18 issues. ECF No. 93. Plaintiffs respectfully seek reconsideration of just two of those rulings—one in full and one to clarify the scope of the Order.

*First*, Plaintiffs request that the Court reverse its denial of Plaintiffs' motion to compel BHN to respond to Interrogatory No. 12 by stating the number of subscribers terminated for non-payment during the claim period. *Id.* at ¶ 1.b. The discovery is directly relevant to at least two different issues: Plaintiffs' vicarious liability claim (*i.e.*, BHN's ability to control infringement by terminating subscribers), and to rebut BHN's oft-repeated defense that internet service is so essential to its customers that it does not terminate service lightly. *Second*, Plaintiffs request that the Court narrow its grant of BHN's motion to compel Plaintiffs to produce a vast swath of competitively sensitive licensing and distribution agreements in response to RFP No. 8— agreements that, ultimately, are irrelevant given Plaintiffs' election of statutory damages. *Id.* at

2.c. Plaintiffs propose below a pragmatic approach to resolving the latter issue that would still provide BHN with more than sufficient discovery to conduct its alleged damages analysis, while avoiding an overbroad obligation to produce "all" documents that would be virtually impossible to meet. Simply put, fairness requires that the first ruling be reversed and the second be narrowed.

## LEGAL STANDARD

A court may alter a prior decision where "the interest of justice demand[s] correction." *Evergreen Media Holdings, LLC v. Paul Rock Produced, LLC*, No. 2:14-CV-499-FTM-29MRM, 2015 WL 13730160, at *1 (M.D. Fla. Dec. 11, 2015) (quoting *Am. Home Insur. Co. v. Glenn Estess & Assoc., Inc.*, 763 F.2d 1237, 1239 (11th Cir. 1985)). Courts have recognized three grounds justifying reconsideration of an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice. *Id.* The third ground applies here.

## ARGUMENT

**I. Terminations For Non-Payment Are Relevant To BHN's Defense, Plaintiffs' Vicarious Liability Claim, and Willfulness and Damages**

The Court denied Plaintiffs' request to compel BHN to answer Interrogatory No. 12:

**INTERROGATORY NO. 12:** State the number of Subscribers, per month and year, whose internet service you terminated for failing to pay amounts owing on the Subscriber's account.

**OBJECTIONS:** Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, and to the extent this request seeks information outside the Discovery Period. Bright House further objects to this request because it is unduly burdensome and unnecessarily duplicates other discovery requests that Plaintiffs have propounded, including FRP Nos. 2 and 15. Bright House reserves its right to respond to this interrogatory pursuant to Fed. R. Civ. P. 33(d).

*Relevance To BHN's Defense*. Notwithstanding BHN's boilerplate objections, the information sought is *directly relevant to one of BHN's core defenses*. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's

claim or defense and proportional to the needs of the case."). Upon review of the hearing transcript, it appears as though the Court may not have fully understood Plaintiffs' argument.[1] Plaintiffs therefore clarify their argument below.

Plaintiffs contend that BHN is liable for the continued provision of internet service to known infringing subscribers. In defense, BHN has argued that terminating customers' internet service for repeated instances of copyright infringement would be a "draconian measure" with "dramatic impact" on customers given the importance of internet access in the modern world. ECF No. 82 at 9. According to BHN, this "dramatic impact" is "focused on the human cost of losing access to a basic utility, internet access, that is fundamental to how we function in society." *Id.* In other words, BHN claims that internet service is too vital to be disrupted or disconnected lightly.

In its motion to dismiss, BHN made the same argument. It stated that its "only ability to prevent or limit any infringement occurring on its network stems from its technical ability to 'suspend or terminate a customer's [i]nternet access.'" ECF No. 32 at 5. But it cannot reasonably be expected to do so because "in the modern world disconnecting a subscriber's internet access is a drastic remedy" that would impact its customers' access to employment, education, entertainment, health care resources, and even civic participation. ECF No. 32 at 5 n.2. BHN thus claims it does not terminate internet access lightly because such access "is critical for individuals in contemporary society." *Id.* at 12 n.3

Having made these assertions, BHN has put directly at issue how it treats that allegedly "critical" internet access when its customers' behaviors contravene BHN's financial interests (*i.e.*, non-payment), particularly compared to its treatment of that "critical" access when other behaviors harm Plaintiffs but remain lucrative for BHN (*i.e.*, infringement). In order to test BHN's assertion

---

[1] At one point the Court noted that "I don't understand the argument." Ex. A at 25:8.

that terminating a customer's internet service is a drastic remedy that it avoids—such that it should not reasonably be expected to terminate subscribers it knows are using the service to infringe repeatedly—Plaintiffs are entitled to know how many subscribers' internet service BHN terminated for non-payment during the claim period. They are entitled to know the extent to which BHN took its subscribers need to access this supposedly essential utility into account when BHN's revenue is at risk. The Court adopted this logic in granting Plaintiffs' motion to compel discovery on the number of BHN subscribers, so Plaintiffs could test BHN's claim that only a small portion infringed. Ex. A at 17-18. The logic of that correct ruling applies equally here—the discovery sought in both instances bears directly on BHN's defenses.

Two other courts faced with the same interrogatory in virtually identical cases (where both defendants are represented by the same counsel as BHN) found the number of non-payment terminations relevant and discoverable. Ex. B at 10-11 (Jan. 25, 2019 *Cox* Tr., ordering Cox to answer same interrogatory); Ex. C at 17:2-6, 18:21 (Dec. 17, 2019 *Charter* Tr.). This Court should rule that way also.[2]

In *Cox*, the discovery provided was telling, and deeply undermined Cox's claim that it would not terminate internet access lightly. During the two-year period at issue in that case, Cox terminated just 32 subscribers for copyright violations but more than *600,000 subscribers* for non-payment. When Cox, represented by the same counsel representing BHN here, argued in its opening statement that it could not be expected to terminate internet access for copyright violations

---

[2] While the Charter court observed that, in a vacuum, the number of non-payment terminations would not be relevant, it recognized that the information is discoverable to rebut the same argument BHN makes here and to demonstrate the right and ability to control infringement by terminating service. Ex. C at 17:2-6, 18:21. The court thus found the information discoverable and provided Charter an opportunity to investigate whether providing the information by month (rather than by year) would be unduly burdensome. *Id.* at 15:11-16:8. Tellingly, Charter dropped its burden objection.

given its critical place in the modern world, the court admitted the evidence plaintiffs had adduced on non-payment terminations as relevant to rebut Cox's argument. Ex. D at 132-135 (*Cox* Tr.). This is exactly the same scenario here. Having passed the higher threshold of *admissibility* in *Cox* to rebut the argument, certainly the same information is at least *discoverable* at this stage of the *BHN* case.[3]

The manner in which this evidence was used at the *Cox* trial is also illuminating. Cox put on an affirmative witness to describe its policy and procedure for non-payment terminations, including its aggressive pursuit of payments, repeated collection calls, emails and text messages to customers, sending collection agents to customers' homes, and terminating service after 30 days. Ex. D at 2723:1-2726:2 (*Cox* Tr.). On cross examination, the *Cox* plaintiffs contrasted (1) Cox's aggressive procedures and massive number of non-payment terminations, with (2) Cox's toothless procedures for addressing copyright violations and non-existent terminations. Exs. E (*Cox* trial demonstrative); D at 2754:6-2759:13 (*Cox* Tr.). This was compelling evidence that undermined Cox's "drastic measure" argument. A jury is entitled to weigh this evidence in determining whether to reject BHN's argument that the allegedly "drastic" remedy of terminating repeat infringers is unreasonable—just as the *Cox* jury rejected that argument.

The Court repeatedly referred to the scope of potential damages as a basis for granting BHN's discovery requests. The same logic should apply here. Plaintiffs should not be foreclosed from discovery concerning one of BHN's key defenses when Plaintiffs have alleged massive

---

[3] Prior to this ruling, the *Cox* court conditionally granted a motion in limine to exclude non-payment terminations from trial "unless Cox suggests that they terminate lots of customers for cause." *Sony Music Entm't. v. Cox Commc'ns. Inc.*, No. 1:18-cv-00950-LO-JFA (E.D. Va.), ECF No. 590 at 5. When Cox then made the same argument that BHN makes here—namely, that it does not terminate lightly given the importance of internet access to modern life—the court expanded the conditions for exclusion and admitted the evidence.

infringement on BHN's network and the defense concerns both liability and the scope of damages.

***Relevance To Vicarious Liability***.  BHN's non-payment terminations are also relevant to Plaintiffs' vicarious liability claim, particularly BHN's right and ability to control the infringing activity.  BHN disagrees and claims, as the Court noted, that terminations for non-payment and copyright violations are "apples and oranges."  Frankly, BHN's argument misses the point, and ignores the probative value of this evidence on Plaintiffs' vicarious liability count.  In determining whether a defendant has the right and ability to control infringing activity courts look to whether the defendant could and did take action against violations of its policies—including those that are *not* related to infringement.  See *Arista Records, Inc. v. Usenet*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) (the ability to block users for "any reason whatsoever" is "evidence of the right and ability to supervise" infringing activities) (internal quotes omitted); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00-CV-4660 (SHS), 2002 WL 1997918, at *11 (S.D.N.Y. Aug. 29, 2002) (same).

Both *Usenet* and *MP3Board* show that courts find a direct correlation between (i) a defendant's ability to control (and actual control of) its users' violations of other terms or policies, and (ii) its right and ability to control its users' infringing activities.  Thus, if BHN regularly terminated the accounts of subscribers for non-payment or other misconduct as it had the right to pursuant to its terms, then it could have done the same for subscribers it knew repeatedly infringed copyrights.  The *Charter* and *Cox* courts agreed.  *E.g.*, Ex. C at 18:19-21 ("[Y]ou want to use it to show abilities, I understand that. And so we'll do that . . .").  BHN is free to argue to a jury that the weight to be given different types of terminations is low because the discretionary considerations differ, but that should not foreclose discovery on it.

***Relevance To Willfulness and Damages***.  BHN's termination of subscribers' accounts for non-payment is also relevant to willfulness and damages considerations.  It would demonstrate to

a jury the extent to which BHN turned a blind eye to infringement when it was in its financial interest to do so (insofar as infringing subscribers continue to generate revenue for BHN), while readily terminating subscribers for non-payment.

A revised order compelling BHN to answer Interrogatory No. 12 is needed to correct clear error or manifest injustice. Without this important discovery, Plaintiffs will be unfairly prejudiced in testing a key defense that BHN has already put forward.

## II. *All* Licensing and Distribution Agreements For More Than 7,500 Works In Suit Is Overbroad and Disproportionate To The Discovery's Probative Value.

The Court granted BHN's request to compel "[a]ll distribution and/or license agreements" sought by supposedly narrowed RFP No. 8, based on BHN's claimed need to conduct an actual damages analysis of Plaintiffs' lost revenue caused by the infringement (even though that analysis cannot be conducted using the agreements):

**ORIGINAL RFP NO. 8**: All documents concerning any licenses, assignments, and/or grant or transfer of rights of the copyrights that You claim cover(ed) the Copyright Works for any of the last ten (10) years, including copies of agreements reflecting such licenses, assignments, and/or grant or transfer of rights.

**NARROWED RFP NO. 8**: All distribution and/or license agreements entered during the Claim Period or governing the Copyright Works during the Claim Period, including any agreement(s) pertaining to digital streaming and downloading with YouTube, Apple Music and iTunes, Amazon Unlimited, Prime Music, Pandora, Google Play, Vevo, Dailymotion, Qello, and/or Vimeo or any agreements providing for a tiered pricing structure based on the value of any Copyright Works during the Claim Period, and documents sufficient to identify all licensing fees and/or royalties for the Copyright Works during the Claim Period.

**OBJECTIONS**: Plaintiffs object to this request's call for "all documents concerning any licenses, assignments, and/or grant or transfer of rights" as overly broad, not proportional to the needs of the case, and therefore unduly burdensome. The request for "all documents" is in and of itself overly broad and not proportional to the needs of the case. In addition, the request seeks documents concerning any and all licenses, assignments, and/or grants or transfers of rights of the copyrighted works-in-suit, without regard to whether such assignments have any bearing on issues in this case, and Plaintiffs therefore object on relevance grounds, and on the grounds that the request is vague and ambiguous in its reach. Moreover, "grant or transfer of right" is vague and ambiguous. Plaintiffs also object to the part of this request pertaining to agreements as irrelevant. Bright House has no legitimate need for copies of all agreements reflecting licenses, agreements, and/or grants or transfers of rights of the copyrighted works. Plaintiffs' agreements contain extremely sensitive and confidential business and proprietary information. The very high potential

for prejudice to Plaintiffs and nonparties significantly outweighs the marginal, if any, relevance such agreements could have to this case.

**RESPONSE**: Subject to the foregoing objections, upon entry of an appropriate protective order, Plaintiffs will produce responsive, non-privileged documents in their possession, custody, or control sufficient to demonstrate that Plaintiffs are the legal and/or beneficial owners of an exclusive right under copyright to their respective copyrighted works-in-suit, to the extent such documents can be located following a reasonable and diligent search.

Plaintiffs' motion seeks only to clarify precisely what Plaintiffs are obligated to produce in light of the breadth of the request, its limited relevance, and Plaintiffs' current understanding regarding potentially responsive documents. While Plaintiffs respectfully disagree that the requested agreements have any relevance to BHN's professed need to conduct an actual damages analysis, this motion is limited to the scope of the Order only. The Court repeatedly admonished the parties for serving requests for "all" documents in a given category, yet RFP No. 8 does just that and was nonetheless granted in full. It is the potential overbreadth of this request that is problematic, particularly given the disproportionate burden and minimal relevance.

***Proposed Revised Order.*** Plaintiffs, therefore, propose a pragmatic approach that balances BHN's claimed need for the discovery with the breadth and very real burdens the order imposes. The overwhelming majority of Plaintiffs' download and streaming revenues derive from a small number of catalog-wide, high-value agreements. Given this, the burdens described below, and the limited relevance of the information sought, Plaintiffs propose that, in lieu of producing *all* licensing and distribution agreements, Plaintiffs would produce copies of the core catalog-wide agreements, in terms of revenue derived therefrom, which collectively account for approximately 90 percent of each Plaintiff group's total U.S. audio-only download and streaming revenue—that is, each Plaintiff group (*e.g.*, Sony Music, Warner Music, etc.) would produce approximately its top 10 to 20 deals.

### A. Most Licensing and Distribution Agreements Have Nothing To Do With The Peer-To-Peer Infringement At Issue Here and Producing Them Would Be Unduly Burdensome.

Absent this clarification, the complexity and challenge of producing "all" distribution and/or licensing agreements that governed all works during the claim period cannot be overstated. Each sound recording or composition may be the subject of hundreds of different kinds of licenses (multiplied by thousands of works in suit), ranging from licenses for use in advertisements, movies, video games, sound recordings, television, and other ancillary uses (even into greeting cards and toys). It is difficult to see any relevance, for example, to the terms on which a Plaintiff licensed a sound recording for use in the closing credits of a movie ten years before the infringement at issue by BHN's subscribers. None of these "one-off" agreements provides any information regarding the value of the lost downloads or streams Plaintiffs would have obtained if not for the infringing conduct of BHN's subscribers. The request even includes agreements with audio-visual service providers like Vimeo or Vevo (which primarily offer streaming of music videos), though Plaintiffs' claims relate only to the illegal uploading and downloading of audio-only files.

None of these has any bearing on Plaintiffs' lost sales or revenue caused by the unlawful copying and distribution of their works through BHN's network. Yet the burden to identify, collect and produce "all" agreements would be massive. Plaintiffs do not maintain master lists or databases that identify all agreements for a particular sound recording or musical work. Different parts of each company could have responsibility for different types of licenses, assignments, transfers or grants. And even within each department, there does not exist a master list or database that identifies all agreements concerning a particular sound recording or musical work.[4]

---

[4] Each Plaintiff previously submitted a declaration explaining what the breadth of the request means in terms of burden and the manual and uncertain prospect of compliance. *See* Abitbol Decl. (continued…)

— 9 —

### B. Production of Plaintiffs' Core Catalog-Wide Download and Streaming Agreements Is A Reasonable and Proportional Compromise.

The only conceivable metric that could bear on Plaintiffs' actual harm from unlawful peer-to-peer copying and distribution pertains to downloading or streaming revenue. Plaintiffs have therefore endeavored in good faith to identify those catalog-wide license and distribution agreements in effect during the claim period that generate the overwhelming majority of U.S. audio and audio-visual downloading and streaming revenue. Based on their search efforts to date, the Plaintiffs have identified over 400 such catalog-wide agreements, with more than 800 other documents in amendments, modifications or extensions.[5]

The collection, review, and production of even these catalog-wide agreements alone would require substantial expenditures of employee time (and in at least one case, even cross-country travel given that the agreements are not always centrally stored in a single location). The amount of time varies by Plaintiff group, and for some would require up to a week of employee time to sort through potentially responsive materials, diverting such employees from their regular business responsibilities. And this is just for the catalog-wide agreements, not the hundreds or thousands of one-off agreements that have nothing to do with downloading or streaming revenue. The burden involved far outweighs any arguable relevance of the full set of agreements.

While there is some overlap in counterparties to these catalog-wide agreements among the various Plaintiff groups, these hundreds of agreements involve at least 175 separate

---

¶ 11; Leak Decl. ¶ 14; McMullan Decl. ¶ 14; Blietz Decl. ¶ 12; Flott Decl. ¶ 14 (ECF Nos. 83-1, 83-3 through 83-6).

[5] In the *Cox* case, Plaintiffs made a proffer of their revenue collected per digital download, including the tiers (or in some cases averages) that BHN seeks here. Cox's damages expert used that information to perform the actual damages analysis BHN claims to need here, demonstrating alleged lost revenue caused by infringement. Though Plaintiffs here have offered to provide a similar proffer to BHN—which BHN outright rejected—and no more is needed, Plaintiffs' proposed revised order would give BHN significantly more information.

counterparties—not to mention substantially more counterparties if all one-off agreements are added, as the request seeks. This substantial number of contractual counterparties is critical to understanding the burden associated with producing them. The agreements are generally subject to confidentiality provisions requiring notice and an opportunity for each of those 175-plus counterparties to object to disclosure. Providing notice and an opportunity to object to 175-plus counterparties will be burdensome and time-consuming, to the say the least. The proposal above would lessen that burden while still resulting in the production of the core catalog-wide agreements that generate approximately 90 percent of Plaintiffs' audio download and streaming revenue. BHN needs no more.

Plaintiffs' proposal to provide the subset of core catalog-wide agreements addresses BHN's stated goal of discovering the revenue streams Plaintiffs derive from licensing agreements. At the same time, it will reduce the burden of collecting and producing the substantially greater number of agreements that, in the aggregate, account for only a small percentage of revenue—and many of which involve means of exploitation that bear no relationship to the infringing activity alleged here (*e.g.*, audiovisual exploitations, streaming agreements with airlines, or licenses to make vinyl records), such that they could not possibly have any bearing whatsoever on the issues in the case. This proposal would also substantially reduce the universe of implicated counterparties, thereby meaningfully reducing the burden associated with providing notice or seeking their consent.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court revise its January 9 order to (1) compel BHN to respond to Plaintiffs' Interrogatory No. 12, and (2) clarify that the required production in response to BHN RFP No. 8 is limited to copies of the core catalog-wide agreements that account for approximately 90 percent of each Plaintiff group's total U.S. audio download and streaming revenues.

## LOCAL RULE 3.01(G) CERTIFICATION

Plaintiffs' counsel conferred with BHN's counsel prior to the bringing of this motion, including through written correspondence on January 21, 2020. The parties have not been able to resolve the issues in this Motion.

Dated: January 22, 2020

Respectfully submitted,

 /s/ *Jeffrey M. Gould*
Matthew J. Oppenheim (*pro hac vice*)
Scott A. Zebrak (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com

Mitchell A. Kamin (*pro hac vice*)
Neema T. Sahni (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Jonathan M. Sperling (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

David C. Banker, Esquire
Florida Bar No. 0352977
Bryan D. Hull, Esquire
Florida Bar No. 020969
BUSH ROSS, P.A.
1801 North Highland Avenue
P.O. Box 3913
Tampa, FL 33601-3913

Telephone: (813) 224-9255
dbanker@bushross.com
bhull@bushross.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2020, I caused the foregoing document and all accompanying materials to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

Dated: January 22, 2020

                                                  /s/ *Jeffrey M. Gould*
                                                  Jeffrey M. Gould

                                                  *Attorney for Plaintiffs*