**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC., *et al.*,

      Plaintiffs,

    v.

                                   **Case No. 8:19-cv-710-MSS-TGW**

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.


**PLAINTIFFS' PARTIAL OBJECTION TO TWO DISCRETE RULINGS IN**
**MAGISTRATE JUDGE WILSON'S JANUARY 9, 2020 DISCOVERY ORDER**

This action is brought by major record companies and music publishers against one of the nation's largest internet service providers. Plaintiffs allege that Bright House Networks ("BHN") is contributorily and vicariously liable for infringement of their copyrighted sound recordings and musical compositions. For years, copyright owners sent BHN more than one hundred thousand notices that certain customers were using BHN's service to infringe. But BHN deliberately turned a blind eye to its subscribers' infringement and refused to take reasonable measures to curb its customers from infringing—even *after* it became aware of particular customers engaging in specific, repeated acts of infringement.

Discovery in this case is critical to unearth what BHN did and said behind closed doors. While BHN has publicly decried the impropriety of copyright infringement, the evidence suggests that internally BHN had a very different view of copyright infringement and its legal obligations. And yet BHN has aggressively sought to avoid discovery, including basic discovery to support claims that BHN has made in its defense. Discovery began in June 2019 and BHN has produced a mere *five* documents so far, compared to Plaintiffs' production of more than 100,000 documents.

Against that backdrop, Magistrate Judge Thomas G. Wilson held a hearing on January 8, 2020 on 18 separate issues raised in Plaintiffs' and BHN's respective motions to compel.  On January 9, he granted-in-part and denied-in-part both motions, with rulings on all 18 issues.  ECF No. 93.  Plaintiffs' respectfully lodge objections to two portions of that order—one in full and one to clarify the scope of the order.  Both rulings are clearly erroneous and contrary to law.

*First*, Plaintiffs request that the Court reverse the denial of Plaintiffs' motion to compel BHN to state the number of subscribers terminated for non-payment during the claim period.  *Id.* at ¶ 1.b.  By his own admission, Judge Wilson did not understand the argument for why this information is necessary and discoverable, and he cut off Plaintiffs' attempt to explain it.  The discovery is directly relevant to at least two issues:  Plaintiffs' vicarious liability claim (*i.e.*, BHN's ability to control infringement by terminating subscribers), and to rebut BHN's oft-repeated defense that internet service is so essential to its customers that it does not terminate service lightly.  The requested discovery will demonstrate the extent to which BHN refused to terminate internet service of known repeat infringers when it was in BHN's financial interest to keep those subscribers, while readily terminating subscribers for non-payment.  Two other courts presiding over virtually identical cases against other internet service providers, found the requested information discoverable.  One of those cases has already proceeded to trial and the district court judge found the information passed the even higher threshold of admissibility.  At a minimum, it is discoverable here too.

*Second*, Plaintiffs request that the Court narrow the overbroad order requiring Plaintiffs to produce a vast swath of competitively sensitive licensing and distribution agreements that have nothing to do with this case and would be disproportionately burdensome—and, in fact, virtually impossible—to identify, collect, review and produce.  *Id.* at 2.c.  Although Plaintiffs have elected

statutory damages, BHN claims to need the agreements to conduct an actual damages analysis (that cannot be done using those agreements). Judge Wilson refused to consider Plaintiffs' detailed burden declarations, ignored the proportionality requirement and the unimportance of the information sought, and authorized what he himself characterized as a "fishing expedition." Plaintiffs propose below a pragmatic approach to resolving this dispute that would still provide BHN with more than sufficient discovery to conduct its supposed damages analysis, while balancing the disproportionate burden imposed by the order, as Judge Wilson refused to do.[1]

## BACKGROUND

Plaintiffs are record companies and music publishers that produce, manufacture, distribute, sell, and license commercial sound recordings and musical compositions. ECF No. 94 ("First Amended Complaint" or "FAC") ¶ 1. Through enormous investments of money, time, and creative effort, Plaintiffs—and the recording artists and songwriters they represent—have developed and marketed some of the world's most famous and popular music. *Id.* Collectively, Plaintiffs own or control the copyrights to millions of musical compositions and sound recordings, which is one of their primary sources of income. *Id.* ¶ 12. Defendant BHN is one of the largest internet service providers in the country.

This case concerns BHN's contributory and vicarious liability for its knowing, willful, and extensive contribution to, and profiting from, the massive infringement of Plaintiffs' copyrighted works through BHN's network. The claims involve BHN's continued provision of internet service to known, repeat infringers.

---

[1] The two issues raised in this objection are also the subject of Plaintiffs' narrow motion asking Judge Wilson to reconsider the same rulings. ECF No. 101. Plaintiffs have timely filed the instant objection to preserve their rights. Should Judge Wilson grant Plaintiffs' motion to reconsider as to either or both of the issues raised here, Plaintiffs will promptly notify the Court and withdraw their objection as appropriate.

BHN maintains an acceptable use policy that prohibits use of its network for, *inter alia*, copyright infringement.   BHN also maintains terms and conditions of service that require customers to pay their monthly subscription fees.   Its policies provide that a customer's service may be terminated for violation of either condition.   In defending against Plaintiffs' claims, BHN contends that terminating a customer's internet service for repeatedly infringing copyrights would be a "draconian measure" with "dramatic impact" on customers given the importance of internet access in the modern world.   ECF No. 82 at 9.   BHN thus claims that internet service is too vital to be disrupted or disconnected lightly.

### A.  Plaintiffs' Discovery Requests

Plaintiffs served interrogatories on June 10, 2019 and BHN responded on July 10.   Exs. A-B.[2]   The parties then exchanged letters and conferred by teleconference on BHN's objections but could not resolve their disputes over many issues.   On November 22, Plaintiffs moved to compel responses to a number of document requests and interrogatories.   ECF No. 74.   On January 8, 2020, Judge Wilson held a hearing on 18 separate issues raised in Plaintiffs' and BHN's respective motions to compel.   Ex. G (Hr'g Tr.)   On January 9, 2020, Judge Wilson issued an order granting-in-part and denying-in-part both motions, with rulings on all 18 issues.   ECF No. 93.   Relevant to this request, Judge Wilson denied Plaintiffs' motion to compel a response to Interrogatory No. 12, seeking the number of subscribers whose internet service BHN terminated for non-payment during the claim period.   *Id.* at ¶ 1.b.

BHN has produced a mere *five* documents in seven months of discovery to date, while Plaintiffs have produced more than 100,000 documents.   Gould Decl. ¶ 3.

---

[2] All exhibits cited are attached to the Declaration of Jeffrey M. Gould, filed in connection with this objection.

### B.    BHN's Discovery Requests

BHN served its first set of document requests on June 25, 2019 and Plaintiffs served responses on July 25.  Exs. C-D.  The parties thereafter exchanged letters and conferred by teleconference on objections but could not resolve their disputes over many issues.  On October 23, 2019, BHN moved to compel further responses to 19 overbroad requests.  ECF No. 64.  Judge Wilson denied the motion without prejudice on October 30 for failing to comply with local rules, overbreadth and vagueness.  ECF No. 66.  BHN then purported to narrow certain requests, but the practical scope of the requests was not narrowed in any meaningful way and remained objectionable.  Exs. E-F.  BHN filed another motion to compel on November 27.  ECF No. 80. Following the same January 8 hearing on both parties' motions, Judge Wilson granted-in-part and denied-in-part BHN's motion.  ECF No. 93.  Relevant to this objection, Judge Wilson granted BHN's motion to compel a vastly overbroad swath of license and distribution agreements in response to RFP No. 8 that have little to no bearing on any issue in the case.  *Id.* at ¶ 2.c.

### LEGAL STANDARD

A non-dispositive order by a magistrate judge may be reversed by the district court if, as here, the order is clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a).  An order is "clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definitive and firm conviction that a mistake has been committed." *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350-52 (11th Cir. 2005) (citation omitted).  A magistrate judge's order "is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Palma v. Fla. Neurological Ctr., LLC*, No. 5:10-CV-117-OC-34TBS, 2011 WL 6153423, at *2 (M.D. Fla. Dec. 12, 2011).

**ARGUMENT**

**I.    Terminations for non-payment are highly relevant to BHN's defense, Plaintiffs' vicarious liability claim, and willfulness and damages.**

Judge Wilson's denial of discovery concerning the number of subscribers whose internet service BHN terminated for non-payment is clearly erroneous and contrary to law because the information sought is highly relevant to one of BHN's core defenses, to Plaintiffs' vicarious liability claim, and to willfulness and damages.

Plaintiffs' Interrogatory No. 12 sought the following:

INTERROGATORY NO. 12:   State the number of Subscribers, per month and year, whose internet service you terminated for failing to pay amounts owing on the Subscriber's account.

OBJECTIONS: Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, and to the extent this request seeks information outside the Discovery Period. Bright House further objects to this request because it is unduly burdensome and unnecessarily duplicates other discovery requests that Plaintiffs have propounded, including FRP Nos. 2 and 15. Bright House reserves its right to respond to this interrogatory pursuant to Fed. R. Civ. P. 33(d).

**A.    Non-payment terminations are relevant to BHN's defense.**

Notwithstanding BHN's boilerplate objections, the information sought is *directly relevant to one of BHN's core defenses*.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.").  When Plaintiffs attempted to explain their argument, Judge Wilson said, "I don't understand the argument."  Ex. G at 24-26.  He then repeatedly cut-off Plaintiffs' attempt to clarify, issued his ruling, and admonished Plaintiffs to move on to the next issue.  *Id*. Plaintiffs therefore set forth below the argument they were foreclosed from delivering at the hearing and which demonstrates the clearly erroneous nature of the ruling.

Plaintiffs contend that BHN is liable for the continued provision of internet service to known infringing subscribers.  In defense, BHN has argued that terminating customers' internet

service for repeated instances of copyright infringement would be a "draconian measure" with "dramatic impact" on customers given the importance of internet access in the modern world.  ECF No. 82 at 9.  According to BHN, this "dramatic impact" is "focused on the human cost of losing access to a basic utility, internet access, that is fundamental to how we function in society."  *Id.*  In other words, BHN claims that internet service is too vital to be disrupted or disconnected for copyright infringement.

In its motion to dismiss, BHN made the same argument.  It stated that its "only ability to prevent or limit any infringement occurring on its network stems from its technical ability to 'suspend or terminate a customer's [i]nternet access.'"  ECF No. 32 at 5.  But it cannot reasonably be expected to do so because "in the modern world disconnecting a subscriber's internet access is a drastic remedy" that would impact its customers' access to employment, education, entertainment, health care resources, and even civic participation.  ECF No. 32 at 5 n.2; ECF No. 99 at 3, 5 n.3.  BHN thus claims it does not terminate internet access lightly because such access "is critical for individuals in contemporary society."  ECF No. 32 at 12 n.3; ECF No. 99 at 18 n.7.

Having made these assertions, BHN has put directly at issue how it treats that allegedly "critical" internet access when its customers' behaviors contravene BHN's financial interests (*i.e.*, non-payment), particularly compared to its treatment of that "critical" access when other behaviors harm Plaintiffs but remain lucrative for BHN (*i.e.*, infringement).  In order to test BHN's assertion that terminating a customer's internet service is a drastic remedy that it avoids—such that it should not reasonably be expected to terminate subscribers it knows are using the service to infringe repeatedly—Plaintiffs are entitled to know how many subscribers' internet service BHN terminated for non-payment during the claim period.  They are also entitled to know the extent to which BHN took its subscribers need to access this supposedly essential utility into account when

BHN's revenue is at risk.  Judge Wilson adopted this logic in granting Plaintiffs' motion to compel discovery on the number of BHN subscribers, so Plaintiffs could test BHN's claim that only a small portion infringed.  Ex. G at 17-18.  The logic of that correct ruling applies equally here—the discovery sought in both instances bears directly on BHN's defenses.

Two other courts faced with the same interrogatory in virtually identical cases (where both defendants are represented by the same counsel as BHN) found the number of non-payment terminations relevant and discoverable.  Ex. H at 10-11 (Jan. 25, 2019 *Cox* Tr., ordering Cox to answer same interrogatory); Ex. I at 17:2-6, 18:21 (Dec. 17, 2019 *Charter* Tr.).[3]  This Court should rule that way also.

In *Cox*, the discovery provided was telling, and deeply undermined Cox's claim that it would not terminate internet access lightly.  During the two-year period at issue in that case, Cox terminated just 32 subscribers for copyright violations but more than *600,000 subscribers* for non-payment.  When Cox, represented by the same counsel representing BHN here, argued in its opening statement that it could not be expected to terminate internet access for copyright violations given its critical place in the modern world, the court admitted the evidence plaintiffs had adduced on non-payment terminations as relevant to rebut Cox's argument.  Ex. J at 132-135 (*Cox* Tr.).  This is exactly the same scenario here.  Having passed the higher threshold of *admissibility* in *Cox* to rebut the argument, certainly the same information is at least *discoverable* at this stage here.[4]

---

[3] While the Charter court observed that, in a vacuum, the number of non-payment terminations would not be relevant, it recognized that the information is discoverable to rebut the same argument BHN makes here and to demonstrate the right and ability to control infringement by terminating service. Ex. I at 17:2-6, 18:21.  The court thus found the information discoverable and provided Charter an opportunity to investigate whether providing the information by month (rather than by year) would be unduly burdensome.  *Id.* at 15:11-16:8.  Tellingly, Charter dropped its burden objection.

[4] Prior to this ruling, the *Cox* court conditionally granted a motion in limine to exclude non-payment terminations from trial "unless Cox suggests that they terminate lots of customers for (continued…)

The manner in which this evidence was used at the *Cox* trial is also illuminating.  Cox put on an affirmative witness describing its policy and procedure for non-payment terminations, including its aggressive pursuit of payments, repeated collection calls, emails and text messages to customers, sending collection agents to customers' homes, and terminating service after 30 days.  Ex. J at 2723:1-2726:2 (*Cox* Tr.).  On cross examination, the *Cox* plaintiffs contrasted (1) Cox's aggressive procedures and massive number of non-payment terminations, with (2) Cox's toothless procedures for addressing copyright violations and non-existent terminations.  Ex. K (*Cox* trial demonstrative); Ex. J at 2754:6-2759:13 (*Cox* Tr.).  This was compelling evidence that undermined Cox's "drastic measure" argument.  A jury is entitled to weigh this evidence in determining whether to reject BHN's argument that the allegedly "drastic" remedy of terminating repeat infringers is unreasonable—just as the *Cox* jury rejected that argument.

Judge Wilson repeatedly referred to the scope of potential damages as a basis for granting BHN's discovery requests.  The same logic should apply here.  Plaintiffs should not be foreclosed from important discovery concerning a key BHN defense when Plaintiffs have alleged massive infringement on BHN's network and the defense concerns both liability and the scope of damages.

### B.    Non-payment terminations are relevant to vicarious liability.

BHN's non-payment terminations are also relevant to Plaintiffs' vicarious liability claim, particularly BHN's right and ability to control the infringing activity.  BHN disagrees and claims, as the Court noted, that terminations for non-payment and copyright violations are "apples and oranges."  Frankly, BHN's argument misses the point, and ignores the probative value of this

---

cause." *Sony Music Entm't. v. Cox Commc'ns. Inc.*, No. 1:18-cv-00950-LO-JFA (E.D. Va.), ECF No. 590 at 5.  When Cox then made the same argument that BHN makes here—namely, that it does not terminate lightly given the importance of internet access to modern life—the court expanded the conditions for exclusion and admitted the evidence.

evidence on Plaintiffs' vicarious liability count.  In determining whether a defendant has the right and ability to control infringing activity courts look to whether the defendant could and did take action against violations of its policies—including those that are *not* related to infringement.  *See Arista Records, Inc. v. Usenet*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) (the ability to block users for "any reason whatsoever" is "evidence of the right and ability to supervise" infringing activities) (internal quotes omitted); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00-CV-4660 (SHS), 2002 WL 1997918, at *11 (S.D.N.Y. Aug. 29, 2002) (same).

Both *Usenet* and *MP3Board* show that courts find a direct correlation between (i) a defendant's ability to control (and actual control of) its users' violations of other terms or policies, such as non-payment, hacking or spam, and (ii) its right and ability to control its users' infringing activities.  Thus, if BHN regularly terminated the accounts of subscribers for non-payment or other misconduct as it had the right to pursuant to its terms, then it could have done the same for subscribers it knew repeatedly infringed copyrights.  The *Charter* and *Cox* courts agreed.  *E.g.*, Ex. I at 18:21 ("[Y]ou want to use it to show abilities, I understand that. And so we'll do that . . .").  BHN is free to argue to a jury that the weight to be afforded different types of terminations is low because the discretionary considerations differ, but that should not foreclose discovery on other terminations.

### C.    Non-payment terminations are relevant to willfulness and damages.

BHN's termination of subscribers' accounts for non-payment is also relevant to willfulness and damages considerations.  It would demonstrate to a jury the extent to which BHN turned a blind eye to infringement when it was in its financial interest to do so (insofar as infringing subscribers continue to generate revenue for BHN), while readily terminating subscribers for non-payment.  When considering BHN's willfulness and statutory damages, a jury should be able to compare the number of subscribers BHN terminated for copyright infringement against the number

of subscribers it terminated for failure to pay for service.

\*   \*   \*

A revised order compelling BHN to answer Interrogatory No. 12 is needed to correct clear error.  Without this important discovery, Plaintiffs will be unfairly prejudiced in testing a key defense that BHN has already put forward and in putting forth its affirmative case.

## II.     The Order to produce *all* license and distribution agreements for more than 7,500 works flouts proportionality and expressly authorizes a "fishing expedition" into irrelevant, burdensome and overbroad discovery.

The order requiring Plaintiffs to produce "all" license and distribution agreements for more than 7,500 individual works is clearly erroneous and contrary to law.  Plaintiffs submitted detailed declarations establishing the nature and extent of the burden associated with these requests, including the manual and uncertain prospect of compliance.  *See* Abitbol Decl. ¶ 11; Leak Decl. ¶ 14; McMullan Decl. ¶ 14; Blietz Decl. ¶ 12; Flott Decl. ¶ 14 (ECF Nos. 83-1, 83-3 through 83-6). By his own admission, however, Judge Wilson ignored the declarations, accusing Plaintiffs of using them to get around page limits and conceding that he "didn't read any of them."  Ex. G at 90:11-91:2. Judge Wilson likewise expressly refused to consider the proportionality of the information sought to the needs of the case, and instead authorized what he himself characterized as a "fishing expedition."  *See id.* at 84:6-8 (Judge Wilson stating that "of course it is" a "fishing expedition"), 100:4-11 (Judge Wilson authorizing the discovery nonetheless).  In his view, the potential for large damages under Congress' statutory damages scheme means "you're entitled to fish" and "the proportionality test sort of falls by the wayside," *id.* at 100:4-11, 88:7-9, without regard to "the importance of the discovery in resolving the issues."  Fed. R. Civ. P. 26(b)(1).

Judge Wilson's disregard for Plaintiffs' burden declarations, refusal to meaningfully assess proportionality, and express authorization of a fishing expedition are clear errors and contrary to law.  *See Porter v. Ray*, 461 F.3d 1315, 1324 (11th Cir. 2006) (affirming district court's denial of

discovery because "the discovery rules do not permit [a party] to go on a fishing expedition");

*Tiger v. Dynamic Sports Nutrition, LLC*, No. 6:15-CV-1701-Orl-41TBS, 2016 WL 1408098, at *2

(M.D. Fla. Apr. 11, 2016). ("Proportionality *requires . . .* the court to consider whether relevant

information is discoverable" starting with "a consideration of how and to what degree the

requested discovery bears on [the] claims and defenses") (emphasis added, internal quotation

omitted); *Am. Beverage Ass'n v. City & Cty. of San Francisco*, 871 F.3d 884, 897 (9th Cir. 2017),

affirmed on reh'g en banc, 916 F.3d 749 (9th Cir. 2019) (the "district court erred," and thus abused

its discretion, by disregarding an affidavit in support of preliminary injunction request).

Against this backdrop, the Court granted BHN's request to compel "[a]ll distribution and/or

license agreements" sought by supposedly narrowed RFP No. 8:

**ORIGINAL RFP NO. 8**: All documents concerning any licenses, assignments, and/or grant or transfer of rights of the copyrights that You claim cover(ed) the Copyright Works for any of the last ten (10) years, including copies of agreements reflecting such licenses, assignments, and/or grant or transfer of rights.

**NARROWED RFP NO. 8**: All distribution and/or license agreements entered during the Claim Period or governing the Copyright Works during the Claim Period, including any agreement(s) pertaining to digital streaming and downloading with YouTube, Apple Music and iTunes, Amazon Unlimited, Prime Music, Pandora, Google Play, Vevo, Dailymotion, Qello, and/or Vimeo or any agreements providing for a tiered pricing structure based on the value of any Copyright Works during the Claim Period, and documents sufficient to identify all licensing fees and/or royalties for the Copyright Works during the Claim Period.

**OBJECTIONS**: Plaintiffs object to this request's call for "all documents concerning any licenses, assignments, and/or grant or transfer of rights" as overly broad, not proportional to the needs of the case, and therefore unduly burdensome. The request for "all documents" is in and of itself overly broad and not proportional to the needs of the case. In addition, the request seeks documents concerning any and all licenses, assignments, and/or grants or transfers of rights of the copyrighted works-in-suit, without regard to whether such assignments have any bearing on issues in this case, and Plaintiffs therefore object on relevance grounds, and on the grounds that the request is vague and ambiguous in its reach. Moreover, "grant or transfer of right" is vague and ambiguous. Plaintiffs also object to the part of this request pertaining to agreements as irrelevant. Bright House has no legitimate need for copies of all agreements reflecting licenses, agreements, and/or grants or transfers of rights of the copyrighted works. Plaintiffs' agreements contain extremely sensitive and confidential business and proprietary information. The very high potential for prejudice to Plaintiffs and nonparties significantly outweighs the marginal, if any, relevance such agreements could have to this case.

**RESPONSE**: Subject to the foregoing objections, upon entry of an appropriate protective order, Plaintiffs will produce responsive, non-privileged documents in their possession, custody, or control sufficient to demonstrate that Plaintiffs are the legal and/or beneficial owners of an exclusive right under copyright to their respective copyrighted works-in-suit, to the extent such documents can be located following a reasonable and diligent search.

The current order would require Plaintiffs to identify and produce every possible license for each of more than 7,500 copyrighted works. This would extend from catalog-wide agreements that are not specific to individual works, to individual licenses involving everything from television and advertising usage to inclusion in greeting cards.

Though Plaintiffs have elected statutory damages, BHN claims it needs this discovery to conduct an actual damages analysis of Plaintiffs' lost revenue caused by the infringement. Of course, that analysis cannot be done using the agreements. Aside from a conclusory statement that the pricing information contained in these documents is "highly relevant to the valuation of the works-in-suit," ECF No. 80 at 13, BHN makes no attempt to explain why these sensitive agreements are relevant to a computation of actual damages. The agreements set forth the terms of licenses and distribution arrangements that Plaintiffs have granted for the *lawful* use of Plaintiffs' works in limited circumstances. They have no bearing on the financial harm caused to Plaintiffs by the kind of unfettered, viral infringement at issue in this case.

While Plaintiffs respectfully disagree that the requested agreements have any relevance to BHN's professed need to conduct an actual damages analysis, this appeal is limited to the scope of the order only. Judge Wilson repeatedly admonished Plaintiffs for serving requests for "all" documents in a given category, yet BHN's RFP No. 8 does just that and was nonetheless granted in full. It is the potential overbreadth of this request that is problematic, particularly given the disproportionate burden it imposes and minimal relevance of the information sought—all of which Judge Wilson ignored. Plaintiffs therefore propose below a pragmatic approach to resolving this issue that still provides BHN with more than sufficient discovery to conduct the claimed damages

analysis, while rationally balancing the disproportionate burden imposed by the current order.

***Proposed Revised Order.*** The overwhelming majority of Plaintiffs' download and streaming revenues derive from a small number of catalog-wide, high-value agreements. Given this, the burdens described below, and the limited relevance of the information sought, Plaintiffs propose that, in lieu of producing *all* licensing and distribution agreements, Plaintiffs would produce copies of the core catalog-wide agreements, in terms of revenue derived therefrom, which collectively account for approximately 90 percent of each Plaintiff group's total U.S. audio-only download and streaming revenue—that is, each Plaintiff group (*e.g.*, Sony Music, Warner Music, etc.) would produce approximately its top 10 to 20 deals.

### A. Most licensing and distribution agreements have nothing to do with the peer-to-peer infringement at issue here and producing them would be unduly burdensome.

This more limited production is warranted because most of the requested agreements have no bearing on Plaintiffs' lost sales or lost revenue caused by unlawful copying and distribution of their works through BHN's network. Each sound recording or composition may be the subject of hundreds of different kinds of licenses (multiplied by thousands of works in suit), ranging from licenses for use in advertisements, movies, video games, sound recordings, television and other ancillary uses (even into greeting cards and toys). It is difficult to see any relevance, for example, to the terms on which a Plaintiff licensed a sound recording for use in the closing credits of a movie ten years before the infringement at issue by BHN's subscribers. None of these "one-off" agreements provides any information regarding the value of the lost downloads or streams Plaintiffs would have obtained if not for the infringing conduct of BHN's subscribers. The request even includes agreements with audio-visual service providers like Vimeo or Vevo (which primarily offer streaming of music videos), though Plaintiffs' claims relate only to the illegal uploading and downloading of audio-only files.

— 14 —

The complexity and challenge of producing "all" distribution and/or licensing agreements that governed all 7,500 works during the claim period, regardless of when entered, cannot be overstated. Indeed, the burden to identify, collect and produce "all" agreements would be massive. Plaintiffs do not maintain master lists or databases that identify all agreements related to a particular sound recording or musical work. Different parts of each company could have responsibility for different types of license agreements, assignments, transfers or grants. And even within each department, there does not exist a master list or database that identifies all agreements relevant to a particular sound recording or musical work.

### B. Production of Plaintiffs' core catalog-wide download and streaming agreements is a reasonable compromise.

The only conceivable metric that could bear on Plaintiffs' actual harm from unlawful peer-to-peer copying and distribution pertains to downloading or streaming revenue. Plaintiffs have therefore endeavored in good faith to identify those catalog-wide license and distribution agreements in effect during the claim period that generate the overwhelming majority of U.S. audio and audio-visual downloading and streaming revenue. Based on their search efforts to date, the Plaintiffs have identified over 400 such catalog-wide agreements (including audio-visual agreements), with more than 800 other documents in amendments, modifications or extensions.[5]

The collection, review, and production of even these catalog-wide agreements alone would require substantial expenditures of employee time (and in at least one case, even cross-country travel given that the agreements are not always centrally stored in a single location). The amount

---

[5] In the *Cox* case, Plaintiffs made a proffer of their revenue collected per digital download, including the tiers (or in some cases averages) that BHN seeks here. Cox's damages expert used that information to perform the actual damages analysis BHN claims to need here, demonstrating alleged lost revenue caused by infringement. Though Plaintiffs here have offered to provide a similar proffer to BHN—which BHN outright rejected—and no more is needed, Plaintiffs' proposed revised order would give BHN significantly more information.

of time varies by Plaintiff group, and for some would require up to a week of employee time to sort through potentially responsive materials, diverting such employees from their regular business responsibilities.  And this is just for the catalog-wide agreements, not the hundreds or thousands of one-off agreements that have nothing to do with downloading or streaming revenue.  The burden involved far outweighs any arguable relevance of the full set of agreements.

While there is some overlap in counterparties to these catalog-wide agreements among the various Plaintiff groups, these hundreds of agreements involve at least 175 separate counterparties—not to mention the substantially more counterparties implicated if one were to add in all one-off agreements, as the request seeks.  This substantial number of contractual counterparties is critical to understanding the burden associated with producing them.  The agreements contain some of the most highly sensitive commercial information in the music industry, and, are therefore generally subject to confidentiality provisions requiring notice and an opportunity for each of those 175-plus counterparties to object to disclosure.  Providing notice and an opportunity to object to 175-plus counterparties will be burdensome and time-consuming, to the say the least.  The proposal above would lessen that burden while still resulting in the production of the core catalog-wide agreements that generate approximately 90 percent of Plaintiffs' audio download and streaming revenue.  BHN needs no more.

Plaintiffs' proposal to provide the subset of core catalog-wide agreements addresses BHN's stated goal of discovering the revenue streams Plaintiffs derive from licensing agreements.  At the same time, it would reduce the burden of collecting and producing the substantially greater number of agreements that, in the aggregate, account for only a small percentage of revenue—and many of which involve means of exploitation that bear no relationship to the infringing activity alleged here (*e.g.*, audiovisual exploitations, streaming agreements with airlines, or licenses to make vinyl

records), such that they could not possibly have any bearing whatsoever on the issues in the case. This proposal would also substantially reduce the universe of implicated counterparties, thereby meaningfully reducing the burden associated with providing notice or seeking their consent.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court reverse the January 9 Discovery Order, in part, by (1) compelling BHN to respond to Plaintiffs' Interrogatory No. 12, and (2) clarifying that the required production in response to BHN RFP No. 8 is limited to copies of the core catalog-wide agreements that account for approximately 90 percent of each Plaintiff group's total U.S. audio-only download and streaming revenues.

## LOCAL RULE 3.01(G) CERTIFICATION

Plaintiffs' counsel conferred with BHN's counsel prior to the bringing of this motion, including through written correspondence on January 21, 2020.  The parties have not been able to resolve the issues in this Motion.

Dated: January 23, 2020                    Respectfully submitted,

                                           /s/ *Jeffrey M. Gould*
                                           Matthew J. Oppenheim (*pro hac vice*)
                                           Scott A. Zebrak (*pro hac vice*)
                                           Jeffrey M. Gould (*pro hac vice*)
                                           OPPENHEIM + ZEBRAK, LLP
                                           4530 Wisconsin Ave. NW, 5th Fl.
                                           Washington, DC 20016
                                           Telephone: (202) 621-9027
                                           matt@oandzlaw.com
                                           scott@oandzlaw.com
                                           jeff@oandzlaw.com

                                           Mitchell A. Kamin (*pro hac vice*)
                                           Neema T. Sahni (*pro hac vice*)
                                           COVINGTON & BURLING LLP
                                           1999 Avenue of the Stars, Suite 3500
                                           Los Angeles, CA 90067-4643
                                           Telephone: (424) 332-4800
                                           mkamin@cov.com
                                           nsahni@cov.com

                                           Jonathan M. Sperling (*pro hac vice*)
                                           COVINGTON & BURLING LLP
                                           The New York Times Building
                                           620 Eighth Avenue
                                           New York, NY 10018-1405
                                           Telephone: (212) 841-1000
                                           jsperling@cov.com

                                           David C. Banker, Esquire
                                           Florida Bar No. 0352977
                                           Bryan D. Hull, Esquire
                                           Florida Bar No. 020969
                                           BUSH ROSS, P.A.
                                           1801 North Highland Avenue
                                           P.O. Box 3913
                                           Tampa, FL 33601-3913
                                           Telephone: (813) 224-9255
                                           dbanker@bushross.com
                                           bhull@bushross.com

                                           *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2020, I caused the foregoing document and all accompanying materials to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

Dated: January 23, 2020

/s/ *Jeffrey M. Gould*
Jeffrey M. Gould

*Attorney for Plaintiffs*