**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC., *et al.*,

      Plaintiffs,

v.

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.

Case No. 8:19-cv-00710-MSS-TGW

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'**
**FIRST AMENDED COMPLAINT AS TO THE CLAIM FOR VICARIOUS LIABILITY**

---

## PRELIMINARY STATEMENT

Between 2012 and 2016, thousands of subscribers to Bright House Networks, LLC ("BHN") illegally distributed Plaintiffs' music through online file-sharing programs like BitTorrent, with some users pirating hundreds of Plaintiffs' songs.  Pursuant to the Digital Millennium Copyright Act ("DMCA"), Plaintiffs regularly and consistently provided BHN with detailed notice of this activity, including which subscriber accounts were implicated.  Despite knowing of this infringement—and having both the legal right and practical ability to stop it—BHN did nothing to stem its users' illegal conduct.  The reason for BHN's refusal to act is simple: by tolerating users' infringement, BHN reaped millions of dollars in subscription fees that it would otherwise have lost if it terminated infringing users' accounts.

Plaintiffs brought this action to hold BHN responsible not, as BHN contends, "for merely providing internet access," (Mot. at 14), but for engaging in conduct that gives rise to textbook secondary liability under the Copyright Act.  Indeed, BHN concedes that Plaintiffs have adequately pled a claim for contributory infringement under the Copyright Act and moves to dismiss only Plaintiffs' claim for vicarious infringement.  The Court should deny the motion because Plaintiffs have more than adequately pled both elements of a vicarious infringement claim: that BHN has the right and ability to control its users' infringing activity, and that it receives a direct financial benefit from such infringement.

*First*, BHN unquestionably has the right and ability to control its users' infringing conduct.  As every court that has considered the issue has concluded, internet service providers ("ISPs"), like BHN, can stop or limit their users' infringing conduct by terminating their internet accounts.  Contrary to BHN's suggestion, it is immaterial that BHN cannot prevent its users from accessing infringing material through *other ISPs* after it terminates their accounts with BHN.

1

Liability obtains if a defendant can stop *or limit* infringing conduct, which BHN can do by terminating users' internet access *through BHN*.  Similarly, it is immaterial whether terminating accounts is a "drastic" remedy, as BHN suggests.  (*Id.* at 5 n.1.)  In passing the DMCA, Congress clearly stated that it *expected* ISPs to impose such a remedy under appropriate circumstances if an ISP was made aware that its users were repeatedly engaging in infringement.

*Second*, Plaintiffs' allegations are more than sufficient, at the pleading stage, to show BHN's receipt of a direct financial benefit.  Plaintiffs' First Amended Complaint ("FAC") advances two theories of benefit, both of which state a claim for relief.  First, Plaintiffs allege that BHN receives a direct financial benefit because certain of its users are drawn to its service by the availability of infringing content.  As the FAC sets forth, BHN has sought to draw users to its service by touting specific features of that service that are attractive to copyright infringers, including fast internet speeds that allow users to "download and upload large amounts of content, including music, in seconds."  (FAC ¶ 74.)  The FAC further alleges that users have utilized these speeds to pirate Plaintiffs' works *over a hundred thousand times*.  These allegations, and others, permit the reasonable inference that at least *some* BHN users are attracted to its service by the ability to infringe Plaintiffs' works, which is all that is required to state a claim.

Contrary to BHN's arguments, demonstrating "draw" is not the only way to satisfy the financial benefit prong.  Separate and apart from that, Plaintiffs have alleged that BHN also receives a direct financial benefit from subscription fee revenues that BHN collects from known repeat infringers whose accounts it refused to terminate.  By tolerating such repeated acts of infringement, BHN increases its revenue, pocketing substantial subscription fees each month that BHN would otherwise have lost if it properly terminated infringing users.  Because BHN has "an economic incentive to tolerate infringing conduct," it reaps a direct financial benefit from such

infringement, as other courts have expressly recognized.  *See, e.g.*, *Capitol Records, LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015).

Recent decisions in similar cases confirm the sufficiency of Plaintiffs' allegations.  In *Warner Bros. Records, Inc. v. Charter Communications, Inc.*, 2019 WL 5387099 (D. Colo. Oct. 21, 2019), Magistrate Judge Hegarty of the District of Colorado recommended denying an ISP's motion to dismiss a vicarious infringement claim based on allegations that BHN concedes are strikingly similar to those at issue here.  *See id.* at *4-7.  And in *Sony Music Entertainment v. Cox Communications, Inc.*, No. 1:18-cv-950 (E.D. Va.) ("*Sony*"), Judge O'Grady of the Eastern District of Virginia not only denied a motion for summary judgment seeking to dismiss a vicarious infringement claim similar to Plaintiffs', but a jury recently found the ISP-defendant liable for vicarious infringement on precisely the same theories.  *See Sony*, Dkt. Nos. 586, 669. *Sony* is particularly instructive because the plaintiffs' vicarious infringement claim was based primarily on the ISP-defendant's collection of hundreds of millions of dollars in subscription fees *after failing* to terminate known repeat infringers, thereby confirming that "draw" is unnecessary for proving a vicarious infringement claim.  *See Sony*, Dkt. No. 396, at 33.

For these and other reasons, BHN's motion, (Dkt. No. 99), should be denied.

## FACTUAL BACKGROUND

Plaintiffs are record companies and music publishers that produce, distribute, sell, and license commercial sound recordings and musical compositions.  (FAC ¶ 1.)  Through enormous investments of money, time, and creative effort, Plaintiffs—and the recording artists and songwriters they represent—have developed and marketed some of the world's most popular music.  (*Id.*)  Collectively, Plaintiffs own or control the copyrights to millions of musical compositions and sound recordings, which is one of their primary sources of income.  (*Id.* ¶ 12.)

3

In recent years, Plaintiffs' interest in—and exclusive right to reproduce and distribute—their copyrighted works has come under increasing attack from online peer-to-peer file-sharing programs, like BitTorrent.  (*Id.* ¶¶ 77-79.)  BitTorrent is a file-sharing protocol that allows users to transfer music and other files directly to one another over the internet.  Although peer-to-peer file sharing is nothing new, what makes BitTorrent unique is that it allows users to download files from multiple "peers" at once—even peers who possess only a small piece of the file.  (*Id.* ¶ 79.)  The efficiencies gained from this type of file-sharing protocol have led to an explosion in online piracy.  A January 2011 report, for example, estimates that 11.4% of all internet traffic at the time involved the unauthorized distribution of copyrighted works through BitTorrent.  (*Id.* ¶ 80.)  Plaintiffs' own copyrighted works have been distributed millions of times through BitTorrent, depriving Plaintiffs of untold millions of dollars.  (*Id.* ¶ 89.)

Defendant BHN is one of the largest internet service providers ("ISPs") in the country.  (*Id.* ¶ 2.)  BHN provides high-speed internet service to its customers in exchange for monthly subscription fees, with higher download speeds available for higher monthly fees.  (*Id.* ¶¶ 2, 73.)

As set forth in Plaintiffs' FAC, BHN seeks to draw subscribers to its high-speed internet service—including subscribers who wish to download and distribute music illegally through programs like BitTorrent—by touting fast internet speeds that allow users to "download and upload large amounts of content, including music, in seconds."  (*Id.* ¶ 74.)  Users, in turn, have utilized these speeds to pirate a "staggering" amount of Plaintiffs' works.  (*Id.* ¶¶ 77-78, 82.)  Between 2012 and 2015, for example, Plaintiffs and their representatives identified *over one hundred thousand* specific instances in which BHN subscribers utilized peer-to-peer file-sharing programs to distribute and copy Plaintiffs' songs illegally.  (*Id.* ¶ 82.)  Tens of thousands of these subscribers were *serial* infringers, with some users pirating *hundreds* of Plaintiffs' songs over the

course of several months.  (*Id.* ¶ 85.)

BHN's terms of service expressly prohibit users from engaging in copyright infringement and reserve to BHN the right to terminate users' accounts for participating in online piracy.  (*Id.* ¶ 86.)  Notwithstanding this policy, BHN has turned a blind eye to the rampant infringement that occurs over its network.  (*Id.* ¶ 87.)  Between 2012 and 2015, BHN ignored over a hundred thousand statutory infringement notices that Plaintiffs and others submitted to it, each of which detailed specific acts of infringement committed by specific BHN subscribers.  (*Id.* ¶¶ 82, 87.)

The reason for BHN's failure to act is simple: BHN derives significant income from the fees that its infringing users pay, and BHN does not want to lose the revenue it generates from these subscribers by terminating their accounts.  (*Id.* ¶ 88.)

Although not strictly necessary to the analysis, Plaintiffs allege that BHN's refusal to terminate subscribers acts as a further draw to its service, as users come to understand that they can download music illegally over BHN's network without fear that BHN will terminate their accounts.  (*Id.* ¶¶ 76, 88.)  BHN's conduct also encourages users to purchase more bandwidth from BHN and continue using—and paying subscription fees for—BHN's service.  (*Id.* ¶ 76.)

Given BHN's failure to respond appropriately to Plaintiffs' DMCA notices, Plaintiffs filed two claims, one for contributory infringement and one for vicarious infringement, based on BHN's refusal to curb repeat infringement over its network.  BHN concedes that Plaintiffs have adequately pled a claim for contributory infringement and moves to dismiss only Plaintiffs' vicarious infringement claim.  The Court should deny the motion.

## LEGAL STANDARD

To withstand a motion to dismiss, a complaint need only contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.*  Plausibility is not a

probability standard, and thus courts recognize that "a given set of actions may well be subject to

diverging interpretations, each [one] of which is plausible." *In re Zinc Antitrust Litig.*, 2016 WL

3167192, at *11 (S.D.N.Y. June 6, 2016).  When this occurs, "the Court may not choose between

two plausible inferences," *id.*, but must instead draw "all reasonable inferences . . . in favor of

the plaintiff." *St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1052 (M.D.

Fla. 2018).  In deciding a motion to dismiss, the Court is limited to the facts alleged in the

complaint, which it must construe in the light most favorable to the plaintiff.  *Grossman v.

Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000).[1]

## ARGUMENT

A defendant is vicariously liable for third parties' copyright infringement where it "has

the right and ability to supervise the infringing activity" and a "direct financial interest" in the

infringement. *M.L.E. Music Sony/ATV Tunes, LLC v. Julie Ann's, Inc.*, 2008 WL 2358979, at *3

(M.D. Fla. June 9, 2008).  Plaintiffs' FAC plausibly alleges both of these elements.

## I.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT BHN HAS THE RIGHT AND ABILITY TO SUPERVISE ITS USERS' INFRINGEMENT.

Plaintiffs have adequately pled the first element of a vicarious infringement claim: that

---

[1] BHN has asked the Court to take judicial notice of various facts in connection with its motion to dismiss that do *not* appear in the FAC.  (Dkt. No. 100.)  In doing so, BHN attempts an end run around the Rule 12(b)(6) standard by asking the Court to consider extrinsic evidence in support of its defenses and weigh that evidence against Plaintiffs' allegations.  There is no circumstance in which the Court could consider on this motion the *contents* of the documents to which BHN points and accept them as true.  Even when judicial notice is merited, "notice may be taken only to establish what [certain] documents contain, not the veracity of their contents." *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016); *see also Shahar v. Bowers*, 120 F.3d 211, 214 n.5 (11th Cir. 1997).  (*See* Dkt. No. 107, filed contemporaneously herewith.)

BHN has the right and ability to control its users' infringement by terminating their accounts.

It is well-established that the right and ability "to block infringers' access to a particular environment . . . is evidence of the right and ability to supervise." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001). Blocking access entails both "a legal right to stop or limit the directly infringing conduct" and "the practical ability to do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007). In the internet context, this means an ISP is liable for its users' infringement where it has the contractual right to "terminate accounts," *Escape Media*, 2015 WL 1402049, at *42, and the practical ability to "terminate, suspend or restrict users' subscriptions, thereby limiting their access to uploading or downloading," *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009).

BHN does not dispute (nor could it) that it has the *contractual right* to terminate users' accounts for engaging in infringement. (Mot. at 20.) Instead, BHN argues that it lacks the *practical ability* to limit infringing conduct by *exercising* this right and terminating users' accounts. (*Id.*) This argument is unavailing. As every court that has considered the issue has concluded, "[f]ile-sharing programs," like BitTorrent, "are completely dependent on the internet to facilitate the download or upload of files," and thus an ISP's termination of users' accounts necessarily "stops or limits" infringement. *BMG Rights Mgmt. (US) LLC v. Cox Commcn's, Inc.*, 149 F. Supp. 3d 634, 674 (E.D. Va. 2015). After all, "[w]ithout the internet, individuals cannot upload or download illegal content." *Id.* at 675; *see also UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018) ("[An ISP] can stop or limit the infringing conduct by terminating its subscribers' internet access.").

BHN concedes that it can block users' access to the internet *through BHN*, but contends that it lacks the ability to stop their infringement because it cannot prevent them from accessing

the internet through other means.  (Mot. at 20-21.)  This argument fails for multiple reasons.

*First*, BHN's argument misunderstands the scope of Plaintiffs' claim.  Plaintiffs are not seeking to hold BHN responsible for *any* act of infringement that occurs *anywhere* on the internet; rather, they are seeking to hold BHN liable for a discrete and historical set of infringing acts committed by *BHN subscribers over BHN's network*.  (FAC ¶ 5.)  BHN undoubtedly has the ability to stop or limit *these* infringing acts, which is all that is required to state a claim.

*Second*, even if users' ability to access infringing content through services other than BHN were relevant to the analysis, BHN's argument still fails, as courts have never required a defendant to be able to completely stop infringement in order to impose liability.  Instead, liability obtains as long as a defendant may "stop *or limit*" infringing conduct, including by making it more difficult.  *Amazon*, 508 F.3d at 1173 (emphasis added).  Here, BHN can plainly make infringement more difficult by blocking users' access to the internet through BHN, thereby eliminating a key tool that BHN users use to download music illegally.

*Third*, BHN ignores well-established case law rejecting the precise argument it advances.  In *Grande*, for example, the court held that an ISP had sufficient control over its users' infringing conduct because it could terminate their accounts, notwithstanding that some users could "obtain the service from another ISP."  2018 WL 1096871, at *10.  In *BMG*, the court similarly held that an ISP could control its users' conduct, notwithstanding that the ISP could not "exercise physical control" over users' actions over other networks.  149 F. Supp. 3d at 674-75.  These cases make clear that as long as an ISP can stop or limit infringing conduct through its own network, it satisfies the first element of a vicarious infringement claim.

BHN's cases are not to the contrary.  BHN cites *Amazon* for the proposition that an ISP's ability to "curtail some infringement . . . by terminating [users'] accounts" is "insufficient to

establish vicarious liability." (Mot. at 21 (citing 508 F.3d at 1174).) *Amazon*, however, says no such thing. In that case, the Ninth Circuit held that the search engine Google was not vicariously liable for certain websites' infringement because the most that Google could do to stop or limit the infringing conduct was to terminate its advertising relationships with the websites in question. 508 F.3d at 1173-74. Although terminating these advertising relationships might apply some economic pressure on the websites to stop infringing, the court held that Google ultimately lacked control because it could not block the websites' means of infringement. *Id.* In *Perfect 10, Inc. v. Visa International Service Association*, the Ninth Circuit similarly held that a defendant's exertion of "indirect economic pressure" is insufficient to state a vicarious infringement claim. 494 F.3d 788, 805 (9th Cir. 2007).

Here, by contrast, there is nothing indirect about BHN's relationship with its users or its ability to control its users' conduct. Unlike Visa and Google, BHN has the ability to restrict infringers' access to the very means of infringement by terminating their accounts. As the court explained in *BMG*, when an ISP "exercises its contractual right" to terminate an infringer's account, the ISP "blocks a direct infringer's access to the internet," precluding him "from participation in the infringing activity." 149 F. Supp. 3d at 674-75. Indeed, *Visa* acknowledged that if the defendant in that case could "block [infringers'] access to the Internet," liability would obtain. 494 F.3d at 804. The case law that BHN cites thus weighs against dismissal.[2]

*Finally*, BHN argues that terminating users' accounts is a "drastic remedy" that BHN should not be required to exercise in light of the internet's importance to its subscribers. (Mot. at

---

[2] BHN contends that *Amazon* and *Visa* turn on whether a defendant is a "closed system" or general purpose ISP. (Mot. at 21-22.) This is not true. To the extent that *Amazon* invoked the terminology of a "closed system," it was to note that such systems have the ability to block users' access to the environment in which infringement is occurring. BHN, too, has this ability.

5 n.2.)[3]  BHN does not and cannot cite to any authority for this proposition.  Indeed, BHN's flawed policy argument actually contradicts the public policy that Congress has established, as set forth in the DMCA.  The DMCA insulates an infringer like BHN from secondary liability only where an ISP has "reasonably implemented . . . a policy that *provides for the termination* in appropriate circumstances of subscribers . . . who are repeat [copyright] infringers."  17 U.S.C. § 512(i)(1)(A) (emphasis added).  The DMCA thus makes clear that, whether "drastic" or not, Congress *expects* ISPs to terminate users who engage in repeated acts of infringement.  BHN's arguments to the contrary are unavailing.[4]

## II.     PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT BHN RECEIVES A DIRECT FINANCIAL BENEFIT FROM ITS USERS' INFRINGEMENT.

Plaintiffs have also adequately pled that BHN receives a direct financial benefit from users' infringement, thereby satisfying the second element of a vicarious infringement claim.

### A.     *Plaintiffs' Allegations Permit the Reasonable Inference that BHN Receives a Direct Financial Benefit from Its Users' Infringement.*

A direct financial benefit exists whenever "there is a causal relationship between the infringing activity and any financial benefit a defendant reaps."  *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).  Such a relationship does not require a defendant to receive a financial benefit that is "tied directly to the sales of infringing goods."  *Arista Records LLC v.*

---

[3] Plaintiffs do not plead that terminating users' Internet access is a "drastic remedy."  BHN nonetheless asks the Court to take judicial notice of this fact based on select quotations from a few government websites.  (Dkt. No. 100, at 5-7.)  Putting aside the fact that the Court cannot take judicial notice of the *truth* of these statements, it bears emphasis that none of the websites in question states that terminating users' internet access is, in fact, a "drastic remedy."

[4] It should also be noted that nothing about the vicarious infringement test requires an ISP to terminate a user's account *immediately* after it receives a copyright infringement notice.  The test is not prescriptive in nature, and thus an ISP is entitled to offer its users a "carrot" to stop infringing before applying the "stick" of termination.  What an ISP may not do, however, is ignore specific and identifiable acts of infringement indefinitely, without *ever* taking steps to control them.  This is precisely what BHN has done.

*Lime Grp. LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011).  Rather, a benefit exists whenever (i) "the availability of infringing material acts as a 'draw' for [the defendant's] customers," *Napster*, 239 F.3d at 1023, or (ii) when the defendant "has an economic incentive to tolerate infringing conduct," *Escape Media*, 2015 WL 1402049, at *42.

      In an attempt to avoid liability, BHN repeatedly misstates the financial benefit standard.

      *First*, BHN contends that the *only* way for Plaintiffs to show a direct financial benefit is to show that BHN's subscribers were "draw[n]" to its service by the ability to infringe.  (Mot. at 8.)  That is simply not the law.  There are *multiple* ways to demonstrate a direct financial benefit, only *one* of which involves a "draw."  Here, Plaintiffs offer two theories of financial benefit: one based on allegations that users are drawn to BHN's service by the ability to infringe, and another based on allegations that BHN has an incentive to tolerate infringing conduct.  Plaintiffs' allegations are sufficient to show a direct financial benefit under either theory.[5]

      *Second*, with respect to Plaintiffs' theory of "draw," BHN repeatedly misrepresents the standard.  For example, BHN contends that Plaintiffs cannot establish that infringement is a draw to BHN's service because the draw of infringement is "relatively insignificant" as compared to other, legitimate draws to BHN.  (*Id.* at 12.)  "[T]he law is clear," however, "that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw"—"it need only be 'a' draw."  *Usenet*, 633 F. Supp. 2d at 157.  As long as "some percentage" of a defendant's customers are "drawn" to its service, "at least in part," by the ability to infringe, Plaintiffs have met the relevant standard.  *BMG*, 149 F. Supp. 3d at 676.

---

[5] To confirm that a draw is unnecessary to show a direct financial benefit, the Court need look no farther than *Shapiro, Bernstein & Co. v. H.L. Green Co.*, which BHN holds out as one of the "fundamental" vicarious infringement cases.  (Mot. at 10 (citing 316 F.2d 304 (2d Cir. 1963)).)  *Shapiro* found a financial benefit to exist where the defendant had a "financial interest" in continued copyright infringement; the case did not involve a draw in any way.

*Third*, BHN repeatedly states that it is shielded from liability because its service permits a "vast array of uses," some of which are legitimate.  (Mot. at 12-13.)  The amenability of BHN's service to legitimate uses, however, is irrelevant to the vicarious infringement test.  In *Lime Group*, for example, the court rejected the argument that the owners of LimeWire, an online file-distribution service, could escape liability because LimeWire permits both infringing and non-infringing uses.  784 F. Supp. 2d at 435-36.  Other courts have reached the same conclusion. *See, e.g.*, *Napster*, 239 F.3d at 1022-23.

Construed under the proper standard, Plaintiffs' allegations plainly allege a direct financial benefit.

*First*, the FAC plausibly alleges that at least "some percentage" of BHN's customers are "drawn" to its service, "at least in part," by the ability to infringe.  *BMG*, 149 F. Supp. 3d at 676.  Specifically, Plaintiffs have alleged that:

- Infringing subscribers are "drawn" to BHN by advertisements touting specific features of BHN's service that are attractive to infringers, including the ability "to download and upload large amounts of content, including music, in seconds," (FAC ¶ 74);

- BHN users have utilized these features to pirate Plaintiffs' works more than a hundred thousand times, (*id.* ¶ 82);

- Despite receiving notice of users' infringement, BHN did nothing to stop it, (*id.* ¶ 2); and

- BHN's "failure to police . . . infringing subscribers" was a further draw to users, who purchased more bandwidth from BHN, allowing them to download Plaintiffs' songs in greater numbers and a faster rates, (*id.* ¶ 76, 88).

Based on these facts, it is entirely reasonable to infer that that at least "some percentage" of BHN's subscribers selected BHN because they wanted to download Plaintiffs' songs illegally. *BMG*, 149 F. Supp. 3d at 676.  In other contexts, courts have drawn such common-sense conclusions.  *See, e.g.*, *Fonovisa, Inc. v. Cherry Auctions, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996) (inferring customers were "draw[n]" to defendant's swap meet because of infringing

material, based on fact that infringing material was available and sold at swap meet; notably, the swap meet also had non-infringing sales); *Marvel Enters., Inc. v. NCSoft Corp.*, 2015 WL 878090, at *3-4 (C.D. Cal. Mar. 9, 2005) (inferring users were "draw[n]" to online gaming platform because of infringing material, based on allegation that a "significant number" of users created characters that infringed on plaintiff's copyrights).[6]

*Second*, separate from the draw of infringement, BHN receives a direct financial benefit because it has a financial incentive to tolerate infringement and derives substantial revenue by doing so.  As the court explained in *Escape Media*, "evidence of financial gain is not necessary to prove vicarious liability as long as the service provider has an economic incentive to tolerate infringing conduct."  2015 WL 1402049, at *42.  Here, BHN plainly has an incentive to tolerate infringement, as infringing users pay substantial subscription fees to BHN.  Despite knowing who these infringers are—as well as the specific acts of infringement they committed—BHN has declined to terminate these users' accounts, as termination would result in BHN forgoing the substantial subscription fees these users pay to BHN each month.  (FAC ¶ 87.)

Recent case law confirms the sufficiency of Plaintiffs' allegations.  In *Charter*, for example, Magistrate Judge Hegarty recommended denying an ISP's motion to dismiss a vicarious infringement claim on the ground that plaintiffs' allegations sufficed to establish the ISP's receipt of a direct financial benefit.  *See* 2019 WL 5387099, at *7.  As BHN concedes, the plaintiffs' allegations in *Charter* are substantially similar to the allegations here.  Both suits allege that an ISP attracted users to its service through ads touting fast speeds and the ability to

---

[6] BHN asks the Court to take judicial notice of facts related to the Copyright Alert System ("CAS"), an experimental program devised by certain copyright owners and five ISPs to educate consumers and deter online infringement.  (Mot. at 6 n.4.)  BHN's request for judicial notice fails, however, as the significance and effect of CAS is not a proper subject for judicial notice.

download music quickly.  Both suits allege that users utilized these speeds to pirate Plaintiffs'

works more than a hundred thousand times.  And both suits allege that the ISP failed to take

steps to curb infringement, thus attracting additional users.  As Magistrate Judge Hegarty

recognized, these allegations are sufficient to state a claim, and the same is true here.[7]

Sony is also instructive.  There, plaintiffs asserted that an ISP-defendant received a direct

financial benefit, in part, because the ISP "chose not to stop [infringing conduct] on its network

. . . in order to collect revenues that it would lose if it terminated the particular accounts that were

repeatedly the subject of infringement notices."  Sony, Dkt. No. 396, at 33.  Not only did

plaintiffs' claim survive summary judgment, id., Dkt. No. 586, but a jury recently returned a

verdict in plaintiffs' favor on the vicarious infringement claim asserted there, id., Dkt. No. 669.

If the Sony plaintiffs' claim based on the same legal theories was sufficient to withstand a

summary judgment motion and a trial, surely Plaintiffs' claim survives a motion to dismiss.

Incredibly, BHN not only ignores the Sony action, but falsely claims that Plaintiffs' legal theory

based, in part, on Sony is "novel" and untested.  (Mot. at 18.)

      B.    *BHN's Focus on Facts that Plaintiffs Have Not Alleged Misunderstands the Pleading Standard.*

Rather than focus on Plaintiffs' allegations, BHN rattles off a list of additional allegations

that Plaintiffs purportedly failed to make, none of which is necessary to state a plausible claim.

For example, BHN faults Plaintiffs for failing to allege (i) that "BHN specifically target[s]

---

[7] BHN argues that Judge Hegarty's recommendation should not be credited because it misapplies the law and credits plaintiffs' characterization of the facts as opposed to the complaint's allegations.  (Mot. at 19.)  BHN is wrong on both counts.  With respect to the facts, BHN references a number of Charter's objections to Judge Hegarty's word choice, including his use of the word "piracy" to describe infringers' conduct.  Charter claims these words were never used in the complaint, but Charter is wrong.  On the law, Plaintiffs note that other courts have favorably cited Judge Hegarty's opinion, including the court in *Sony*—a strong indication that courts consider its reasoning persuasive.  *See Sony*, Dkt. No. 586, at 17.

infringing subscribers," (*id.* at 15); (ii) that infringers "chose BHN over other providers," (*id.* at 17); (iii) that "BHN encourages subscribers to purchase . . . faster package[s] for the purpose of infringing," (*id.* at 15); and (iv) that "infringing subscribers disproportionately subscribe to faster speeds as compared to non-infringing subscribers," (*id.*). This argument fails for many reasons.

*First*, to the extent these allegations are even relevant to Plaintiffs' claim—and many of them are not—their omission from the FAC does not bear on whether Plaintiffs have stated a claim. In order to survive a motion to dismiss, a plaintiff need not "plead all the factual evidence sufficient to establish a prima facie case." *Graessle-Mercer Co. v. Nat'l Horseman, Inc.*, 2016 WL 8467180, at *3 (D. Ariz. Sept. 30, 2016). Rather, the question is whether a plaintiff has pled enough facts to "raise a reasonable expectation that discovery will reveal evidence" of wrongdoing. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiffs have done so.

*Second*, the information that BHN faults Plaintiffs for not pleading is "peculiarly within [BHN's] knowledge or control." *United States v. Lab Corp. of Am. Holdings*, 2015 WL 7292774, at *4 (S.D.N.Y. Nov. 17, 2015). Courts "relax [the] pleading requirements where the relevant facts are known only to the defendant." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995); *see also Jones v. Nat'l R.R. Passenger Corp.*, 2018 WL 4501133, at *6 (N.D. Cal. Sept. 18, 2018). As the FAC alleges, the identities of BHN's users are known only to BHN. (FAC ¶ 83.) Thus, whether BHN "specifically target[s] infringing subscribers" depends on facts that must be discovered from BHN. Similarly, whether infringers "chose BHN over other providers so they could infringe Plaintiffs' copyrights" cannot be understood without seeking targeted discovery from such subscribers, whose identities are known only to BHN.

*BMG*, a factually similar case from the Eastern District of Virginia, provides a useful example of what discovery can yield. There, the court denied an ISP's motion for summary

judgment on the ground that discovery had elicited evidence of Cox's receipt of a direct financial

benefit, including "a survey conducted by its expert" showing that approximately 10% of Cox's

users subscribed to Cox, at least in part, because they wanted to "download or upload free digital

music through sites" that facilitated infringement.  149 F. Supp. 3d at 676.  The *BMG* plaintiffs

further introduced company emails evidencing the importance that Cox officials placed on the

subscription fees that infringing users paid each month.  *See id.* at 655-58.  Of course, the *BMG*

plaintiffs did not have this evidence at the pleading stage, but obtained it through discovery.

Plaintiffs here should be afforded the same opportunity to conduct discovery and expand on the

inferences that may be drawn from the facts they have already alleged.[8]

      Indeed, it should be noted that, of the cases that BHN cites in support of its argument that

Plaintiffs' allegations are insufficient to state a claim, almost all were disposed of at summary

judgment, not on motions to dismiss.  *See, e.g., Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657,

672-74 (9th Cir. 2017); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117-18 (9th Cir. 2007).

BHN cannot procure dismissal of Plaintiffs' claim by insisting that Plaintiffs plead factual

information they are entitled to elicit in discovery and that is uniquely within BHN's possession.[9]

---

[8] In fact, Plaintiffs have already served discovery requests seeking some of the information BHN argues Plaintiffs should have included in the FAC.  Accordingly, in the event that BHN's motion is granted, Plaintiffs should be afforded leave to amend their complaint.  *See* Fed. R. Civ. P. 15.

[9] The cases BHN cites that were decided on motions to dismiss are distinguishable.  In *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 2009 WL 334022, at *6 (C.D. Cal. Feb. 2, 2009), the court dismissed a vicarious claim against investors in a website, where the only benefit alleged was the *hypothetical* profits the investors would earn if the website were sold—a type of benefit the court deemed too attenuated to state a claim.  In *Thompson v. HMC Grp.*, 2014 WL 12589313, at *4 (C.D. Cal. Jul. 25, 2014), the court similarly dismissed a claim where the only benefit alleged was the costs the defendant saved by failing to pay the copyright owner.  Finally, in *Sarvis v. Polyvore, Inc.*, 2013 WL 4056208, at *9-10 (D. Mass. Aug. 9, 2013), and *Zagorsky-Beaudoin v. Rhino Entm't Co.*, 2019 WL 4259788, at *9 (D. Ariz. Sept. 9, 2019), courts dismissed vicarious claims insofar as plaintiffs merely parroted the elements of the claim.

C.    *BHN's Other Arguments Are Unavailing.*

1.    <u>Plaintiffs Have Pled More than an "Added Benefit."</u>

BHN argues at length that Plaintiffs' allegations establish nothing more than that the availability of infringing content through its network is an "added benefit" to its service, not a "draw" for its subscribers.  (Mot. at 8.)  BHN's argument misunderstands the operative case law.

Contrary to BHN's suggestion, no court has ever provided a qualitative distinction between "draws" and "added benefits."  In *Ellison*, for example, the Ninth Circuit affirmed a district court's grant of summary judgment after finding that the plaintiff had failed to offer evidence that infringement was a draw to AOL's service.  357 F.3d at 1079.[10]  In the absence of such evidence, the court concluded that infringement was nothing more than an "added benefit" to AOL's network, not a draw for its subscribers.  *Id.*  In reaching this conclusion, however, the Ninth Circuit did not opine on how to distinguish between draws and added benefits, especially at the pleading stage.  To the contrary, the court explained that "there is usually substantial overlap" between draws and added benefits, and that facts suggestive of an added benefit are often equally suggestive of a draw.  *Id.*

The Ninth Circuit's recognition of the "overlap" between draws and added benefits merits the advancement of Plaintiffs' claim.  Because facts indicative of an added benefit are also indicative of a draw, it is difficult, if not impossible, to distinguish between draws and added benefits at the pleading stage, where plaintiffs need only allege facts sufficient to show that a draw is *plausible*.  At worst, the facts that Plaintiffs have alleged in support of draw—*e.g.*, advertisements that tout BHN's fast internet speeds, which allow users to download music

---

[10] Unlike the hundred-thousand-plus infringement notices Plaintiffs sent BHN identifying specific instances of infringement—the sheer volume of which supports an inference of draw—Ellison had notified AOL in just a single email that his writings were posted on an online newsgroup that AOL provided to its subscribers.  *Ellison*, 357 F.3d at 1079.

quickly through BHN's service, and subscribers' use of these speeds to pirate Plaintiffs' works on a "staggering" scale—are "subject to diverging interpretations, each one of which is plausible." *Zinc*, 2016 WL 3167192, at *11. When this occurs, a court "may not choose between two plausible inferences," but must instead construe the facts in the light most favorable to the plaintiff. *Id.* Here, the Court must find that Plaintiffs' allegations suffice to plead a draw, not just an added benefit. A contrary holding would conflict with *Ellison*.[11]

### 2.    *Giganews* Does Not Preclude Plaintiffs' Claim.

BHN next contends that Plaintiffs' claim is barred by the Ninth Circuit's decision in *Giganews*, as Plaintiffs have not alleged that BHN users are drawn to its service by the ability to infringe Plaintiffs' works *in particular*, as distinguished from copyrighted works *in general*. (Mot. at 16-17 (citing 847 F.3d at 663).) This argument fails for two reasons.

*First*, to the extent that *Giganews* holds that a "draw" exists only insofar as customers are attracted to a defendant's service because of the specific works in suit, the decision conflicts with the weight of authority, which holds that a direct financial benefit exists as long as customers are drawn to a defendant's service by the *general* ability to infringe. *See, e.g.*, *Escape Media*, 2015 WL 1402049, at *43; *Lime Grp.*, 784 F. Supp. 2d at 435.

*Second*, even if *Giganews* articulates the right standard, Plaintiffs have met it. Plaintiffs, who are among the "largest" music companies in the world, own or control the copyrights to

---

[11] BHN misconstrues *Ellison* in other ways. For example, BHN argues that *Ellison* draws a "pertinent" distinction between two types of entities in assessing a financial benefit: (i) entities like Napster, for whom "virtually 'all of [their] "draw" of customers result[s] from . . . providing access to infringing material,'" and (ii) entities like AOL, which provide a "vast array of products and services." (Mot. at 12.) According to BHN, the fact that it provides many services renders the draw of infringement to its network "relatively insignificant" as compared to other draws, shielding BHN from liability. (*Id.*) In fact, *Ellison* holds precisely the opposite. According to the court, "[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal connection between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is." 357 F.3d at 1079.

"millions" of sound recordings, including "some of the world's most famous and popular music." (FAC ¶¶ 1, 12, 37.) Based on the volume and popularity of Plaintiffs' copyrights, it is reasonable to infer that at least some BHN users are drawn to its service by the ability to infringe Plaintiffs' works *in particular*. Plaintiffs are thus differently situated than the *Giganews* plaintiff, who was a single purveyor of pornographic images. *Giganews*, 847 F.3d at 664.

        3.     *Grande* Does Not Preclude Plaintiffs' Claim.

BHN next maintains that Plaintiffs' claim is foreclosed by *Grande*, a non-binding decision from the Western District of Texas. (Mot. at 13-14 (citing 2018 WL 1096871, at *10).) This is not the case.

In *Grande*, the court dismissed a vicarious infringement claim against an ISP on the ground that plaintiffs pled only one conclusory fact in support of the defendant's receipt of a direct financial benefit. 2018 WL 1096871, at *10. *Grande* is distinguishable from this action, however, as Plaintiffs have pled far more than one conclusory fact. Specifically, Plaintiffs have alleged that BHN touted specific features of its service that were attractive to infringers, and that BHN's policy of non-enforcement motivated users to sign up for or remain with BHN. Plaintiffs have also alleged that BHN has an incentive not to terminate users' accounts—an allegation buttressed by the fact that BHN has declined to terminate users despite receiving repeated notices of their infringement. In light of these additional facts, *Grande* does not control the outcome here.[12]

---

[12] Moreover, Plaintiffs assert that the *Grande* court's decision suffers from erroneous legal analysis, including insofar as it faulted plaintiffs for failing to allege that infringing material is "something exclusively available through Grande's service." 2018 WL 1096871, at *10. To be vicariously liable, a defendant is not required to provide "exclusive[]" access to infringing material. Indeed, if that were the case, ISPs could never be held liable for vicarious infringement, as defendants could always point to other ways for users to access infringing material over the internet. This is not the law.

4.      BHN's Reliance on Landlord Cases Does Not Shield It from Liability.

Finally, BHN argues that it cannot be held vicariously liable for users' infringement because it is analogous to a landlord—a class of defendants generally immune from vicarious infringement claims.  (Mot. at 10-11.)  In particular, BHN argues that it is not liable for users' infringement because, like a landlord, it charges subscribers a flat monthly fee and provides a service that can be used for both infringing and non-infringing purposes.  (*Id.* at 11.)

BHN misunderstands the attributes of a landlord that shield it from liability.  For example, BHN cannot argue that a landlord's receipt of flat monthly fees shields it from liability, as courts have expressly rejected the view that a benefit must be "directly tied to the sale of particular infringing items."  *Fonovisa*, 76 F.3d at 263.  Indeed, courts can and do impose liability on defendants who charge flat fees to customers in exchange for their services.  *See, e.g.*, *id.*; *Coach, Inc. v. Swap Shop, Inc.*, 2012 WL 12887010, at *8 (S.D. Fla. Sept. 21, 2012).  Nor are landlords shielded from liability because they lease general-use properties.  To the contrary, BHN's argument conflicts with numerous cases holding that defendants are *not* excused from vicarious infringement claims because their services permit "substantial non-infringing uses." *Lime Grp.*, 784 F. Supp. 2d at 435.

Instead, the factor that drives courts' decisions not to impose liability on landlords is their low level of control over infringing tenants.  *See, e.g.*, *Shapiro*, 316 F.2d at 307 (holding that landlords are immune from liability because landlords "exercise[] no supervision" over direct infringers); *Coach*, 2012 WL 12887010, at *8 (declining to impose liability on landlord because it did not meet the "supervis[ion] and control prong").  Because BHN *has* the ability to control its infringing users, *supra* at 6-10, these landlord-tenant cases are inapposite.

## CONCLUSION

For the foregoing reasons, BHN's motion to dismiss, (Dkt. No. 99), should be denied.

Dated: February 4, 2020

*/s/ Mitchell A. Kamin*
Mitchell A. Kamin (*pro hac vice*)
Neema T. Sahni (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Jonathan M. Sperling (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

David C. Banker, Esquire
Florida Bar No. 0352977
Bryan D. Hull, Esquire
Florida Bar No. 020969
BUSH ROSS, P.A.
1801 North Highland Avenue
P.O. Box 3913
Tampa, FL 33601-3913
Telephone: (813) 224-9255
dbanker@bushross.com
bhull@bushross.com

Matthew J. Oppenheim (*pro hac vice*)
Scott A. Zebrak (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com
kerry@oandzlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 4, 2020, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

*/s/ Mitchell A. Kamin*
Attorney