UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UMG RECORDINGS, INC.,** *et al.*,

    Plaintiffs,

v.                                                     Case No: 8:19-cv-710-MSS-TGW

**BRIGHT HOUSE NETWORKS, LLC,**

    Defendant.

## ORDER

**THIS CAUSE** comes before the Court for consideration of Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint as to the Claim for Vicarious Liability, (Dkt. 99), Plaintiffs' response in opposition thereto, (Dkt. 106), Defendant's reply in support of the Motion, (Dkt. 119), and Plaintiffs' Notices of Supplemental Authority. (Dkts. 127, 137) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** the Motion to Dismiss Plaintiffs' First Amended Complaint as to the Claim for Vicarious Liability.

    I.  **BACKGROUND**

        **A. Factual Allegations**

This action arises from copyright infringement allegedly committed by thousands of subscribers to Bright House Networks, LLC, one of the largest internet service providers ("ISPs") in the country. (Dkt. 94 at ¶¶ 1-2) Plaintiffs—a collection of record companies that hold copyrights in "some of the world's most famous and popular music"—seek to hold Bright House liable for refusing to take steps to stop its subscribers from

illegally downloading and distributing Plaintiffs' music through BitTorrent and other file-sharing services. (Id. at ¶ 2) Plaintiffs allege that, even after their representatives sent hundreds of thousands of notices to Bright House identifying specific instances of infringement by its subscribers, Bright House declined to terminate or otherwise take meaningful action against the infringing subscribers.  (Id. at ¶¶ 2-3) According to Plaintiffs, Bright House's failure to act in the face of this knowledge subjects it to secondary liability for the direct infringement committed by its users. (Id. at ¶ 5)

### i.  Peer-to-Peer Distribution Systems, Including BitTorrent

Bright House subscribers allegedly use BitTorrent and other peer-to-peer distribution networks to illegally download and distribute Plaintiffs' music. (Id. at ¶ 92) A peer-to-peer service is a decentralized network that allows its users to share digital files, including music. (Id. at ¶ 78) BitTorrent is a particularly efficient peer-to-peer system. (Id. at ¶ 79) By breaking each file into pieces, BitTorrent allows users to download different pieces of a file simultaneously from multiple users. (Id.) The system also enables users to begin sharing a file before it has finished downloading, meaning that users "can be both downloading and uploading different pieces of a file from, and to, multiple other users." (Id.) BitTorrent's efficiency has made it popular among infringers. (Id.) According to a January 2011 study, "11.4 percent of all Internet traffic involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent." (Id.)

### ii.  Bright House and the Infringement Allegedly Committed on Its Network

Yet, Plaintiffs in this action do not seek relief against the creators of BitTorrent or any Bright House subscribers. Instead, Plaintiffs have sued Bright House, an ISP that provides access to a high-speed internet network. (Id. at ¶ 73) Bright House offers a range

of subscription services, allowing customers to "purchase Internet service based on different downloading speeds." (Id.) Plaintiffs allege that Bright House's "consumer marketing material" "touted how its service enables subscribers to download and upload large amounts of content, including music, in seconds." (Id. at ¶ 74) The result, according to Plaintiffs, is that "[m]any of Bright House's subscribers are primarily drawn to its service because it allows them to use Bright House's network to download music and other copyrighted content—including unauthorized content—as efficiently as possible." (Id.)

Bright House's terms of service allow it to suspend or terminate a subscriber's internet access for a variety of reasons, "including a subscriber's copyright infringement activity." (Id. at ¶ 86) Nevertheless, Bright House allegedly refused to terminate or otherwise take action against subscribers who allegedly infringed Plaintiffs' copyrighted works—even after Plaintiffs' representatives sent Bright House hundreds of thousands of notices detailing specific instances of infringement they contend were committed by its subscribers. (Id. at ¶ 87) Some of these infringement notices allegedly identified "serial infringers," that is, customers who "engaged in blatant and repeated infringement of Plaintiffs' copyrighted works." (Id. at ¶ 85) Plaintiffs allege that Bright House's "failure to police its infringing subscribers adequately drew subscribers to purchase Bright House's services, so that the subscribers could then use those services to infringe Plaintiffs' (and others') copyrights." (Id. at ¶ 88)

### B. Procedural History

Plaintiffs initiated this action on March 22, 2019, and Bright House moved to dismiss the vicarious liability claim. (Dkts. 1, 32) Following the completion of the motion-

to-dismiss briefing, but before the Court issued a decision, Plaintiffs were granted leave to file an Amended Complaint. (Dkts. 88, 89, 94)

The Amended Complaint asserts two claims against Bright House: contributory copyright infringement and vicarious copyright infringement. (Dkt. 94 at ¶¶ 90-107) The vicarious liability claim seeks to hold Bright House liable for failing to terminate or otherwise take action against subscribers who infringed Plaintiffs' copyrights by "unlawfully reproduc[ing] and distribut[ing] via BitTorrent or other P2P services thousands of [Plaintiffs'] sound recordings and musical compositions." (Id. at ¶ 101) In support of its vicarious liability claim, Plaintiffs allege that Bright House (i) "has the legal and practical right and ability to supervise and control the infringing activities that occur through the use of its network," and (ii) "derived an obvious and direct financial benefit from its customers' infringement." (Id. at ¶ 102)

Bright House again moved to dismiss the vicarious liability claim. (Dkt. 99)[1] It contends that Plaintiffs fail to adequately allege, as they must to state a claim for vicariously liability, that Bright House profited directly from its users' infringement and had the right and ability to control its users' infringing conduct. (Id. at 1)

## II. LEGAL STANDARD

The threshold for surviving a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a low one. Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al., 711 F.2d 989, 995 (11th Cir. 1983). A plaintiff must plead only enough facts to state a claim to relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1968-69 (2007) (abrogating the "no set

---

[1] Bright House has not sought dismissal of the contributory infringement claim.

- 4 -

of facts" standard for evaluating a motion to dismiss established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff is still obligated to provide the "grounds" for entitlement to relief, and "a formulaic recitation of the elements of a cause of action will not do." Berry v. Budget Rent A Car Sys., Inc., 497 F. Supp. 2d 1361, 1364 (S.D. Fla. 2007) (quoting Twombly, 127 S. Ct. at 1964-65). In evaluating the sufficiency of a complaint in light of a motion to dismiss, the well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff. Quality Foods, 711 F.2d at 994-95. However, the court should not assume that the plaintiff can prove facts that were not alleged. Id. Thus, dismissal is warranted if, assuming the truth of the factual allegations of the plaintiff's complaint, there is a dispositive legal issue which precludes relief. Neitzke v. Williams, 490 U.S. 319, 326 (1989).

### III. DISCUSSION

#### A. The Vicarious Liability Claim Fails Because Plaintiffs Do Not Adequately Allege a Direct Financial Benefit

Plaintiffs claim that Bright House, an ISP, is vicariously liable for copyright infringement committed by its users, who are alleged to have unlawfully downloaded and shared thousands of Plaintiffs' songs. (Dkt. 94 at ¶ 101) Bright House contends that this claim fails as a matter of law because Plaintiffs have not adequately pled the two elements of vicarious liability: Bright House's right and ability to supervise the direct infringement, and its receipt of a direct financial benefit from the infringement. (Dkt. 99 at 1-2) The Court concludes that Plaintiffs have failed to adequately allege that Bright House receives a direct financial benefit from its users' infringing activity. For this reason, the vicarious

liability claim fails, and the Court need not consider whether Plaintiffs have sufficiently alleged that Bright House has the right and ability to control the infringing conduct.

### i.   The Origins of Vicarious Copyright Liability

"Direct copyright infringement arises upon violation of the exclusive rights of a copyright holder," including the rights to reproduce a copyrighted work and distribute it to the public. BUC Int'l Corp. v. Int'l Yacht Council Ltd., 489 F.3d 1129, 1138 n.19 (11th Cir. 2007). Although "the Copyright Act does not specifically provide for secondary liability, vicarious and contributory copyright infringement are well established principles derived from common law." Id. (citing Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930-31 (2005)). "Liability for vicarious copyright infringement arises 'when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement.'" Id. (quoting Grokster, 545 U.S. at 931 n.9).

"Vicarious copyright infringement liability is an outgrowth of *respondeat superior*." Coach Inc. v. Kim's Mgmt., Inc., No. 1:10-CV-02746-JJOF, 2012 WL 13001933, at *11 (N.D. Ga. Feb. 28, 2012). Courts initially employed the doctrine to hold employers liable for copyright infringement committed by employees within the scope of their employment. See, e.g., M. Witmark & Sons v. Calloway, 22 F.2d 412, 414 (E.D. Tenn. 1927) (applying in copyright action "[t]he rule of the common law" that "the master is civilly liable in damages for the wrongful act of his servant in the transaction of the business which he was employed to do").

The doctrine subsequently expanded to cover independent-contractor relationships as well. For example, in Shapiro, Bernstein & Co. v. H. L. Green Co., a

department store licensed an independent "concessionaire" to run "the phonograph record department in twenty-three of its stores." 316 F.2d 304, 306 (2d Cir. 1963). The department store received "a percentage—in some cases 10%, in others 12%—of [the concessionaire's] gross receipts from the sale of records," some of which infringed the plaintiffs' copyrights. Id. The Second Circuit held that the department store was vicariously liable "for the unauthorized sales of the 'bootleg' records," reasoning that (i) the department store had "an obvious and direct financial interest in the exploitation of copyrighted materials" because it received "10% or 12% of the sales price of every record sold by [the concessionaire]," and (ii) the department store "retained the ultimate right of supervision over the conduct of the record concession and its employees." Id. at 307-08. The Second Circuit justified its expansion of vicarious liability on the grounds that "[m]any of the elements which have given rise to the doctrine of *respondeat superior*"—specifically, "an obvious and direct financial interest in" the infringing conduct and "the right and ability to supervise [it]"—"may also be evident in factual settings other than that of a technical employer-employee relationship." Id. at 307.

Likewise, in "the so-called 'dance hall cases,' the operator of an entertainment venue was held liable for infringing performances when the operator (1) could control the premises and (2) obtained a direct financial benefit from the audience, who paid to enjoy the infringing performance." Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 262 (9th Cir. 1996) (citing Buck v. Jewell-LaSalle Realty Co., 283 U.S. 191, 198-99 (1931); Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co., 36 F.2d 354 (7th Cir. 1929)). In these cases, the owner of the dance hall derived a direct financial benefit from the infringing content because the audience paid admission primarily to listen or dance to the

available infringing music being performed. See Shapiro, Bernstein & Co., 316 F.2d at 307 ("[T]he cases are legion which hold the dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income.").

"The absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity"—denominated vicarious liability. Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 435 (1984). However, the Supreme Court has admonished that courts must be "circumspect in construing the scope of rights created by a legislative enactment which never contemplated" the "competing interests that are inevitably implicated by [a] new technology." Id. at 431. In Sony Corp., the targeted "new technology" was the VTR (VCR); today the "new technology" is the sale of internet portal access through which subscribers download pirated works. Indeed, "[t]he judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme." Id.[2]

---

[2] The Court went on to reverse the grant of copyright protection against the sale of VTR's, recognizing that "[s]ound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology. In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests." Sony Corp., 464 U.S. at 431.

### ii. The Court Declines to Adopt Plaintiffs' Theory of Direct Financial Benefit

Plaintiffs in this case seek to extend vicarious liability even further by applying it to Bright House, one of the largest ISPs in the country. (Dkt. 94 at ¶¶ 1-2) Plaintiffs contend that Bright House receives a direct financial benefit from its users' infringement because "at least some percentage of [Bright House's] customers are drawn to its service, at least in part, by the ability to infringe." (Dkt. 106 at 12) To support this assertion, Plaintiffs allege that (i) Bright House "has touted how its service enables subscribers to download and upload large amounts of content, including music, in seconds"; (ii) Bright House's "failure to police its infringing subscribers adequately drew subscribers to purchase Bright House's services"; and (iii) Bright House subscribers have illegally downloaded and distributed Plaintiffs' music on a "massive" scale. (Dkt. 94 at ¶¶ 74, 76, 82, 88) These allegations are insufficient to plead that Bright House receives a direct financial benefit from its subscribers' infringement.

Plaintiffs claim that they can satisfy the direct financial benefit requirement simply by alleging that the ability to download infringing content is one of many reasons some subset of subscribers subscribe to Bright House's services. (Dkt. 106 at 11) Plaintiffs rely on a line of non-binding cases holding that, "to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw—rather, it need only be 'a' draw." Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) (citing Ellison v. Robertson, 357 F.3d 1072, 1079 (9th Cir. 2004)). This interpretation of the direct financial benefit requirement effectively reads the limiting term "direct" out of the test, allowing the imposition of vicarious liability based on indirect, highly

attenuated connections between infringing conduct of the patron and alleged financial benefits. The Court rejects Plaintiffs' expansive interpretation of this requirement.

Instead, the Court concludes based on binding precedent that, even if liability is to be established under a "draw" theory, liability must, nonetheless, be based upon a *direct* financial benefit to the alleged vicarious infringer. Grokster, 545 U.S. at 931 n.9; BUC Int'l Corp., 489 F.3d at 1138 n.19. Thus, the plaintiff must be prepared to show and must, therefore, allege that the availability of infringing content "provide[s] the *main* customer 'draw' to the [service]." Adobe Sys. Inc. v. Canus Prods., Inc., 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001) (emphasis added). Put differently, "the very success of the [defendant's] venture [must] depend[ ] on the [infringing] activity." Id. Absent this limitation, the "draw" theory "would provide essentially for the limitless expansion of vicarious liability into spheres" far removed from the factual settings in which vicarious liability arose— employer-employee and independent-contractor relationships. Id. Moreover, requiring that the availability of infringing material be the primary customer draw to the service ensures that a defendant will be held vicariously liable only if it has "an obvious and direct financial interest in" the infringing conduct. Shapiro, Bernstein & Co., 316 F.2d at 307.

Here, Plaintiffs have failed to allege that Bright House receives a direct financial benefit from its users' infringement because there are no well-pled allegations that (i) the availability of infringing content (ii) "provide[s] the *main* customer 'draw' to the [service]." Adobe Sys. Inc.,173 F. Supp. 2d at 1051 (emphasis added). At most, Plaintiffs allege that *access* to infringing content generally available on the internet is one of many reasons motivating some subscribers to enroll with any ISP. Plaintiff do not allege that there is anything unique about the service Bright House offers as a portal to the internet or as a

portal to this alleged contraband content. Plaintiffs, moreover, do not allege that there is any infringing content "available" on the Bright House platform, such as a storage vehicle (i.e., Cloud storage) from which a would-be infringer could seek to secure infringing content directly or indirectly from Bright House. This distinguishes the present action from the foundational cases on which Plaintiffs' novel claims are based. In those cases, the defendant allegedly either (i) received a share of the proceeds from the sale of infringing content, Shapiro, Bernstein & Co., 316 F.2d at 307-08; or (ii) was directly responsible for providing infringing content that could be enjoyed at the defendant's venue: music on a karaoke machine or music performed at a dance hall, for example. E.g., Dreamland Ball Room v. Shapiro, Bernstein & Co., 36 F.2d 354, 355 (7th Cir. 1929). In stark contrast, all that is alleged here is that Bright House offers a conduit to the "World Wide Web." In fact, Plaintiffs candidly allege that the available infringing content is found on the robust peer-to-peer sharing platforms ubiquitous to the internet and driven largely by BitTorrent (and similar networks), which are, as discussed, in no way affiliated with or controlled by Bright House or any other ISP, for that matter. (Dkt. 94 at ¶¶ 77-80)

But, even if the Court were to indulge the notion that *access* to infringing content generally available on the internet is sufficient to satisfy the first prong of the "draw test," Plaintiffs fail to plead secondly that such access to infringing content is the *main* draw to Bright House's service. In fact, what Plaintiffs allege is that Bright House's internet speed and efficiency are "draws" to the service. Plaintiffs allege, for example, that "[m]any" subscribers are "drawn" to Bright House because its network "allows them to . . . download music and other copyrighted content—including unauthorized content—as efficiently as possible." (Id. at ¶ 74) But this allegation does not support a reasonable inference or

plausibly assert that the *main* draw for Bright House subscribers is access to infringing content generally available on the internet. In fact, Plaintiffs do not even adequately assert that efficiency, which allegedly enhances the ease with which an infringer might illegally access copyrighted content, is itself the *main* draw to Bright House's service. Instead, Plaintiff advance a sort of "dog-whistle" theory that Bright House advertises faster internet speeds to surreptitiously entice the prospective infringer. It is not readily apparent or plausibly alleged that an internet thief would be "drawn" by the efficiency of internet service any more than the average law-abiding purchaser of copyrighted content. All users presumably seek faster, more reliable internet service. It is also not readily apparent or plausibly alleged that speed is the only draw or principal draw and certainly not that access to infringing content is the principal draw to Bright House subscribers.

Plaintiffs alternatively allege that some subscribers are drawn in part to Bright House by its "failure to police . . . infringing subscribers adequately." (Id. at ¶ 88) Again, however, this is not the test: the test is whether users are drawn to Bright House by the *availability of infringing content*. Nor, if this were the test, is there an allegation in the complaint that the *main* draw for Bright House subscribers is the company's alleged failure to take meaningful action against copyright infringement. In addition, to the extent Plaintiffs rely on the Digital Millennium Copyright Act ("DMCA") safe harbor to support their interpretation of the scope of vicarious liability, that reliance is misplaced. The DMCA was "not intended to imply that a service provider is or is not liable as an infringer either for conduct that qualifies for a limitation of liability or for conduct that fails to so qualify. Rather, the limitations of liability apply if the provider is found to be liable under existing principles of law." S. Rep. No. 105-190, at 19 (1998); see also 17 U.S.C. § 512(l) ("The

failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.").

Significantly, Plaintiffs' expansive interpretation of the draw theory effectively eliminates the requirement that the defendant receive a *direct* financial benefit from drawing the infringer to available infringing content. Under Plaintiffs' theory, any aspect of Bright House's service that serves as "a" draw to some subset of subscribers who then go on to engage in infringement subjects Bright House to liability, no matter how insignificant or tangential the alleged draw is to the infringing content wherever found on the internet. Any proportionate value that may be ascribed by post hoc edict to that general enticement to purchase internet services from Bright House cannot constitute a *direct* financial benefit to Bright House owing principally to the draw to available infringing content. At best, any such benefit would be indirect and attenuated rather than, as the foundational case law requires, "obvious and direct." Shapiro, Bernstein & Co., 316 F.2d at 307.

Indeed, to accept Plaintiffs' theory "would impose liability on every ISP, as the music at issue is available on the Internet generally, as is the BitTorrent protocol, and is not something exclusively available through [Bright House's] services." UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC, No. A-17-CA-365-LY, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018), adopted by 2018 WL 2182282 (W.D. Tex. Mar. 26, 2018). In other words, under Plaintiffs' theory, every ISP that is paid for providing internet service obtains a direct financial benefit from its users' subsequent infringement of Plaintiffs' music because the relevant content "can [be] access[ed] through *any* ISP." UMG

Recordings, Inc. v. Grande Commc'ns Networks, LLC, No. A-17-CA-365-LY, 2018 WL 4501535, at *3 (W.D. Tex. Sept. 20, 2018), adopted by 2018 WL 6588575 (W.D. Tex. Oct. 15, 2018). This is precisely the type of "limitless expansion of vicarious liability" that the *direct* financial benefit requirement is designed to guard against. Adobe Sys. Inc.,173 F. Supp. 2d at 1051.

Thus, Plaintiffs have failed to plead facts establishing that Bright House obtains "an obvious and direct financial interest in" or that it draws subscribers to its internet service platform by offering the "availability of infringing conduct." Shapiro, Bernstein & Co., 316 F.2d at 307. This is fatal to Plaintiffs' vicarious liability claim.

### iii. Plaintiffs' Remaining Arguments Are Unavailing

Plaintiffs advance additional arguments to attempt to salvage their vicarious liability claim. None are persuasive.

First, Plaintiffs contend that they can satisfy the direct financial benefit requirement simply by alleging that Bright House "has an economic incentive to tolerate infringing conduct." (Dkt. 106 at 11) Plaintiffs' sole support for this assertion—Capitol Records, LLC v. Escape Media Grp., Inc., No. 12-CV-6646 AJN, 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015)—is inapposite. There, it was undisputed that "infringing content [was] a substantial draw to [the defendant's music streaming service], as demonstrated by the fact that approximately 84.5% of the website's streams [were] of works belonging to major labels with whom [the defendant] ha[d] no license." Id. at *43. Moreover, "80% of [the defendant's] revenue [was] derived from website advertisements, and the more visitors [the streaming service] attract[ed], the more advertising revenue [the defendant] [would] earn." Id. Based on these facts, the court concluded that (i) the defendant "ha[d] a clear

economic incentive to tolerate" copyright infringement, and (ii) the defendant "receive[d] a direct financial benefit from [such] infringement." Id. Here, by contrast, Plaintiffs have failed to allege any facts even suggesting that the majority of the traffic on Bright House's network consists of infringing material. Thus, nothing in Capital Records suggests that "an economic incentive to tolerate infringing conduct," standing alone, is sufficient to establish a direct financial benefit.

Second, Plaintiffs cite the recent decision in Warner Records Inc. v. Charter Commc'ns, Inc., No. 19-CV-00874-RBJ-MEH, 2020 WL 1872387 (D. Colo. Apr. 15, 2020), a case brought by a group of record companies seeking to hold an ISP secondarily liable for direct infringement committed by its users. In Charter, the court declined to dismiss the plaintiffs' vicarious liability claim, reasoning that the direct financial benefit requirement could be satisfied by allegations that the availability of infringing content was "one among several draws to [the ISP's] services." Id. at *3. For the reasons discussed above, however, the Court declines to adopt such an expansive interpretation of the direct financial benefit requirement. Likewise, the Court finds unpersuasive the Charter court's reliance on the allegation that the ISP's subscribers were drawn to the service by its "failure to stop or take other action in response to notices of infringement." Id. at *6. Such an allegation is insufficient because it does not establish that the ISP's purported failure to act was the main draw of the service.

In short, because Plaintiffs have failed to adequately allege that Bright House has a direct financial interest in its users' infringement, the vicarious liability claim fails as a matter of law. The Court need not (and does not) reach the separate question of whether

Plaintiffs have sufficiently pled that Bright House has the right and ability to supervise the infringing conduct that occurs on its network.[3]

## IV. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint as to the Claim for Vicarious Liability, (Dkt. 99), is **GRANTED**.

    a. Count II of the Amended Complaint is **DISMISSED**.

2. Defendant's Motion for Judicial Notice, (Dkt. 100), is **DENIED AS MOOT**.

3. Defendant shall answer the Amended Complaint within **fourteen (14) days** of the date of this Order.

**DONE and ORDERED** in Tampa, Florida this 8th day of July, 2020.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Any Unrepresented Party

---

[3] Bright House requests that the Court take judicial notice of "a widely publicized agreement that certain Plaintiffs are a party to and related press releases and information available on several government websites which describe the necessity of the Internet as a resource." (Dkt. 100 at 1) Because the Court need not rely on these materials to decide Bright House's Motion, the Court denies as moot the request to take judicial notice.