## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UMG RECORDINGS, INC., *et al.*,

        Plaintiffs,

    v.

BRIGHT HOUSE NETWORKS, LLC,

        Defendant.

**Case No. 8:19-cv-710-MSS-TGW**

## PLAINTIFFS' MOTION TO COMPEL FURTHER DISCOVERY RESPONSES AND PRODUCTION OF DOCUMENTS

      Seventeen months into this case, defendant Bright House Networks, LLC ("BHN") has ***produced a grand total of ten documents*** (four of which are public rather than internal documents).  BHN has refused outright to provide documents going to the core of Plaintiffs' claims and BHN's defenses.  It also has provided virtually no substantive interrogatory responses.  It is clear BHN will not provide discovery in earnest absent court order.  Plaintiffs therefore seek an order compelling BHN to:

      1.      Provide full responses to Plaintiffs' Interrogatory Nos. 13 and 14, stating how many copyright infringement notices it received from 2012 to 2016, and what actions it took in response to them;

      2.      Produce documents concerning its practices for responding to copyright infringement notices, responsive to Plaintiffs' Requests for Production 41 and 71;

      3.      Produce financial documents relevant to Plaintiffs' request for statutory damages, responsive to Plaintiffs' Requests for Production 49, 59, 60, and 65; and

      4.      Produce all such documents and information within 20 days.

**BACKGROUND**

Plaintiffs are record companies and music publishers that produce, manufacture, distribute, sell, and license commercial sound recordings and musical compositions.  Dkt. 94 ¶ 1.  Through enormous investments of money, time, and creative effort, Plaintiffs—and the recording artists and songwriters they represent—have developed and marketed some of the world's most famous and popular music.  *Id.*  Collectively, Plaintiffs own or control the copyrights to millions of musical compositions and sound recordings, which is one of their primary sources of income.  *Id.* ¶ 12.

Between March 2013 and May 2016 (the "Claim Period"), thousands of subscribers to BHN, an internet service provider, illegally distributed Plaintiffs' music through peer-to-peer file-sharing programs like BitTorrent.  *Id.* ¶ 2.  Pursuant to the Digital Millennium Copyright Act ("DMCA"), Plaintiffs sent BHN over one hundred thousand notices identifying specific, repeat infringements on BHN's network by specific BHN subscribers. *Id.*

BHN's terms of service expressly prohibit users from engaging in copyright infringement and reserve to BHN the right to terminate users' accounts for participating in online piracy.  *Id.* ¶ 86.  Notwithstanding this policy, BHN turned a blind eye to the rampant infringement occurring over its network so it could continue to reap millions of dollars in profits from infringing subscribers.  Plaintiffs' claim for contributory copyright infringement arises from BHN's business decision to continue providing its internet services to known, repeat infringers of Plaintiffs' works on its network.

In its Answer filed on July 22, 2020, BHN asserted as an affirmative defense that the DMCA's "safe harbor" provisions shield it from liability.  Dkt. 151 at 44-45.  To be eligible for that affirmative defense, BHN must demonstrate that it "adopted *and reasonably implemented*" a repeat-infringer policy that resulted in the termination of repeat infringers—any of them, not just those in Plaintiffs' notices—under appropriate circumstances.  17 U.S.C. § 512(i)(1)(A) (emphasis added).

Plaintiffs served the requests at issue in this Motion on February 7, 2020.  Sahni Decl. Exs. A-B.  They cover BHN's knowledge of its subscribers' infringing conduct, its practices for responding to infringement on its network, the willfulness of BHN's refusals to terminate known repeat infringers on its network, and whether BHN reasonably implemented a policy that "terminat[ed] in appropriate circumstances [] subscribers…who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).  BHN responded overwhelmingly with either a boilerplate refusal to produce the requested documents and information, or by limiting production to documents in a manner that would keep BHN from having to produce virtually anything.  Sahni Decl. Exs. E-F, C-D.

Plaintiffs first raised these deficiencies with BHN on March 19 (Interrogatories) and March 25 (Requests for Production).  Sahni Decl. Exs. E-F.  BHN refused to respond to Plaintiffs' March 25 letter regarding the RFPs at issue here for months, notwithstanding more than half a dozen written and oral requests from Plaintiffs for BHN's positions in writing. *See id*. Exs. G; H at 3; I at 1, 2, 5.  When BHN finally did respond, it became clear that BHN would not provide core discovery absent a court order.  *See* Sahni Decl. Exs. J-K.

## LEGAL STANDARD

Plaintiffs are entitled to discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  In response to a motion to compel disclosure pursuant to Fed. R. Civ. P. 37(a), "[t]he party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information."  *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000).  Any objection based on the request being overly broad or unduly burdensome cannot be boilerplate, but instead must provide a "full, fair explanation" of the objection "particular to the facts of the case."  M.D. Fl. Discovery Handbook § III.A.6 (rev. June 5, 2015).

## ARGUMENT

**I.      BHN should be ordered to state how many infringement notices it received from 2012 to 2016 and what actions it took in response to them.**

Through its safe-harbor defense, BHN asserts that it has "adopted and *reasonably implemented,* and informs [its] subscribers and account holders of … a policy that provides for the termination in appropriate circumstances of subscribers and account holders of [its] network who are repeat infringers."  17 U.S.C. § 512(i)(1)(A) (emphasis added).

Interrogatories 13 and 14 together seek the most basic information necessary to test BHN's assertion that it "reasonably implemented" a repeat-infringer termination policy:  the total number of infringement notices BHN received each month during the Discovery Period

of March 2012 through May 2016 (No. 13); and the number of actions, by type of action, that

it took in response to those notices (No. 14).[1]

**Interrogatory No. 13:**  State the number of Infringement Notices you received each month from January 1, 2010 through May 17, 2016 and identify the person(s) most knowledgeable about such notices since January 1, 2010.[2]

**RESPONSE:**  Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, because it seeks information about works and parties not at issue in this case and for a time period well outside of Plaintiffs' claims period in this case. Bright House further objects to this request because it is unduly burdensome and unnecessarily duplicates other discovery requests that Plaintiffs have propounded.  Bright House further objects to this request to the extent it seeks information that is not reasonably accessible because of undue burden or cost, and Bright House reserves the right to shift the cost of accessing such information to Plaintiffs.  Bright House reserves its right to respond to this interrogatory pursuant to Fed. R. Civ. P. 33(d).

**SUPPLEMENTAL RESPONSE:**  Subject to and without waiving its objections, pursuant to Fed. R. Civ. P. 33(d), Bright House directs Plaintiffs to the document Bates numbered BHN_00000814, which provides data regarding the notices Bright House received from Plaintiffs and third parties directed at subscribers who received Plaintiffs' notices during the Discovery Period.  The person most knowledgeable is Timothy Frendberg, who was the Senior Director of Network Security Operations from 2008 to May 2017 at Bright House.

Rather than providing the data called for by this Interrogatory, BHN directs Plaintiffs

to its production of a "ticket data log" in response to RFP 2, which the Court ordered in

January, well before BHN asserted its safe-harbor defense.  Dkt. 91 at 2.  This log provides

certain data regarding BHN's receipt of notices concerning the subscribers identified in

Plaintiffs' notices ("RIAA-Accused Subscribers").  (RFP 2 was limited to notices regarding

RIAA-Accused Subscribers, rather than notices regarding *any* subscriber, because BHN had

---

[1] Pursuant to Local Rule 3.04, Plaintiffs quote in full all discovery requests and responses at issue in this Motion.  All discovery requests and objections quoted herein are contained in Plaintiffs' discovery requests and BHN's objections and responses thereto.  *See* Sahni Decl. Exs. A-D.

[2] This request is limited to the Discovery Period (March 2012 through May 2016).

not at the time asserted the safe harbor defense, which puts at issue whether BHN reasonably implemented a repeat infringer policy as to its subscribers generally.  Jan. 8, 2020 Hrg. Tr. (Ex. N to Sahni Decl.) at 58:7-19, 140:22-141:11.)

BHN's citation to its ticket-data log is a deficient response for two reasons.  *First*, BHN's asserted safe harbor defense puts squarely at issue its treatment of and communication with *all* repeat infringers—not just the RIAA-Accused Subscribers.  That is because "Section 512(i)(1)(A) requires an assessment of the service provider's 'policy,' not how the service provider treated a particular copyright holder."  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007).  Thus, BHN's "response to adequate non-party notifications [*i.e.*, notifications on behalf of rights-holders other than Plaintiffs] is relevant in determining whether [it] reasonably implemented [its] policy against repeat infringers."  *Id*.

Plaintiffs are therefore entitled to know how many *total* notices BHN received—and how many actions BHN took in response (*see* Interrogatory No. 14, below)—in order to illustrate just how many notices BHN ignored, and thereby test BHN's assertion that it reasonably implemented a policy to terminate repeat infringers.  Indeed, comparing the number of customer-facing actions taken to the total number of notices received can be dispositive of BHN's affirmative defense.  In *UMG Recordings, Inc. v. Grande Commc'ns Networks,* for example, the court found the ISP ineligible for the DMCA safe harbor as a matter of law, because "the evidence is undisputed that it failed to terminate any customers from 2010 through 2016, despite receiving over a million infringement notices"—a number which included *all notices received*, not just those from the plaintiffs.  384 F. Supp. 3d 743, 754-58 (W.D. Tex. 2019).  By refusing this discovery, BHN seeks to deprive Plaintiffs of

core evidence that bears directly on the validity of BHN's affirmative defense.  This discovery will also show BHN's knowledge of specific infringements and infringers.

*Second*, the ticket-data document that BHN produced does not even provide a complete picture of the actions BHN took with respect to Plaintiffs' notices.  The document contains *only 200* entries for notices sent by Plaintiffs, even though Plaintiffs sent BHN *over 109,000 notices*.  Sahni Decl. ¶ 22.  It therefore discloses next to nothing about how BHN treated repeat infringers who received Plaintiffs' notices, let alone how BHN treated other infringers.

**Interrogatory No. 14:**  State the number of Customer Facing Actions, by Customer Facing Action, you took each month from January 1, 2010 through May 17, 2016 in response to the Infringement Notices identified in response to Interrogatory No. 13 and identify the person(s) most knowledgeable about such Customer Facing Actions.[3]

**Plaintiffs' Definition of Customer Facing Action**:  The term "Customer Facing Action" shall mean any action that you directed to a Subscriber as a result of having received an Infringement Notice, including: forwarding a copy of the Infringement Notice to the Subscriber; sending the Subscriber a warning in response to receiving an Infringement Notice; suspending, slowing (i.e., "throttling") or otherwise adversely affecting the Subscriber's internet access; or disconnecting or terminating the Subscriber's internet service.

**RESPONSE**:  Bright House objects that this request is overbroad, unduly burdensome,   and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, because it seeks information about works and parties not at issue in this case and for a time period well outside of Plaintiffs' claims period in this case. Bright House further objects to this request as vague, ambiguous, and overbroad because of Plaintiffs' use of the term "Customer Facing Action," which, with the present definition, requires speculation.  Bright House further objects to this request to the extent it seeks information that is not reasonably accessible because of undue burden or cost, and Bright House reserves the right to shift the cost of accessing such information to Plaintiffs.  Bright House reserves its right to respond to this interrogatory pursuant to Fed. R. Civ. P. 33(d).

**SUPPLEMENTAL RESPONSE**: Subject to and without waiving its objections, pursuant to Fed. R. Civ. P. 33(d), Bright House directs Plaintiffs to the document Bates numbered

---

[3] As with Interrogatory No. 13, this request is limited to the Discovery Period of March 2012 through May 2016.

BHN_00000814, which details the customer facing actions Bright House took in response to notices it received from Plaintiffs and third parties directed at subscribers who received Plaintiffs' notices during the Discovery Period.  The person most knowledgeable is Timothy Frendberg, who was the Senior Director of Network Security Operations from 2008 to May 2017 at Bright House.

In response to Interrogatory 14, BHN again pointed to the same very limited ticket-data that it cited in response to Interrogatory 13.  That is a deficient response for the same reasons described above.  *First*, BHN put its treatment of all repeat infringers at issue when it claimed a safe harbor from liability in this case by virtue of having "implemented…a policy that provides for the termination in appropriate circumstances of subscribers…who are repeat infringers."  17 U.S.C. § 512(i)(1)(A).  To test that assertion, Plaintiffs need to know if BHN implemented its purported termination policies for *all* repeat infringers.  Again, the total number of Customer Facing Actions compared with the total number of notices was *dispositive on summary judgment* of the safe-harbor defense in *Grande*.  384 F. Supp. 3d at 754-58.

Other courts have likewise found that this ratio of "actions taken with respect to total notices" can give rise to an inference that the ISP did not reasonably implement a repeat-infringer policy.  *See Disney Enterprises, Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *22-24 (S.D. Fla. Sept. 20, 2013) (discussing the number of terminations and the *total* number of notices received from *all rights-holders*—not just the plaintiffs—and concluding that the "[d]ocuments and statistics indicate that there was never any realistic threat of termination to Hotfile's users…[t]his renders Hotfile's policy legally insufficient under Section 512(i)"); *BMG*, 149 F. Supp. 3d at 659 ("[A]n inference that Cox was not reasonably implementing its

[repeat-infringer] policy may be drawn from the numbers" showing the "customer facing actions" Cox took, per month, "in response to alleged infringements.").

And the plaintiffs in *Sony Music Entm't v. Cox Commc'ns, Inc.*, No. 1:18-CV-950-LO-JFA, (E.D. Va.), who won a jury verdict on their claim of contributory copyright infringement, presented compelling evidence of the defendant's record in addressing copyright violations using the precise type of information Plaintiffs seek here. *See* Sahni Decl. Ex. O. Plaintiffs are entitled to that same discovery; BHN's refusal to provide it is calculated to prevent *precisely* this same sort of undeniably compelling evidence from being shown to the jury here.

*Second*, BHN's ticket data document is an especially deficient response for actions BHN purportedly took in response to notices, because it fails to disclose whether BHN terminated, suspended, or even "throttled" the service of any repeat infringers. Most fundamentally, the ticket data shows no "actions" taken at all. The document shows only the *status* of each ticket—whether it was open, resolved, or ignored. Sahni Decl. ¶ 22. But BHN can—and must—disclose what actions it actually took. For example, BHN has claimed—without documentary support or pointing to specific examples—that it suspended and terminated subscribers in response to infringement notices during the Claim Period, including in response to infringement notices sent by Plaintiffs. Sahni Decl. Ex. P; Ex. Q at Responses to RFAs 7-8. BHN will presumably rely on similar statements to support its assertion of a safe harbor. *See* Ex. P. The ticket data cited by BHN, however, shows no such thing.[4]

---

[4] And, again, it's an extremely limited universe: there are data for only 200 of Plaintiffs' 109,458 notices, and for only approximately 3,200 notices sent by other rights-holders over the entire Claim Period. Sahni Decl. ¶ 22.

BHN's invocation of the safe harbor defense entitles Plaintiffs to discovery concerning BHN's termination or suspension of subscribers in response to infringement notices, and in the context of how many overall notices.  Indeed, in *Warner Records Inc. v. Charter Commc'ns, Inc*., a pending similar litigation between Plaintiffs and another ISP represented by the same counsel as BHN ("Charter Case"), the Defendant ISP was ordered to produce this information in response to identical interrogatories.  Sahni Decl. Ex. M at 26-27 ("Charter's invocation of the DMCA Safe Harbor puts at issue its overall policies and procedures for addressing infringement. Information relating to the total number of notices received and Charter's reaction to those notices is therefore relevant. Plaintiffs are entitled to probe how Charter's infringement policies were actually implemented.").

## II.    BHN should be ordered to produce documents concerning its practices for responding to copyright infringement.

Again, to qualify for its safe-harbor defense, BHN must show not only that it *adopted* a policy that would terminate repeat infringers in appropriate circumstances, but also that it *reasonably implemented* such a policy.  That an ISP failed to reasonably implement a policy may be shown not only by raw data (*see* Section I, *supra*), but also by contemporaneous documents reflecting the ISP's actual practices for responding to copyright infringement and what the ISP said when it took—or refused to take—actions in response to repeat infringement.  *See*, *e.g.*, *BMG*, 149 F. Supp. 3d at 655-662 (finding that the "record conclusively establishes that…Cox publicly purported to comply with its policy, while privately disparaging and intentionally circumventing the DMCA's requirements," and including pages of discussion of contemporaneous documents and internal emails reflecting Cox's practices); *Grande*, 384 F. Supp. 3d at 754-58 (finding ISP ineligible for safe harbor

and citing internal emails reflecting practice that diverted from public policy of terminating

repeat infringers); *Hotfile*, 2013 WL 6336286, at *9-10, 21, 24 (finding service provider

ineligible for safe harbor and citing documents in record demonstrating service provider's

practice of ignoring notices, notwithstanding public-facing two-strike termination policy).

As with the raw data it refuses to provide in response to Interrogatories 13 and 14,

BHN has also stonewalled discovery of documents reflecting its actual practices for

responding to copyright infringement, *i.e.*, the very types of documents that have been

powerful evidence in other similar cases.

### A.    Plaintiffs' RFP No. 41

**RFP 41:** Documents sufficient to show all policies, practices, or capabilities that you
considered, formulated, rejected, or adopted for taking adverse action (including suspending
or terminating internet service) against Subscribers or Users for alleged copyright
infringement.

**ANSWER:**    Bright House objects to this request as over-broad and unduly burdensome,
and as seeking information that is outside the scope of permissible discovery because it is not
relevant to any party's claim or defense and demands all documents concerning general
subjects such that the request fails to describe with reasonable particularity the items or
categories of items to be produced for inspection. Bright House objects to this request as
duplicative of other discovery requests that Plaintiffs have propounded. Bright House further
objects to this request to the extent it improperly seeks information protected from disclosure
by the attorney-client privilege, work product doctrine, common interest privilege, or other
applicable privilege or doctrine. Bright House also objects to this request as duplicative of
other discovery requests that Plaintiffs have propounded.

Subject to and without waiving the foregoing objections, Bright House will produce
responsive, non-privileged documents constituting the copyright policies, repeat infringer
policies and acceptable use policies for the Discovery Period, to the extent they exist and are
within its possession, custody, or control after undertaking a reasonable and diligent search
and to the extent not already produced in response to other requests.

This request seeks documents sufficient to show all policies, practices, or capabilities

that BHN considered, formulated, rejected, or adopted for taking adverse actions against

users for alleged copyright infringement.  BHN agreed to produce only the final copyright

policies it already produced.  This is directly at odds with the cases finding ISPs ineligible for the safe harbor because their internal documents showed they did not *in practice* implement, as required, their copyright, repeat infringer, and acceptable use policies.  *See, e.g.*, *BMG,* 149 F. Supp. 3d at 659 ("Despite having a repeat-infringer policy on the books, Cox's implementation rendered the policy an 'absolute mirage.'"); *Grande*, 384 F. Supp. 3d at 754 ("Grande argues that it has adopted an appropriate policy because since 2012 it has had a public-facing policy providing for the termination of infringing subscribers.  The evidence in the record indicates the opposite.").

BHN has produced only 10 documents thus far in this case, but they already show that its practices diverged from its policies.  BHN's public-facing documents state, for example, that "[i]t is our policy to terminate the access of repeat infringers."[5] Sahni Decl. Ex. R.  But BHN has not produced a single document in this case demonstrating the termination of any subscriber for copyright infringement.[6]  And BHN's refusal to produce documents reflecting its actual practices would shield from production even, for example, an internal email stating: "Ignore the written policy, infringing subscribers are too lucrative for us to terminate."  In the Charter Case, the Defendant ISP was ordered to produce documents

---

[5] BHN failed to produce this policy—or any other policies containing this language—even though the Court ordered it *in January* to "produce copies of final DMCA, repeat infringer, and/or acceptable use policies for the period March 1, 2012, to May 31, 2016," and to do so in 60 days.  Dkt. 91 at 2.  The policy is unquestionably "final"—Plaintiffs found it on internet archives of BHN's website—and was last revised on March 16, 2012.

[6] BHN denied a Request for Admission asking it to admit that it had no documents created during the Claim Period demonstrating that it terminated an infringing subscriber's access to BHN's internet services in response to an infringement notice.  Sahni Decl. Ex. Q at Response to RFA 2.  Despite serving requests that called for such documents over a year ago, Plaintiffs have received none.

responsive to a nearly identical request.  Sahni Decl. Ex. M at 27-28.

**B.     Plaintiffs' RFP No. 71**

**RFP 71:**  Communications distinguishing, differentiating, or otherwise comparing BHN's responses to violations of its Acceptable Use Policies for reasons other than copyright infringement (including for hacking or spamming) to its responses to violations of those policies on the basis of copyright infringement.

**ANSWER:**    Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, including because it demands all documents concerning general subjects such that the request fails to describe with reasonable particularity the items or categories of items to be produced for inspection.

This request seeks documents distinguishing BHN's treatment of copyright infringement from its treatment of other violations of its Acceptable Use Policy ("AUP"). Responsive documents would show, for example, that BHN enforced its policy against spammers strictly and as written, but decided not to enforce its copyright infringement policy as written.  Courts have found such documents directly relevant to whether an ISP reasonably implemented its repeat-infringer policy.  *E.g., BMG*, 149 F. Supp. 3d at 656-57 (denying safe harbor defense, citing four Cox emails explaining that practice of "reactivating" copyright infringers "only pertains to DMCA violations.  It does not pertain to spammers, hackers, etc.").

Because these documents would illustrate that BHN could do something about its subscribers' infringing conduct but chose not to, they are also relevant to show BHN's material contribution to its subscribers' infringing conduct and its willfulness in failing to stop it.  In the Charter Case, the Defendant ISP was ordered to produce documents responsive to a nearly identical request.  Sahni Decl. Ex. M at 30-31.

### III.     BHN should be ordered to produce documents relevant to Plaintiffs' request for statutory damages.

Plaintiffs have elected to seek statutory damages in this case, pursuant to Section 504(c) of the DMCA.  Under Section 504(c), if the court or jury finds BHN's conduct to be willful, then plaintiffs could potentially be entitled to damages ranging from $750 to $150,000 per work.  17 U.S.C. § 504(c)(2).  "In determining the amount of statutory damages, a court considers '(1) the expenses saved and profits reaped by [the d]efendants in connection with the infringements; (2) the revenues lost by [the p]laintiffs as a result of [the d]efendants' conduct; and (3) the infringers' state of mind—whether willful, knowing, or merely innocent.'"  *Universal Music Corp v. Latitude 360 Nevada, Inc.*, 2016 WL 3200087, at *4 (M.D. Fla. May 4, 2016) (citing *Nick-O-Val Music Co. v. P.O.S. Radio, Inc.*, 656 F. Supp. 826, 829 (M.D. Fla. 1987)).  BHN has refused to provide documents relevant to these factors.

### A.     Plaintiffs' RFP No. 49

**RFP 49**:  Documents discussing the impact of Subscribers' use of BitTorrent and/or peer-to-peer networks on your current or future profits.

**ANSWER:** Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, including its demand for all documents concerning general subjects such that the request fails to describe with reasonable particularity the items or categories of items to be produced for inspection. Bright House further objects to this request to the extent that it is duplicative of other discovery requests that Plaintiffs have propounded.

Subject to and without waiving the foregoing objections Bright House will produce responsive, documents concerning the use of BitTorrent to infringe copyrights, to the extent Bright House finds such documents within its possession, custody, or control after undertaking a reasonable and diligent search and to the extent not already produced in response to other requests.

This case concerns BHN's liability for its subscribers' use of peer-to-peer networks like BitTorrent to engage in mass infringement of Plaintiffs' copyrighted works.  As the court observed in *Sony v. Cox*, based on an extensive trial record, over 99% of BitTorrent use is for copyright infringement.  *Sony Music Entm't v. Cox Commc'ns, Inc.*, 2020 WL 3121306, at *7 (E.D. Va. June 2, 2020).  Given that BitTorrent is used almost exclusively for piracy, the *Sony* jury was entitled to presume that files on BitTorrent were unlawfully reproduced and distributed.  *Id*.

Request 49, in turn, seeks documents discussing the impact of BHN's subscribers' BitTorrent use on BHN's current or future profits.  Such documents could hardly be more relevant to the "profits reaped by [the d]efendants in connection with the infringements"—a factor the jury may consider in determining the appropriate statutory damages amount. *Latitude 360 Nevada, Inc.,* 2016 WL 3200087, at *4.  BHN's agreement to produce only "documents concerning the use of BitTorrent to infringe copyrights" does not cover what this request seeks, which is the impact of BitTorrent use on BHN's bottom line.

**B.    Plaintiffs' RFP No. 59**

**RFP 59**:  Documents sufficient to show the average revenue and profit that you have received per Subscriber, for the life of the account, from January 1, 2012 to present.

**ANSWER:**    Bright House objects that this request is outside the claim period. Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, including because it demands all documents concerning general subjects such that the request fails to describe with reasonable particularity the items or categories of items to be produced for inspection and with respect to the overbroad requested time period. Bright House objects to this request as vague and ambiguous, in particular as to Plaintiffs' use of the phrase "sufficient to show" which requires speculation. Moreover, Bright House has already agreed to produce billing records for those Subscribers that were identified in the Infringement Notices sent by Plaintiffs' or on Plaintiffs' behalf.

This tailored request asks for documents sufficient to show BHN's average revenue or profit per subscriber.  These averages speak directly to the "profits" BHN "reaped" from failing to take appropriate action against infringing subscribers.

To calculate those profits, Plaintiffs *initially* asked BHN to produce documents sufficient to show the revenues it collected from the subscribers identified in Plaintiffs' notices, and the Court ordered BHN to produce that information in January.  Dkt. 91 at RFP 19.  But BHN produced revenue data for only *137 accounts*, although Plaintiffs sent BHN over a hundred thousand infringement notices specifying infringements committed at over 20,000 different IP addresses.  *See* Sahni Decl. ¶ 21.  In other words, BHN could not provide the ordered information for the *vast majority* of subscribers at issue.  RFP 59 is necessary given BHN's inability to produce the individual-subscriber revenue data that the Court already ordered.  In the Charter Case, the Defendant ISP was ordered to produce documents responsive to an identical request.  Sahni Decl. Ex. M at 37-38.

### C.      Plaintiffs' RFP No. 60

**RFP 60**:   Documents sufficient to show the average and/or estimated total length of time that you retain Subscribers, from inception to termination of the subscription for any reason.

**ANSWER:**    Bright House objects that this request is outside the claim period. Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, including because it demands all documents concerning general subjects such that the request fails to describe with reasonable particularity the items or categories of items to be produced for inspection.

Like RFP 59, RFP 60 is a partial, but necessary, substitute for BHN's inability to produce the individual-subscriber revenue data that the Court already ordered.  Plaintiffs will use RFP 60 to create their own model of the average profits BHN received from infringing subscribers.  Specifically, Plaintiffs experts may use the average length of time that BHN

— 16 —

retained each subscriber, together with historical pricing information, to calculate a model for the average profits BHN reaped from failing to take appropriate action against any given infringing subscriber.

### D. Plaintiffs' RFP 65

**RFP 65:**  Documents sufficient to show the extent to which compensation (including bonus structure(s)) for your employees, customer service representatives, or members of your internet security or customer safety team was tied to retention of Subscribers.

**ANSWER:**  Bright House objects that this request is vague and ambiguous, overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense.

This narrow request seeks documents relevant to BHN's motivation or intent to not terminate subscribers who used BHN's network for copyright infringement.  Under Section 504(c) of the DMCA, if Plaintiffs prove that BHN's material contribution to its subscribers' infringing conduct was willful, they are entitled to a higher damages ceiling—up to $150,000 per work.  17 U.S.C. § 504(c).  It may be that BHN's willfulness would be manifested in a document expressly saying BHN intended to ignore infringement notices in order to increase profits.  But Plaintiffs are entitled to make this case in other ways as well, including by showing that BHN incentivized its employees to not terminate subscribers by tying their compensation to retention of subscribers' accounts.  For instance, if BHN made it economically unattractive for its employees to actually enforce its acceptable use policies and terminate repeat infringers—*e.g.*, by depriving them of bonuses for subscriber retention— that would demonstrate its willfulness in not terminating subscribers who engaged in known, rampant copyright infringement.  In the Charter Case, the Defendant ISP was ordered to produce documents responsive to a nearly identical request.  Sahni Decl. Ex. M at 39-40.

**IV.    BHN should be ordered to produce documents sought in this Motion, and documents it agreed to produce long ago, within 20 days.**

As of the filing of this Motion, BHN has produced a total of 10 documents in this case.  While the parties are negotiating search terms to collect documents responsive to a number of RFPs, Plaintiffs have asked BHN over and over again to begin making rolling productions of documents responsive to RFPs that are not the subject of any dispute and collection of which does not turn on application of any electronic search terms  ("Agreed-Upon RFPs").  Sahni Decl. Ex. L.  But BHN has not made a production in 2020 unless it was Court-ordered.  In addition, despite the Court ordering BHN in May to respond to certain interrogatories, BHN *still* has not done so.  *See* Dkt. 134 at 2.  Nor has BHN produced the final copyright policies—a narrow set of documents—that the Court ordered produced within 60 days in January.  *See supra* at 12-13 n.6, Dkt. 91 at 2.  It has become clear that BHN will not produce documents or answer interrogatories without a court-ordered deadline.  This is not a proper way to conduct discovery, especially in a complex, Track Three case like this. *See S. Gardens Citrus Processing Corp. v. Barnes Richardson et. al*, 2012 WL 12905615, at *2 (M.D. Fla. Mar. 6, 2012) ("failure to produce documents that are clearly responsive to the discovery requests causing unnecessary delay and further motions[] will be frowned upon by the Court.").  Plaintiffs therefore request that the Court:

(1)  order BHN to produce the documents and answer the interrogatories described in Sections I-IV above within 20 days of any order on this Motion;[7]

(2) order BHN to produce documents responsive to the Agreed-Upon RFPs, some of which BHN agreed *in 2019* to produce—which include licenses, specific documents

---

[7] This would not apply to documents that require search terms to collect; the parties have agreed to negotiate those search terms in advance.

referenced in the 10 documents BHN *has* produced, sworn statements, press releases or public statements, and the like—within 20 days of any order on this Motion; and

(3)  hold a hearing on this Motion so that the Court can provide firm guidance regarding the appropriate conduct of discovery, and to avoid Plaintiffs needing to bring serial motions to compel BHN's compliance with the most basic discovery obligations.[8]

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court issue an order compelling BHN to produce the categories of information and documents discussed herein.

## LOCAL RULE 3.01(G) CERTIFICATION

Plaintiffs' counsel conferred with BHN's counsel on multiple occasions prior to the bringing of this motion, including extensive correspondence over the course of over four months and several teleconferences.  The parties have not been able to resolve the issues in this Motion.  *E.g.,* Sahni Decl. ¶¶ 6-12.

Dated: August 14, 2020                             Respectfully submitted,

/s/ *Jonathan M. Sperling*
Jonathan M. Sperling (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

---

[8] Plaintiffs are still conferring with BHN over document requests related to BHN's actual practices for responding to copyright infringement, for which BHN responded by agreeing to produce documents only if they concerned the Plaintiffs or the works in suit.  These restrictions are improper; the requests seek documents relevant to Plaintiffs' claims that, by their nature, are not likely to mention Plaintiffs or their works.  Further, BHN's limitation to Plaintiffs or Plaintiffs' works in suit ignores that the safe harbor defense looks at an ISP's actions generally, not just those related to Plaintiffs.  While Plaintiffs are still conferring with BHN over some of these RFPs, they anticipate they will need to move to compel BHN to lift this improper restriction in due course.

Mitchell A. Kamin (*pro hac vice*)
Neema T. Sahni (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Matthew J. Oppenheim (*pro hac vice*)
Scott A. Zebrak (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com

David C. Banker, Esquire
Florida Bar No. 0352977
Bryan D. Hull, Esquire
Florida Bar No. 020969
BUSH ROSS, P.A.
1801 North Highland Avenue
P.O. Box 3913
Tampa, FL 33601-3913
Telephone: (813) 224-9255
dbanker@bushross.com
bhull@bushross.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2020, I caused the foregoing document and all accompanying materials to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

Dated:  August 14, 2020,

/s/ *J. Hardy Ehlers*
J. Hardy Ehlers

*Attorney for Plaintiffs*