**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC., *et al.*,

      Plaintiffs,

v.

      Case No. 8:19-cv-00710-MSS-TGW

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.

**DEFENDANT BRIGHT HOUSE NETWORKS, LLC'S MOTION TO COMPEL**

**PUBLIC VERSION**

# **INTRODUCTION**

Bright House Networks ("BHN") provided high speed internet service to its subscribers until BHN merged with Charter[1] in May 2016. Plaintiffs are 63 of the world's largest record labels and music publishers—multi-billion-dollar music conglomerates—and have sued BHN on a theory of contributory infringement.[2] Plaintiffs allege that BHN knew about infringing Peer-to-Peer ("P2P") activity by its subscribers as a result of notices of alleged infringement sent by the record label Plaintiffs' ("RLP") agent the Recording Industry Association of America ("RIAA"). However, the notices that the RIAA sent only identify a fraction of the works-in-suit and none of the music publisher plaintiffs ("MPP") sent any notices.

Despite these glaring evidentiary gaps, Plaintiffs seek windfall statutory damages exceeding $1 billion against BHN based on the allegation that BHN's subscribers infringed 7,271 works. To defend against these claims, BHN served discovery requests seeking: (1) Plaintiffs' evidence of direct infringement (necessary for Plaintiffs to hold BHN liable); (2) Plaintiffs' purported harm from the alleged infringement and P2P infringement; (3) Plaintiffs' own efforts to address P2P infringement; and (4) the actual number of "works" eligible for a separate damages award. BHN also served discovery requests relevant to its counterclaims, which allege that Plaintiffs knowingly sent false infringement notices. Plaintiffs refuse to provide this fundamental discovery. BHN seeks an order requiring Plaintiffs to respond to

---

[1] Plaintiffs have separately sued Charter in Colorado on similar claims seeking over a billion dollars. *Warner Records, Inc., et al. v. Charter Commc'ns., Inc.*, No. 1:19-cv-00874-RBJ-MEH ("*Charter*"), and have sued other Internet Service Providers ("ISPs") in several other courts. *See, e.g.*, *Sony Music Entm't v. Cox Commc'ns. Inc.*, 2018 WL 6059386 (E.D. Va. Nov. 19, 2018) ("*Sony*"); *UMG Recordings Inc., et al. v. Grande Comm.*, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018)).

[2] On July 8, 2020, the Court granted BHN's motion to dismiss the vicarious liability claim with prejudice, leaving only the contributory liability claim. ECF 142.

BHN's Requests for Production ("RFP") 22, 27, 61, 65, 67, 68, 92, 98, 99, MPP Interrogatory 13, and RLP Interrogatories 13, 14, 16, and 18.[3]

## **PROCEDURAL HISTORY**

Plaintiffs filed their initial complaint on March 22, 2019, asserting claims for contributory infringement and vicarious liability, for 7,554 works. On January 7, 2020, Plaintiffs amended their complaint to drop 283 works (the "Dropped Works"). On July 22, 2020, BHN answered Plaintiffs' contributory liability claim and asserted two counterclaims: for violation of DMCA Section 512(f) and the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. (2019) §§ 501.201 *et seq.* for knowingly sending BHN inaccurate infringement notices in connection with the Dropped Works and for failing to take appropriate steps to confirm ownership or actual infringement of those works. As an ISP, BHN cannot independently verify whether the information contained within a notice is accurate—it takes the notices at face value and processes them in accordance with its policies. Plaintiffs have moved to dismiss BHN's counterclaims.

The parties met and conferred extensively on the requests at issue in this motion. Plaintiffs have flatly refused to provide the fundamental discovery, necessitating this motion.

## **LEGAL STANDARD**

Parties may seek discovery on "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). The Federal Rules "strongly favor full discovery whenever possible." *Johnson v. New Destiny*

---

[3] BHN's requests and Plaintiffs' responses, including the parties' subsequent correspondence related to the same, are attached to the Declaration of Erin Ranahan ("Ranahan Decl."). Ranahan Decl., Ex. 1-14.

*Christian Ctr. Church, Inc.*, No: 6:15–cv–1698–Orl–37GJK, 2017 WL 8948379, at \*1 (M.D. Fla. Jan. 5, 2017).

## REQUESTS AT ISSUE[4]

### I.   Discovery Fundamental to Statutory Damages

#### a.   MPP Interrogatory 13

**MPP ROG 13:** Identify which of the music composition(s) listed on Exhibit B (including any amendments to same) to Plaintiffs' Complaint correspond with (or are embedded within) which of the sound recording(s) listed on Exhibit A (including any amendments to same) to Plaintiffs' Complaint, if any.

**Plaintiffs' Objection and Response:** 1. Music Publisher Plaintiffs object to the interrogatory as vague, ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case. The phrase "correspond with (or are embedded within)" is vague, ambiguous, and overbroad because there are numerous ways that a musical composition and sound recording may be related, and it is unclear to what type of relationship BHN is referring. BHN's use of these terms implies distinct definitions for "correspond with" and "embedded within"— definitions which BHN has not provided. The burden of researching and listed any possible relationship between the musical compositions listed on Exhibit B and the sound recordings listing on Exhibit A would be significant, and is not proportional to the needs of this case. 2. Music Publisher Plaintiffs object to the interrogatory insofar as it seeks information equally and readily available to BHN. 3. Music Publisher Plaintiffs object to the interrogatory because whether "music composition(s) listed on Exhibit B . . . correspond with (or are embedded within) . . . sound recording(s) listed on Exhibit A" is not relevant to any claim or defense in suit. Each sound recording listed on Exhibit A and each musical composition listed on Exhibit B has been exploited individually as a standalone work.

Subject to, and without waiving their objections, Music Publisher Plaintiffs state that each musical composition listed on Exhibit B is a standalone work that has been exploited individually.

**Argument:** The MPPs are music publishers with copyrights to musical compositions (lyrics and melody) and the RLPs are record companies with copyrights to sound recordings. For the vast majority of the works-in-suit, the sound recording is derivative of the asserted musical composition. This means that here, an MPP owns the lyrics to Lady Gaga's "Bad

---

[4] Per the Local Rules, BHN states each request at issue, Plaintiffs' response and why the motion should be granted.

Romance" while a RLP owns the recording, and both copyrights were allegedly infringed when a user of a BHN subscriber's account shared a P2P music file. But when copyrighted works are owned by distinct entities and separately copyrightable, the Copyright Act provides that the owners of the copyrights are collectively entitled to a ***single award*** of statutory damages. *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016).

Plaintiffs currently assert 4,582 sound recordings and 2,689 musical compositions, for a total of 7,271 copyrighted works. Thus, Plaintiffs' potential maximum statutory damages are over $1 billion. However, when the thousands of sound recordings that are derivative of the musical compositions are properly accounted for, that number drops precipitously, reducing BHN's potential exposure by hundreds of millions of dollars.[5] In order to bring this case, Plaintiffs necessarily had to have determined which of their sound recordings are derivative of their musical compositions. This is because the MPPs did not send BHN any notices—rather, all notices were sent by the RLPs, which own the sound recordings. After these notices were sent, the MPPs determined which of their copyrights were allegedly infringed, so they must know the overlap.

The relevance of this information is clear. In *Sony*, the court granted Cox's post-trial motion on this precise legal issue, holding that the plaintiffs (many of the same in this case) are entitled only to a single award of statutory damages for overlapping sound recordings and musical compositions. Similarly, the Special Master in *Charter* ordered the plaintiffs (again,

---

[5] *See Sony*, ECF 711 (Cox's Post-Trial Response Regarding Derivative and Dropped Works) ("Removing the 2,370 derivative works, the 67 works Plaintiffs dropped from the *Charter* litigation, and one duplicative work— a total of 2,438 works—results in a final number of works tally of 7,579. At $99,830.29 per work, that translates to a total damages award of $756,613,767.91.").

many of which are the same in this case) to produce this information.[6] The same result is warranted here. Plaintiffs should be compelled to provide this information as a verified interrogatory response.

**b.   RLP Interrogatory 13**

**RLP ROG 13:** Identify which sound recordings listed on Exhibit A (including any amendments to same) to Plaintiffs' Complaint were first issued or released together on or as albums or compilations, including for each the name of the corresponding album or compilation.

**Plaintiffs' Objections:** 1. Record Company Plaintiffs object to the terms "issued" and "released" as vague and ambiguous. BHN's use of these terms implies distinct definitions for each—definitions which BHN has not provided. 2. Record Company Plaintiffs object to the term "compilations" as vague and ambiguous, including that it is unclear whether BHN is requesting, for example, that Record Company Plaintiffs identify any sound recording on Exhibit A that was released together with another sound recording on Exhibit A as part of a playlist, a marketing promotion, on a streaming service, a third party product (such as a movie soundtrack), or something else. BHN's use of the terms "albums" and "compilations" implies distinct definitions for each—definitions which BHN has not provided. 3. Record Company Plaintiffs object to the interrogatory because whether sound recordings were "first issued or released together on or as albums or compilations" is not relevant to any claim or defense in suit. Each sound recording listed on Exhibit A has been exploited as a standalone work through multiple platforms, including online services such as iTunes or Spotify. Each is a distinct copyright work, and the manner in which it was first issued or released does not bear on any claim or defense in suit. 4. Record Company Plaintiffs object to the interrogatory insofar as it seeks information equally and readily available to BHN, including through publicly available sources (*e.g.*, the copyright registration certificates state the date on which a recording was first published). 5. Record Company Plaintiffs object to the interrogatory as unduly burdensome, and not proportional to the needs of the case. A sound recording can be packaged with other sound recordings in numerous different ways (*e.g.*, as part of an album, a marketing promotion, a playlist, a soundtrack to a movie or dramatic work, or on a streaming service), and it would require an unduly burdensome investigation to identify and group together all sound recordings on Exhibit A that were released together in any manner. 6. Record Company Plaintiffs object to the interrogatory because it contains at least three distinct topics that should be separately numbered interrogatories: (1) Which sound recordings in Exhibit A were first issued on "albums" or "compilations"; (2) the names of the "albums" and compilations"; and (3) what other sound recordings in Exhibit A, if any, were included on the "albums" or "compilations."

---

[6] *See* Ranahan Decl., Ex. 15, *Charter*, ECF 190 at 6-8; *see also EMI Christian Music Grp., Inc.*, 844 F.3d at 101 (placing the burden on the copyright owner to show that works are separate as opposed to parts of compilations).

**Argument:** Interrogatory No. 13 seeks basic information about whether the RLPs' works-in-suit were first released on albums or compilations, and, if so, the name of the corresponding album or compilations. This is based on the provision in the Copyright Act that "***all the parts*** of a compilation or derivative work constitute ***one work***" for the purpose of calculating statutory damages. 17 U.S.C. § 504(c) (emphasis added).[7] Thus, the Copyright Office has explicitly warned rights holders, like Plaintiffs, of the monetary consequences of registering works as compilations.[8]

Whether a work-in-suit is a part of compilation is key in this case, as the majority of Plaintiffs' sound recordings were collectively registered albums or compilations. As such, if Plaintiffs establish liability, Plaintiffs would only be entitled to a single award per compilation or album as opposed to 4,582 separate awards of statutory damages. Based on this reasoning, the *Charter* Special Master recently ordered Plaintiffs to produce this same information, noting that "limiting the number of works for which damages are available by even a small fraction may have a significant impact on any potential damages." Ranahan Decl., Ex. 16, *Charter*, ECF 230 at 18-19.

Further, some courts, including those in the Eleventh Circuit, also consider the context in which the individual parts of a compilation were exploited in the market to determine whether a separate award of statutory damages is appropriate. *Yellow Pages Photos, Inc. v.*

---

[7] The Copyright Office's guidance confirms the Act's plain language. *See* U.S. Copyright Office, Circular 34 at 3 ("[A]n album that contains multiple sound recordings … is considered a collective work for purposes of registration" and "[a] collective work is considered a single work for purposes of calculating statutory damages.").
[8] *Id.* ("A collective work is considered a single work for purposes of calculating statutory damages…. ***Thus, when you register a number of individual works as part of a collective work, you may be entitled to seek one award of statutory damages for the collective work as a whole rather than a separate award for each individual work, even if the defendant infringed all of those works***.") (emphasis added).

*Ziplocal, LP*, 795 F.3d 1255, 1263, 1277, 1282 (11th Cir. 2015) (upholding the district court's finding that over 10,000 stock images constituted 178 collections for purposes of statutory damages, and in doing so considering how the individual works were exploited and registered with the Copyright Office). Here, the information BHN seeks is relevant to the Court's determination of this issue.

Finally, Plaintiffs should have ready access to this basic information pertaining to the release dates of their albums, and Plaintiffs have already been ordered to compile it in *Charter*. BHN should not bear the burden of researching thousands of recordings to determine whether any were first released as parts of albums or as singles, particularly given that Plaintiffs would inevitably object to this information as unverified or inaccurate. Weighing these issues, the Special Master in *Charter* determined that Plaintiffs' burden was lower. The same is true here.

### c.    RFP 22

**RFP 22:** All documents concerning the effect from copyright infringement using peer-to-peer file sharing technologies on Your projected and actual total revenue and/or profits generated during Plaintiffs' Claim Period.

**Plaintiffs' Response:** Subject to Plaintiffs objections, the Protective Order, and the parties' correspondence and discussions during the meet-and-confer process, Plaintiffs will produce non-privileged studies, reports, and analyses assessing the financial effect of copyright infringement via BitTorrent and other peer-to-peer file sharing networks on Plaintiffs' revenues from the works in suit, to the extent such studies, reports, and analyses exist and can be found in Plaintiffs' possession, custody, or control after a reasonable search.

**Argument:** Plaintiffs agree to produce some documents responsive to this request but refuse to produce documents created *after* the Claim Period even if they pertain to the Claim Period. This artificial distinction makes no sense, as documents reflecting any effects from P2P infringement on Plaintiffs' financials during the Claim Period are just as likely to have been created *after* the time period at issue. For example, a document created in 2017 may outline

7

the effects of P2P infringement for the years prior. Importantly, Plaintiffs do not object based on relevance, only that it would be burdensome to search for post-Claim Period-created documents. But Plaintiffs should be able to identify the types of documents that outline such effects, whether they be financial reports, presentations, white papers, internal memoranda, or email updates from key custodians, and then search for those same documents in the years immediately following the Claim Period to determine whether they concern the Claim Period. Plaintiffs should be compelled to produce these basic documents, which are likely readily identifiable and indisputably relevant.

## II.   Discovery Relating to the Accuracy of Plaintiffs' Notices of Alleged Infringement

### a.   RFP 65

**RFP 65:** All documents pertaining to the relationship, agreement, and/or communications between You and/or any other Plaintiff and the RIAA and/or MarkMonitor regarding this lawsuit, the Copyright Works, and/or Bright House.

**Plaintiffs' Response:** Subject to Plaintiffs' objections, the Protective Order, and the parties' correspondence and discussions during the meet-and-confer process, Plaintiffs will produce non-privileged documents concerning (1) MarkMonitor, and (2) peer-to-peer file sharing networks, copyright infringement, Bright House, or the RIAA, to the extent such documents exist and can be found in Plaintiffs' possession, custody, or control after a reasonable search. Plaintiffs will also produce non-privileged documents concerning the RIAA, Bright House, and copyright infringement, to the extent such documents exist and can be found in Plaintiffs' possession, custody, or control after a reasonable search. [March 1, 2012 to May 17, 2016]

**Narrowed RFP 65:** For the time period May 1, 2012 through present, documents sufficient to demonstrate the relationship, agreement, and/or communications between You and/or any other Plaintiff and the RIAA and/or MarkMonitor regarding this lawsuit, the Copyright Works, and/or Bright House.

**Argument:** Plaintiffs' notice program was managed by the RIAA. The RIAA in turn hired MarkMonitor, a rights monitoring company, to scan P2P networks, identify instances of suspected infringement by ISP subscribers, and send ISPs notices about alleged infringements occurring on the subscribers' accounts. Before sending notices MarkMonitor was supposed to

use the technology of a company called Audible Magic to verify whether the files allegedly being shared did in fact contain copies of Plaintiffs' copyrighted works. For example, just because a file traded was titled "Born to Run" does not mean that the file contained copies of tracks from that Bruce Springsteen album, let alone all of the recordings that might be included on that album. Indeed, in many instances, files on P2P networks are either mislabeled, misleadingly labelled, or contain "duds," fakes, or corrupted or "polluted" files.[9] Thus, MarkMonitor's work on behalf of Plaintiffs and its utilization of the Audible Magic technology is integral to Plaintiffs' ability to establish direct infringement.[10]

It has come to light that, when Plaintiffs sent notices to BHN between 2013 and 2015, Plaintiffs elected a cheaper version of MarkMonitor's system through which MarkMonitor did not actually download a copy (or even a portion of a copy) of the file allegedly being shared by BHN's subscribers. Instead, MarkMonitor merely looked for what it believed were copies of files Audible Magic had previously determined were infringing, without ever reviewing any file found on a subscriber's computer. Despite sending notices to BHN between 2013 and 2015, Plaintiffs did not sue until March 2019. In the years between, Plaintiffs (through their agents, including counsel), corresponded with the RIAA and MarkMonitor to develop the evidence for their case against BHN that was not collected by MarkMonitor when the alleged infringement was allegedly occurring. Some of that post-hoc evidence has been produced in

---

[9] Ranahan Decl., Ex. 17 (Santos, et al. *Funnel: Choking Polluters in BitTorrent File Sharing Communities*, IEEE Transactions on Network and Service Management, vol. 8, no. 4, pp. 310-321 (December 2011)).

[10] *GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*, 131 F. Supp. 3d 1291, 1299 (M.D. Fla. 2015) ("[F]or a party to be held liable for a claim of contributory infringement, there must first be a finding of direct infringement.") (citing *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1298 n. 11 (11th Cir. 2008). Plaintiffs do not contest that both the RIAA and MarkMonitor are central to this case, and disclosed them both in their Initial Disclosures. *See* Ranahan Decl., Ex. 18 (Plaintiffs' Initial Disclosures).

this case in the form of a hard drive, which contains certain files that (according to their metadata) were first downloaded by MarkMonitor between March 2016 and December 2018.



, two years after the claims period in this case closed and three and a half years after the last notice at issue was sent. This spreadsheet has been produced by Plaintiffs, though none of the underlying data has been made available.

In short, Plaintiffs intend to rely on MarkMonitor and Audible Magic evidence that post-dates the period for which they are prepared to provide discovery. To understand the basis for the selectively produced MarkMonitor work product (and the nature of its omissions) BHN has requested that Plaintiffs be compelled to produce responsive documents through the present. Plaintiffs' proposed response, which limits their production to the Claim Period that ended in May 2016,[12] is unacceptable because it would excise from their production *all* of their communications and documents with the RIAA and MarkMonitor

---

[11] The agreement has been produced in *Charter* and Plaintiffs stated that they would be producing it here too.
[12] Plaintiffs did not send any notices of alleged infringements to BHN for the works in suit after March 2015—the last year of the "Claim Period" (March 24, 2013-May 17, 2016).

concerning the evidence purportedly supporting Plaintiffs' direct infringement claim during the very period of time when Plaintiffs were gathering the evidence.

Further, Plaintiffs' proposed response is far too narrow because it is limited to documents that concern MarkMonitor. However, BHN seeks documents between Plaintiffs and the RIAA **and/or** MarkMonitor regarding three topics: (1) this lawsuit, (2) the works-in-suit, and/or (3) BHN. BHN requests that Plaintiffs be compelled to provide search terms that address the scope of BHN's request. If nothing else, communications from RIAA about the results of the MarkMonitor investigation should be produced. Beyond that, BHN's request is already narrowly-tailored to seek only relevant documents, irrespective of the date they were created. Plaintiffs' communications with MarkMonitor and the RIAA concerning this lawsuit, the works in suit, and BHN are indisputably relevant regardless of when they were produced.[13]

Plaintiffs' claim that some post-Claim Period documents may be privileged is not a reason to bar the discovery. BHN intends to challenge Plaintiffs' claim of privilege over its communications with MarkMonitor, particularly as they relate to Plaintiffs' efforts to compile evidence in support of proving direct infringement. At a minimum, Plaintiffs cannot use some of MarkMonitor's findings to assert liability, and at the same time use an alleged privilege to shield discovery of the circumstances under which those findings were made or of other findings that may not be so helpful.[14] Moreover, there can be no privilege attaching to communications with the non-attorneys whose communications are sought here. To the extent

---

[13] In *Charter*, Plaintiffs only produced the RIAA's agreement with MarkMonitor, which was entered into on Plaintiffs' behalf, after a court order to produce all agreements between Plaintiffs and MarkMonitor. Plaintiffs have yet to produce that same agreement in this case, though they agree to do so.

[14] *F.T.C. v. CyberSpy Software, LLC*, No. 6:08-CV-1872-ORL-31, 2009 WL 8708856, at *2 (M.D. Fla. May 26, 2009) ("The attorney-client privilege is meant as a shield and not as a sword.").

that evidence was compiled in anticipation of litigation, that work may or may not be subject to the work product doctrine, but that doctrine is, of course, defeasible, depending on what is being protected and what is otherwise available. Here, the ability to challenge any work product claim is important to the case, as Plaintiffs' only evidence of direct infringement are MarkMonitor's investigations and notices, and the purported accuracy of the MarkMonitor system that generated them. Plaintiffs have produced some of this information, as they must in order to establish direct infringement. Plaintiffs should be compelled to produce the rest, including any responsive documents and a log of any documents over which Plaintiffs claim privilege so that BHN can investigate and challenge the privilege claim as appropriate.

### b.    RFP 67

**RFP 67:** All documents concerning any technical or qualitative analysis of any computer code, computer program, software, hardware, system, process, or device utilized to identify infringement and/or produce the copyright notices which were sent to Bright House or upon which You will rely in this litigation, including any documents drafted by the Center for Copyright Information ("CCI"), MarkMonitor, Stroz Friedberg, or Harbor Labs.

**Plaintiffs' Response:** Subject to Plaintiffs' objections, the Protective Order, and the parties' correspondence and discussions during the meet-and-confer process, Plaintiffs will produce, for the time period of March 1, 2012 to May 17, 2016, non-privileged analyses of the computer code utilized to identify infringement and/or produce the infringement notices that were sent to Bright House and Charter during the claim period of March 24, 2013 to May 17, 2016, to the extent such analyses exist and can be found in Plaintiffs' possession, custody, or control after a reasonable search. Plaintiffs will not, however, produce any such documents that relate solely to the Copyright Alert System.

**Narrowed RFP 67:** Documents concerning any technical or qualitative analysis of any computer code or other systems responsible for the process in identifying infringement and/or producing the infringement notices that were sent to Bright House or upon which You will rely in this litigation, including any documents drafted by the Center for Copyright Information ("CCI"), MarkMonitor, StrozFriedberg, or Harbor Labs.

**Argument:** Plaintiffs sent notices to ISPs under two separate programs: (i) participants in the Copyright Alert System ("CAS") and (ii) non-participants. While the programs were

distinct, MarkMonitor was the rights monitoring company that identified the alleged infringement on P2P networks, generated the notices, and ultimately sent the notices to the ISPs, and used the exact same technology and system in both programs. Plaintiffs have agreed to produce technical and qualitative analyses of the system used to send notices to BHN. Plaintiffs have taken the position, however, that if the technical or qualitative analysis was commissioned as part of the CAS, or by an entity affiliated with the CAS, the document is *per se* non-responsive.

There are at least two significant technical analyses performed on MarkMonitor's system, which were commissioned as part of the CAS. Because these important documents would be withheld under Plaintiffs' proposal, Plaintiffs' position is plainly untenable. Notably in *Sony*, many of the same plaintiffs (represented by some of the same counsel) acknowledged that these analyses were responsive to an identical request—*i.e.*, analyses of the MarkMonitor system used to send notices to non-CAS ISPs. Given this admission, Plaintiffs should be compelled to provide the same responsive documents here, irrespective of whether the document was commissioned as part of the CAS or otherwise. Moreover, ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Ranahan Decl., Ex. 19 (MM000023). As a consequence, a technical analysis of either program is relevant to the issue of the reliability of the technology relied on in this case.

Plaintiffs should also be compelled to search for and produce documents created after the Claim Period. The request is reasonably limited to technical analyses of the system used to

send notices to BHN. If Plaintiffs conducted an analysis in later years regarding this system, that is directly responsive to BHN's request and should be produced. Further, if Plaintiffs, in consultation with the RIAA, MarkMonitor, or any other entity, analyzed the system used to generate the notices at issue in this case while investigating their claims against BHN, which is highly likely, that is also responsive and should be produced. The reliability of Plaintiffs' evidence of direct infringement is central to this case, and the reliability of that evidence is premised on the accuracy of MarkMonitor's system. Plaintiffs should be compelled to produce this probative information.

### c.    RFP 68

**RFP 68:** All documents and correspondence relating to the reliability and/or efficacy of the MarkMonitor System, including but not limited to audits related thereto, and documents and communications with MarkMonitor, Stroz Friedberg, and/or Harbor Labs pertaining to any technical assessments of the MarkMonitor System.

**Plaintiffs' Response:** Subject to their objections and the Protective Order, Plaintiffs will produce responsive, non-privileged documents in their possession, custody, or control, for the period from January 1, 2013 to May 17, 2016, concerning the reliability of the MarkMonitor system used to produce the copyright notices sent to Charter upon which Plaintiffs will rely in this litigation, to the extent located following a reasonable and diligent search.

**Narrowed RFP 68:** For the time period May 1, 2012 through present, documents and correspondence addressing the reliability and/or efficacy of the MarkMonitor System, including but not limited to audits related thereto, and documents and communications with MarkMonitor, Stroz Friedberg, and/or Harbor Labs containing or addressing any technical assessments of the MarkMonitor System.

**Argument:** For the same reasons stated above with respect to RFP 67, Plaintiffs should be compelled to search for and produce responsive documents through present.

### d.     RFP 92

**RFP 92:** For the Copyrighted Works, copies of the digital files You used (or provided to a third party to use) to create a digital fingerprint through the Audible Magic System that were used by Audible Magic and/or MarkMonitor in connection with the creation of the infringement notices sent to Bright House.

**Plaintiffs' Response:** Plaintiffs have or will produce digital copies of the recordings in suit and infringing copies of the works in suit.

**Argument:** MarkMonitor utilized the technology of another third-party, Audible Magic, to purportedly "confirm" that the audio file allegedly shared on P2P networks by ISP subscribers actually contained a copy of Plaintiffs' copyrighted work. To do this, Plaintiffs either sent *legitimate* copies of their works to Audible Magic or utilized Audible Magic's technology in order to create a unique digital fingerprint of the sound file. The copies of the files from which these fingerprints were made are called "reference files." MarkMonitor in turn downloaded files from P2P networks purportedly comprising *illegitimate* copies of the reference files, and asked Audible Magic to compare fingerprints of them to the fingerprints of the reference files. If the fingerprints of the reference file and the fingerprint of the downloaded file matched, then MarkMonitor considered the copy being traded on P2P networks to contain an illegitimate copy of Plaintiffs' copyrighted works. MarkMonitor would send notices when it subsequently identified ISP users sharing that same illegitimate file. Critically, however, MarkMonitor never again downloaded a copy of that file from an ISP user to confirm that the file being shared did in fact contain a copy of Plaintiffs' copyright works. MarkMonitor instead entirely relied solely on its initial comparison of the legitimate reference file fingerprint to the downloaded file fingerprint. The plaintiffs in *Charter* recently revealed, for the first time, and after months of briefing on this issue, that Plaintiffs did not retain the

digital fingerprints comprising the reference file.[15] And Audible Magic has represented to BHN that the reference fingerprint database is dynamic in nature, so that the contents of that database as of the relevant period cannot be reconstructed. The *Charter* plaintiffs nonetheless represented that they are able to utilize International Standard Recording Codes ("ISRCs") to determine what versions of the works-in-suit were used as reference files. Plaintiffs have not, however, produced anything to establish which ISRCs were used in this process, how they were selected, or what works were identified by them. As a result of these revelations, the *Charter* Special Master compelled this information.[16] BHN seeks the same information here.

### e.   RFP 99

**RFP 99:** Documents sufficient to show Your process for verifying the accuracy of the information in Notices of Alleged Infringement before they were sent on Your behalf. For the avoidance of doubt, the term "information in Notices of Alleged Infringement" is any of the information concerning the allegedly infringed work, any information concerning the alleged infringement, any information concerning the IP address at which the alleged infringement occurred, and any statement that the sender is authorized to send such Notice of Alleged Infringement.

**Plaintiffs' Objection and Response:** Plaintiffs object to this Request as overly broad, unduly burdensome, irrelevant, not proportional to the needs of the case, including because it (1) seeks documents that are not relevant to any claim or defense at issue in the case; (2) incorporates a definition of "information in Notices of Alleged Infringement" that, by its terms, is not limited to information included in a Notice of Alleged Infringement; (3) is not limited to the RIAA notice program that resulted in Plaintiffs' infringement notices to Bright House; and (4) is not limited to the relevant time period at issue in this case. Plaintiffs object to this Request as vague and ambiguous as to the phrase "IP address at which the alleged infringement occurred." Plaintiffs object to this Request to the extent it calls for documents not within Plaintiffs' possession, custody, or control. Plaintiffs further object to this Request to the extent it calls for

---

[15] BHN separately requested the digital fingerprints with its RFP 93. In light of the *Charter* plaintiffs' representations that they did not retain copies of the fingerprints, BHN does not move to compel Plaintiffs' production of those files here. However, BHN reserves its rights to revisit this request, should it learn more during the course of discovery.

[16] Plaintiffs were recently ordered to "produce documents sufficient to show which files were fingerprinted, including the information upon which Plaintiffs relied in order to represent that the digital files Plaintiffs have produced to date have the same ISRCs as the files from which the Audible Magic Reference Files were created. To the extent that the reference files themselves exist, those files shall be produced pursuant to this order." Ranahan Decl., Ex. 16, *Charter*, ECF 230 at 26.

information protected by the attorney-client privilege, attorney work-product doctrine, joint defense or common-interest privilege, or any other privilege or immunity recognized by federal or state law. Plaintiffs further object to this Request insofar as it seeks public documents available to Bright House, including trial testimony from *Sony Music Entertainment v. Cox Communications, Inc*. Subject to and without waiving their objections, Plaintiffs have produced or will produce responsive, non-privileged documents in their possession, custody, or control sufficient to demonstrate MarkMonitor's process for monitoring and detecting infringements by Bright House's subscribers and sending infringement notices to Bright House, to the extent such documents can be located following a reasonable and diligent search.

**Argument:** It is unclear why Plaintiffs refuse to produce documents sufficient to demonstrate their process for verifying the accuracy of the notices upon which they rely for their claims. Beyond the steps MarkMonitor took to purportedly verify the information contained within their notices, Plaintiffs also were required to take steps to ensure that they owned the works allegedly being shared on P2P networks. And they were required to ensure that the version of the work they identified matched the version they owned. If Plaintiffs did *not* have a process to ensure the accuracy of this information, then Plaintiffs should be compelled to say so. If they did have a process, then Plaintiffs should be compelled to produce documents sufficient to show the process.

### f.    MPP Interrogatory 15 and RLP ROG 14

**MPP ROG 15:** For each music composition listed on Exhibit B (including any amendments to same) to Plaintiffs' Complaint, identify each RIAA Notice that references the allegedly infringed file corresponding to that music composition.

**RLP ROG 14:** For each sound recording listed on Exhibit A (including any amendments to same) to Plaintiffs' Complaint, identify each RIAA Notice that references the allegedly infringed file corresponding to that sound recording.

**Plaintiffs' Objection to MPP ROG 15:** 1. Music Publisher Plaintiffs object to the interrogatory insofar as it seeks information equally and readily available to BHN, including by using the hash information included in the RIAA notices. 2. Music Publisher Plaintiffs object to the interrogatory to the extent it seeks to obtain expert opinions prior to the period for expert discovery. 3. Music Publisher Plaintiffs object to the interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case.

**Plaintiffs' Objection to RLP ROG 15:** 1. Record Company Plaintiffs object to the interrogatory insofar as it seeks information equally and readily available to BHN, including by using the hash information included in the RIAA notices. 2. Record Company Plaintiffs object to the interrogatory to the extent it seeks to obtain expert opinions prior to the period for expert discovery. 3. Record Company Plaintiffs object to the interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case.

**Argument:** MPP Interrogatory 15 asks Plaintiffs to identify the specific notices for each of the MPP's works-in-suit. Plaintiffs clearly had to have this information in order to file suit. *See* FAC ¶ 96 (alleging the notices indicate BHN's subscribers infringed the works-in-suit). For this reason, the *Charter* plaintiffs have already been ordered to produce this information (although they are currently objecting to the order). Plaintiffs should be compelled to produce the same information here because the information provides the foundation for Plaintiffs' secondary infringement claim. Indeed, Plaintiffs have alleged that BHN's knowledge of the purported infringement—an element of Plaintiffs' contributory liability claim—derives from the notices. But, on their face, Plaintiffs' notices only identify approximately 25% of the 4,582 sound recordings in suit. Moreover, because the MPPs did not send *any* notices to BHN, none of their musical compositions are identified either. In order to have filed suit on the 75% of the works not identified in the notices by name, the MPPs had to have determined which of their musical compositions are implicated by the RLP's notices. And the RLPs had to have determined which of their unidentified 3,000-plus sound recordings are allegedly implicated by their notices.

Plaintiffs wrongly claim BHN can do this work on its own for the 75% of works-in-suit that are not actually identified in the notices (worth approximately $500,000 in added statutory damages) through a convoluted series of steps involving cryptographic hash numbers

and several voluminous spreadsheets produced by Plaintiffs, and by manually listening to music on the contested MarkMonitor hard drive that purportedly contains tens of thousands of what Plaintiffs describe as the "infringing files." It makes no sense to require BHN to do this given that Plaintiffs have already made this factual determination and have ready access to the information. Plaintiffs' burden is less than BHN's, and they should be compelled to respond to BHN's interrogatories and provide verified responses about *Plaintiffs' factual* contentions regarding a critical component of their *prima facie* case.[17]

## III.  Plaintiffs' Anti-Piracy Efforts and the Effect from Peer-to-Peer Infringement

### a.  RFP 27

**RFP 27:** All documents that mention, refer to, or relate to Bright House and/or the above-captioned litigation that were created, received, or sent from 2013 to the present.

**Plaintiffs' Response:** Subject to their objections, the Protective Order, and the parties' correspondence and discussions during the meet-and-confer process, Plaintiffs will produce responsive, non-privileged documents in their possession, custody, or control concerning Bright House and copyright infringement for the time period January 1, 2013 to May 17, 2016, to the extent located following a reasonable and diligent search. Notwithstanding the foregoing, Plaintiffs respond that they will not produce documents responsive only to the part of this request pertaining to "the above-captioned litigation."

**Argument:** As discussed with RFP 65, the requested post-Claim Period documents are necessary to explore Plaintiffs' coordination with third-parties MarkMonitor, Audible Magic, and the RIAA in the development of the evidence Plaintiffs intend to rely upon to prove direct infringement by BHN's subscribers, including any efforts undertaken by outside counsel. The

---

[17] In *Charter*, the plaintiffs claimed that their expert may perform an analysis "along the lines of what Charter seeks." Even if that were true (which it is not), it is irrelevant, as BHN is not seeking the expert analysis and is entitled to a factual answer to its interrogatories on this foundational point during fact discovery. Indeed, in *Charter*, the Special Master rejected this very point. Ranahan Decl., Ex. 15, *Charter*, ECF 190 at 10 ("Contrary to Plaintiffs' assertion, the information sought by MPP interrogatory 15 and RCP interrogatory 14 is basic factual information that will need to be set forth in order for Plaintiffs to establish liability.").

evidence is also necessary to test the accuracy of the infringement data and to explore what the

infringement data means. To the extent Plaintiffs claim that any documents are privileged, they

should be compelled to search for and log them so BHN can assess the validity of the claim.

### b.   RFP 61

**RFP 61:** Documents sufficient to demonstrate the specific actions You undertook in the last ten (10) years that were intended to reduce the infringement of Your Copyright Works and/or any of Your other copyrighted works, including any amount of money you expended on these actions.

**Plaintiffs' Response:** Subject to their objections and the Protective Order, Plaintiffs will produce notices of infringement in their possession, custody, or control that are related to the copyrighted works in suit and were sent to Charter by or on behalf of Plaintiffs, to the extent located following a reasonable and diligent search.

**Narrowed RFP 61:** Documents sufficient to demonstrate the actions Plaintiffs took and costs spent over the last ten years, as related to the following anti-piracy measures, including but not limited to those involving the RIAA, the IFPI, the NMPA, and/or any other such organizations that assisted in these measures: P2P notice programs, P2P spoofing campaigns, Digital Rights Management (DRM) or other types of digital content-protection measures Plaintiffs implemented or, conversely, considered but elected not to implement, and threatened or actual litigation as related to alleged P2P infringement against entities developing or hosting P2P networks, such as BitTorrent, Ares, Gnutella, and eDonkey. Documents sufficient to demonstrate these measures should include any internal or external presentations, reports, white papers, summaries, notes, or other comprehensive documents regarding potential antipiracy measures, ongoing antipiracy measures, and the efficacy of antipiracy measures implemented.

**Argument:** Plaintiffs' anti-piracy efforts are relevant to the issue of mitigation,

whether advanced as an affirmative defense or a factor the jury may consider when deciding a

"just" amount of statutory damages. *See, Malibu Media, LLC v. Zumbo*, No. 2:13-CV-729-

JES-DNF, 2014 WL 2742830, at *3-4 (M.D. Fla. June 17, 2014) (holding that "because

[courts] ha[ve] broad discretion in determining how to award statutory damages and may

consider actual damages as a factor in making that determination, a failure to mitigate damages

may remain relevant, particularly because one purpose of statutory damages is to approximate

actual damages that are difficult to prove.") *Id.* (collecting cases). Indeed, this is because "'[s]tatutory damages are not intended to provide a plaintiff with a windfall recovery'; they should bear some relationship to the actual damages suffered." *Clever Covers, Inc. v. Sw. Fla. Storm Def., LLC*, 554 F. Supp. 2d 1303, 1313 (M.D. Fla. 2008) (quoting *Peer Internat'l Corp. v. Luna Records,* 887 F.Supp. 560, 569 (S.D.N.Y.1995)).

Plaintiffs will no doubt put on evidence at trial here, as they did in *Sony*, that online piracy has decimated Plaintiffs' respective businesses. Ranahan Decl., Ex. 20 (*Sony* Trial Tr.) 29:19-23, 38:20-39:19; 1739:15-17; 1742:19-20; 1743:9-18; 2972:16-17; 2975:14-2976:6. BHN needs to be able to take the requested discovery to provide proper context to this allegation. BHN has reason to believe that, in the years during which Plaintiffs complain P2P infringement was at its peak, Plaintiffs massively cut their anti-piracy budgets. Plaintiffs could have taken reasonable steps to thwart some of their harm if they truly believed they were being harmed and if curtailing this infringement was an actual goal, but they did not. Thus, RFP 61 is necessary to support BHN's position that Plaintiffs could have spent far less to help curb alleged infringement than Plaintiffs are seeking as damages though this lawsuit. The amount that could have been spent to avoid the harm should be weighed against the windfall damages Plaintiffs are seeking.

Additionally, Plaintiffs allege that online P2P infringement "undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license the compensation to which they are entitled." FAC, ¶ 102. BHN is entitled to demonstrate that Plaintiffs could have avoided, and thus have failed to mitigate, those alleged harms. Because the court must consider the harm to Plaintiffs from any alleged

infringement, evidence pertaining to mitigation is squarely relevant. The required discovery will also help the jury to decide (if it finds in Plaintiffs' favor on liability) the degree to which BHN should be held responsible for Plaintiffs' alleged harm, or whether responsibility should be allocated to Plaintiffs or non-parties (such as the direct infringers or the creators of the P2P networks). Indeed, the DMCA safe harbor was created so that innovation was not stifled with threats of astronomical liability against service providers, and to encourage content owners to cooperate with ISPs to combat infringement.

### c.      RLP Interrogatory 16

**RLP ROG 16:** Explain in detail the process for selecting the works that were monitored as part of the RIAA Notice Program.

**Plaintiffs' Objection:** 1. Record Company Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case, including because it (1) seeks information that is not relevant to any claim or defense at issue in the case; (2) is not limited to works at issue in the case; (3) is not limited to the RIAA notice program that resulted in Plaintiffs' infringement notices to Bright House; and (4) is not limited to the relevant time period at issue in this case. 2. Record Company Plaintiffs object to this Interrogatory as vague and ambiguous as to the terms "[e]xplain in detail," "process," "selecting," "monitored," and "RIAA Notice Program." 3. Record Company Plaintiffs object to this Interrogatory to the extent it calls for information protected by the attorney-client privilege, attorney work-product doctrine, joint defense or common-interest privilege, or any other privilege or immunity recognized by federal or state law.

**Argument:** The information sought by this request is relevant for two reasons. First, evidence showing which works Plaintiffs elected to monitor (versus those that were not monitored) will help the jury understand that Plaintiffs valued the works-in-suit differently and, importantly, elected to not protect certain works. If Plaintiffs establish liability, this information is relevant to the jury's determination of statutory damages. Second, evidence showing how frequently Plaintiffs monitored their works is important to refute Plaintiffs' infringement claims. If there are no notices for a particular work during a particular time

period, but Plaintiffs have represented that they were actively monitoring that work during that time period, BHN can show that that work was not infringed by any BHN subscriber during that time period. The ability to demonstrate that certain works were not infringed will be helpful to rebut Plaintiffs' argument that it is impossible to measure the extent of infringement of their works on P2P networks, based on their claim that MarkMonitor's system only captures a small fraction of the actual infringement occurring day in and day out. Plaintiffs' over-stated claims regarding the extent of P2P infringement can be contextualized, and the information sought by this request allows for that.

### d.     RLP Interrogatory 18

**RLP ROG 18:** Describe in detail all actions You have taken against Bright House subscribers who You allege infringed the Noticed Works.

**Plaintiffs' Objection:** 1. Record Company Plaintiffs object to this Interrogatory as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case, including because it (1) seeks information that is not relevant to any claim or defense at issue in the case; (2) is not limited to works at issue in the case; (3) is not limited to the RIAA notice program that resulted in Plaintiffs' infringement notices to Bright House; and (4) is not limited to the relevant time period at issue in this case. 2. Record Company Plaintiffs further object to this Interrogatory on the grounds that the actions they took or did not take against Bright House subscribers who infringed Plaintiffs' works are utterly irrelevant to any issue in this case, as it is *Bright House's* secondary liability that is at issue here. Record Company Plaintiffs were not and are not required to take any direct action against Bright House's subscribers in order to assert their claims against Bright House for Bright House's failure to address rampant, repeat infringement by its subscribers. 3. Record Company Plaintiffs further object to the Request because it relies on information exclusively within Bright House's possession, custody, or control—namely, the identity of the Bright House subscribers who were the subject of Plaintiffs' notices of infringement— which Bright House itself has identified and cannot now identify because it systematically deleted information pertaining to Plaintiffs' infringement notices. 4. Record Company Plaintiffs object this Interrogatory as vague and ambiguous as to the terms "[d]escribe in detail" and "actions."

**Argument:** The information sought by this request is relevant to mitigation, whether as an affirmative defense or as a factor to be considered by the jury when determining statutory

damages. If Plaintiffs were aware of BHN subscribers who received disproportionate amounts of notices but elected not to take any further action available to them, such as filing a lawsuit against the subscriber directly, the jury should be able to consider such evidence. The fact that Plaintiffs may not know the identity of all of BHN's subscribers is not a basis to oppose the discovery, as the request only requires Plaintiffs to respond with the information currently available. If Plaintiffs are aware of any direct actions taken against BHN subscribers, they should respond. If they are not aware of having taken any such action, they should unequivocally state this.

## IV.     Discovery Relating to Bright House's Counterclaims

### a.     RFP 98

**RFP 98:** Documents sufficient to demonstrate Your ownership of, or possession of an exclusive right in, each of the Dropped Works at the time You sent a Notice of Alleged Infringement for that Dropped Work, and that You were authorized to send Notices of Alleged Infringement concerning those works between January 2013 and March 2015.

**Plaintiffs' Objection:** Plaintiffs object to this Request as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case, including because it (1) seeks documents concerning works that are not issue in the case; (2) seeks documents regarding Plaintiffs' authorization to send Notices of Alleged Infringement concerning works without regard to whether those works were in fact the subject of a Notice of Alleged Infringement; and (3) is not limited to the relevant time period at issue in this case. Plaintiffs object to this Request as vague and ambiguous as to the term "authorized to send." Plaintiffs further object to this Request to the extent it calls for information protected by the attorney-client privilege, attorney work-product doctrine, joint defense or common-interest privilege, or any other privilege or immunity recognized by federal or state law. Pursuant to the foregoing objections, Plaintiffs will not produce documents responsive only to this Request.

**Argument:** BHN's counterclaims allege that Plaintiffs knowingly sent false notices related to the Dropped Works and that the RIAA, acting on Plaintiffs' behalf, either falsely claimed it was authorized to send the notices, or failed to exercise reasonable diligence in claiming it had authority to send the notices, in violation of 17 U.S.C. § 502(f) and the

FDUPTA. The information sought by this request is necessary to establish that Plaintiffs did

not own the Dropped Works at the time notices were sent. Further, BHN should be entitled to

explore why Plaintiffs sent notices on the Dropped Works, sued on them, and subsequently

dropped them. This discovery may not be thwarted simply because a motion to dismiss BHN's

counterclaims is pending. Such a practice is strongly disfavored, and courts routinely deny

requests to stay or delay discovery while a motion to dismiss is pending. *See e.g., Regions*

*Bank v. Kaplan*, No. 8:12-CV-1837-T-17MAP, 2014 WL 12810531, at *1 (M.D. Fla. Jan. 31,

2014) ("[M]otions to stay discovery are disfavored and are not ordinarily granted…").

Plaintiffs should produce documents in response to RFP 98.

Dated: August 17, 2020

Respectfully submitted,

Charles K. Verhoeven (*pro hac vice*)
David Eiseman (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 (telephone)
(415) 875-6700 (facsimile)
E-mail: charlesverhoeven@quinnemanuel.com
E-mail: davideiseman@quinnemanuel.com

Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400 (telephone)
(312) 705-7401 (facsimile)
E-mail: andrewschapiro@quinnemanuel.com

GUNSTER, YOAKLEY &
STEWART, P.A.

*s/ Erin R. Ranahan*
Erin R. Ranahan (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
(213) 615-1933 (telephone)
(213) 615-1750 (facsimile)
E-mail: eranahan@winston.com

Michael S. Elkin (*pro hac vice*)
Seth E. Spitzer
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700 (telephone)
(212) 294-4700 (facsimile)
E-mail: melkin@winston.com
E-mail: sspitzer@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor

William J. Schifino, Jr.,
Florida Bar Number 564338
John Schifino
Florida Bar Number 72321
Ryan Lee Hedstrom,
Florida Bar Number 124724
401 E. Jackson St., Ste. 2500
Tampa, FL 33602
(813) 228-9080 (telephone)
(813) 228-6739 (facsimile)
E-mail: wschifino@gunster.com
E-mail: rhedstrom@gunster.com
E-mail: jschifino@gunster.com

San Francisco, CA 94111-5840
(415) 591-1506 (telephone)
(415) 591-1400 (facsimile)
E-mail: jgolinveaux@winston.com

*Attorneys for Defendant*
*Bright House Networks, LLC*

## **CERTIFICATE OF GOOD FAITH CONFERENCE**

Pursuant to Local Rule 3.01(g), I hereby certify that counsel for the movant has

conferred with all parties or non-parties who may be affected by the relief sought in this

motion in a good faith effort to resolve the issues but has been unable to do so.

*s/ Erin R. Ranahan*
Erin R. Ranahan

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on August 17, 2020, a true and correct copy of the foregoing was filed

with the Court via CM/ECF which will send a notice of electronic filing to the parties of record.

<u>*s/ Erin R. Ranahan*</u>
Erin R. Ranahan