## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UMG RECORDINGS, INC., *et al.*,

      Plaintiffs and Counter-Defendants,

v.

BRIGHT HOUSE NETWORKS, LLC

      Defendant and Counter-Plaintiff.

Case No. 8:19-cv-00710-MSS-TGW

---

## BRIGHT HOUSE NETWORKS, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS AMENDED COUNTERCLAIMS

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.      **BACKGROUND** ................................................................................................. 1

II.     **ARGUMENT** ................................................................................................... 4

    A.    **Bright House Has Adequately Pleaded A Claim Under 17 U.S.C. § 512(f)** .......... 4

        1.    **Bright House Has Adequately Pleaded Harm** .............................. 4

        2.    **Bright House Has Adequately Pleaded Knowledge** .................... 8

    B.    **Bright House Has Adequately Stated A FDUTPA Claim** ................................. 14

        1.    **Bright House's FDUTPA Claim Is Not Preempted** .................... 14

        2.    **The FDUTPA Claim Is Pleaded With Particularity** .................... 16

        3.    **Bright House Has Alleged A Deceptive Or Unfair Trade Practice** ......... 17

        4.    **Bright House Has Adequately Pleaded Damages** .................... 19

    **CONCLUSION** ............................................................................................ 20

i

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,
  790 F. Supp. 2d 1024 (N.D. Cal. 2011) .................................................................... 5

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,
  2011 WL 2690437 (N.D. Cal. July 8, 2011) .......................................................... 15, 16

*Arista Records, Inc. v. Mp3Board, Inc.*,
  2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ........................................................... 6

*Automattic Inc. v. Steiner*,
  82 F. Supp. 3d 1011 (N.D. Cal. 2015) .................................................................. 7, 12

*Bailey v. St. Louis*,
  196 So. 3d 375 (Fla. Dist. Ct. App. 2016) ............................................................... 19

*Blackfeet Nat'l Bank v. Nelson*,
  171 F.3d 1237 (11th Cir. 1999)............................................................................ 14

*Burciaga v. Gold Club Tampa, Inc.*,
  2016 WL 9526567 (M.D. Fla. Dec. 28, 2016) .......................................................... 19

*Capitol Records, Inc. v. MP3tunes, LLC*,
  611 F. Supp. 2d 342 (S.D.N.Y. 2009)...................................................................... 5

*Capitol Records, Inc. v. MP3tunes, LLC*,
  821 F. Supp. 2d 627 (S.D.N.Y. 2011) ...................................................................... 6

*Disney Enters., Inc. v. Hotfile Corp.*,
  2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) .......................................................... 10

*Economakis v. Butler & Hosch, P.A.*,
  2014 WL 820623 (M.D. Fla. Mar. 3, 2014).............................................................. 18

*Fruitstone v. Spartan Race Inc.*,
  2020 WL 2781614 (S.D. Fla. May 29, 2020) ............................................................ 17

*Glob. Tech Led, LLC v. Hilumz Int'l Corp.*,
  2017 WL 588669 (M.D. Fla. Feb. 14, 2017) ............................................................ 19

*Ground Zero Museum Workshop v. Wilson*,
  813 F. Supp. 2d 678 (D. Md. 2011) ........................................................................ 12

*Harris v. Nordyne, LLC*,
  2014 WL 12516076 (S.D. Fla. Nov. 14, 2014)........................................................... 16

*Hill v. Morehouse Med. Assocs., Inc.*,
2003 WL 22019936 (11th Cir. Aug. 15, 2003) .................................................. 17

*ISE Entm't Corp. v. Longarzo*,
2018 WL 1569803 (C.D. Cal. Feb. 2, 2018) ...................................................... 11

*James D. Hinson Elec. Contracting Co. v. Bellsouth Telecomms., Inc.*,
2008 WL 360803 (M.D. Fla. Feb. 8, 2008) ........................................................ 19

*Johnson v. New Destiny Christian Ctr. Church, Inc.*,
2017 WL 3682357 (M.D. Fla. Aug. 25, 2017) .................................................. 12

*K.T. v. Royal Caribbean Cruises, Ltd.*,
931 F.3d 1041 (11th Cir. 2019)........................................................................ 10

*Lenz v. Universal Music Corp.*,
2008 WL 962102 (N.D. Cal. Apr. 8, 2008) ...................................................... 15

*Lenz v. Universal Music Corp.*,
815 F.3d 1145 (9th Cir. 2016)...................................................................... 9, 11

*LLW Enter., LLC v. Ryan*,
2020 WL 2630859 (M.D. Fla. May 4, 2020) .................................................... 19

*McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*,
851 F.3d 1076 (11th Cir. 2017)........................................................................ 13

*Motor Components, L.L.C. v. Imex Serv., Inc.*,
2005 WL 8155973 (S.D. Fla. Apr. 19, 2005) .................................................. 11

*Online Policy Grp. v. Diebold*,
337 F. Supp. 2d 1195 (N.D. Cal. 2004) ....................................................... 12-13

*Opinion Corp. v. Roca Labs, Inc.*,
2016 WL 6824383 (M.D. Fla. Nov. 17, 2016) .................................................... 5

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*,
2011 WL 1598916 (C.D. Cal. Apr. 27, 2011).................................................... 16

*Rossi v. Motion Picture Ass'n of Am. Inc.*,
391 F.3d 1000 (9th Cir. 2004)...................................................................... 12-13

*State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*,
278 F. Supp. 3d 1307 (S.D. Fla. 2017)............................................................. 18

*State of Fla., Office of Atty. Gen., Dep't of Legal Affairs v. Tenet Healthcare Corp.*,
420 F. Supp. 2d 1288 (S.D. Fla. 2005)............................................................. 16

*Tommy Hilfiger Licensing, Inc., v. Goody's Family Clothing, Inc.*,
2003 WL 22331254 (N.D. Ga. May 9, 2003) .................................................... 12

iii

*Wallace v. S. Cable Sys., LLC*,
  2016 WL 9308535 (N.D. Fla. Nov. 4, 2016) ..................................................... 19

*XTec, Inc. v. Hembree Consulting Servs., Inc.*,
  2014 WL 12729173 (S.D. Fla. Aug. 1, 2014) ................................................... 18

## **Statutory Authorities**

17 U.S.C. § 106 .......................................................................................................... 14

17 U.S.C. § 301 ....................................................................................................... 14-15

17 U.S.C. § 512 ................................................................................................. *passim*

## **Rules and Regulations**

Fed. R. Civ. P. 8 .......................................................................................................... 9

Fed. R. Civ. P. 9 ..................................................................................................... 16-17

From 2013 to 2016, Plaintiffs sent millions of infringement notices to internet access providers nationwide, including tens of thousands to Bright House.  Plaintiffs' notices were sent by their agent, the Recording Industry Association of America ("RIAA"), via MarkMonitor, a company that could purportedly detect online copyright infringement and send infringement notices *en masse*.  Based on those notices, Plaintiffs seek more than $1 billion in damages from Bright House for secondary infringement of over 7,000 works in suit.  However, MarkMonitor could not detect infringement accurately: MarkMonitor's notices were riddled with false assertions of infringement, including representations that Plaintiffs owned hundreds of works that they do not in fact own.  Indeed, at the time they filed this suit, Plaintiffs sought tens of millions of dollars for works that they later dropped when it became clear that they would need to prove ownership.  Plaintiffs' decision to send false infringement notices harmed Bright House and its customers, and violated both Section 512(f) of the Digital Millennium Copyright Act ("DMCA") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  The Court should deny Plaintiffs' motion to dismiss, which is predicated on a misreading of both the statutes at issue and Bright House's Counterclaims.

## I.  BACKGROUND

Plaintiffs have asserted copyright infringement claims against Bright House that purportedly accrued between March 24, 2013 and May 17, 2016 (the "Claim Period").  Dkt. 164, Amended Counterclaims ("ACC" or "Counterclaims") ¶ 31 (Aug. 25, 2020).  During this time, Bright House utilized a system called ECATS to partially automate its handling of infringement notices.  *Id*. ¶ 33.  Bright House received tens of thousands of notices from Plaintiffs, via the RIAA and MarkMonitor.  *Id*. ¶ 88.  Plaintiffs' notices each claimed to have

"identified a user … reproducing or distributing an unauthorized copy of a copyrighted sound recording." *Id.* ¶ 71.  The notices further asserted that the targeted user's "Internet account was used to illegally copy and/or distribute copyrighted music over the Internet," and claimed to contain "the details of the illegal file-sharing." *Id.*  The notices also asserted "that the information in the notice is accurate," and that the sender had "a good faith belief that this activity is not authorized by the copyright owner, its agent, or the law." *Id.*  Accepting and processing infringement notices proved time-consuming and costly for Bright House, requiring multiple systems and numerous personnel to work in coordination. *Id.* ¶ 36.

Plaintiffs knew their notices were unreliable.  In 2013, shortly before the Claims Period began, multiple news sources reported that MarkMonitor was repeatedly sending infringement notices with obvious inaccuracies. *Id.* ¶¶ 101-02.  Around the same time, the RIAA, Plaintiffs' primary trade organization, was informed that MarkMonitor's process was flawed and inaccurate by two different independent auditors hired to assess MarkMonitor's technology in connection with the Copyright Alert System: Stroz Friedberg and Harbor Labs. *Id.* ¶¶ 104-12.  Stroz Friedberg made six recommendations that "focused on improving the accuracy and reliability" of MarkMonitor's processes, finding that MarkMonitor generated notices for allegedly infringing files before it verified those files as authentic. *Id.* ¶¶ 106-07.  Specifically, although the RIAA had hired a company called Audible Magic to verify that the allegedly infringing files in fact matched Plaintiffs' copyrighted works, MarkMonitor sent infringement notices to Bright House ***before*** Audible Magic verified that the files were in fact a match. *Id.* ¶ 108.  Harbor Labs also reported to the RIAA that MarkMonitor needed to undergo consistent and regular end-to-end and unit testing to improve its verification approaches, and that

2

MarkMonitor did not maintain any data confirming that its notices were accurate. *Id*. ¶¶ 111-12. Notwithstanding MarkMonitor's evident deficiencies, Plaintiffs failed to verify either that they actually owned the copyrights asserted in the notices or that the files identified by MarkMonitor were in fact infringing copies of the works asserted in the notices. *Id*. ¶¶ 76-78.

Not knowing this, when Bright House received a notice from Plaintiffs, Bright House forwarded those notices to the accused subscribers in accordance with its ECATS procedures, informing them that infringing a copyright violates Bright House's Acceptable Use Policy and emphasizing that they should immediately stop the exchange of any infringing material. *Id*. ¶ 37. Plaintiffs' trade organizations, including the RIAA, recognized that this procedure—sending notices to accused subscribers—was effective and significantly reduced infringement. *Id*. ¶¶ 57-58. Notwithstanding Bright House's effective response to Plaintiffs' deluge of notices, Plaintiffs sued Bright House in 2019, alleging that Bright House's subscribers infringed 7,554 sound recordings and musical compositions ("works in suit"). Dkt. 1, Complaint ¶ 69, Exs. A & B (Mar. 22, 2019).

On February 15, 2020—after it became clear that Plaintiffs would need to prove ownership of the works in suit—Plaintiffs dropped over 280 works (the "Dropped Works"). *Id*. ¶¶ 65, 70. They did so because they did not own many of these works, despite having sought over $42 million in damages for them. *Id*. ¶ 67. Indeed, for many of the Dropped Works, the claimant listed on the U.S. Copyright Office registration certificate is a third party, which appears to be independent of the asserting Plaintiff. *Id*. ¶ 69. Thus, Plaintiffs knowingly sent notices to Bright House for hundreds of works they did not own and for actions they knew were not infringing. *Id*. ¶¶ 71, 74.

Plaintiffs' false notices harmed Bright House, as Bright House bore the cost and burden of investigating and processing the false notices and engaging with its subscribers to address the resulting issues.  *Id*. ¶¶ 120, 147, 149.  When Bright House forwarded false notices to its customers, it suffered harm to its goodwill and reputation, and was further injured by having to defend against the meritless claims asserted in the false notices.  *Id*. ¶¶ 146-49.

## II.    ARGUMENT

### A.    Bright House Has Adequately Pleaded A Claim Under 17 U.S.C. § 512(f)

Plaintiffs advance two reasons why Bright House has purportedly failed to plead a DMCA misrepresentation claim under 17 U.S.C. § 512(f): (1) that Bright House has not adequately pleaded "cognizable harm" and (2) that Bright House has not adequately pleaded "actual knowledge."  Neither of these arguments has merit.

#### 1.    Bright House Has Adequately Pleaded Harm

Section 512(f) provides in relevant part that "[a]ny person who knowingly materially misrepresents under this section … that material or activity is infringing … shall be liable for any damages … incurred by … a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing."  17 U.S.C. § 512(f). Relying on cases that do not involve "conduit" service providers like Bright House—who provide consumers with access to the Internet but do not themselves host the allegedly infringing content—Plaintiffs assert that Bright House does not have the ability to manually remove or disable access to infringing material.  Thus, according to Plaintiffs, Bright House

could suffer no harm "in removing or disabling access to the material or activity claimed to be infringing."

Plaintiffs misread Bright House's Counterclaims and § 512(f).  Contrary to Plaintiffs' assertions, the Counterclaims do identify the steps Bright House took when it received an infringement notice.   After processing "notices from the RIAA, which were sent by MarkMonitor, purporting to assert rights owned by Plaintiffs, in accordance with its policies and ECATS procedures," Bright House "forwarded those notices to accused subscribers, reminding them that infringing copyright violates Bright House's Acceptable Use Policy and emphasizing that they should take immediate action to stop the exchange of any infringing material." ACC ¶ 37.  In other words, as soon as Bright House received a notice, Bright House expended resources to "remove or disable" allegedly infringing content by directing the subscribers who had the power to manually remove the content to do so.

None of the cases Plaintiffs cite addresses steps taken by internet access providers or other "conduits" to remove or disable purportedly infringing content.   Instead, each case addresses circumstances where websites or content hosts declined to exercise their power to remove content from their own servers (and one case does not address damages at all).  *See Opinion Corp. v. Roca Labs, Inc.*, 2016 WL 6824383, at *3 (M.D. Fla. Nov. 17, 2016) (rejecting a § 512(f) claim with no allegation host removed negative reviews); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1029 (N.D. Cal. 2011) (rejecting a § 512(f) claim where online video game operator did not remove purportedly infringing content); *Capitol Records, Inc. v. MP3tunes, LLC*, 611 F. Supp. 2d 342, 347 (S.D.N.Y. 2009) (dismissing a § 512(f) claim where website "took no action other than filing an anticipatory

lawsuit in California"); *Arista Records, Inc. v. Mp3Board, Inc.*, 2002 WL 1997918, at *15 (S.D.N.Y. Aug. 29, 2002) (not addressing damages element).  In other words, Plaintiffs argue that this case—where Bright House took affirmative action to "remove or disable access" to purportedly infringing material—is akin to cases where content hosts took no such action.

Plaintiffs' strained reading does not comport with the text or purpose of § 512(f). Section 512(f) contains no requirement that the service provider must have been **successful** "in removing or disabling" the purportedly infringing content in order to recover damages.  Rather, the statute is worded broadly to provide a cause of action when a provider incurs expenses "in removing or disabling" the content as a result of a false notice, even if the content is not ultimately removed or disabled because the provider is not in a position to do so.[1]  Indeed, Congress carefully balanced the rights of various stakeholders in crafting the DMCA.  *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 636 (S.D.N.Y. 2011) ("The DMCA seeks to balance the interests of copyright owners and online service providers by promoting cooperation, minimizing copyright infringement, and providing a higher degree of certainty to service providers on the question of copyright infringement.").  But Plaintiffs' reading of the statute, which would preclude conduit internet service providers from **ever** stating a claim, destroys any semblance of balance and would not promote cooperation or provide certainty to service providers.  Plaintiffs' belief that they can inundate internet service providers with infringement notices and subject those providers to billion-dollar secondary liability if the

---

[1]    Plaintiffs do not even posit, much less prove, that Bright House's efforts were **un**successful.

providers' responses to the notices are not to Plaintiffs' liking, while barring the providers from recourse even if every single notice is fraudulent, is not and cannot be the law.

The proper reading of § 512(f)—which best comports with the statutory text and purpose—allows internet service providers to recover for misrepresentations in notices to the extent they suffered damages associated with removal of purportedly infringing content.[2] Here, Bright House's removal efforts (based on Plaintiffs' false notices) "created tension with the impacted subscribers, negatively affected goodwill, and caused reputational harm to Bright House," and Bright House was forced to expend resources investigating "the veracity of the notices."  ACC ¶¶ 145-49.  Bright House also "incurred costs in implementing its ECATS" system, and was "injured through its defense of the allegations concerning fallacious notices." *Id.*  This constitutes a cognizable injury under § 512(f).  *See Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1029 (N.D. Cal. 2015) (construing damages under § 512(f) broadly, consistent with "Congressional intent that recovery be available for damages" even if not substantial (citation omitted)).

Finally, contrary to Plaintiffs' assertion, the Eighth Circuit's decision in *In re Charter Communications, Inc. Subpoena Enforcement Matter* does not bear upon the adequacy of Bright House's § 512(f) claim.  Instead, *In re Charter* interprets a separate DMCA provision, 17 U.S.C. § 512(h), concerning a copyright holder's ability to subpoena entities that actually

---

[2]    The Amended Counterclaims also allege that notification systems like Bright House's were very effective at reducing infringement, as the RIAA's chairman recognized.  ACC ¶ 57 (noting a similar notification program resulted in "fewer and fewer" infringement alerts "at each level").  This is further evidenced by the fact that fewer subscribers received subsequent alerts, as recognized by an organization created in part by some of the Plaintiffs.  *Id.* ¶ 58 ("[V]ery few subscribers, after repeated alerts, will persist (or allow others to persist) in the content theft.").

store purportedly infringing content and the corresponding safe harbor provisions in 17 U.S.C. § 512(c).  393 F.3d 771, 777 (8th Cir. 2005).  The *In re Charter* court held that the § 512(h) subpoena power is limited to entities protected by the § 512(c) safe harbor because § 512(h) ***by its express terms*** limits the power to subpoenas that have "a notification described in" § 512(c).  *Id.* at 776-77; *see also* 17 U.S.C. § 512(h)(2)(A), (h)(4) (expressly cross-referencing § 512(c)).  In contrast, § 512(f) contains no express reference to § 512(c), instead establishing liability for any person who knowingly makes a material misrepresentation regarding infringement.  Indeed, that Congress chose to ***expressly*** limit one DMCA provision to only § 512(c) entities—but declined to do so in § 512(f)—is persuasive evidence that Congress did not intend to exclude "conduit" internet service providers like Bright House from the protections afforded by § 512(f).

## 2.    Bright House Has Adequately Pleaded Knowledge

Plaintiffs' argument that Bright House has not adequately pleaded the knowledge element of a § 512(f) claim is also without merit, and ignores the text of § 512(f) and Bright House's well-pleaded allegations.  Bright House alleges that Plaintiffs had ***actual knowledge*** of the false notices because either (1) they knew those notices to be false at the time they were sent or (2) took deliberate steps to avoid obtaining that knowledge. Separately, and in the alternative, Bright House alleges that Plaintiffs ***should have known*** that the notices were false at the time they were sent.

Plaintiffs incorrectly assert that actual subjective knowledge of the false notices is required to state a claim under § 512(f), and that Bright House has failed to state a claim because it has pleaded its theories in the alternative.  This argument fails for multiple reasons.

First, even accepting Plaintiffs' (incorrect) assertion that "should have known" is not sufficient scienter to support a § 512(f) claim, Bright House is permitted to plead legal theories in the alternative. *See* Fed. R. Civ. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").  Bright House expressly alleges that Plaintiffs had actual knowledge (subjectively or by proxy through willful blindness) that many of its notices were false, or, in the alternative, should have known that its notices were false.[3]  *See* ACC ¶¶ 85-86, 133-134, 136-137.  Because only one alternative statement of a claim must be adequate, Bright House has pleaded Plaintiffs' knowledge even under a narrow reading of the scienter requirement.

Plaintiffs also wrongly contend that Bright House has not plausibly alleged facts sufficient to support Plaintiffs' actual knowledge that the notices were false.  In doing so, Plaintiffs ignore that the Counterclaims expressly allege that Plaintiffs knew the notices were inaccurate at the time they were sent, ACC ¶¶ 85, 136, and that Bright House has set forth detailed allegations supporting these assertions, *id*. ¶¶ 66-71, 100-02, 111-12, 132. Specifically, the Counterclaims allege that each of the notices affirmatively represented that the senders had a good faith belief that infringement occurred and that the alleged use of the material complained of was not authorized by the copyright owner, its agent, or the law.  *Id.* ¶ 132.  The Counterclaims include numerous facts indicating that Plaintiffs knew they did not have a good faith basis to send these notices.  The fact that Plaintiffs suddenly dropped

---

[3]    Courts recognize that willful blindness—taking deliberate steps to avoid obtaining knowledge—meets § 512(f)'s "knowingly" standard.  *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1155 (9th Cir. 2016).

hundreds of works from this suit after learning they had to prove ownership is an indication that Plaintiffs were sending notices for works that they had no good faith belief they owned.[4] *Id.* ¶¶ 66-71; *see also Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *48 (S.D. Fla. Sept. 20, 2013) (denying summary judgment on knowledge element of § 512(f) claim based on evidence of the defendant's "interest in an application of its takedown rights beyond works that it owns").

Additionally, the Counterclaims identify multiple sources that stated, from the beginning of the notice period in 2013, that MarkMonitor was regularly sending false copyright infringement notices. ACC ¶¶ 100-02. And, specifically with reference to these notices, the Counterclaims allege that when the RIAA commissioned Stroz Friedberg in 2012 to assess the accuracy of MarkMonitor's ISP notice program, it reported that MarkMonitor identified infringement of thousands of files before they were "verified" to be infringing, creating a substantial likelihood that false notices would be sent. Id. ¶¶ 106-07. Harbor Labs also informed the RIAA that MarkMonitor needed to undergo more consistent unit testing and improve its verification process. *Id.* ¶ 111. Harbor Labs further informed the RIAA that MarkMonitor did not maintain any precision-relevant metrics on its live system, meaning that MarkMonitor did not maintain any data confirming that its notices were accurate. *Id.* ¶ 112. Both the public reports of MarkMonitor's inaccuracy and the confirmation of those reports by

---

[4]   Plaintiffs maintain that their withdrawal of the Dropped Works does not suggest that they do not own those works. At this stage, however, the Court must accept all factual allegations as true and draw all reasonable inferences in favor of Bright House. *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1043 (11th Cir. 2019). Here, the Counterclaims allege that Plaintiffs dropped at least some works because "they do not 'own and/or control in whole or in part the copyrights and/or exclusive rights' to the works." ACC ¶ 67. The Court may reasonably infer from the timing of Plaintiffs' decision to drop the works that they did so because they could not prove ownership.

independent auditors coincided with the start of the notice period in this case.  This creates a reasonable inference that Plaintiffs knew they had no good faith basis to believe in the accuracy of their notices at the time the notices were sent.  *See Lenz*, 815 F.3d at 1159 ("[A] party need only know that it is ignorant of the truth or falsity of its representation for its misrepresentation to be knowing.") (Smith, J., concurring in part); *see also ISE Entm't Corp. v. Longarzo*, 2018 WL 1569803, at *7 (C.D. Cal. Feb. 2, 2018) (denying motion to dismiss § 512(f) claim where defendant "refused to withdraw the takedown notice" after learning that it was inaccurate).

For similar reasons, Bright House has adequately alleged willful blindness.  Willful blindness requires that "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  *Lenz*, 815 F.3d at 1155 (citation omitted).  Here, Bright House alleges in its Counterclaims that Plaintiffs were aware from repeated contemporaneous public reports and independent audits that MarkMonitor employed inaccurate and imprecise techniques that virtually guaranteed that it issued false notices.  ACC ¶¶ 100-02, 106-07, 111-12.  Yet, Plaintiffs continued to send notices *en masse* through MarkMonitor's flawed process for years, failing to confirm that they in fact owned the works in each notice or that the purportedly infringing files were in fact copies of the works asserted in the notices.  *Id.* ¶¶ 76-77.  Drawing all reasonable inferences in Bright House's favor, Bright House has plausibly alleged that Plaintiffs were willfully blind to the falsity of their notices at the time they were sent.  *See, e.g.*, *Motor Components, L.L.C. v. Imex Serv., Inc.*, 2005 WL 8155973, at *3 (S.D. Fla. Apr. 19, 2005) (defendant willfully blind where it had information suggesting products were counterfeit, but never inquired where the products were produced or purchased); *Tommy*

*Hilfiger Licensing, Inc., v. Goody's Family Clothing, Inc.*, 2003 WL 22331254, at \*19 (N.D. Ga. May 9, 2003) (finding willful blindness where defendant purchased Hilfiger t-shirts on secondary market, and was aware that counterfeit merchandise is often offered on the secondary market).

Further, although Bright House has adequately pleaded Plaintiffs' actual knowledge and/or willful blindness, Bright House need not do so.  Courts have repeatedly held that a party has properly stated a § 512(f) claim if it alleges that the other party "actually knew, ***should have known if it acted with reasonable care or diligence***, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations."  *Online Policy Grp. v. Diebold*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004) (citing Black's Law Dictionary's definitions of "knowledge") (emphasis added); *see also Johnson v. New Destiny Christian Ctr. Church, Inc.*, 2017 WL 3682357, at \*3 (M.D. Fla. Aug. 25, 2017); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 704 (D. Md. 2011); *Automattic*, 82 F. Supp. 3d at 1026-27.  These decisions reflect the plain language of § 512(f), and specifically the ordinary legal meaning of the term "knowingly," which includes both actual and constructive knowledge.  *Diebold*, 337 F. Supp. 2d at 1204; *Johnson*, 2017 WL 3682357, at \*3.

Bright House recognizes that courts are split as to whether a § 512(f) claim can be sustained where a copyright holder should have known that it sent false notices.  Bright House, however, submits that Plaintiffs' position rests on an incorrect reading of the DMCA.  The cases cited by Plaintiffs all rely on *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1004-05 (9th Cir. 2004), for the proposition that "there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner" for § 512(f) liability to

attach.  But the *Rossi* court expressly conflated two different DMCA standards: the "good faith" standard identified in § 512(c), and the "knowing" standard of § 512(f).  *Id*.  "When Congress uses different language in similar sections [of the same statute], we should give those words different meanings."  *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1089 (11th Cir. 2017) (citation omitted).  Congress could have chosen to import a "good faith" standard into § 512(f)—for instance by attaching liability where a notice is "not submitted in good faith"—but instead chose to use the term "knowingly," which has a separate and distinct legal meaning.  Congress' use of the word "knowingly" in § 512(f), without any qualification, is especially significant because Congress repeatedly used the phrase "actual knowledge" in several other sections of the DMCA, yet did not use the qualifier "actual" in § 512(f).  *See* 17 U.S.C. § 512(c)(1)(A)(i)-(ii) (making a condition of § 512(c) safe harbor that the service provider "does not have actual knowledge" that material is infringing); *id*. § 512(d) (same with respect to § 512(d) safe harbor).  These drafting distinctions all indicate that Congress intended "knowingly" in § 512(f) to carry its ordinary legal meaning, which includes both actual and constructive knowledge.  Put differently, the courts finding that a rights holder "knowingly" submitted a false notice when it "should have known" that the notice was false correctly interpreted § 512(f), and this Court should follow their reasoning.  *See, e.g.*, *Diebold*, 337 F. Supp. 2d at 1204.  This is particularly true here, given that Plaintiffs' motion does not dispute that they should have known that many of their notices—some of which were submitted for works they did not own, and thousands of which were submitted without any accuracy verification—were false.

13

**B.** **Bright House Has Adequately Stated A FDUTPA Claim**

    **1.** **Bright House's FDUTPA Claim Is Not Preempted**

Although Plaintiffs assert that their *en masse* false notices to Bright House are not subject to the DMCA's misrepresentation provisions, they also contend that the DMCA preempts all state laws attaching liability to the submission of false notices.  While convenient for Plaintiffs, this untenable theory must be rejected because it would immunize parties from liability even for deliberately fraudulent conduct.  Section 301(b)(3) of the Copyright Act provides that "[n]othing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to … activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106."  17 U.S.C. § 301(b)(3).  As such, § 301(b) is, in effect, a ***reverse*** preemption provision pursuant to which state laws survive the existence of federal laws.  *See, e.g.*, *Blackfeet Nat'l Bank v. Nelson*, 171 F.3d 1237, 1244 (11th Cir. 1999) (holding that a law providing that federal laws may not "invalidate, impair, or supersede" state insurance laws "reverse[d] the doctrine of preemption in cases involving state insurance laws, such that a state law specifically regulating the business of insurance shall preempt a conflicting federal law").  Because § 512(f) of the DMCA is part of the same title as § 301(a) under the plain text of the Copyright Act, no provision of the DMCA preempts state law unless the state law right in question is "equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106."  17 U.S.C. § 301(b)(3).  Here, Bright House's FDUTPA claim is predicated on misrepresentations, not copyright infringement itself, as outlined in § 106.

Bright House acknowledges that a handful of district courts have ruled that state law claims predicated on infringement notices are preempted by the DMCA. *See* Dkt. 171, Plaintiffs' Motion to Dismiss Counterclaims ("Mot.") 13 (Sept. 8, 2020). Plaintiffs' out-of-circuit cases, however, fail to adequately address the express language of § 301(b), which limits the preemptive effect of the copyright laws—including the DMCA—to only those state law claims that sound in copyright infringement. Plaintiffs' cases effectively read the "nothing in this *title*" language out of § 301(b), instead reading § 301(b) to say "nothing in this *section*" shall have a preemptive effect. But "title" and "section" have distinct meanings. Indeed, other subsections of § 301 expressly limit "[t]he scope of Federal preemption under this *section*." 17 U.S.C. § 301(e) (emphasis added). Congress thus could only have intended for the word "title" in § 301(b) to displace the preemptive effect of the copyright laws generally. None of Plaintiffs' cases explain why the plain text of the statute can be ignored.

To the extent Plaintiffs succeed in their argument that notices submitted to "conduit" internet service providers may not form the basis of a § 512(f) claim (and they should not), Bright House's FDUTPA claim cannot be deemed preempted as a matter of law. Indeed, Plaintiffs' position with respect to § 512(f) is that notices submitted to conduit entities fall outside the ambit of the DMCA's misrepresentation provisions—which is precisely the scenario in which preemption does not apply, even under the cases Plaintiffs have cited. *See, e.g.*, *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 2011 WL 2690437, at *4 (N.D. Cal. July 8, 2011) ("[W]hat matters for preemption purposes is whether the defendant's actions fall within the ambit of the DMCA."); *Lenz v. Universal Music Corp.*, 2008 WL 962102, at *4 (N.D. Cal. Apr. 8, 2008) (granting leave to amend where plaintiff "may be able to allege that

the take down notice was based on YouTube's Terms of Use policy rather than the DMCA"). Where "the DMCA is not applicable to the instant dispute," the DMCA "does not preempt" state law claims. *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 2011 WL 1598916, at *15 (C.D. Cal. Apr. 27, 2011). Plaintiffs cannot have it both ways. They are not entitled to a finding that false notices to conduit entities do not give rise to a claim under the DMCA, and a finding that state law claims based on such notices are preempted.[5]

### 2.      The FDUTPA Claim Is Pleaded With Particularity

Plaintiffs also incorrectly argue that Bright House's FDUTPA claim must be dismissed based on the particularity requirement of Rule 9(b). As an initial matter, FDUTPA claims need not be alleged with particularity, as "FDUTPA was enacted to provide remedies for conduct outside the reach of traditional common law torts such as fraud." *State of Fla., Office of Atty. Gen., Dep't of Legal Affairs v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005); *see also Harris v. Nordyne, LLC*, 2014 WL 12516076, at *4 (S.D. Fla. Nov. 14, 2014) (collecting cases and noting that "[t]his Court joins several decisions in holding that the requirements of Rule 9(b) categorically do not apply to claims under FDUTPA").

But even if the heightened pleading standard did apply, Bright House has met it. Specifically, Bright House has identified: (1) the precise representations alleged to be false, regarding Plaintiffs' ownership of the works at issue and their good faith belief that

---

[5]     The issues in this case differ significantly from *Amaretto Ranch Breedables*, where the court ruled that a state law claim was preempted by the DMCA even though the plaintiff failed to state a DMCA claim. 2011 WL 2690437, at *4. In *Amaretto*, there was no dispute that the notices at issue, which were directed to a § 512(c) storage provider, fell within the ambit of the DMCA and specifically § 512(f). Here, Plaintiffs assert just the opposite: that all notices directed to "conduit" entities fall ***outside*** the ambit of § 512(f). As *Amaretto* itself recognizes, a state law claim is not preempted where the notices at issue are not governed by § 512(f). *Id.* at *4.

infringement occurred, ACC ¶ 71; (2) the precise mechanism through which the notices were sent to Bright House, *id*. ¶ 37; (3) many of the specific works at issue in the relevant notices, by identifying the Dropped Works and listing specific works in Exhibit A to the Counterclaims, *id*. ¶ 69 and Ex. A; (4) the identification number, date and time, identified IP address, file name, and work title of hundreds of the notices at issue, *id*. Ex. A; and (5) the precise actions Bright House took in response to Plaintiffs' false notices and the ways in which Plaintiffs' conduct harmed Bright House and consumers, *id*. ¶¶ 37, 120-21, 147, 149.  These allegations are sufficient to plead a FDUTPA claim, especially where the claim is based on conduct spanning several years.[6]  Notably, the only purported deficiency Plaintiffs identify is that the Counterclaims do not tie notices to individual Plaintiffs—but Bright House did not do so because the **notices themselves** do not identify which copyright owner is asserting infringement.  *Hill*, 2003 WL 22019936, at *3 (Rule 9(b)'s pleading standard is less stringent when the information about the fraud "is peculiarly within the defendant's knowledge or control").  Instead, the Counterclaims identify hundreds of specific representative works and notices, which is more than adequate to allow Plaintiffs to lodge a defense.

> **3.**    **Bright House Has Alleged A Deceptive Or Unfair Trade Practice**

Plaintiffs next assert that Bright House has not alleged a deceptive or unfair practice in "trade or commerce" because the notices were a "pursuit of legal remedies."  Mot. 17.  Not so. The "FDUTPA is to be construed 'liberally' to promote its underlying policies," *Fruitstone v.*

---

[6]    Indeed, "Rule 9(b)'s heightened pleading requirement may be applied less stringently when the fraud allegedly occurred over a period of time," and in that circumstance, parties are permitted to "set forth a representative sample" of the alleged misconduct.  *Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, at *3 n.6 (11th Cir. Aug. 15, 2003) (citations omitted).

*Spartan Race Inc.*, 2020 WL 2781614, at \*12 (S.D. Fla. May 29, 2020), and Florida courts have stated that "the definition of 'trade or commerce' is quite broad," *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1324 (S.D. Fla. 2017) (citation omitted).  This is in accordance with the FDUTPA's aim to "protect the consuming public and legitimate business enterprises from those who engage in … unconscionable, deceptive, or unfair acts or practices."  *State Farm*, 278 F. Supp. 3d at 1324.

None of Plaintiffs' cases stands for the proposition that a nexus to the law automatically places conduct outside of "trade or commerce."  The principal case upon which Plaintiffs rely states only that a "person is not engaged in trade or commerce ***merely*** by the exercise of contractual or legal remedies." *Economakis v. Butler & Hosch, P.A.*, 2014 WL 820623, at \*3 (M.D. Fla. Mar. 3, 2014) (emphasis added).  And each of the other cases Plaintiffs cite concern debt collection letters or pre-litigation demands for monetary payment—in other words, legal demands entirely divorced from the sale of any product or service in the marketplace.  *See* Mot. 17.  By contrast, the Counterclaims detail an elaborate scheme related to Plaintiffs' sale of music in the marketplace.  Specifically, Bright House's allegations create a plausible inference that Plaintiffs sent false, *en masse* infringement notices to threaten Bright House's subscribers in a belief that this would increase sales of their products.  *See, e.g.*, ACC ¶¶ 116-18, 122-23.  And Plaintiffs' motion recognizes that the notices at issue implicate "the very same music [Plaintiffs] sell in the market every day."  Mot. 12.  Under the requisite broad construction of the FDUTPA, Plaintiffs engaged in "trade or commerce" when they vexatiously sent tens of thousands of infringement notices believing such notices would increase their sales.  *See, e.g.*, *XTec, Inc. v. Hembree Consulting Servs., Inc.*, 2014 WL

18

12729173, at *5 (S.D. Fla. Aug. 1, 2014) (sharing legal document about competitor is trade or commerce under the FDUTPA).

### 4.    Bright House Has Adequately Pleaded Damages

Finally, Plaintiffs assert that Bright House does not have "actual damages" because it did not overpay for goods or services. But the FDUTPA has no such requirement, and "reading the statute to require a FDUTPA plaintiff to purchase something of value from the defendant would stand contrary to the express holdings of other courts." *James D. Hinson Elec. Contracting Co. v. Bellsouth Telecomms., Inc.*, 2008 WL 360803, at *3 (M.D. Fla. Feb. 8, 2008).[7] Courts routinely find "actual damages" under the FDUTPA outside of the narrow, consumer-focused categories identified by Plaintiffs. *See, e.g.*, *LLW Enter., LLC v. Ryan*, 2020 WL 2630859, at *7 (M.D. Fla. May 4, 2020) (allegations of lost profits state FDUTPA claim) (Scriven, J.); *Glob. Tech Led, LLC v. Hilumz Int'l Corp.*, 2017 WL 588669, at *9 (M.D. Fla. Feb. 14, 2017) (same).[8]

Here, Bright House and its subscribers "suffered actual damage as a result" of Plaintiffs' misconduct, including that "Bright House has incurred costs in implementing its ECATS system and its customer service operations in receiving, processing, and forwarding the inaccurate notices." ACC ¶ 154. Bright House also has incurred "the cost and burden of investigating the veracity of the inaccurate notices." *Id.* ¶ 156. Bright House's subscribers

---

[7]    In fact, Florida amended the FDUTPA in 2001 to remove the requirement that a plaintiff be a consumer. *Bailey v. St. Louis*, 196 So. 3d 375, 383 (Fla. Dist. Ct. App. 2016) (replacement of consumer with "person" demonstrates an intent to allow a broader base of complainants).

[8]    *See also Burciaga v. Gold Club Tampa, Inc.*, 2016 WL 9526567, at *5 (M.D. Fla. Dec. 28, 2016); *Wallace v. S. Cable Sys., LLC*, 2016 WL 9308535, at *3 (N.D. Fla. Nov. 4, 2016).

were harmed by being forced to respond to Plaintiffs' allegations, and because their accounts

(and internet access) were put at risk.  *Id.* ¶ 121.  These damages are not attenuated.  They flow

directly from Plaintiffs' misconduct, which forced Bright House to expend significant

resources in implementing its response to Plaintiffs' false notices.

## <u>CONCLUSION</u>

The Court should deny Plaintiffs' motion to dismiss Bright House's Counterclaims.

Dated: September 22, 2020

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Tel: (415) 591-1506
Email: jgolinveaux@winston.com

Michael S. Elkin (*pro hac vice*)
Thomas Patrick Lane (*pro hac vice*)
Seth E. Spitzer (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Email: melkin@winston.com
Email: tlane@winston.com
Email: sspitzer@winston.com

Erin R. Ranahan (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071
Tel: (213) 615-1933
Email: eranahan@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-5600
E-mail: mbrody@winston.com

Respectfully submitted,

*/s/ Andrew H. Schapiro*
Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400
Email: andrewschapiro@quinnemanuel.com

Charles K. Verhoeven (*pro hac vice*)
David Eiseman (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
Email: charlesverhoeven@quinnemanuel.com
Email: davideiseman@quinnemanuel.com

William J. Schifino, Jr.
Florida Bar No. 564338
John Schifino
Florida Bar No. 72321
Ryan Hedstrom
Florida Bar No. 124724
GUNSTER, YOAKLEY & STEWART, P.A.
401 E. Jackson St., Ste. 2500
Tampa, FL 33602
Tel: (813) 228-9080
Email: bschifino@gunster.com
Email: jschifino@gunster.com
Email: rhedstrom@gunster.com

*Counsel for Defendant*

*Bright House Networks, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Bright House

Networks, LLC's Response in Opposition to Plaintiffs' Motion to Dismiss Amended

Counterclaims was served by the Court's CM/ECF system on September 22, 2020.

*/s/ Andrew H. Schapiro*
Andrew H. Schapiro
