# Exhibit A

```
 1                  UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3   UMG RECORDINGS, INC., ET AL.,

 4                 Plaintiffs,

 5        vs.                        CASE NO. 8:19-cv-710-T-35TGW
                                     October 9, 2020
 6                                   Tampa, Florida
                                     2:41 - 5:36 p.m.
 7
     BRIGHT HOUSE NETWORKS, LLC,
 8
                   Defendant.
 9   _____/

10

11

12

13

14

15

16              TRANSCRIPT OF MOTION HEARING
           BEFORE THE HONORABLE THOMAS G. WILSON
17              UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24   Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
25   transcription.
```

1  Anything submitted after 4:00 p.m. on the day prior to the
2  hearing will be disregarded. So guess what? I disregarded
3  that stuff. I was still here at 7:06, but I didn't read it,
4  I'm not going to do it. And so we know how to disregard
5  stuff. That's why I don't -- I just don't get it, why it
6  would interfere with some other case.
7           MR. SCHAPIRO: So, Your Honor, we would,
8  therefore, ask that they be ordered to produce it in answer
9  to this interrogatory. We don't care if it's a spreadsheet
10 or a narrative paragraph or whatever it might be by -- you
11 know, as soon as they're able to reasonably do it, which I
12 would hope and imagine would be four weeks, six weeks,
13 something like that.
14          THE COURT: Well, of course, this case isn't
15 moving along at the fastest pace either. So, yeah, I'm
16 going to grant Interrogatory 13. And I'm not going to worry
17 about the timing of it. I'll ask you at some point what's a
18 reasonable amount of time to produce whatever you have to
19 produce and so we'll get that at the end. If I don't
20 forget, I regularly do. So at this point, 13 will be
21 granted.
22          MR. SCHAPIRO: So, your Honor, that brings us to
23 what we call RLP Interrogatory 13, the record label
24 publishers or Plaintiffs' Interrogatory 13. This is an
25 issue that relates to some extent to the question you raised

1    about The Big Chill.  The interrogatory concerns which sound
2    recordings were first issued as albums or compilations.  And
3    the Copyright Act itself states that -- tells us that --
4             THE COURT:  Are we still on 13?
5             MR. SCHAPIRO:  Well, it's a different 13.  So the
6    first 13 was for the music publisher plaintiffs.  So the --
7             THE COURT:  Yeah.
8             MR. SCHAPIRO:  And this second 13 is for the
9    record label.
10            THE COURT:  Where is that listed?
11            MR. SCHAPIRO:  It's the second one in our brief,
12   Your Honor, and it is at page five, page five of our brief.
13   I can read it if you would like.
14            THE COURT:  Okay.  Yeah.  All right.
15            MR. SCHAPIRO:  Yes.  It says:  Identify which
16   sound recordings listed on Exhibit A, parentheses, including
17   any amendments to same, closed parentheses, to plaintiffs'
18   complaint were first issued or released together on or as
19   albums or compilations, including for each the name of the
20   corresponding album or compilation.
21            So what we're trying to find out there is if
22   they're listing Ain't Too Proud to Beg, was that listed
23   first as part of an album or a compilation.  And the reason
24   we're asking for that is that 17 U.S.C., Section 504(c),
25   that's 17 U.S.C. 504(c) of the Copyright Act, instructs that

1 all parts of a compilation or derivative work may constitute
2 one work for purposes of calculating statutory damages.
3     So we're back at this issue, which is going to
4 have a huge impact on our exposure if they manage to get a
5 verdict in this case on whether they just get one award for
6 the album or whether they're allowed to get an award for
7 every song on the album if --
8     THE COURT: Well, that's why I brought up The Big
9 Chill. That's what made me think of it.
10     MR. SCHAPIRO: You put your finger on it. And the
11 copyright office has thought about this too. We quote that
12 copyright office guidance in our brief and the copyright
13 office tells owners that when you register a number of works
14 as part of a collective work, you may seek only one award
15 even if a defendant infringed them all. One award for the
16 collective. And we cite some authority for that in Footnote
17 Seven and Eight of our brief, page six.
18     So this is a key issue, because our understanding
19 is that most of the works in this case were originally
20 registered only as compilations or albums as their original
21 registration. And so do they get a single award per album
22 or do they get 4,582 separate awards. For that reason, yet
23 again, the *Charter* Special Master ordered production of this
24 information because it could have a significant impact on
25 damages.

1  And there's an example that I think is
2  instructive, it's from an Eleventh Circuit case that we cite
3  in our brief, it's called the *Yellows Pages Photo* case.
4  That was a case where the issue was there were 10,000 stock
5  photograph images, but the court rules or one of the parties
6  argued -- I can't recall how it ended up -- that these were
7  100 -- actually just 178 collections.  So there's a big
8  difference.  You have 178 collections of photos, you have
9  10,000 photos.  When you start multiplying by statutory
10 damages, it has a huge impact.
11       So there's no burden, because they've already been
12 ordered to produce this in the *Charter* cases.  They're the
13 owners of these -- these records and these compositions, so
14 they should be heard to say that it's problematic for them
15 to provide.
16       THE COURT:  What says the plaintiff?
17       MR. OPPENHEIM:  Your Honor, unlike the first
18 request that we went through where there was no directly
19 relevant case law in the Eleventh Circuit and the issue had
20 been decided different ways by different courts, this one's
21 clear.  It's clear in the Eleventh Circuit and it's clear in
22 virtually every other circuit.  The Eleventh Circuit in the
23 *Feltner* case rules unequivocally that it does not matter
24 whether the works are registered together.  Individual works
25 that can live their own copyright life are entitled to

1  separate statutory damage awards.  That's what the Eleventh
2  Circuit rules.  And that law is good law, it's the law
3  that's applied in this circuit, and it's the law that is
4  consistent with what many, many other courts have held, and
5  it's why this kind of analysis was not done or allowed in
6  the *Cox* case and it -- the only reason that the Special
7  Master ordered it -- and I'm going to get to what the order
8  was in a second, because Mr. Schapiro was not forthcoming in
9  that respect.
10            But what the Special Master said, well, this issue
11 has not been addressed in the Tenth Circuit and as the
12 Special Master I'm not going to opine on the legal issue.
13 But in the Eleventh Circuit the law's unequivocal that if
14 you release an album with ten different works and those
15 works are individual works that can live their own copyright
16 life, which, of course, they do, you can listen to each of
17 them individually, download them individually, stream them
18 individually, that they are subject to a separate statutory
19 damage award.
20            So as a matter of law, the defendant is just wrong
21 on this one.  But if you're going to entertain it,
22 notwithstanding *Feltner*, then there are huge problems with
23 the language of the interrogatory and it is enormously
24 burdensome and that burden issue is one that has received
25 multiple briefings and hearings by the Special Master in the

1  *Charter* case, because the plaintiffs have indicated in the
2  *Charter* case they don't know that we could ever do this
3  analysis for some of the works in the case, not to mention
4  not sure what the analysis is.
5       So I'm happy to go through the vagueness issue,
6  I'm happy to go through the burdensomeness issue, but I
7  don't think we have to get there, because the *Feltner*
8  decision in the Eleventh Circuit, the defendants can cite
9  you no law that contradicts and the Eleventh Circuit
10 controls this.
11      THE COURT:  So tell me, there's a problem deciding
12 which sound recordings were first issued as an album?  Why
13 is that a problem?
14      MR. OPPENHEIM:  Well, Your Honor, one would
15 imagine that a record company might have a complete catalog
16 of everything that issued and when, but they don't, because
17 they issue many, many, many different sound recordings at
18 many, many different times in many, many different countries
19 in many, many different formats and --
20      THE COURT:  We're only talking about the sound
21 recordings listed on Exhibit A.  How many you got?  How many
22 is it?
23      MR. OPPENHEIM:  Of the 7500, I want to say it's
24 roughly 4,000-plus sound recordings.
25      MR. SCHAPIRO:  4,582 is my understanding, Your

1  Honor.
2       THE COURT: Okay. So it's a problem to determine
3  which ones were first issued as albums?
4       MR. OPPENHEIM: Yes, Your Honor, it is -- in many
5  instances, not all, but in many instances virtually
6  impossible. And let me give you an example of why that is.
7       If a record company acquires a label that issued
8  the sound recording before the record label acquired that
9  label, the record company may not have the records, the
10 files which indicate what was the first release of this, was
11 it first released on radio, was it first released as a
12 promo, was it first released as a single, was it
13 simultaneously released as a single and as an album, did it
14 come out in a movie first? These are difficult questions to
15 answer in the normal course and when you throw in that many
16 of these recordings are works that were acquired or works
17 that may have come from overseas or that are older, it
18 becomes enormously difficult.
19      In the *Charter* case we knew there would be some
20 burden and when the Special Master ordered us to do this
21 because there was no law in the Tenth Circuit like *Feltner*,
22 we dug into it and we started doing an enormous amount of
23 work to try to understand how to answer this. And what we
24 discovered was that it's virtually impossible in some
25 instances to figure out what the answers are. And so what

```
 1   the Special Master actually did and came back to and said,
 2   look, you answer for the ones you can answer.  So she didn't
 3   order production as to everything, she recognized that we
 4   wouldn't be able to based on declarations that were put in.
 5   So again, that's because --
 6              THE COURT:  Well, I'll go along with that
 7   approach.  If you can't figure something out, you can't
 8   figure something out.  If you don't have a document, you
 9   don't have it.  That's sort of basic.  But this is --
10              What'd you say, 4,000-something?
11              MR. SCHAPIRO:  4,582.
12              THE COURT:  Just the way I read this, and your
13   objections seem to read more problems into this thing than
14   there is, it's, hey, it's 4,000 sound recordings which were
15   first issued as an album.  I'm having trouble thinking
16   that's so complicated.
17              MR. OPPENHEIM:  Your Honor, the Eleventh
18   Circuit --
19              MR. SCHAPIRO:  It's not, Your Honor, and --
20              MR. OPPENHEIM:  -- decision on this could not be
21   more clear.  In some respects it was one of the first cases
22   of many, many Circuit decisions that made clear that when
23   you have multiple works that are registered together, but
24   those multiple works that can be monetized on their own and
25   have a life on their own, they are -- they get individual
```

1  damage awards, statutory damage awards.  And that's what
2  *Feltner* says.  And if *Feltner* is right, which it has to be
3  for this Court, because it's good Eleventh Circuit law, then
4  this discovery is improper.
5              MR. SCHAPIRO:  Your Honor, let me address *Feltner*.
6  So -- and I apologize, I'm just reading this off a phone
7  where I have it, because we didn't file -- we didn't have
8  the opportunity to file a reply in this case.  But, Your
9  Honor, I'm going to be reading from a case called *LaDarius*
10 *Entertainment Group* (ph), a Southern District of Florida
11 2005 case, it is 2005 Westlaw 8157690 distinguishing
12 *Feltner*.
13             I think having this phone here is causing --
14             So in that case the court distinguished *Feltner*
15 and said defendants -- so *Feltner* I should point out is a
16 case involving videos and films.  And the court in that case
17 said:  Defendants cite *MCA v. Feltner* for the proposition
18 that each work infringed for purposes of statutory damages
19 is defined as each creative expression has an independent
20 economic value or viability.  However, in *Feltner*, the
21 Eleventh Circuit qualified its holding, quote, in light of
22 the pretrial stipulation in this case -- this according to
23 *Feltner*, the deference we give a District Court in
24 interpreting a pretrial stipulation and Feltner's failure to
25 offer evidence at trial on this issue, we find that the

1  District Court did not err in interpreting the pretrial
2  stipulation as not placing in issue the number of works
3  infringed.
4           This is essentially a factual issue with this idea
5  of living a copyright life of its own.  And even
6  Mr. Oppenheim can't say, because it's not accurate, that
7  every court everywhere agrees with this view.  So even if it
8  were the case, and it's not, that *Feltner* disposes of this
9  issue, which it certainly is not the case, we are still
10 allowed, because we may want to make the argument or
11 challenge that, to get this discovery which they're being
12 ordered to produce anyway elsewhere and which surely they
13 must have.  I mean, they are record companies and music
14 publishers.  They are suing us.  And if it turns out that
15 somebody in 1979 forgot to bring the file box over when
16 Electra got bought by Warner or something like that, well, I
17 think that should be their problem, not our problem, but we
18 can address that if and when it arises if they're -- so they
19 have no, by the way, I should point out submitted a
20 declaration to my knowledge about burden in this case and so
21 I think they should be ordered to produce it.
22          THE COURT:  Okay.  What's --
23          MR. OPPENHEIM:  So --
24          THE COURT:  Go ahead.
25          MR. OPPENHEIM:  I'm sorry, Your Honor.

| | |
|---|---|
| 1 | THE COURT: Go ahead. |
| 2 | MR. OPPENHEIM: For Mr. Schapiro to come forward |
| 3 | and cite to you a unreported District Court decision about a |
| 4 | stipulation that is different than the lengthy written |
| 5 | Eleventh Circuit decision is just not compelling. So the |
| 6 | Eleventh Circuit actually did a full-blown legal analysis of |
| 7 | the question of whether or not you can get separate |
| 8 | statutory damage awards for different television episodes |
| 9 | that were registered collectively as a single work. And the |
| 10 | Eleventh Circuit didn't rely on whether or not there was |
| 11 | some stipulation, they did an analysis and what -- the |
| 12 | conclusion they came to is the same conclusion that the *Cox* |
| 13 | court came to, in the UMG *Cox* case and Sony *Cox* case, and |
| 14 | now (inaudible) individual works that can live their own |
| 15 | copyright life are entitled to separate statutory damage |
| 16 | awards. And a 2005 Westlaw decision from a District Court |
| 17 | in Florida does not reverse the Eleventh Circuit law in |
| 18 | this, which is controlling. |
| 19 | MR. SCHAPIRO: So, Your Honor, let me just read |
| 20 | more from that Westlaw decision in the Southern District of |
| 21 | Florida, which the Court might I think properly |
| 22 | distinguished *Feltner* by saying: An entire episode of a |
| 23 | television show is distinguishable from an individual song |
| 24 | on what would most likely be referred to in common parlance |
| 25 | as a compilation album. |

1     At a minimum, the fact that a judge in the
2 Southern District of Florida in a case that involved music
3 and song suggests that this is an open issue that we should
4 be allowed to argue about at the proper time and not that
5 discovery should be foreclosed.
6     THE COURT:  I'm back -- I'm still stuck on the --
7 what appears to be a rather straightforward request of which
8 sound recordings on Exhibit A of approximately 4,000 sound
9 recordings were first issued as an album.  I'm not sure why
10 that's such a problem.
11     Now, I can understand if, to use the example a box
12 wasn't brought over when there was a shift in ownership, but
13 then you can say that, we only have records for 3,762.  So
14 I'm going to grant --
15     MR. OPPENHEIM:  So, Your Honor --
16     THE COURT:  I'm going to grant No. 13, that 13.
17     MR. SCHAPIRO:  Thank you, Judge.  I think that
18 brings us to our request --
19     MR. OPPENHEIM:  Your Honor?
20     THE COURT:  Go ahead.
21     MR. OPPENHEIM:  I recognize Your Honor doesn't
22 appreciate looking at exhibits to filings, but we did submit
23 lengthy declarations on behalf of our clients expressing
24 issues both with the ambiguity here, as well as the
25 burden --

1           THE COURT:  No.  No.  And I read your response.
2  The notion that this is an ambiguous interrogatory is
3  frivolous.  It's clear as it can be.  (Inaudible) is trying
4  to make something ambiguous.  This isn't an ambiguous thing,
5  it's -- so if you have lawyers with a declaration saying I
6  don't understand what you're talking about, I understand
7  what they're talking about, so --
8           MR. OPPENHEIM:  Well, Your Honor, can I ask -- can
9  I ask a question then?
10           THE COURT:  Sure.
11           MR. OPPENHEIM:  Which is if an album is released
12  simultaneously with a digital single, is that first release,
13  or is it a release if it's a radio promotion as compared to
14  an album sale?  Or is it a release if it's in a movie?  And
15  these are the kinds of things that really aren't clear to
16  us.  And it's easy to read it and say, well, I can make
17  sense, but when you apply it to the industry, it is
18  ambiguous.  So I understand why from your perspective and
19  probably, frankly, from mine on first reading, it may seem
20  clear.
21           THE COURT:  Okay.
22           MR. OPPENHEIM:  But when our clients read it --
23           THE COURT:  Give it to some lawyer in your firm
24  who doesn't know anything and let him or her read it and
25  then answer it, because it's clear on its face what they're

1  asking for.  It may be that you cannot answer it fully for
2  some reason or other, but at this point, that one is not
3  difficult to understand.  So I'm granting it.  And if you
4  need to have caveats or explanations or parentheses or
5  whatever, okay, do that.  But we're talking about probably
6  less than 4,000, because apparently there's some information
7  lost.
8           But in terms of -- because I regularly in
9  discovery disputes bring out the proportionality requirement
10 and say, now, this case isn't worth that.  This one
11 requires, okay, the extent of the amount of work required is
12 going to have to be done, because it's proportionate to the
13 amount at issue.  So I'm granting the RLP Interrogatory 13.
14           MR. SCHAPIRO:  Your Honor, before we go to Request
15 for Production 22, I know there's some static and I know
16 that your Deputy has been trying to figure out what it is,
17 but maybe we could just take a minute, because I think the
18 recording might be --
19           THE COURT:  Probably is.
20           MR. SCHAPIRO:  Would it be someone on the phone?
21 Because we've all taken -- tried to move our phones away
22 from the microphone.
23           MR. OPPENHEIM:  We have as well.  We hear the
24 static.  We do have a phone delay as well.
25           DEPUTY CLERK:  Make sure you don't have any

```
 1  UNITED STATES DISTRICT COURT )
                                  )
 2  MIDDLE DISTRICT OF FLORIDA    )

 3
                    REPORTER TRANSCRIPT CERTIFICATE
 4
          I, Howard W. Jones, Official Court Reporter for the
 5  United States District Court, Middle District of Florida,
    certify, pursuant to Section 753, Title 28, United States
 6  Code, that the foregoing is a true and correct transcription
    of the stenographic notes taken by the undersigned in the
 7  above-entitled matter (Pages 1 through 122 inclusive) and
    that the transcript page format is in conformance with the
 8  regulations of the Judicial Conference of the United States
    of America.
 9

10                              /s    Howard W. Jones
                                    _____
11                              Howard W. Jones, RPR, FCRR
                                Official Court Reporter
12                              United States District Court
                                Middle District of Florida
13                              Tampa Division
                                Date:  10-15-2020
14

15

16

17

18

19

20

21

22

23

24

25
```