# Exhibit C

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UMG RECORDINGS, INC., *et al.*,

    Plaintiffs,

v.

BRIGHT HOUSE NETWORKS, LLC,

    Defendant.

Case No. 8:19-cv-710-MSS-TGW

**DECLARATION OF JONATHAN GLASS IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO BRIGHT HOUSE'S MOTION TO COMPEL**

I, Jonathan Glass, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

    1.    I am Senior Vice President, Head of Digital Legal Affairs for Warner Music Group ("WMG"). I have worked in Digital Legal Affairs at WMG for 10 years. I am a senior negotiator of global digital distribution agreements for WMG's sound recordings to generate revenue for the company and our artists. Through my work, I am generally familiar with WMG's practices and procedures for developing, exploiting, and distributing sound recordings and its efforts to enforce its copyrights covering its sound recordings. I have personal knowledge of the facts set forth below and/or have learned of these facts as a result of my position and responsibilities at WMG. If called upon and sworn as a witness, I could and would testify competently as to the matters set forth herein. I submit this Declaration, based on personal knowledge and information learned in the course of business, in support of Plaintiffs' opposition to Bright House's motion to compel.

    2.    The Warner Music Plaintiff group is comprised of Warner Records Inc., Atlantic Recording Corporation, Bad Boy Records LLC, Elektra Entertainment Group Inc., Fueled By

1

Ramen LLC, Nonesuch Records Inc., Lava Records LLC, Maverick Recording Company, The All Blacks U.S.A., Inc., Warner Music Inc., Warner Records/SIRE Ventures LLC, and WEA International Inc.

3. The Warner Music Plaintiff group is part of WMG's recorded music division whose primary business is to license, sell or otherwise commercially distribute copyrighted sound recordings, not musical compositions.

4. In this litigation, WMG is claiming infringement of the sound recordings identified in the current Exhibit A to the Amended Complaint, for the period of March 24, 2013 through May 17, 2016.

**WMG Exploits Sound Recordings Individually Even When Those Sound Recordings Are Included As Part of An Album**

5. As a general matter and routine business practice, both within and outside of the relevant claim period, WMG releases and monetizes its sound recordings individually even when they are part of an album, and often promotes and markets tracks individually as well. This practice has become particularly important within the past decade, given the emergence of digital downloading and streaming technology as the principal method by which fans consume music. Thus, notwithstanding that WMG distributes sound recordings in both physical and digital album format, the overwhelmingly dominant means of exploitation in the modern digital age is on an individual track basis. And although the album format was the standard in the pre-digital age, it was often the case that one or more "singles" were released prior to the album release.

6. Consistent with this, during the relevant claim period in this case, WMG distributed all or virtually all of its claimed copyrighted sound recordings as individual tracks available online through sources such as iTunes, Spotify, and YouTube, among others. Indeed, individual tracks

2

are often available for purchase, streaming or downloading as "singles" at different times, including before a full album is released, in order to maximize their independent economic value.

7. WMG also licenses sound recordings to be included in a film, TV show or other audiovisual work, and generally does so on an individual track basis, not on an album basis. These licenses are commonly referred to as synchronization licenses.

8. Even in the rare case where a sound recording is sold only on an album, WMG generally monetizes those sound recordings individually on certain digital distribution partners like YouTube upon release.

**Interrogatory No. 13 Is Vague and Burdensome**

9. I have been asked to explain some of the challenges WMG would face in attempting to answer Interrogatory No. 13 by identifying each WMG sound recording in suit that was "first issued or released together on or as albums or compilations." Leaving aside whether the information sought has any legal relevance, answering the request to any reasonable degree of certainty would be extremely difficult and, in some cases, impossible. WMG has no specific business reason to internally track whether, or the date or manner in which, a sound recording is "first issued or released on or as albums or compilations," and therefore, the requested information may not exist. Even if the information does exist, it cannot be systematically and efficiently extracted from any one database or system.

10. Additionally, the request is vague and ambiguous as to the meaning of the phrase "first issued or released." "First issued or released" is not defined and it is not clear whether this refers to a "first release" via radio promotion and airplay, first commercial distribution to the public or something else. Regardless, applying any of these definitions, WMG would have to conduct manual searches for information related to each of the more than 1,000 WMG sound recordings in

3

suit across multiple databases, physical files, and multiple record labels and divisions, and the information needed to answer the question may not exist. Therefore, WMG would not be able to respond with a level of reasonable certainty as to many works in suit and, in many cases, would not be able to respond at all. And the effort required merely to confirm that this information likely does not exist would be extremely burdensome.

11. There are two main reasons why it will be difficult (if not impossible) to respond to Interrogatory No. 13. *First*, the works in suit encompass dozens of "legacy artist" recordings, dating back to the 1970s, 1980s, and 1990s, for which WMG does not have readily accessible and complete records. *Second*, WMG acquired rights to many of the works in suit after an initial release by a predecessor owner, through a catalogue purchase or corporate acquisition or merger. In such cases, WMG does not typically get information on initial release dates or formats for sound recordings it acquires.

12. If we interpret "first issued or released" to mean "first released for radio promotion and airplay," it would be very difficult to pinpoint the first release date. The Warner Music Plaintiff group is largely comprised of independently operating companies that have different radio promotion departments. Even for modern-day releases, this is not the type of information that the Warner Music Plaintiff group stores in a consistent, easily accessible manner. For older recordings, WMG often released one or more physical "singles" for promotional purposes in advance of an album release. Singles may have been released in various formats for which the release dates were not recorded. An attempt to identify each single that pre-dated an album release prior to the digital era would require a manual song-by-song search across physical files, sales databases, promotional records, and the internet, among potentially other sources of information.

13. Even if we interpret "first issued or released" to mean "first commercially distributed to the public," it would still be difficult to pinpoint the first release date. Again, for legacy recordings, and particularly for those that were part of a catalog or company acquisition, WMG likely did not acquire this information. In order to determine initial release dates for such tracks, and whether they were initially released as part of an album, WMG personnel would need to search publicly available websites like wikipedia.com or discogs.com – which Bright House can just as easily do – to varying degrees of accuracy but no way to confirm the accuracy.

14. It would be equally or more burdensome to try to determine this information where WMG has existing records. WMG could attempt to search numerous physical and electronic information repositories for every product on which a WMG sound recording in suit appeared and try to pinpoint the product that was released earliest in time. But there was far less formality in the manner and amount of data WMG captured during the pre-modern digital era. Compounding the uncertainty, physical distribution of music during this era occurred through multiple different supply chains, including in the U.S. and other territories, and attempting to determine a true "first release" date would require an analysis across each supply chain network. Moreover, given changes in media formats, the release date that appears in a system for a given album could be the date associated with its release on a re-issued configuration, rather than its actual first release. Therefore, an additional manual review would be required for all 1,000-plus WMG sound recordings in suit to cross-reference any date information that does exist in the database against sales records, promotional data from WMG's record label divisions, and supply chain and delivery history records.

15. If Bright House is merely trying to ascertain which sound recordings were "registered" together under one copyright registration, as part of an album or compilation, then it

5

can easily determine that itself by reference to the registration certificate numbers provided in the Exhibits to the Complaint and the thousands of registration documents already produced in discovery. But the copyright registrations may not provide the answer to which recordings were "first released or issued" as part of an album or compilation. Among other reasons, album registrations do not usually state whether the sound recordings included in the registration were also released simultaneously as individual tracks. Even a track that is identified on a registration as "preexisting" or having been "previously registered" could have been previously released as part of a different album, another "compilation" (such as an EP) or as a "single."

16. As noted above, virtually every sound recording released in the digital age (i.e., around when iTunes became a full catalogue download store) has been initially released for purchase as an individual track, regardless of whether it was also released simultaneously as part of an album. To identify any exceptions from this standard practice, WMG would have to manually search and cross-reference multiple databases to determine whether any sound recording was exclusively exploited as "album only", and then determine the release dates for each product on which the sound recording appeared. And even in the rare case where a sound recording is sold exclusively on an album, WMG generally monetizes individual recordings through certain digital distribution partners like YouTube; thus, additional research would be required even for tracks initially available for sale as part of a physical album or as "album only."

17. Given these challenges, I estimate that it would take WMG several months to determine which WMG sound recordings in suit were initially released exclusively as part of an album. However, notwithstanding our best efforts, it may not be possible to reach a determination with certainty for the reasons stated above.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*Jonathan Glass*
Jonathan Glass (Sep 8, 2020 12:18 EDT)

Jonathan Glass

Executed this <u>8th</u> day of September, 2020 in <u>Pleasantville, NY                              </u>.