# Exhibit D

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UMG RECORDINGS, INC., *et al.*,

    Plaintiffs,

v.

BRIGHT HOUSE NETWORKS, LLC,

    Defendant.

Case No. 8:19-cv-710-MSS-TGW

**DECLARATION OF WADE LEAK IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO BRIGHT HOUSE'S MOTION TO COMPEL**

I, Wade Leak, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am Executive Vice President, Deputy General Counsel, Chief Compliance, Ethics and Privacy Officer at Sony Music Entertainment. As in-house counsel, I manage and supervise litigation for SME and its affiliates that own or control copyrights in sound recordings, including Arista Music, Arista Records LLC, LaFace Records LLC, Provident Label Group, LLC, Sony Music Entertainment, Sony Music Entertainment US Latin LLC, The Century Family, Inc., Volcano Entertainment III, LLC, and Zomba Recordings LLC (collectively, the "Sony Music Plaintiffs"). I submit this Declaration, based on personal knowledge and information learned in the course of business, in support of Plaintiffs' opposition to Bright House's motion to compel.

2. SME is a record company, which owns or exclusively licenses copyrighted sound recordings. SME does not own or exclusively license compositions.

1

3. In this litigation, SME is claiming infringement of the sound recordings identified in the current Exhibit A to the Amended Complaint, for the period of March 24, 2013 through May 17, 2016.

**SME Exploits Recordings Individually Even When Part of An Album**

4. SME develops, exploits and distributes sound recordings most often through various unincorporated record label divisions, some of which functionally operate as independent companies.

5. As a general matter and routine business practice, both within and outside of the relevant claim periods, SME releases and monetizes its sound recordings individually even when they are also included on an album, and often promotes and markets tracks individually as well. This practice has become particularly important within the past decade, given the emergence of digital downloading and streaming technology as the principal method by which fans consume music. Thus, notwithstanding that SME distributes recordings in both the physical and digital album format, the overwhelmingly dominant means of exploitation in the modern digital age is on an individual track basis. And although the album format was the standard in the pre-digital age, it was often the case that one or more so-called "singles" were released prior to the album release.

6. Consistent with this, during the relevant claim period in this case, SME distributed all or virtually all of its claimed copyrighted sound recordings as individual tracks available online through sources such as iTunes, Spotify, and YouTube, among others. Indeed, individual tracks are often available for purchase, streaming, or downloading as "singles" at different times, including before a full album is released, in order to maximize their independent economic value.

7. SME also licenses sound recordings to be included in a film, TV show, or other audiovisual work, and generally does so on an individual track basis, not based on albums. These licenses are commonly referred to as synchronization licenses. In addition, SME licenses individual sound recordings for use on products owned and marketed by third parties, such as "best of the 90s"-type compilations and greeting cards.

8. Even in the rare case where recordings are sold exclusively on albums, SME has generally monetized individual recordings that were available on certain digital distribution partners like YouTube upon release.

**Interrogatory No. 13 is Vague and Burdensome**

9. I have been asked to explain some of the challenges SME would face in attempting to answer Interrogatory No. 13 by identifying each SME sound recording in suit that was "first issued or released together on or as albums or compilations." Leaving aside whether the information sought has any legal relevance, answering the request to any reasonable degree of certainty would be extremely difficult and, in some cases, impossible. SME does not have, and historically did not have, an internal system, database or set of files that makes plain whether a specific recording was first issued as part of an album or compilation in the ordinary course. SME has no specific business reason to internally track whether, or the date or manner in which, a recording is "first issued or released on or as an album or compilation," and therefore information to determine the requested information may or may not exist. Where it does exist and is in SME's possession, it cannot be systematically and efficiently extracted from any one system.

10. Beyond this, the request is vague and ambiguous as to the meaning of the phrase "first issued or released." The colloquial terms first "issued" and "released" are not defined, and it is not clear whether this refers to "first release" for radio promotional and airplay, first

3

commercial distribution to the public, or something else. Regardless, applying any of these definitions, SME would have to conduct a manual search for each of the nearly 2,000 recordings across multiple databases, physical files, and multiple record labels and divisions, and, as discussed below, the information needed to answer the question simply may not exist. Therefore, SME would not be able to reach a level of reasonable certainty in responding as to many works in suit and, in many cases, it would be impossible to answer. And yet the effort required for that level of uncertainty would be extraordinary.

11. However one defines "first released," there are three main reasons it will be difficult (if not impossible) to respond. *First*, the works in suit encompass dozens of so-called "legacy artist" recordings, going back to the late 1970s, 1980s and 1990s, for which SME does not have readily accessible records (or even any records) to look up the requested information. *Second*, Plaintiffs acquired ownership rights to many of the works in suit after an initial distribution by a predecessor, through a catalogue purchase, corporate acquisition or merger. In those cases, SME often does not have information in its current systems or databases to determine how a recording may have been "first released." *Third*, and related, SME was formed through a merger between Sony Music Entertainment and BMG in 2004. Many of the recordings in suit were originally released by BMG, many by Sony. Integration of the two companies' records was not complete until years later, and in integrating the systems of the two companies not all data was converted into the successor systems with the detail necessary to research the question at hand.

12. Against this backdrop, if we interpret "first release" to mean "first released" for radio promotion and airplay, it would be difficult to pinpoint that date. Even for modern-day releases, there is no reliable way to gather that information across SME's multiple radio promotion departments at each of SME's numerous label division represented in the suit. SME

4

may have records of more relatively recent recordings first released in this manner, but it would be a manual process to search for the correct radio promotional department within the correct label group to find the release date for each individual song. For older, legacy recordings SME often released one or more physical "singles" for radio promotional in advance of an album release. The "release" of such single could be the date on which a record label executive or marketing employee physically handed a vinyl record to a radio station manager, or shipped out promotional copies. SME would not have a record of when such exchange took place, when the disc jockey first played the single on air, or whether that occurred apart from the overall album release.

13. Further, if we interpret "first released" to mean "first commercially distributed to the public," that still raises "impossibility" issues in some instances, and results in a heavy burden, in others. Again, for legacy recordings, particularly for those that were part of a catalog/company acquisition, SME likely does not have the records. To try to figure out initial release dates for such tracks, and whether they were initially released as part of an album, SME personnel would need to search publicly available websites like Wikipedia or Discogs.com, but SME has no way of confirming if such information is accurate and Bright House can just as easily check those public websites. For any records SME does have, there is no way to confirm the information with any reasonable degree of certainty or comfort to include it in a verified interrogatory response.

14. SME could attempt to manually search its records to identify every product on which a sound recording appeared and look for the earliest in time. Prior to the modern digital age (*i.e.*, around when iTunes became a full catalog download store ), the album format was the standard, and it was often the case that one or more "singles" were released prior to an album's release. However, given the changes in formats and the multiple records that now exist for older

5

albums in our systems, it would be extremely difficult to definitively determine whether a particular sound recording was initially released solely on an album. SME would have to manually search for records relating to each sound recording, including SME sales databases to check for a first sale date, promotional materials across SME's many labels and divisions, and other internal records. Moreover, given changes in media formats, the release date that appears in a system for a given album could be the date associated with its release on a re-issued configuration, rather than its actual first release. The manner of delivering content to distribution partners has also changed over time, and there are inconsistencies in how records of such delivery were created (if at all) and maintained over many years. The older the recordings, the less likely it is that SME possesses clear data that would allow us to systematically run a query to determine which tracks were first made available as singles instead of as part of an album.

15. If Bright House is merely trying to ascertain which sound recordings were "registered" together under one copyright registration, as part of an album or compilation, then it can easily determine that for itself by reference to the registration certificate numbers provided in the Exhibits to the Complaint and the thousands of registration documents already produced. Even looking at copyright registrations (itself a manual process) will not provide the answers to which recordings were *first released or issued* as part of an album or compilation. Among other reasons, the registrations do not state whether the sound recordings included in the registration were released simultaneously for individual consumption. Even for tracks identified on a registration as "preexisting" or "previously registered," those tracks could have been previously released as part of a different album or another "compilation" (such as an EP).

16. As noted above, virtually every sound recording released in the modern digital age (*i.e.*, when iTunes became a full catalogue download store) has been initially released for purchase as an individual track, regardless of whether it was also released simultaneously as part

6

of an album. To identify any exceptions from this standard practice, SME would have to search its databases to determine whether any single sound recording was exclusively exploited as "album only." These searches would also need to be supplemented by manual review because some of the tracks in suit may have never been available as digital products at all due to contractual restrictions. And even in the rare case where recordings are sold exclusively on albums, SME generally monetizes individual recordings available on certain digital distribution partners like YouTube upon release; thus additional research would be required even for tracks initially available for sale as part of a physical album or as "album only."

17. Given these challenges, I estimate that it would take SME several months to determine which sound recordings in suit were initially released (at any time) exclusively as part of an album. However, notwithstanding our best efforts, it may not be possible to reach a determination with certainty for the reasons stated above.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_Wade Leak_

Wade Leak

Executed this 8th day of September, 2020 in Red Cloud, NE