# Exhibit E

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UMG RECORDINGS, INC., *et al.*,

      Plaintiffs,

v.

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.

Case No. 8:19-cv-710-MSS-TGW

### DECLARATION OF ALASDAIR MCMULLAN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO BRIGHT HOUSE'S MOTION TO COMPEL

I, Alasdair McMullan, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

      1.      I am Senior Vice President of Business & Legal Affairs at UMG Recordings, Inc., which is a United States-based legal entity for recorded music operations, and part of the group of companies colloquially known as "Universal Music Group." Universal Music Group is a vertically integrated, global group of affiliated record labels, and other corporate entities, with common parentage through the French conglomerate, Vivendi S.E. Universal Music Group's foreign affiliated record labels operate worldwide. In my capacity as in-house counsel for UMG Recordings, Inc., among other things, I manage and supervise litigation for Plaintiffs UMG Recordings, Inc. and Capitol Records, LLC (formerly Capitol Records, Inc.) (collectively, "UMG" or the "UMG Plaintiffs") and all of their record label affiliates.  I submit this Declaration, based on personal knowledge and information learned in the course of business, in support of Plaintiffs' opposition to Bright House's motion to compel.

1

2. UMG is a record company, which owns or exclusively licenses copyrighted sound recordings. As a general matter, UMG does not own or exclusively license compositions.

3. In this litigation, UMG is claiming infringement of the sound recordings identified in the current Exhibit A to the Amended Complaint, for the period of March 24, 2013 through May 17, 2016.

**UMG Exploits Recordings Individually Even When Also Included On An Album**

4. UMG develops and exploits sound recordings in multiple ways, most often through various unincorporated record label divisions, many of which functionally operate as independent companies.

5. As a general matter and routine business practice, both within and outside of the relevant claim periods, UMG releases and monetizes its sound recordings individually even when they are also included on an album, and promotes and markets tracks individually as well. This practice has become particularly important within the past decade, given the emergence of digital downloading and streaming technology as the principal method by which fans consume music. Thus, notwithstanding that UMG distributes recordings in both the physical and digital album format, the overwhelmingly dominant means of exploitation in the modern digital age is on an individual track basis. And although the album format was prevalent in the pre-digital age, it was often the case that one or more "singles" were released prior to an album release.

6. Accordingly, during the relevant claim period in this case, UMG distributed the overwhelming majority of its claimed copyrighted sound recordings as individual tracks available online through sources such as iTunes, Spotify, and YouTube, among others. Indeed, individual tracks, as a matter of course, are made available to consumers for streaming or

downloading (or other purchase methods) as "singles" at different times, including before a full album is released, in order to maximize their independent economic value.

7. Another significant source of revenue for UMG, as well as other record labels, is the licensing of sound recordings to be included in a film, TV show, commercial advertisement or other audiovisual work (commonly referred to as synchronization licenses), and this activity is always done by licensing an individual track, not the entire album on which that track may appear.

8. Even in the rare case where recordings are made available for purchase exclusively as part of an album, UMG has generally monetized individual recordings upon release through certain digital distribution partners like YouTube.

**Interrogatory No. 13 is Vague and Burdensome**

9. I have been asked to explain some of the challenges UMG would face in attempting to answer Interrogatory No. 13 by identifying each UMG sound recording in suit that was "first issued or released together on or as albums or compilations." Leaving aside whether the information sought has any legal relevance, answering the request to any reasonable degree of certainty would be extremely difficult and, in some cases, impossible. UMG does not specifically track in its internal systems for all recordings whether, or the date or manner in which, a recording is "first issued or released on or as an album or compilation," and therefore information to determine the requested information may or may not exist. Where it does exist and is in UMG's possession, it cannot be systematically, efficiently and accurately extracted from any one database or system, without significant work and analysis.

10. Beyond this, the request is vague and ambiguous as to the meaning of the phrase "first issued or released." Defendant BHN did not define the colloquial terms "first issued" and

3

"released," and it is not clear whether this refers to, for example, "first release" to radio stations for promotional airplay, first commercial distribution to the public, or something else. Regardless, applying any of these definitions, UMG would have to structure multiple queries and, in certain instances conduct a manual record search, for each of the more than 1,650 UMG sound recordings across multiple databases, physical files, and multiple record labels and divisions, and the information needed to answer the question may or may not exist. Therefore, UMG would not be able to reach a level of reasonable certainty in responding as to many works in suit and, in many cases, it would be impossible to answer. And yet the effort required for that level of uncertainty would be extraordinary.

11.     However one defines "first released," there are two main reasons it will be difficult (if not impossible) to respond. *First*, the works in suit encompass dozens of so-called "legacy artist" recordings, going back to the late '70s, '80s and '90s, for which UMG may not have readily accessible records (or even any records) to look up the requested information. *Second*, Plaintiffs acquired ownership of many of the works in suit after an initial release by a predecessor company, through a music catalogue acquisition, or other corporate acquisition or merger. In those cases, I am informed that UMG often does not have entirely accurate information in its current systems or databases to determine how a recording may have been "first released."

### Under Any Interpretation of "First Release" Responding to Defendants' Request Is Burdensome

12.     Against this backdrop, if Plaintiffs interpret "first release" to mean "first released" for radio promotion and airplay, it would be difficult to pinpoint that date. Even for modern-day releases (*e.g.*, post-2000), there is no efficient way to gather that information across the multiple radio promotion departments at each of UMG's record label divisions—including

4

Island Records, Interscope Records, Motown Records, Republic Records, etc.— since the divisions operate as somewhat "independent" companies, with their own employees and departmental structures.  UMG may have documentation of radio promotional release dates for more recent sound recordings, but it would still entail gathering that information from each radio promotion department at the correct label division.  For older, legacy recordings UMG (or its predecessor(s)) oftentimes released one or more physical "singles" for radio promotion in advance of an album release.  The "release" of such single could be the date on which a record label executive or marketing employee physically handed a vinyl record to a radio station manager, or shipped out promotional copies.  UMG undoubtedly would not have precise records of when such exchange took place, when the disc jockey first played the single on air, or when any of that occurred apart from, or in relation to, the overall album release.

13. Further, if Plaintiffs interpret "first released" to mean "first commercially distributed to the public," that still raises "impossibility" issues in some instances, and results in a heavy burden, in others.  Again, for legacy recordings, particularly for those that were part of a catalog/company acquisition, UMG likely does not even have the documentation necessary to answer the question definitively.  Just to cite one specific example, UMG's claims in suit include infringement of 18 recordings by iconic reggae artist Bob Marley.  Marley's original recordings (dating back to the 1970s and 1980, before his untimely death in 1981) were created and released by the legendary Island Records label, which was first founded around 1959, but only later acquired by UMG.  Having had no involvement or control over those original releases, UMG may not have any (or accurate) records regarding the manner or timing of Island Records' initial release of those recordings.  To illustrate further the difficulty of the issue, even publicly-available sources  (such as the Wikipedia website entry for Bob Marley's "One Love"—one of

5

the sound recordings infringed by Bright House's subscribers in this lawsuit) suggest that it was "released" multiple times, including as a single, before ending up on an album. UMG would have to resort to a manual search of files—some may literally be maintained as paper records in storage warehouses, if they were not converted to microfiche—to determine if such physical records exist at all to try to confirm that information.

### Limitations In UMG's Databases Also Make Ascertaining Certain Information Difficult, If Not Impossible

14. Although UMG does maintain a searchable repertoire database that contains some reliable information for more recent sound recording releases, it would require substantial effort to pinpoint for the over 1,650 recordings in suit every product on which each appeared, and look for the earliest in time. Moreover, I am advised that, in many cases, the specific "release date" listed in that repertoire database may not be entirely reliable – particularly in the case of catalogue acquisitions resulting from a corporate acquisition or merger, as described previously. Oftentimes in such cases, the release date was defaulted to "January 1" of whatever year was reflected in the copyright registration for the recording. In other cases—particularly for older legacy recordings, like the Bob Marley example noted above and others—the year "1900" may be listed. This likely occurred if a specific date was not recorded (and likely unknown) at the time the product information was input into the repertoire database. There could be numerous reasons for this, including that (i) the information was not available (for example, because the album was first released by a predecessor in interest, as in the Bob Marley example above), (ii) the release date was simply not recorded at all or (iii) a placeholder was recorded while the database was being created. Moreover, given changes in media formats (*i.e.*, from physical media such as vinyl records and CDs to .mp3 files), the release date that appears in the system for a given album could be the date associated with its release on a re-issued

6

configuration, rather than its actual first release. Therefore, a manual review still would be required for all 1,650-plus recordings to cross reference any dates referenced in the database against (i) sales department and other scheduling records, (ii) promotions department data from each of UMG's label divisions, and (iii) digital supply chain department records of delivery histories to digital service partners (such as Amazon, Apple or Spotify, etc.) —all with no guarantee UMG even has the information.

15.  If Bright House is merely trying to ascertain which sound recordings were "registered" together under one copyright registration number, as part of an "album or compilation," then it can easily determine that for itself by reference to the registration numbers provided in the Exhibits to the Complaint, and the thousands of copies of copyright certificates that Plaintiffs have already produced. Even looking at copyright registrations (itself a manual process), however, will not provide the answers to which recordings were "first released or issued" as part of an album or compilation. Among other reasons, the registrations do not state whether the sound recordings included in the registration were released simultaneously for individual consumption. Even for tracks identified on a registration as "preexisting" or "previously registered," those tracks could have been previously released as part of a different album or another "compilation" (such as an EP), or as a so-called "single."

16.  As noted above, the overwhelming majority of UMG's sound recordings released in the modern digital age (*i.e.*, when Apple's iTunes became a full catalogue download store) have been exploited on an individual track basis, regardless of whether they also were released simultaneously as part of an album. To identify any exceptions from this standard practice, UMG would have to manually search its databases to determine whether any single sound recording was exclusively exploited as "album only." These searches would also need to be

supplemented by manual review because the date field anomalies in the repertoire database described above may also persist even in the post-digital era. And even in the rare case where recordings are sold exclusively on albums, as explained, UMG generally monetizes individual recordings upon release through certain digital distribution partners like YouTube.

17. Given these challenges, I estimate that it would take UMG several months to attempt to determine which products were initially released (at any time) exclusively as part of an album. However, notwithstanding our best efforts, it may not be possible to reach a determination with certainty for the reasons stated above.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*alasdair mcmullan (Sep 8, 2020 13:13 PDT)*

Alasdair McMullan

Executed this 8 day of September, 2020 in Los Angeles CA.

8