**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC., *et al.*,

      Plaintiffs,

   v.                         **Case No. 8:19-cv-710-MSS-TGW**

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF**
**DOCUMENTS AND CUSTODIAL FILES**

More than two years into this case and over seven months after this Court compelled Defendant Bright House Networks, LLC ("BHN") to produce documents, BHN has still only produced 732 documents.[1] BHN's tiny production is the result of its refusal to heed this Court's prior rulings, which required BHN to produce documents concerning its practices regarding copyright infringement by subscribers on its network, regardless of the identity of the rights holder.

Specifically, on September 25, 2020, this Court ordered BHN to produce "documents showing all practices . . . that [BHN] considered, rejected, or adopted for taking adverse action . . . against Subscribers or Users for alleged copyright infringement," "communications showing different treatment between alleged copyright infringement violations and other alleged violations of [BHN's] policies," and information concerning the number of infringement notices BHN

---

[1] Plaintiffs, by contrast, have produced over 200,000 documents.

received, including "non-parties' notices." *See* Dkt. 197 (granting Plaintiffs' motion to compel RFP Nos. 41 and 71 and Interrogatory No. 13). Seven months later, BHN continues selectively to ignore the Court's ruling that these categories of documents are discoverable and refuses to produce other documents within those same categories.

Other courts have also held that information about an internet service provider's ("ISP") practices regarding all rights holders' accusations of infringement are fundamentally relevant to evaluating the Digital Millennium Copyright Act ("DMCA") safe harbor defense. This conclusion makes sense because the safe harbor defense, which BHN asserts here, requires ISPs to show that they "adopted and reasonably implemented" a policy to terminate "repeat infringers." 17 U.S.C. § 512(i)(1)(A). The defense necessarily takes account of how BHN dealt with *all* instances of repeat infringement—not just infringement of Plaintiffs' works.

Even apart from the safe harbor, BHN's general practices are also relevant to establishing BHN's contribution to its subscribers continued infringement—an element of Plaintiffs' contributory infringement claim—and BHN's state of mind in contributing to its subscribers' infringement—a well-established factor in determining statutory damages under the Copyright Act.

Not only has BHN refused to produce relevant documents concerning its handling of infringement notices, it has failed to produce documents concerning

its per-subscriber revenues that this Court ordered it to produce seven months ago. *See* Dkt. 197 (granting Plaintiffs' motion to compel RFP No. 59).

To compound these deficiencies, BHN refuses to search the documents of the custodians most likely to have relevant materials, even where the few documents BHN have produced show that those custodians participated in relevant communications.

Plaintiffs thus bring this motion to compel BHN to produce: (1) communications relevant to Plaintiffs' contributory infringement claim and BHN's asserted safe harbor defense; (2) communications relevant to BHN's state of mind; (3) documents this Court previously ordered BHN to produce concerning its subscriber revenues, and (4) documents from eight custodians who, on the face of BHN's own documents, are likely to possess relevant information.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are record companies and music publishers that produce, manufacture, distribute, sell, and license commercial sound recordings and musical compositions. Dkt. 1; Dkt. 94 ¶¶ 1-2. BHN, one of the largest ISPs in the country, knowingly contributed to and profited from the massive infringement of Plaintiffs' copyrighted works on BHN's network by its subscribers. *Id.* ¶¶ 2, 90-98. In an effort to protect their works, pursuant to the Copyright Act, Plaintiffs and their agents regularly provided BHN with detailed notices that BHN customers were infringing their copyrighted works. *Id.* ¶ 2. Despite Plaintiffs'

efforts, BHN turned a blind eye to the infringement and Plaintiffs' infringement notices—even when it was carried out by known, repeat infringers. *Id.*

Since its first document production 16 months ago, BHN has produced a total of 732 documents. *See* Decl. of Stacey Grigsby ("Grigsby Decl.") ¶ 22. BHN has confessed that it deleted nearly all of the custodial data for three employees on its initial custodian list, and failed to retain the custodial files for eight other employees that it has since agreed are relevant document custodians. *See* Grigsby Decl. Exs. N-O.  BHN also produced very little of the data it admittedly generated regarding infringement notices it received or how it handled them, indicating it apparently did very little to save that data.

But these issues alone do not explain BHN's small document production. Instead, it is largely attributable to BHN's stonewalling and insistence on re-litigating the scope of discovery for every document request, even where the Court has already ruled against it. At issue here are seven document requests: six (RFPs 33, 48, 64, 80, 81, and 95) from Plaintiffs' Second Requests for Production (hereinafter "Plaintiffs' Second RFPs"), which were served on February 7, 2020, and one (RFP 126) from Plaintiffs' Fourth Requests for Production (hereinafter, "Plaintiffs' Fourth RFPs"), served on August 27, 2020. Grigsby Decl. Exs. A-B. In response to these requests, BHN issued blanket objections and then dragged out the conferral process for months. As a result, the disputes described herein only ripened as of February 2021, over a year after most of these requests were served. *See* Grigsby Decl. ¶23 and Exs. D, H-K (memorializing conferrals).

## LEGAL STANDARD

Plaintiffs are entitled to discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In response to a motion to compel disclosure pursuant to Fed. R. Civ. P. 37(a), "[t]he party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information." *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000). Any objection based on the request being overly broad or unduly burdensome cannot be boilerplate, but instead must provide a "full, fair explanation" of the objection "particular to the facts of the case." M.D. Fl. Discovery Handbook § III.A.6 (rev. Feb 1, 2021).

## ARGUMENT

### I.  BHN Should Be Ordered to Produce Communications Relevant to Plaintiffs' Contributory Infringement Claims, BHN's Safe Harbor Defense, and Statutory Damages

BHN has failed to produce communications relevant to three core issues: (1) its safe harbor defense, (2) BHN's contribution to continued infringement on its networks, and (3) the extent to which it acted willfully—a factor that triggers the Copyright Act's enhanced statutory damages under the Copyright Act. All of these issues are squarely within the bounds of discovery.

### A.  Legal Background

*First,* the safe harbor defense only immunizes BHN from liability for secondary copyright infringement where BHN demonstrates that it "adopted *and reasonably implemented*" and informed subscribers of a policy to terminate

"repeat infringers" in appropriate instances. *See* 17 U.S.C. § 512(i)(1)(A) (emphasis added). This Court has already confirmed that documents showing how BHN actually implemented its policies are relevant and discoverable:

> The Court: . . . [I]f you all adopted some policy and then somebody who is in charge of enforcing the policy decides, I'm not going to pay any attention to it, and there are e-mails saying that, that is clearly relevant.

Sept. 24, 2020 Hr'g Tr., Grigsby Decl. Ex. L. 45:11-16.

This Court also previously rejected BHN's argument that it can exclude from discovery documents concerning infringement notices that it received from non-party rights-holders. *See* Dkt. 197 (granting motion to compel responses to, *inter alia*, RFPs 41 and 71 and to interrogatory No. 13, "*including non-parties' notices*"). As this Court observed, infringement notices from non-party rights-holders are "relevant in the broad sense . . . It could show something, Bright House got twice as many [infringement notices] from everybody else and they just ignored it." Sept. 24, 2020 Hr'g  Tr. 22:9-12, Grigsby Decl. Ex. L.

This finding is consistent with the ruling in the *Charter* case, in which the court articulated a "general rule," namely that: "I do not believe that it is reasonable to limit the requests, in general, to just the . . . alleged infringing plaintiffs' works."[2] Grigsby Decl. Ex. R, Charter July 2, 2020 Hr'g Tr. at 16:8-14.

---

[2] The *Charter* case proceeding in the District of Colorado involves similar claims against defendant Charter Communications, Inc., which acquired BHN in 2016. The parties are represented by the same respective counsel in both this case and in *Charter*.

Moreover, other courts around the country have also recognized that communications regarding a defendant's implementation of its repeat-infringer policy are relevant to the safe harbor defense. *See, e.g.*, *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 655-662 (E.D. Va. 2015) (denying safe harbor defense based on evidence that "Cox publicly purported to comply with its [repeat infringer] policy, while privately disparaging and intentionally circumventing the DMCA's requirements"); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 754-58 (W.D. Tex. 2019) (finding ISP ineligible for safe harbor based on, *inter alia,* internal emails reflecting practices diverting from its written policies).

Communications regarding infringement notices sent by other rights holders are equally relevant to whether BHN "reasonably implemented" a policy to terminate repeat infringers. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("[Defendants] actions towards copyright holders who are not a party to the litigation are relevant in determining whether [defendants] reasonably implemented their repeat infringer policy."); *see also Disney Enters., Inc. v. Hotfile*, 2013 WL 6336286, at *22-24 (S.D. Fla. Sept. 20, 2013) (considering the number of terminations and the total number of notices received from all rights-holders—not just from plaintiffs); *Grande*, 384 F. Supp. 3d at 758 (considering evidence as to all notices received by defendant, not just those sent on behalf of plaintiffs, in determining the applicability of the safe harbor

defense). Despite the abundance of guidance on this issue from this Court and others, BHN continues to withhold discovery.

*Second*, the requests below are also relevant to Plaintiffs' contributory infringement claim, for which Plaintiffs must demonstrate that BHN facilitated or materially contributed to infringement of the works at issue. *See Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987) (A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another."). Plaintiffs will do so by showing that BHN continued to provide known repeat infringers with the tool to infringe, without taking any reasonable steps to stop or deter it.

*Third*, BHN must provide discovery relating to its state of mind. "In determining the amount of statutory damages [under the Copyright Act], a court considers . . . the infringers' state of mind—whether willful, knowing, or merely innocent." *Universal Music Corp v. Latitude 360 Nev., Inc.*, 2016 WL 3200087, at *4 (M.D. Fla. May 4, 2016) (internal citation omitted). Section 504(c) of the Copyright Act authorizes increased statutory damages where infringement is willful. 17 U.S.C. § 504(c)(2). Yet, BHN has refused to produce documents that would shed light on its overall program for handling infringement notices, which would speak directly to its state of mind.

### B.   Requests at Issue

### 1.   Plaintiffs' RFP No. 95

**Request No. 95:** Communications discussing the re-activation of the accounts of any Subscribers whose accounts were terminated for violation of any policy relating to copyright infringement. Grigsby Decl. Ex. A at 16.

**Second Supplemental Answer:** Subject to and without waiving the foregoing objections, Bright House will produce responsive non-privileged, non-work product communications, if any, sufficient to show Bright House's policies during the Discovery Period concerning reactivating accounts of Bright House subscribers terminated for alleged copyright infringement, to the extent Bright House finds such documents within its possession, custody, or control after undertaking a reasonable and diligent search, and to the extent not already produced in response to other requests. Grigsby Decl. Ex. F at 56. [3]

RFP 95 requests communications related to BHN's re-activation of accounts that it terminated for copyright infringement. There can be no genuine dispute that whether BHN re-activated repeat infringers, and under what circumstances, is relevant to whether BHN contributed to continued infringement by known repeat infringers and reasonably implemented a repeat infringer policy, or instead had a "nod-and-a-wink" policy of nominally terminating subscribers, but then quickly reinstating them and wiping clean their slate. This information is equally relevant to BHN's willfulness in contributing to ongoing infringement by its subscribers. *See BMG*, 149 F. Supp. 3d at 655-56 (granting summary judgment denying Cox's safe harbor defense based, in part, on communications in which Cox employees discussed an "unwritten policy" to

---

[3] Pursuant to the Court's Standing Order (Dkt. 258), Plaintiffs quote in full all discovery requests and insufficient responses at issue in this Motion. All discovery requests and objections quoted herein are contained in Plaintiffs' discovery requests and BHN's objections and responses thereto. *See* Grigsby Decl. Exs. A-C, E-G.

"restart" the company's DMCA repeat-infringer policy for infringing subscribers whom it terminated and re-activated).

BHN limits its response to only the "relevant policies" concerning re-activation of subscribers and not the requested communications concerning those policies. Grigsby Decl. Ex. H. The effect of this limitation is to shield from discovery the documents that bear on the relevant question. BHN's written policies provide Plaintiffs with no information as to whether, when, and how BHN *implemented* those policies, which is an express consideration under the statute and bears on BHN's contribution to continuing infringement. This Court has previously acknowledged as much, ordering BHN to produce any e-mails "when somebody says, hey, this is our policy but we're not going to follow it." Sept. 24, 2020 Hr'g Tr. 96:7-9, Grigsby Decl. Ex. L.

To the extent BHN terminated and re-activated any subscribers who were the subject of Plaintiffs' notices, the response to this RFP would also be relevant to Plaintiffs' contributory infringement claim.

### 2.   Plaintiffs' RFP No. 126

**Request 126:** Your internal communications discussing any Infringement Notice, any instance of alleged copyright infringement, or any "ticket" generated in response to any Infringement Notice, including internal communications concerning the actual or potential termination of any Subscriber's account with BHN. Grigsby Decl. Ex. B at 5.

**Answer:** Subject to and without waiving the foregoing objections, Bright House will produce responsive non-privileged communications as stated in its responses to Plaintiffs' Request for Production of Documents No. 34 [that is, "Bright House will produce representative, responsive non-privileged, non-work product communications, if any, sufficient to show Bright House's implementation of its repeat infringer termination policy during the Discovery Period." (Aug. 18, 2021 Supplemental Answer to RFP 34)]. Grigsby Decl. Exs. G at 7-8, F at 15-16.

**Feb. 5, 2021 Response:** Plaintiffs' RFP 126 . . . seeks internal communications regarding notices, copyright infringement generally, tickets generally, and communications regarding "actual or potential termination of any Subscriber's account with BHN". Subject to our objections, we agreed to produce internal communications regarding subscriber terminations, even if those subscribers were not recipients of Plaintiffs' notices. We did not agree to broadly produce all internal communications regarding "tickets" or "copyright infringement" without limitation. Similar to RFP 33, Plaintiffs' request as drafted is overbroad and not narrowly tailored to the needs of the case. We also note that several other RFPs seek internal communications regarding copyright infringement (see, e.g., RFP 35 (internal communications regarding terminations and suspensions and violations of copyright policies); RFP 43 (communications discussing subscriber "satisfaction or dissatisfaction" with BHN's copyright infringement policies)) and BHN has agreed to produce documents in response to these requests as well. Grigsby Decl. Ex. I at 1-2.

RFP 126 requests discrete categories of internal BHN communications related to infringement notices various rights holders (including, but not limited to, Plaintiffs), sent to BHN. These communications are relevant because they will demonstrate whether and how BHN applied its repeat-infringer policy. To the extent the communications reveal that BHN was aware of copyright infringement and failed to take appropriate action, such communications demonstrate BHN's contribution to infringement, undermine BHN's safe harbor defense, and demonstrate its willfulness.

Despite the clear relevance of the request as written, BHN has agreed to produce only "internal communications regarding subscriber *terminations*," and to exclude other internal communications. *See* Grigsby Decl. Ex. I at 1 (emphasis added). BHN has refused to answer whether it is withholding documents concerning its *failure* to implement its repeat infringer policy. *See* Grigsby Decl. Ex. I at 1-4. For instance, BHN's current position appears to contemplate withholding e-mails where its employees continue to warn or even suspend,

rather than terminate, a customer who has been the subject of thousands of infringement notices and yet continues to infringe. This is precisely the type of communication that shows an ISP defendant contributed to infringement or failed to reasonably implement its repeat infringer policy and, therefore, is ineligible for the safe harbor. *See, e.g.*, *BMG*, 149 F. Supp. 3d 634 at 657-60 (citing emails in which Cox repeatedly warned customers about infringing activity but declined to terminate as examples of a failure to reasonably implement repeat infringer policy); *see also Grande*, 384 F. Supp. 3d at 757 (granting summary judgment for plaintiffs on the safe harbor defense and citing an email in which the defendant's employees noted that "we have users who are racking up DMCA take down requests and no process for remedy in place."). Indeed, the Special Master in *Charter* ordered the defendant there to produce documents responsive to the full scope of an identically-worded RFP. *See* Grigsby Decl. Ex. S at 4 (denying any limitation to the scope of RFP No. 30).

### 3.    Plaintiffs' RFP No. 33

**Request No. 33:** Communications as between members of your Security and Abuse team (as that term is used in your June 19, 2019 Initial Disclosures), on the one hand, and any Subscribers or Users, on the other, discussing or considering any Infringement Notice, notice of alleged copyright infringement or violation of any DMCA policy or other policy regarding copyright infringement, or any "ticket" generated in response to any Infringement Notice.[4] Grigsby Decl. Ex. A at 8.

**Aug. 18, 2020 Supplemental Answer:** Subject to and without waiving the foregoing objections, Bright House will produce responsive non-privileged communications with subscribers identified in notices of claimed infringement that Bright House received during the Discovery Period, concerning Bright House's implementation of its repeat

---

[4] As part of the conferral process, Plaintiffs proposed narrowing the scope of RFP 33 on October 20, 2020. *See* Grigsby Decl. Ex. I at 25. The text here reflects the operative request.

infringer policy, to the extent Bright House finds such documents within its possession, custody, or control after undertaking a reasonable and diligent search. Grigsby Decl. Ex. F at 14-15.

**Feb. 5, 2021 Response:** Regarding your request in RFP 33 for "all communications" between BHN and its subscribers "discussing or considering" numerous vague categories of information, BHN agreed to produce (subject to its objections): (1) communications related to Plaintiffs' [sic] or the works at issue in this case within the Discovery Period; and (2) communications regarding the implementation of BHN's DMCA policy in respect to suspensions and terminations. BHN objected to Plaintiffs' broader request for "all communications" on several grounds, and believes its proposed compromise is a reasonable one. BHN regularly received and processed notices and related correspondence related to various types of alleged copyright infringement during the claims period, and despite Plaintiffs' contentions otherwise, not every document concerning copyright infringement generally is relevant to this specific dispute. As Plaintiffs know, subscriber communications implicate PII, and thus the review and production of these materials is burdensome due to the need to review for and redact this material. So for example, to respond to Plaintiffs' broad request, Charter [sic] would need to review for, redact, and produce "auto-away" vacation bounce-back messages from subscribers in receipt of an automated abuse notification alleging that someone at that IP address has been detected as potentially sharing copyrighted films online. Such material is not remotely relevant to this case. Charter's [sic] proposal provides Plaintiffs with the communications related to the actual works at issue in this case, and communications related to the broader topic of DMCA suspensions and terminations (which Plaintiffs argue is relevant due to BHN's assertion of a safe harbor defense). "All communications" related to any kind of copyright issue is overly broad, and, even if Plaintiffs' argument is credited that it is tangentially relevant, it is disproportionate to the needs of this case. Grigsby Decl. Ex. I at 1.

RFP 33 seeks communications between a discrete and limited number of BHN employees and BHN subscribers relating (i) to copyright infringement occurring on its network and (ii) violations of BHN's DMCA policy. Such communications could not be more relevant and seek something different than the internal communications sought above. BHN has limited its agreement to produce communications (1) "related to Plaintiffs' [sic] or the works at issue in this case within the Discovery Period"; and (2) "regarding the implementation of BHN's DMCA policy in respect to suspensions and terminations."

Both limitations are improper. As noted in Part I.A, an ISP may not limit its production to documents concerning Plaintiffs or the works-in-suit, especially where the ISP has placed the implementation of its repeat-infringer policy fully at issue by asserting a safe harbor defense. *See, e.g.*, *Perfect 10*, 488 F.3d at 1113 ("Section 512(i)(1)(A) requires an assessment of the service provider's 'policy,' not how the service provider treated a particular copyright holder."); *accord Grande*, 384 F. Supp. 3d at 754-58; *Hotfile*, 2013 WL 6336286, at *22-24.

Likewise, as discussed above, BHN's limitation to documents concerning suspensions or terminations omits communications where it *should have* suspended or terminated but did not. In particular, BHN refuses to explain whether it would produce relevant categories of documents such as (i) communications reflecting BHN's *failure* to implement its DMCA policy and (ii) communications in which a subscriber admitted to the activity described in an infringement notice and BHN nevertheless failed to suspend or terminate.

These types of documents are relevant to BHN's safe harbor defense. For example, in *Grande*, defendants relied on a "forward-facing statement that they would terminate customers for repeat infringements" as the basis of their claim for safe harbor defense. *Grande*, 384 F. Supp. 3d at 756. However, discovery of internal communications revealed that customers would not be terminated for repeated copyright infringement "regardless of the source of any notice," "regardless of the content of any notice," and "regardless of the volume of notices . . . for a given customer." *Id.* at 755-56. Relying upon these e-mails, the *Grande*

court rejected defendant's safe harbor defense. *Id.* at 755-58. These same documents would also be relevant to BHN's contribution to its subscribers' infringing conduct and its willfulness in failing to stop such conduct.

### 4.    Plaintiffs' RFP No. 64

**Request No. 64**: Documents sufficient to reflect the content of any calls between your employees, customer service representatives, or members of your internet security or customer safety team, on one hand, and Subscribers or Users identified in Infringement Notices or otherwise identified in connection with actual or alleged copyright infringement, on the other. Grigsby Decl. Ex. A at 12.

**Answer:** Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense. Bright House further objects that the request is overbroad and should be limited to those Subscribers that were identified in the Infringement Notices sent by Plaintiffs' [sic] or on Plaintiffs' behalf. Grigsby Decl. Ex. F at 37-38.

**Feb. 5, 2021 Response:** As we noted before, our accommodation to Plaintiffs regarding RFP 129 was not intended to reopen previous negotiations regarding these requests, which implicate different information, data sources and objections. [5] For RFPs 63-64, BHN has agreed to produce all records of calls in the ECAT system that concern any copyright infringement notices and tickets for the subscribers who received RIAA notices,[6] without limiting these to Plaintiffs' works in suit. For at least the reasons given above, Plaintiffs' request for records of all calls to or from any subscribers, without limitation, is overbroad. Grigsby Decl. Ex. I at 2.

RFP 64 seeks the documents, such as internal notes or communications, concerning calls BHN employees made to alleged repeat infringers. To address BHN's scope concerns, Plaintiffs narrowed RFP 64 to seek only documents relating to subscribers who were the subject of three or more infringement

---

[5] BHN's response references an agreement between the parties relating to RFP 129, in which BHN agreed to produce ticket data related to all subscribers who were the subject of three or more infringement notices.

[6] Infringement notices sent by, or on behalf of, Plaintiffs to BHN are referred to as "RIAA notices." ECAT is the BHN database on which infringement notices and communications with customers about such notices are logged.

notices. ISPs like BHN routinely record such work log notes. The notes of these calls will provide evidence as to when and how BHN implemented its repeat infringer policies. Discovery of these communications is, accordingly, relevant to Plaintiffs' contributory claim, BHN's safe harbor defense, and BHN's willfulness.

BHN again improperly seeks to limit its production to the "Subscribers that were identified in the infringement notices sent by Plaintiffs' [sic] or on Plaintiffs' behalf." For the same reasons as above, this is improperly narrow.

BHN's position is at odds with its other discovery responses. While it objects to producing the call notes for RFP 64, it agreed to produce other details *from the same database* concerning its receipt and handling of infringement notices—including subscriber account number and IP address, date of infringement, and customer-facing actions taken by BHN. Grigsby Decl. Ex. I at 2 (agreeing to produce ECAT ticket data in response to RFP 129). BHN cannot meaningfully distinguish its position that the ECAT data showing *how* BHN responded to a notice is *within* the scope of discovery and not unduly burdensome, but that the notes of calls between BHN's abuse team and infringing subscribers in the same database are somehow outside the bounds of discovery.

### 5.   Plaintiffs' RFP No. 80

**Request No. 80:** All information maintained or noted in ICOMS regarding interactions with customers to whom you mailed a Final Warning letter, as referenced in Paragraph 2 of the document titled "Final Copyright Warning Process Description," produced by you in this case at BHN_00000001. Grigsby Decl. Ex. A at 14.

**Answer:** Bright House objects to this request to the extent that it is duplicative of other discovery requests that Plaintiffs have propounded. Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the

scope of permissible discovery because it is not relevant to any party's claim or defense. Bright House further objects that the request is overbroad and should be limited to information related to those Subscribers that were identified in the Infringement Notices sent by Plaintiffs' [sic] or on Plaintiffs' behalf. Pursuant to Fed. R. Civ. P. 26(b)(2)(B), Bright House objects to the requests to the extent that it requires Bright House to restore and/or search data sources that are not reasonably accessible or to merge data from multiple sources on the grounds that it would subject Bright House to undue burden and expense. Grigsby Decl. Ex. F at 46.

**Feb. 5, 2021 Response:** With request to RFP 80, BHN objected to Plaintiffs' request that BHN extract "all information … regarding interactions with customers" from its legacy system on various grounds, including because it is already providing customer communications from ECAT in response to other requests. Grigsby Decl. Ex. I at 2.

ICOMS is BHN's system for recording, among other things, "█████

██████████████████████████████████████████," including Final Warning letters in BHN's graduated response process for handling repeat infringers. Grigsby Decl. Ex. P at 2 (BHN_00000001), 35 (BHN_00002379). Through RFP 80, Plaintiffs seek ICOMS information relating to BHN's interactions with customers who received such Final Warning letters.

The requested information in ICOMS is relevant because it reveals the extent to which BHN took (or failed to take) action against subscribers identified in ICOMS who received Final Warning letters and may have continued to infringe. The request is narrowly tailored to capture BHN's communications with repeat infringers—exactly the population BHN's policies required it to terminate for further infringement. As noted above, these communications are at the core of whether BHN may benefit from the safe harbor defense.

BHN's most recent objection to RFP 80 is that BHN "is already providing customer communications from ECAT in response to other requests." *See* Grigsby Decl. Ex. I at 2. ECAT is not a substitute for ICOMS data. ECAT and

ICOMS are separate systems that appear to hold separate records. BHN internal documents specifically instruct employees to "  " as it relates to customer interactions following the mailing of a Final Warning Letter. Grigsby Decl. Ex. P at 2 (BHN_00000001).

As with several of its other responses, BHN seeks to limit its production to documents relating to "Subscribers that were identified in the Infringement Notices *sent by Plaintiffs'* [sic] *or on Plaintiffs' behalf*." *See* Grigsby Decl. Ex. F at 47. (emphasis added). Again, BHN's safe harbor defense and willfulness place all of BHN's responses at issue, not merely those responses to Plaintiffs' infringement notices. Nor can BHN establish that any Final Warning Letters did not pertain to subscribers who received Plaintiffs' notices because BHN claims it has not retained data sufficient to match specific subscribers to the notices. *See* Grigsby Decl. Ex. T at 1 (discussing the small volume of BHN's ticket data).

### 6.    Plaintiffs' RFP No. 81

**Request No. 81:** Complete reports of all complaints processed for accounts that received a Final Warning as referenced in the document titled "Final Copyright Warning Process Description," produced by you in this case at BHN_00000001. Grigsby Decl. Ex. A at 14.

**Answer:** Bright House objects to this request to the extent that it is duplicative of other discovery requests that Plaintiffs have propounded. Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense. Bright House further objects that the request is overbroad and should be limited to information related to those Subscribers that were identified in the Infringement Notices sent by Plaintiffs' [sic] or on Plaintiffs' behalf. Subject to and without waiving the foregoing objections, Bright House will produce responsive documents related to those Subscribers identified in the Infringement Notices sent from Plaintiffs or on Plaintiffs' behalf for the Discovery Period, to the extent Bright House finds such

documents within its possession, custody, or control, after undertaking a reasonable and diligent search. Grigsby Decl. Ex. F at 47.

**Feb. 5, 2021 Response:** With respect to RFP 81, BHN has agreed to produce reports of complaints, as described in BHN_00000001, requested by BHN subscribers who received infringement notices sent on Plaintiffs' behalf during the discovery period. To be clear, BHN has agreed to produce such reports to the extent they concern third party complaints as well as Plaintiffs' complaints. Grigsby Decl. Ex. I at 2.

RFP 81 seeks reports of all copyright infringement complaints associated with accounts that received a Final Warning Letter. As described above, BHN's repeat infringer policies obligated it to send a Final Warning Letter to subscribers who were the subject of multiple infringement notices. Prior to sending a Final Warning Letter, BHN would review the record of infringement complaints relating to a customer's infringement and the "███████████████████ ██████████████████████████████████" sent to the repeat infringer. Grigsby Decl. Ex. P at 2 (BHN_00000001).

BHN again imposes a unilateral limitation—agreeing to produce only those complaint reports related to subscribers identified in Plaintiffs' infringement notices—that ignores that BHN's practices with respect to *all* of its subscribers are of core relevance to both the safe harbor defense and BHN's willfulness.  Even if the Court accepts BHN's limitation, BHN does not appear to have the data to determine which reports relate to that subset of notices.

### 7.    Plaintiffs' RFP No. 48

**REQUEST NO. 48**: Documents sufficient to show any growth targets, strategic plans, or internal strategies pertaining to the use or offering of higher bandwidths to Subscribers for the purpose of downloading music. Grigsby Decl. Ex. A at 10.

**Aug. 18, 2020 Supplemental Answer:** Bright House further responds that, in light of the Court's order dismissing Plaintiffs' vicarious liability claims (ECF 142),

documents sought in this request lack relevance to any claim or defense remaining in the case, and on that basis Bright House will not produce documents in response to this request. Grigsby Decl. Ex. F at 27-28.

RFP 48 seeks discovery of BHN's growth targets, strategic plans, and other strategies in which it linked higher bandwidths (internet download and upload speeds) to downloading music because such documents are relevant to statutory damages considerations. Evidence of "the infringers' state of mind" is highly relevant in determining the amount of statutory damages available under the Copyright Act. *See Universal Music Corp*, 2016 WL 3200087, at *4.

It is well known that peer-to-peer ("P2P") internet usage, which is associated with copyright infringement, requires higher bandwidth than standard internet usage. Users of P2P technologies benefit from ISPs that can provide higher bandwidth speeds to optimize their use of the technology. To the extent BHN profited from selling higher speeds and tiers of service, Plaintiffs are entitled to present the jury with information that shows any growth targets, strategic plans, or internal strategies BHN developed to link higher bandwidth to downloading music. This information would speak directly to how BHN structured its business to profit off of its subscribers' copyright infringement, which, in turn, is relevant information for a jury to consider in assessing the magnitude of statutory damages that should be awarded.

BHN refuses to provide these materials on the basis of the Court's prior dismissal of Plaintiffs' vicarious liability claims. While RFP 48 would also be relevant to vicarious liability, that fact does not alter the relevance of RFP 48 to

statutory damages. Considering this same RFP, the court in *Charter* found this discovery request to be "relevant" and "narrowly tailored." *See Warner Bros. Records Inc., et al. v. Charter Communications, Inc.*, 1:19-cv-00874, Doc. 181 at 41 (D. Colo. May 29, 2020). This Court should find the same.

### C.   Any Burden Objection Is Untimely and Unsupported

BHN's generalized claims of burden are either untimely or implausible. BHN has produced fewer than 500 documents in more than a year. It has admitted to failing to preserve relevant data. *See* Grigsby Decl. Exs. N-O. As a result, it is unlikely that BHN would review a large volume of documents for any of Plaintiffs' requests. To the extent BHN believes differently, it should provide hit counts for agreed-upon search terms. *See* Grigsby Decl. Ex. I at 3-4.[7]

## II.   BHN Should Be Ordered to Comply With the Court's Prior Order and Produce Documents Showing its Per-Subscriber Revenues

On September 25, the Court granted Plaintiffs' motion to compel BHN's response to RFP 59 without limitation, ordering it to produce "[d]ocuments sufficient to show the average revenue and profit that [BHN] received per Subscriber, for the life of the account, from January 1, 2012 to present." Dkt. 197. BHN has failed to comply with this clear order.

In response to this RFP, BHN produced a single, two-page document that appears to have been prepared for the purposes of this litigation. The document

---

[7] BHN has already agreed to search terms covering the requested scope of RFPs 33 and 95. *See* Grigsby Decl. Ex. M. BHN's position on burden is particularly perplexing as to those RFPs, as its own objections seem to be the impetus for any additional review.

summarizes its revenues per customer on the purported basis of unproduced "Consolidated Charter Trending Schedules." Grigsby Decl. Ex. P at 46 (BHN_00001711-12). But the summary includes data only for 2014 to 2018 and not—as the Court ordered—from 2012 to the present. Plaintiffs requested that BHN expand the data to the full period 2012 to present, but BHN has refused. *See* Grigsby Decl. Ex. Q.

Plaintiffs are also entitled to discovery of the documents underlying the summary BHN prepared for purposes of this litigation because the summary does not show the requested information, and Plaintiffs cannot meaningfully evaluate the basis and accuracy of BHN's data based on the summary alone. *See, e.g.*, *Foley v. Orange Cnty.*, 2012 WL 12905323, at *5 (M.D. Fla. Oct. 18, 2012) (requiring a party to produce the documents underlying a spreadsheet it created in response to a document request). Plaintiffs requested the underlying documents, to no avail.[8]

This Court should, therefore, enforce its prior order requiring BHN to produce records for the full period 2012 to present in response to RFP 59.

### III. BHN Should Be Ordered to Produce Additional Custodial Files

At least eight additional BHN employees are likely to have discoverable information. BHN has either refused to produce these custodians' documents or simply failed to respond to Plaintiffs' request. *See* Grigsby Decl. Exs. J, K.

---

[8] These documents are also relevant to RFP 18 (requesting documents showing average revenues and profits based on service type), which the Court ordered BHN to produce in January 2020. See Dkt. 93 at 2.

Adding document custodians is permissible where a custodian would provide "unique relevant information not already obtained." *In re 3M Combat Arms Earplug Prod. Liab. Litig*., 2020 WL 4501794, at *1 (N.D. Fla. Aug. 5, 2020). When such a showing is made, it is appropriate to add document custodians when "they are reasonably likely to have relevant data and information in their custodial files and the inclusion of these additional custodians is proportional to the needs of the case." *In re 3M Combat Arms Earplug Prod. Liab. Litig*., 2019 WL 5388523, at *1 (N.D. Fla. Oct. 22, 2019).

Here, the eight custodians whom Plaintiffs request BHN add to its searches all participated in relevant communications regarding BHN's contributory copyright infringement and its implementation of repeat infringer policies. On November 24, 2020, Plaintiffs requested that the following custodians be added:

- **Bruce Jones.** Mr. Jones appears to have been a software engineer at BHN. *See* Grigsby Decl. Ex. P at 13 (BHN_00001574). He developed BHN's ECAT computer database that BHN used to track and manage infringement notices, including implementing BHN's policies and practices for addressing Infringement Notices. *See, e.g*., *id*. None of BHN's other custodians occupied this key role. Mr. Jones's role with respect to ECAT positions him as a prime custodian on the issue of the reasonable implementation of BHN's repeat infringer policy.

- **Gary Doda.** Mr. Doda was BHN's Online Forums Manager. *Id*. at 14 (BHN_00001583). He drafted BHN's customer-facing statements about its repeat infringer response program and communicated with BHN subscribers about BHN's infringement policy. *See id*. Mr. Doda's communications are thus relevant to issues relating to BHN's liability for contributory copyright infringement and its asserted safe harbor defense.

- **Kathleen Rowett-O'Neil.** Ms. O'Neil was the Corporate Customer Care Advocate at BHN. *Id*. at 11 (BHN_00001563). She spoke directly to BHN's subscribers about its graduated response program and was responsible for BHN's outreach to subscribers about its responses to copyright infringement. *See id*. Like Mr. Doda, Ms. O'Neil's role and customer interactions suggest that her

documents would be relevant to BHN's liability for contributory copyright infringement, its asserted safe harbor defense, and its willfulness.

- **Nomi Bergman.** Ms. Bergman was BHN's President. BHN placed Ms. Bergman on the legal hold that it applied for this case, but failed to include her as a document custodian. *See id.* at 7 (BHN_00001324). Ms. Bergman was intimately involved with BHN's repeat infringer response program, *see id.* at 9 (BHN_00001561), directed BHN's responses to questions about that program, *see id.* at 11 (BHN_00001563), and available documents demonstrate that she received elevated calls regarding abuse violations by BHN subscribers, *see id.* at 12 (BHN_00001409). Ms. Bergman was also one of only two or three direct recipients of the monthly "Customer Care" reports that report on topics central to this case, including: statistics on the total number of complaints received during a month's period and the total number of responsive actions taken. *See e.g.*, *id.* at 16 (BHN_00001651). Her role in managing the repeat infringer program makes her likely to have information relevant to BHN's contributory infringement, its safe harbor defense, and its willfulness. She is particularly likely to possess communications not yet produced because she held a more senior position than the existing custodians.[9]

On February 11, 2021, Plaintiffs requested that BHN add four additional

custodians:

- **Chris Droessler.** Mr. Droessler appears to have been a BHN Software Architect. *See id.* at 41 (BHN_00002519). BHN documents indicate that Mr. Droessler was regularly involved in (i) adapting and maintaining the ECAT system to address issues the BHN's Security and Abuse team identified and (ii) implementing BHN's copyright infringement policies and protocols. *See, e.g.*, *id* at 39 (BHN_00002392), 41 (BHN_00002519). Mr. Droessler's role suggests that his custodial file will hold relevant information regarding BHN's reasonable implementation of it repeat infringer policy.

- **Trace Hollifield.** Mr. Hollifield was BHN's Director of Enterprise Security/Network Architecture and Engineering. *Id.* at 25 (BHN_00002313). BHN employees consulted with Mr. Hollifield on a number of occasions to discuss BHN's policies with respect to copyright infringement and copyright infringement complaints related to particular subscribers. *See, e.g.*, *id.* at 24 (BHN_00002305), 25 (BHN_00002313). As Mr. Hollifield was involved directly in addressing issues related to copyright complaints, his documents are likely relevant to BHN's contributory infringement, reasonable implementation of its repeat infringer policy, and willfulness.

---

[9] Despite its refusal to add Ms. Bergman as a custodian, BHN has selectively produced fewer than 100 documents from her files.

- **Steve Miron** and **William Futera.** Mr. Miron was BHN's Chief Executive Officer and Mr. Futera was the BHN Executive Vice President and Chief Financial Officer. Like Ms. Bergman, Messrs. Miron and Futera were both recipients of BHN's monthly "Customer Care" reports, *see e.g.*, *id.* at 16 (BHN_00001651), and appear to have participated in meetings regarding copyright infringement on BHN's network, *see, e.g.*, *id.* at 42 (Birenz_00000042). As senior executives, they were likely aware of and participated in decisions related to how BHN would handle copyright infringement. As such, their custodial files are likely to contain information relevant to establishing BHN's liability for contributory copyright infringement and its willfulness.

 BHN has refused to add any of these custodians despite their relevance. For the first four, BHN claimed in *February* that it is not appropriate to add additional custodians "at this stage" of the case, even though Plaintiffs requested the custodians in *November*. Grigsby Decl. Ex. J at 1, 8-9. BHN has yet to respond to the request for the other four custodians. BHN's position is nonsensical. Fact discovery remains open, it has produced virtually nothing, and yet refuses to search documents of highly relevant custodians. BHN failure to properly preserve custodial data, even as to employees it agreed to add as document custodians, necessitates the addition of these custodians. *See* Grigsby Decl. Exs. N-O. And BHN has not asserted, let alone substantiated, any burden associated with adding custodians. BHN should not be permitted to refuse to add relevant custodians, nor to rely on its own delays in refusing to do so.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court issue an order compelling BHN to (1) produce responsive documents with respect to RFPs 33, 48, 59, 64, 80, 81, 95, and 126; and (2) produce the responsive documents of the eight custodians named above.

## LOCAL RULE 3.01(G) CERTIFICATION

Plaintiffs' counsel conferred by email and teleconference with BHN's counsel on multiple occasions prior to bringing this motion. The parties have been unable to resolve the issues in this Motion.

Dated: April 28, 2021

Respectfully submitted,

 /s/ *Jonathan M. Sperling*

Jonathan M. Sperling (*pro hac vice*)
Joshua B. Picker (*pro hac vice*)
Phil Hill (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com
jpicker@cov.com
pahill@cov.com

Stacey Grigsby (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 10th St NW
Washington, DC 20001
Telephone: (202) 662-6000
sgrigsby@cov.com

Mitchell A. Kamin (*pro hac vice*)
Neema T. Sahni (*pro hac vice*)
Hardy Ehlers (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com

Matthew J. Oppenheim (*pro hac vice*)
Scott A. Zebrak (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com

David C. Banker
Florida Bar No. 0352977
Bryan D. Hull
Florida Bar No. 020969
BUSH ROSS, P.A.
1801 North Highland Avenue
P.O. Box 3913
Tampa, FL 33601-3913
Telephone: (813) 224-9255
dbanker@bushross.com
bhull@bushross.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2021, I caused the foregoing document and all accompanying materials to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

Dated: April 28, 2021

 _/s/ Jonathan M. Sperling_
Jonathan M. Sperling

*Attorney for Plaintiffs*