# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UMG RECORDINGS, INC., *et al.*,

      Plaintiffs,

    v.                          **Case No. 8:19-cv-710-MSS-TGW**

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.

## PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND CUSTODIAL FILES

More than two years into this case and over eight months after this Court compelled Defendant Bright House Networks, LLC ("BHN") to produce documents, BHN has still only produced approximately 843 documents.[1] While BHN claims it has reviewed "hundreds of thousands of documents" in response to Plaintiffs' requests, Dkt. 282 at 2,[2] that implies a hit-rate of well less than one percent. Such a small hit-rate suggests serious shortcomings in BHN's review. BHN's tiny production is also the result of its refusal to heed this Court's prior rulings, which required BHN to produce documents concerning its practices regarding copyright infringement by subscribers on its network, regardless of the identity of the rights holder.

Specifically, on September 25, 2020, this Court ordered BHN to produce

---

[1] Plaintiffs, by contrast, have produced over 200,000 documents.

[2] BHN Response to Plaintiffs' Motion to Compel dated May 19, 2012, Dkt. 282 (the "Response").

"documents showing all practices . . . that [BHN] considered, rejected, or adopted for taking adverse action . . . against Subscribers or Users for alleged copyright infringement," "communications showing different treatment between alleged copyright infringement violations and other alleged violations of [BHN's] policies," and information concerning the number of infringement notices BHN received, including "non-parties' notices." *See* Dkt. 197 (granting Plaintiffs' motion to compel RFP Nos. 41 and 71 and Interrogatory No. 13). Eight months later, BHN continues selectively to ignore the Court's ruling that these categories of documents are discoverable and refuses to produce other documents within those same categories.

Other courts have also held that information about an internet service provider's ("ISP") practices regarding all rights holders' accusations of infringement are fundamentally relevant to evaluating the Digital Millennium Copyright Act ("DMCA") safe harbor defense. This conclusion makes sense because the safe harbor defense, which BHN asserts here, requires ISPs to show that they "adopted and reasonably implemented" a policy to terminate "repeat infringers." 17 U.S.C. § 512(i)(1)(A). The defense necessarily takes account of how BHN dealt with *all* instances of repeat infringement—not just infringement of Plaintiffs' works.

Even apart from the safe harbor, BHN's general practices are also relevant to establishing BHN's contribution to its subscribers continued infringement—an element of Plaintiffs' contributory infringement claim—and BHN's state of mind

in contributing to its subscribers' infringement—a well-established factor in determining statutory damages under the Copyright Act.

Not only has BHN refused to produce relevant documents concerning its handling of infringement notices, it has failed to produce the underlying documents concerning its per-subscriber revenues that this Court ordered it to produce eight months ago. *See* Dkt. 197 (granting Plaintiffs' motion to compel RFP No. 59).

To compound these deficiencies, BHN refuses to search the documents of three senior-level custodians—each of whom is likely to have relevant materials, even where the few documents BHN have produced show that those custodians participated in relevant communications.[3]

Plaintiffs thus bring this motion to compel BHN to produce: (1) communications relevant to Plaintiffs' contributory infringement claim and BHN's asserted safe harbor defense; (2) communications relevant to BHN's state of mind; (3) documents this Court previously ordered BHN to produce concerning its subscriber revenues, and (4) documents from three custodians who, on the face of BHN's own documents, are likely to possess relevant information.

---

[3] As reflected in BHN's Response and acknowledged in the Court's May 24, 2021 Order (the "May 24 Order"), BHN has agreed to produce the responsive documents of Bruce Jones, Gary Doda, Kathleen Rowett-O'Neil, Chris Droessler, and Trace Hollifield, which Plaintiffs requested in February 2021 and, after BHN failed to respond to that request, were the subject of Plaintiffs' motion to compel filed April 28, 2021. *See* Dkt. 282 at 12; Dkt. 285 at 2.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are record companies and music publishers that produce, manufacture, distribute, sell, and license commercial sound recordings and musical compositions. Dkt. 1; Dkt. 94 ¶¶ 1-2. BHN, one of the largest ISPs in the country, knowingly contributed to and profited from the massive infringement of Plaintiffs' copyrighted works on BHN's network by its subscribers. *Id.* ¶¶ 2, 90-98. In an effort to protect their works, pursuant to the Copyright Act, Plaintiffs and their agents regularly provided BHN with detailed notices that BHN customers were infringing their copyrighted works. *Id.* ¶ 2. Despite Plaintiffs' efforts, BHN turned a blind eye to the infringement and Plaintiffs' infringement notices—even when it was carried out by known, repeat infringers. *Id.*

Since its first document production 16 months ago, BHN has produced a total of approximately 843 documents. *See* Decl. of Stacey Grigsby ("Grigsby Decl.") ¶ 22. BHN has confessed that it deleted nearly all of the custodial data for three employees on its initial custodian list, and failed to retain the custodial files for eight other employees that it has since agreed are relevant document custodians. *See* Grigsby Decl. Exs. N-O. BHN also produced very little of the data it admittedly generated regarding infringement notices it received or how it handled them, indicating it apparently did very little to save that data.

But these issues alone do not explain BHN's small document production. Instead, it is largely attributable to BHN's stonewalling and insistence on re-litigating the scope of discovery for every document request, even where the

Court has already ruled against it. At issue here are five document requests: four (RFPs 33, 48, 59, and 64) from Plaintiffs' Second Requests for Production (hereinafter "Plaintiffs' Second RFPs"), which were served on February 7, 2020, and one (RFP 126) from Plaintiffs' Fourth Requests for Production (hereinafter, "Plaintiffs' Fourth RFPs"), served on August 27, 2020. Grigsby Decl. Exs. A-B. In response to these requests, BHN issued blanket objections and then dragged out the conferral process for months. As a result, the disputes described herein only ripened as of February 2021, over a year after most of these requests were served. *See* Grigsby Decl. ¶23 and Exs. D, I-K (memorializing conferrals).

On April 28, 2021, Plaintiffs filed a Motion to Compel Production of Documents and Custodial Files (the "Motion"). Dkt. 272. BHN, in its Response filed on May 19, 2021 (the "Response"), alleged that Plaintiffs had failed to comply with Local Rule 3.01(g). Dkt. 282 at fn 11. BHN did not dispute that the parties had discussed the issues raised in the Motion previously, nor that they had reached impasse on those issues during conferrals or, in the case of Plaintiffs' request to add certain custodians, that BHN had received Plaintiffs' request but did not respond. On May 24, 2021, the Court denied Plaintiffs' motion without prejudice and directed Plaintiffs to confer again with BHN on the bases of its motion prior to filing. Dkt. 285 at 1.

On May 25, Plaintiffs notified BHN that they intended to refile the motion and requested to confer telephonically the following day; BHN provided no response. *See* Grigsby Decl. Ex. H at 17-19. Plaintiffs sent a follow-up email on

the morning of May 26 reiterating their request for a phone conferral that day. *Id.*, at 16. BHN's counsel responded that, despite the fact that BHN had Plaintiffs' Motion for several weeks and had submitted a 20-page Response on May 19, it would not be available to confer until two days later—the Friday afternoon before Memorial Day weekend—because "[w]e are evaluating your email and conferring internally as to whether we can meet some of your requests." *Id.*, at 16. After BHN canceled the Friday conferral due to a remote hearing scheduled in the *Charter*[4] case on little notice, the parties held a telephonic conferral on the motion on June 1, during which they were unable to resolve the issues on the motion raised herein. *See id.*, at 1.

During the meet and confer, BHN belatedly offered—after making no such offers in the months of conferrals before or in its Response to Plaintiffs April 28 Motion—to "consider" running "targeted" searches Plaintiffs proposed in response to certain requests, if, in BHN's discretion, the searches were not "unduly burdensome." *See id.* Plaintiffs declined to engage further given BHN's repeated practice of extending conferrals indefinitely and its failure, even now, to commit definitively to running searches and producing documents rather than merely to "consider" doing so.

## LEGAL STANDARD

Plaintiffs are entitled to discovery "regarding any nonprivileged matter that

---

[4] The *Charter* case, proceeding in the District of Colorado, involves similar claims against defendant Charter Communications, Inc., which acquired BHN in 2016. The parties are represented by the same respective counsel in both this case and in *Charter*.

is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In response to a motion to compel disclosure pursuant to Fed. R. Civ. P. 37(a), "[t]he party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information." *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000). Any objection based on the request being overly broad or unduly burdensome cannot be boilerplate, but instead must provide a "full, fair explanation" of the objection "particular to the facts of the case." M.D. Fl. Discovery Handbook § III.A.6 (rev. Feb 1, 2021).

## ARGUMENT

### I.     BHN Should Be Ordered to Produce Communications Relevant to Plaintiffs' Contributory Infringement Claims, BHN's Safe Harbor Defense, and Statutory Damages

BHN has failed to produce communications relevant to three core issues: (1) its safe harbor defense, (2) BHN's contribution to continued infringement on its networks, and (3) the extent to which it acted willfully—a factor that triggers the Copyright Act's enhanced statutory damages. All of these issues are squarely within the bounds of discovery.

#### A.     Legal Background

*First,* the safe harbor defense only immunizes BHN from liability for secondary copyright infringement where BHN demonstrates that it "adopted *and reasonably implemented*" and informed subscribers of a policy to terminate "repeat infringers" in appropriate instances. *See* 17 U.S.C. § 512(i)(1)(A)

(emphasis added). This Court has already confirmed that documents showing how BHN actually implemented its policies are relevant and discoverable:

> The Court: . . . [I]f you all adopted some policy and then somebody who is in charge of enforcing the policy decides, I'm not going to pay any attention to it, and there are e-mails saying that, that is clearly relevant.

Sept. 24, 2020 Hr'g Tr., Grigsby Decl. Ex. L. 45:11-16.

This Court also previously rejected BHN's argument that it can exclude from discovery documents concerning infringement notices that it received from non-party rights holders. *See* Dkt. 197 (granting motion to compel responses to, *inter alia*, RFPs 41 and 71 and to interrogatory No. 13, "*including non-parties' notices*"). As this Court observed, infringement notices from non-party rights holders are "relevant in the broad sense . . . It could show something, Bright House got twice as many [infringement notices] from everybody else and they just ignored it." Sept. 24, 2020 Hr'g Tr. 22:9-12, Grigsby Decl. Ex. L.

This finding is consistent with the ruling in the parallel *Charter* case, in which the court articulated a "general rule," namely that: "I do not believe that it is reasonable to limit the requests, in general, to just the . . . alleged infringing plaintiffs' works." Grigsby Decl. Ex. R, Charter July 2, 2020 Hr'g Tr. at 16:8-14.

Moreover, other courts around the country have also recognized that communications regarding a defendant's implementation of its repeat-infringer policy are relevant to the safe harbor defense. *See, e.g.*, *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 655-662 (E.D. Va. 2015) (denying safe harbor defense based on evidence that "Cox publicly purported to

comply with its [repeat infringer] policy, while privately disparaging and intentionally circumventing the DMCA's requirements"); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 754-58 (W.D. Tex. 2019) (finding ISP ineligible for safe harbor based on, *inter alia,* internal emails reflecting practices diverting from its written policies).

Communications regarding infringement notices sent by other rights holders are equally relevant to whether BHN "reasonably implemented" a policy to terminate repeat infringers. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("[Defendants'] actions towards copyright holders who are not a party to the litigation are relevant in determining whether [defendants] reasonably implemented their repeat infringer policy."); *see also Disney Enters., Inc. v. Hotfile*, 2013 WL 6336286, at *22-24 (S.D. Fla. Sept. 20, 2013) (considering the number of terminations and the total number of notices received from all rights holders—not just from plaintiffs); *Grande*, 384 F. Supp. 3d at 758 (considering evidence as to all notices received by defendant, not just those sent on behalf of plaintiffs, in determining the applicability of the safe harbor defense). Despite the abundance of guidance on this issue from this Court and others, BHN continues to withhold discovery.

*Second*, the requests below are also relevant to Plaintiffs' contributory infringement claim, for which Plaintiffs must demonstrate that BHN facilitated or materially contributed to infringement of the works at issue. *See Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987) (A contributory infringer is "one who,

with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another."). Plaintiffs will do so by showing that BHN continued to provide known repeat infringers with the tool to infringe, without taking any reasonable steps to stop or deter it.

*Third*, BHN must provide discovery relating to its state of mind. "In determining the amount of statutory damages [under the Copyright Act], a court considers . . . the infringers' state of mind—whether willful, knowing, or merely innocent." *Universal Music Corp v. Latitude 360 Nev., Inc.*, 2016 WL 3200087, at *4 (M.D. Fla. May 4, 2016) (internal citation omitted). Section 504(c) of the Copyright Act authorizes increased statutory damages where infringement is willful. 17 U.S.C. § 504(c)(2). Yet, BHN has refused to produce documents that would shed light on its overall program for handling infringement notices, which would speak directly to its state of mind.

### B. Requests at Issue

#### 1. Plaintiffs' RFP No. 126

**Request 126:** Your internal communications discussing any Infringement Notice, any instance of alleged copyright infringement, or any "ticket" generated in response to any Infringement Notice, including internal communications concerning the actual or potential termination of any Subscriber's account with BHN. Grigsby Decl. Ex. B at 5.

**Answer:** Subject to and without waiving the foregoing objections, Bright House will produce responsive non-privileged communications as stated in its responses to Plaintiffs' Request for Production of Documents No. 34 [that is, "Bright House will produce representative, responsive non-privileged, non-work product communications, if any, sufficient to show Bright House's implementation of its repeat infringer termination policy during the Discovery Period." (Aug. 18, 2021 Supplemental Answer to RFP 34)]. Grigsby Decl. Exs. G at 7-8, F at 15-16.

**Feb. 5, 2021 Response:** Plaintiffs' RFP 126 . . . seeks internal communications regarding notices, copyright infringement generally, tickets generally, and

communications regarding "actual or potential termination of any Subscriber's account with BHN". Subject to our objections, we agreed to produce internal communications regarding subscriber terminations, even if those subscribers were not recipients of Plaintiffs' notices. We did not agree to broadly produce all internal communications regarding "tickets" or "copyright infringement" without limitation. Similar to RFP 33, Plaintiffs' request as drafted is overbroad and not narrowly tailored to the needs of the case. We also note that several other RFPs seek internal communications regarding copyright infringement (see, e.g., RFP 35 (internal communications regarding terminations and suspensions and violations of copyright policies); RFP 43 (communications discussing subscriber "satisfaction or dissatisfaction" with BHN's copyright infringement policies)) and BHN has agreed to produce documents in response to these requests as well. Grigsby Decl. Ex. I at 1-2.

RFP 126 requests discrete categories of internal BHN communications related to infringement notices various rights holders (including, but not limited to, Plaintiffs), sent to BHN. Plaintiffs do not, as BHN suggested in its Response, seek "all" communications relating to infringement notices. Dkt. 272 at 5. The communications Plaintiffs seek are relevant because they will demonstrate whether and how BHN applied its repeat-infringer policy. To the extent the communications reveal that BHN was aware of copyright infringement and failed to take appropriate action, such communications demonstrate BHN's contribution to infringement, undermine BHN's safe harbor defense, and demonstrate its willfulness, for the reasons stated above.

Despite the clear relevance of the request as written, BHN has agreed to produce only internal communications (1) that discuss "*quarantining, suspending, or terminating* any subscriber for receiving too many notices" and (2) all responsive "employee communications regarding *Plaintiffs'* notices." *See* Grigsby Decl. Ex. I at 3; Dkt. 282 at 7 (emphases added). BHN has thus refused to produce responsive documents discussing copyright infringement by subscribers

who were the subject of infringement notices from rights holders *other than* plaintiffs that do not discuss "quarantining, suspending, or terminating any subscriber." This limitation leaves out a large swath of communications in which BHN *failed* to implement its repeat infringer policy, i.e., those communications in which it *should have* discussed "quarantining, suspending, or terminating" a subscriber but did not. *See* Grigsby Decl. Ex. I at 1-4. BHN's statement that it has agreed to produce internal employee communications relating to *Plaintiffs'* notices of infringement obscures that it has *not* agreed to produce the internal communications relating to other rights holders' notices.

By example, BHN's current position contemplates withholding e-mails where its employees discuss continuing to warn a customer who has been the subject of thousands of infringement notices yet continues to infringe, but that do not discuss whether to quarantine, suspend, or terminate that customer. This is precisely the type of communication that shows an ISP defendant contributed to infringement or failed to reasonably implement its repeat infringer policy and, therefore, is ineligible for the safe harbor. *See, e.g.*, *BMG*, 149 F. Supp. 3d 634 at 657-60 (citing emails in which Cox repeatedly warned customers about infringing activity but declined to terminate as examples of a failure to reasonably implement repeat infringer policy); *see also Grande*, 384 F. Supp. 3d at 757 (granting summary judgment for plaintiffs on the safe harbor defense and citing an email in which the defendant's employees noted that "we have users who are racking up DMCA take down requests and no process for remedy in place.").

Indeed, the Special Master in *Charter* ordered the defendant there to produce documents responsive to the full scope of an identically-worded RFP. *See* Grigsby Decl. Ex. S at 4 (denying any limitation to the scope of RFP No. 30).

### 2.   Plaintiffs' RFP No. 33

**Request No. 33:** Communications as between members of your Security and Abuse team (as that term is used in your June 19, 2019 Initial Disclosures), on the one hand, and any Subscribers or Users, on the other, discussing or considering any Infringement Notice, notice of alleged copyright infringement or violation of any DMCA policy or other policy regarding copyright infringement, or any "ticket" generated in response to any Infringement Notice.[5] Grigsby Decl. Ex. A at 8.

**Aug. 18, 2020 Supplemental Answer:** Subject to and without waiving the foregoing objections, Bright House will produce responsive non-privileged communications with subscribers identified in notices of claimed infringement that Bright House received during the Discovery Period, concerning Bright House's implementation of its repeat infringer policy, to the extent Bright House finds such documents within its possession, custody, or control after undertaking a reasonable and diligent search. Grigsby Decl. Ex. F at 14-15.

**Feb. 5, 2021 Response:** Regarding your request in RFP 33 for "all communications" between BHN and its subscribers "discussing or considering" numerous vague categories of information, BHN agreed to produce (subject to its objections): (1) communications related to Plaintiffs' [sic] or the works at issue in this case within the Discovery Period; and (2) communications regarding the implementation of BHN's DMCA policy in respect to suspensions and terminations. BHN objected to Plaintiffs' broader request for "all communications" on several grounds, and believes its proposed compromise is a reasonable one. BHN regularly received and processed notices and related correspondence related to various types of alleged copyright infringement during the claims period, and despite Plaintiffs' contentions otherwise, not every document concerning copyright infringement generally is relevant to this specific dispute. As Plaintiffs know, subscriber communications implicate PII, and thus the review and production of these materials is burdensome due to the need to review for and redact this material. So for example, to respond to Plaintiffs' broad request, Charter [sic] would need to review for, redact, and produce "auto-away" vacation bounce-back messages from subscribers in receipt of an automated abuse notification alleging that someone at that IP address has been detected as potentially sharing copyrighted films online. Such material is not remotely relevant to this case. Charter's [sic] proposal provides Plaintiffs with the communications related to the actual works at issue in this case, and communications related to the broader topic of DMCA suspensions and terminations

---

[5] As part of the conferral process, Plaintiffs proposed narrowing the scope of RFP 33 on October 20, 2020. *See* Grigsby Decl. Ex. I at 25. The text here reflects the operative request.

(which Plaintiffs argue is relevant due to BHN's assertion of a safe harbor defense). "All communications" related to any kind of copyright issue is overly broad, and, even if Plaintiffs' argument is credited that it is tangentially relevant, it is disproportionate to the needs of this case. Grigsby Decl. Ex. I at 1.

RFP 33 seeks communications between a discrete and limited number of BHN employees and BHN subscribers relating (i) to copyright infringement occurring on its network and (ii) violations of BHN's DMCA policy. Such communications could not be more relevant and are distinct from the internal communications sought above. BHN has limited its agreement to produce communications (1) "related to Plaintiffs' [sic] or the works at issue in this case within the Discovery Period"; and (2) "regarding the implementation of BHN's DMCA policy in respect to *suspensions and terminations*." (Emphasis added.)

Both limitations are improper. As noted in Part I.A, an ISP may not limit its production to documents concerning Plaintiffs or the works-in-suit, especially where the ISP has placed the implementation of its repeat-infringer policy fully at issue by asserting a safe harbor defense. *See, e.g.*, *Perfect 10*, 488 F.3d at 1113 ("Section 512(i)(1)(A) requires an assessment of the service provider's 'policy,' not how the service provider treated a particular copyright holder."); *accord Grande*, 384 F. Supp. 3d at 754-58; *Hotfile*, 2013 WL 6336286, at *22-24.

Likewise, as discussed above, BHN's limitation to documents concerning suspensions or terminations omits communications where it *should have* suspended or terminated but did not. In particular, in the Parties' conferrals and BHN's Response, BHN refused to produce communications that do not discuss the defined actions typically taken by BHN under its DMCA policy like the

quarantine, suspension, or termination of subscriber accounts. As with RFP 126, in response to RFP 33 BHN refuses to produce communications that discuss infringement notices but do not discuss quarantining, suspending, or terminating the subscriber. *See* Dkt. 282 at 8. In its Response to the April 28 Motion, BHN attempted to obscure this refusal by noting that it ran the parties' agreed-upon search terms for RFP 33, *see* Dkt. 282 at 7-8. But that glosses over the fact that BHN, in conducting its responsiveness review of those search terms, deemed *non-responsive* any documents that do not discuss the affirmative implementation of its policies. In other words, BHN again seeks to limit its production to those documents showing that it *did* implement its policies, and to exclude from production documents reflecting instances where BHN *should have* implemented its policy, or terminated or suspended a subscriber, but did not.

By hypothetical example, BHN would exclude from production a document in which a BHN employee wrote to a repeat infringing subscriber to inform them that BHN had received thousands of notices of infringement regarding that subscriber if BHN ultimately did not quarantine, suspend, or terminate that subscriber. Such a document would be highly relevant to show that BHN was aware of infringement on its network, but did not actually implement its repeat-infringer policies.

These types of documents are relevant to BHN's safe harbor defense. For example, in *Grande*, defendants relied on a "forward-facing statement that they would terminate customers for repeat infringements" as the basis of their claim

for safe harbor defense. *Grande*, 384 F. Supp. 3d at 756. However, discovery of internal communications revealed that customers would not be terminated for repeated copyright infringement "regardless of the source of any notice," "regardless of the content of any notice," and "regardless of the volume of notices . . . for a given customer." *Id.* at 755-56. Relying upon these e-mails, the *Grande* court rejected defendant's safe harbor defense. *Id.* at 755-58. These same documents would also be relevant to BHN's contribution to its subscribers' infringing conduct and its willfulness in failing to stop such conduct.

BHN's Response claims that producing these core communications would pose an undue burden because, for example, it might call for the production of subscribers' vacation auto-reply messages. *See* Dkt. 282 at 8. But BHN fails to substantiate any such burden; even its vacation bounce-back message hypothetical is purely speculative and, in any event, Plaintiffs agreed to exclude vacation bounce-back messages. *See id.*

### 3.    Plaintiffs' RFP No. 64

**Request No. 64**: Documents sufficient to reflect the content of any calls between your employees, customer service representatives, or members of your internet security or customer safety team, on one hand, and Subscribers or Users identified in Infringement Notices or otherwise identified in connection with actual or alleged copyright infringement, on the other. Grigsby Decl. Ex. A at 12.

**Answer:** Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense. Bright House further objects that the request is overbroad and should be limited to those Subscribers that were identified in the Infringement Notices sent by Plaintiffs' [sic] or on Plaintiffs' behalf. Grigsby Decl. Ex. F at 37-38.

**Feb. 5, 2021 Response:** As we noted before, our accommodation to Plaintiffs regarding RFP 129 was not intended to reopen previous negotiations regarding these

requests, which implicate different information, data sources and objections.[6] For RFPs 63-64, BHN has agreed to produce all records of calls in the ECAT system that concern any copyright infringement notices and tickets for the subscribers who received RIAA notices,[7] without limiting these to Plaintiffs' works in suit. For at least the reasons given above, Plaintiffs' request for records of all calls to or from any subscribers, without limitation, is overbroad. Grigsby Decl. Ex. I at 2.

RFP 64 seeks the documents, such as internal notes or communications, concerning calls BHN employees made to alleged repeat infringers. To address BHN's scope concerns, Plaintiffs narrowed RFP 64 to seek only documents relating to subscribers who were the subject of three or more infringement notices. ISPs like BHN routinely record such work log notes. The notes of these calls will provide evidence as to when and how BHN implemented its repeat infringer policies and when it should have done so but did not. As described above, discovery of these communications is, accordingly, relevant to Plaintiffs' contributory claim, BHN's safe harbor defense, and BHN's willfulness.

BHN again improperly seeks to limit its production to the "Subscribers that were identified in the infringement notices sent by Plaintiffs' [sic] or on Plaintiffs' behalf." *See also* Dkt 282 at 9. In particular, it refuses to produce the call notes from its Enterprise Copyright Action Tool ("ECAT") system—an application BHN developed specifically to automatically process DMCA complaints and record employees' interactions with subscribers regarding those complaints—for anyone

---

[6] BHN's response references an agreement between the parties relating to RFP 129, in which BHN agreed to produce ticket data related to all subscribers who were the subject of three or more infringement notices.

[7] Infringement notices sent by, or on behalf of, Plaintiffs to BHN are referred to as "RIAA notices." ECAT is the BHN database on which infringement notices and communications with customers about such notices are logged.

but those subscribers who received notices sent on Plaintiffs' behalf. *See id.*
(limiting ECAT production to "records of calls in its ECAT system that concern
any copyright infringement notices for subscribers identified as having received
notices sent on behalf of Plaintiffs."). For the same reasons as above with respect
to RFPs 126 and 33, BHN's limitation to ECAT records concerning infringement
notices sent by Plaintiffs is improperly narrow as it excludes key evidence of
BHN's failure to implement its repeat-infringer policies globally.

BHN's position is also at odds with its other discovery responses. While it
objects to producing the call notes for RFP 64, it agreed to produce other details
*from the same database* concerning its receipt and handling of infringement
notices—including subscriber account number and IP address, date of
infringement, and customer-facing actions taken by BHN. Grigsby Decl. Ex. I at 2
(agreeing to produce ECAT ticket data in response to RFP 129). BHN cannot
meaningfully distinguish its position that the ECAT data showing *how* BHN
responded to a notice is *within* the scope of discovery and not unduly
burdensome, but that the notes of calls between BHN's abuse team and infringing
subscribers in the same database are somehow outside the bounds of discovery.
Nor, as BHN claimed in its Response, does its recent agreement to produce of
data from a different system (ICOMS, a manual input system which held different
call records) eliminate its obligation to produce the core call data from ECAT. *See*
Dkt. 282 at 9.

Further, BHN's assertion of undue burden in in reviewing ECAT data and redacting subscriber PII is without merit. *See* Grigsby Decl. Ex. H at 1-2. BHN has reviewed documents for PII throughout this litigation. BHN has not substantiated any purported disproportionate burden here, nor has it explained its assertion in conferrals that the data in ECAT is cumulative of other data BHN has produced. The relevance of the ECAT call notes plainly outweighs BHN's unsubstantiated assertion of burden, and those call notes should be produced.

### 4. Plaintiffs' RFP No. 48

**REQUEST NO. 48**: Documents sufficient to show any growth targets, strategic plans, or internal strategies pertaining to the use or offering of higher bandwidths to Subscribers for the purpose of downloading music. Grigsby Decl. Ex. A at 10.

**Aug. 18, 2020 Supplemental Answer:** Bright House further responds that, in light of the Court's order dismissing Plaintiffs' vicarious liability claims (ECF 142), documents sought in this request lack relevance to any claim or defense remaining in the case, and on that basis Bright House will not produce documents in response to this request. Grigsby Decl. Ex. F at 27-28.

RFP 48 seeks discovery of BHN's growth targets, strategic plans, and other strategies in which it linked higher bandwidths (internet download and upload speeds) to downloading music because such documents are relevant to statutory damages considerations. Evidence of "the infringers' state of mind" is highly relevant in determining the amount of statutory damages available under the Copyright Act. *See Universal Music Corp*, 2016 WL 3200087, at *4.

It is well known that peer-to-peer ("P2P") internet usage, which is associated with copyright infringement, requires higher bandwidth than standard internet usage. Users of P2P technologies benefit from ISPs that can provide higher bandwidth speeds to optimize their use of the technology. To the extent

BHN profited from selling higher speeds and tiers of service, Plaintiffs are entitled to present the jury with information that shows any growth targets, strategic plans, or internal strategies BHN developed to link higher bandwidth to downloading music through P2P technologies that were overwhelmingly used for infringement. This information would speak directly to how BHN structured its business to profit off of its subscribers' copyright infringement, which, in turn, is relevant information for a jury to consider in assessing the magnitude of statutory damages that should be awarded.

BHN refuses to provide these materials because it argues they are relevant only to Plaintiffs' vicarious liability claims, which this Court dismissed. *See* Dkt. 282 at 9-10. While material produced in response to RFP 48 could also be relevant to vicarious liability, that fact does not alter the relevance of RFP 48 to statutory damages. Considering this same RFP, the court in *Charter* found this discovery request to be "relevant" and "narrowly tailored." *See Warner Bros. Records Inc., et al. v. Charter Communications, Inc.*, 1:19-cv-00874, Doc. 181 at 41 (D. Colo. May 29, 2020). This Court should find the same.

### C.   Any Burden Objection Is Untimely and Unsupported

BHN's generalized claims of burden are either untimely or implausible. BHN has produced fewer than 1,000 documents over the course of more than a year. It has admitted to failing to preserve relevant data. *See* Grigsby Decl. Exs. N-O. As a result, it is unlikely that BHN would review a large volume of documents for any of Plaintiffs' requests. To the extent BHN believes differently,

it should provide hit counts for agreed-upon search terms and Plaintiffs would be willing to negotiate the scope of the review to reduce any significant burden. *See* Grigsby Decl. Ex. I at 3-4.[8]

## II.   BHN Should Be Ordered to Comply With the Court's Prior Order and Produce Documents Showing its Per-Subscriber Revenues

On September 25, the Court granted Plaintiffs' motion to compel BHN's response to RFP 59 without limitation, ordering it to produce "[d]ocuments sufficient to show the average revenue and profit that [BHN] received per Subscriber, for the life of the account, from January 1, 2012 to present." Dkt. 197. BHN has failed to comply with this clear order.

In response to this RFP, BHN produced a single, two-page document that appears to have been prepared for purposes of this litigation. The document summarizes its revenues per customer on the purported basis of unproduced "Consolidated Charter Trending Schedules." Grigsby Decl. Ex. P at 23-24 (BHN_00001711-12).

Plaintiffs are entitled to discovery of the documents underlying the summary BHN prepared for purposes of this litigation because Plaintiffs cannot meaningfully evaluate the basis and accuracy of BHN's data based on the summary alone . *See, e.g.*, *Foley v. Orange Cnty.*, 2012 WL 12905323, at *5 (M.D.

---

[8] BHN has already agreed to search terms covering the requested scope of RFP 33. See Grigsby Decl. Ex. M. BHN's position on burden is particularly perplexing as to that RFPs, as its additional burden in reviewing those documents appears to result from its decision to exclude documents that hit on search terms for that request to account for its own objections.

Fla. Oct. 18, 2012) (requiring a party to produce the documents underlying a spreadsheet it created in response to a document request). Plaintiffs requested the underlying documents, to no avail.[9]

In its Response, BHN claims that it should be excused from producing the underlying "Consolidated Charter Trending Schedules" because they contain "highly sensitive financial information." Dkt. 282, at 11. But many responsive documents produced in litigation contain financial information. Here, the Court has already entered a protective order precisely to protect such material from use or disclosure beyond this matter. In addition, the data is several years old, dating to before the period when Charter acquired BHN, which calls into question its sensitivity. *See* Dkt. 282 at 11-12.

This Court should, therefore, enforce its prior order requiring BHN to produce records for the full period 2012 to present in response to RFP 59. Far from being an "eleventh hour" request, as BHN states, Dkt. 282 at 12, the parties have discussed the request for more than six months as BHN delayed in providing a final response. *Id.*, at 11.

## III.   BHN Should Be Ordered to Produce Additional Custodial Files

At least three additional BHN employees, Nomi Bergman, Steve Miron, and William Futera are likely to have discoverable information. BHN has repeatedly and improperly refused to produce these custodians' documents. *See*

---

[9] These documents are also relevant to RFP 18 (requesting documents showing average revenues and profits based on service type), which the Court ordered BHN to produce in January 2020. See Dkt. 93 at 2.

Grigsby Decl. Exs. J, K; Dkt. 282 at 14-18. In the June 1 conferral, BHN simultaneously stood on its objection to adding these custodians, while also offering to "consider" limited searches of their files. Given BHN's pattern of using offers to confer to delay Plaintiffs' efforts to get affirmative relief, this Court should order BHN to produce the custodial files of these individuals.

Adding document custodians is appropriate where a custodian would provide "unique relevant information not already obtained." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2020 WL 4501794, at *1 (N.D. Fla. Aug. 5, 2020). When such a showing is made, it is appropriate to add document custodians when "they are reasonably likely to have relevant data and information in their custodial files and the inclusion of these additional custodians is proportional to the needs of the case." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2019 WL 5388523, at *1 (N.D. Fla. Oct. 22, 2019).

Here, the three custodians whom Plaintiffs request BHN add to its searches all participated in relevant communications regarding BHN's contributory copyright infringement and its implementation of repeat infringer policies. Specifically, BHN should produce the custodial documents of:

- **Nomi Bergman**. BHN placed BHN's former President Ms. Bergman on the legal hold that it applied for this case, but failed to include her as a document custodian. *See* Grigsby Decl. Ex. P at 7 (BHN_00001324). As a senior BHN executive, Ms. Bergman was intimately involved with BHN's repeat infringer response program, *see id.* at 9 (BHN_00001561), directed BHN's responses to questions about that program, *see id.* at 11 (BHN_00001563), and available documents demonstrate that she received elevated calls regarding abuse violations by BHN subscribers, *see id.* at 12 (BHN_00001409). Ms. Bergman was also one of only two or three direct recipients of the monthly "Customer

Care" reports that tracked infringement complaint statistics and BHN's responsive actions. *See e.g.*, *id.* at 12 (BHN_00001651). Furthermore, Ms. Bergman participated in discussions regarding the DMCA policy that included only smaller groups of more senior participants. *See id.* at 25 (BHN_00003241). In one exchange concerning developments in BHN's copyright program, Ms. Bergman responded ███████████████████████ ████████████████████", *see id.* at 29 (BHN_00003488), implying that she was involved in BHN's program more than would be revealed by the approximately 100 documents of hers that BHN has produced from other custodians' files. In another exchange, senior-level BHN executives Tim Frendberg and William Futera discussed putting together materials regarding BHN's copyright program for Ms. Bergman's review, *see id.* at 26 (BHN_00004164).

- **Steve Miron and William Futera**. Mr. Miron was BHN's Chief Executive Officer and Mr. Futera was the BHN Executive Vice President and Chief Financial Officer. Like Ms. Bergman, Messrs. Miron and Futera were both senior-level recipients of BHN's monthly "Customer Care" reports, *see e.g.*, *id.* at 12 (BHN_00001651), and appear to have participated in meetings regarding copyright infringement on BHN's network, *see, e.g.*, *id.* at 20 (Birenz_00000042).

In response to Plaintiff's initial request to add Nomi Bergman, BHN claimed in *February* that it is not appropriate to add additional custodians "at this stage" of the case, even though Plaintiffs requested the custodians in *November*. Grigsby Decl. Ex. J at 1, 8-9. BHN, in its Response to Plaintiffs' April 28 Motion, maintained that position. *See* Dkt. 282 at 19-20 (citing the impending close of fact discovery as reasoning for refusing to add custodians). BHN's argument is nonsensical. Fact discovery remains open, BHN has produced virtually nothing, and yet refuses to search documents of highly relevant custodians. BHN's failure to properly preserve custodial data, even as to employees it agreed to add as document custodians, necessitates the addition of these custodians. *See* Grigsby Decl. Exs. N-O.

BHN has not substantiated any burden associated with adding these custodians, nor has it shown that the discovery requested is cumulative. *See* Dkt. 282 at 13. BHN could easily exclude from its review any documents that it previously reviewed in the files of other custodians. *See* Dkt. 282 at 17-18. BHN should not be permitted to refuse to add relevant custodians, nor to rely on its own delays and judgments as to relevance, especially in light of its exceptionally thin productions to date.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court issue an order compelling BHN to (1) produce responsive documents with respect to RFPs 33, 48, 59, 64, and 126; and (2) produce the responsive documents of the three custodians named above.

## LOCAL RULE 3.01(G) CERTIFICATION

Plaintiffs' counsel conferred by email and teleconference with BHN's counsel prior to bringing this motion, both with respect to the issues raised herein and with respect to Plaintiffs' intent to file this motion. The parties have been unable to resolve the issues in this motion.

Dated: June 2, 2021

Respectfully submitted,

 /s/ *Jonathan M. Sperling*

Jonathan M. Sperling (*pro hac vice*)
Joshua B. Picker (*pro hac vice*)
Phil Hill (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com
jpicker@cov.com
pahill@cov.com

Stacey Grigsby (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 10th St NW
Washington, DC 20001
Telephone: (202) 662-6000
sgrigsby@cov.com

Mitchell A. Kamin (*pro hac vice*)
Neema T. Sahni (*pro hac vice*)
Hardy Ehlers (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com

nsahni@cov.com

Matthew J. Oppenheim (*pro hac vice*)
Scott A. Zebrak (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com

David C. Banker
Florida Bar No. 0352977
Bryan D. Hull
Florida Bar No. 020969
BUSH ROSS, P.A.
1801 North Highland Avenue
P.O. Box 3913
Tampa, FL 33601-3913
Telephone: (813) 224-9255
dbanker@bushross.com
bhull@bushross.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2021, I caused the foregoing document and all accompanying materials to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

Dated: June 2, 2021

_/s/ Jonathan M. Sperling_
Jonathan M. Sperling

_Attorney for Plaintiffs_