UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UMG RECORDINGS, INC., *et al.*,

      Plaintiffs,

  v.                              **Case No. 8:19-cv-710-MSS-TGW**

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.

## PLAINTIFFS' MOTION TO COMPEL

    Plaintiffs move for an order compelling Bright House Networks, LLC ("BHN") to (1) provide responses to Interrogatories and Requests for Admission that seek information central to Plaintiffs' claims and that impose a minimal burden on BHN, (2) produce a single spreadsheet that BHN admits contains data relevant to this case, and (3) produce documents that BHN appears to have improperly withheld on the basis of attorney-client privilege.

    Plaintiffs raised these issues in email and telephone conferrals with BHN starting in April 2021 but were unable to resolve them.[1]  After having reached impasse, Plaintiffs informed BHN by email of September 14, 2021 of their intent

---

[1] *See* Declaration of Neema T. Sahni Exs. H (showing email conferral between the parties between July 16, 2021 and July 28, 2021), J (showing email conferral between the parties between August 9, 2021 and August 24, 2021), O (showing email conferral between the parties on April 12, 2021 and April 26, 2021), P (showing email conferral between the parties on May 12, 2021, May 28, 2021, June 4, 2021, June 14, 2021, June 30, 2021, July 1, 2021, July 2, 2021, July 6, 2021, and July 7, 2021), Q (showing email conferral between the parties on July 30, 2021).

to move for the relief requested herein and offered to confer by phone.[2]  The parties conferred by telephone on September 15, 2021, with respect to the privilege waiver issue but were unable to reach resolution.

## ARGUMENT

### I.   BHN Should Provide Basic, Readily-Available Information About its Termination of Subscribers' Accounts.

Subscriber terminations are a central issue in this case.  Plaintiffs' contributory infringement claim alleges that BHN materially contributed to copyright infringement by continuing to provide service—including by *failing to terminate service*—to known repeat infringers.  *See* First Amended Complaint (Dkt. 96-1), ¶¶ 87, 93, 94.  In response, BHN has argued that terminating a subscriber is not something it would lightly do because of the purported "devastating" effect of cutting off a subscriber's internet service.  Answer and Counterclaims (Dkt. 164) at 47 ¶ 10.  In addition, BHN contends it is entitled to safe harbor from liability, which requires it to demonstrate that it "adopted and reasonably implemented" a policy to terminate repeat infringers in appropriate circumstances.  *See* Dkt. 164 at 44–45; 17 U.S.C. § 512(i)(1)(A).  Plaintiffs are thus entitled to basic information about under what circumstances, if any, BHN determined it was appropriate to terminate subscribers, or to reinstate previously terminated subscribers.

---

[2] *See* Declaration of Neema T. Sahni Exs. I (showing email conferral between the parties on September 14, 2021), BB (showing email and telephonic conferral between the parties on September 14, 2021 and September 15, 2021).

## A.   Plaintiffs' Interrogatory 17

**Interrogatory 17**:  Identify each Subscriber, by account number, whose internet service BHN terminated for non-payment from March 2013 through May 2016, and about whom BHN received at least three (3) Infringement Notices.

**Answer**:  Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, including without limitation because the request seeks information about non-parties and works not at issue in this case, and because the information Plaintiffs seek would lack relevance in any event.  Bright House further objects to Plaintiffs' use of the defined term "Infringement Notice" as overbroad and unduly burdensome, vague and ambiguous, as argumentative, as improperly incorporating a legal conclusion, and as requiring Bright House to speculate as to the existence and ownership of unidentified copyrights, and as to whether a particular notification was made "pursuant to" the DMCA.  Bright House further objects to this request because it is overly broad and unduly burdensome.  Bright House further objects to this request to the extent it seeks information that is not reasonably accessible because of undue burden or cost, and Bright House reserves the right to shift the cost of accessing such information to Plaintiffs.  Bright House reserves its right to respond to this interrogatory pursuant to Fed. R. Civ. P. 33(d)

This Interrogatory asks BHN to identify the overlap between two groups of accounts it has already identified:  (1) accounts that BHN terminated for non-payment, which this Court has already held to be relevant and ordered BHN to identify in response to Plaintiffs' Interrogatory 12;[3] and (2) accounts that were the subject of three or more infringement notices.  A sworn answer identifying the overlap between these two categories is important because it will show that BHN refused to terminate known repeat infringers, but terminated those same subscribers when they stopped paying their bills.  Recognizing its relevance, the Special Master ordered Charter to provide an analogous set of information in the

---

[3] Judge Scriven ordered BHN to respond to Interrogatory 12, *see* Dkt. 134 at 2, which asks BHN to "State the number of Subscribers, per month and year, whose internet service [it] terminated for failing to pay amounts owing on the Subscriber's account."  This Interrogatory asked for the monthly totals of subscribers terminated; the individual account numbers underlying those totals are known only to BHN.

parallel *Charter* litigation.  *See* Dkt. 230 at 7–9, *Warner Records, Inc. v. Charter Communications, Inc.*, No. 19-cv-00874 (D. Colo. Aug. 12, 2020).

The requested information is relevant because it will rebut BHN's contention that the reason it didn't terminate subscribers in response to infringement notices was because "[l]osing Internet access can have devastating consequences for a subscriber" as the Internet is "virtually indispensable to functioning in the modern world."  Dkt. 164 at 46 ¶6, 47 ¶10.  Judge Scriven has already held that BHN's termination of subscribers for non-payment "*certainly is relevant information to support the Plaintiffs' rejoinder to Defendant's defense*" that "termination of infringers is untenable and essentially unconscionable because internet use is so ubiquitous and essential to the fabric of everyday life."  Dkt. 134 at 2.  She therefore ordered BHN to state the number of subscribers it terminated for non-payment during the Claim Period, observing that there is "*no basis factually or legally for the limitation of discovery concerning Defendant's termination of customers for non-payment.*"  *Id.*

This Interrogatory simply asks for BHN to identify the most relevant subset of the information Judge Scriven already ordered: ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ There is no better

---

[4] All exhibit references refer to the exhibits to the Declaration of Neema T. Sahni, dated Sept. 15, 2021.

rejoinder to BHN's position that it was "essentially unconscionable" to terminate a repeat infringer than to show that BHN did, in fact, do so—but only because they stopped paying, not because of their infringement.

Finally, there is no appreciable burden here as BHN need only cross-reference two already-identified data sets (only one of which has been provided to Plaintiffs).

## B.   Plaintiffs' Interrogatory 24

**Interrogatory 24**:  Of those Subscribers whose internet service was terminated (as reflected in BHN's December 14, 2020 Third Supplemental Response to Plaintiffs' Interrogatory No. 14), state the total number who reinstated their internet service with BHN subsequent to the termination.
**Answer:** Bright House objects that this request is overbroad, unduly burdensome, and seeks information that is outside the scope of permissible discovery because it is not relevant to any party's claim or defense, because it seeks information about works and parties not at issue in this case and for a time period well outside of Plaintiffs' claims period in this case.  Bright House further objects to this request as vague and ambiguous, in particular as to the undefined phrase "reinstate[]... internet service." Bright House further objects to this request as vastly overbroad and unduly burdensome, in particular to the extent it purports to requires Bright House to speculate as to the identities of individuals who signed up for Internet accounts with Bright House, including without limitation whether different names may refer to the same individual or whether the same name may refer to different individuals.  Bright House further objects to this request to the extent it seeks information that is not reasonably accessible because of undue burden or cost, and Bright House reserves the right to shift the cost of accessing such information to Plaintiffs.  Bright House reserves its right to respond to this interrogatory pursuant to Fed. R. Civ. P. 33(d).

This Interrogatory asks BHN to state how many of the 18 subscribers it terminated for infringement during the Claim Period (*see* Ex. D) later had their accounts restored, thereby demonstrating whether those terminations were real or "nominal."

This request is directly relevant to BHN's safe harbor defense.  *See* 17 U.S.C. § 512(i)(1)(A).  In *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,

149 F. Supp. 3d 634 (E.D. Va. 2015), the court held that "[t]o implement the repeat infringer policy contemplated by § 512(i), the penalty imposed by service providers must be termination . . . [and] service providers *cannot skirt the termination requirement by imposing something short of complete termination of a subscriber* or account holder." *Id.* at 658, *reversed in part on other grounds*, 881 F.3d 293 (4th Cir. 2018). The *BMG* Court found that Cox fell short of that actual termination requirement, as a matter of law, due to its practice of "reactivating" subscribers once they were terminated. Because these subscribers were only "nominally terminated, only to be reactivated upon request," the court found that "no reasonable juror could find that Cox implemented a repeat-infringer policy." *Id.* at 654, 658.

████████████████████████████████████████████

████████████████████████████████████████████

The remaining question is simply, of 18 subscribers, for how many was that true.

BHN's primary objection to providing this information is that it terminated 17 of the 18 subscribers near the end of the Claim Period, and so may need to look beyond that timeframe to answer. *See* Ex. H. But that is not a valid basis for concealing how many of these terminations were not genuine. Whether BHN later reinstated subscribers whom it terminated *during the Claim Period* is unquestionably relevant; indeed, this information was dispositive in *BMG*. And BHN cannot refuse to provide that information simply because it failed to terminate virtually any subscribers until the very end of the Claim Period.

Nor is there any meaningful burden in answering:  there are only 18 subscribers at issue, BHN knows who they are, and it merely needs to look up those subscribers' account information.

## II.   BHN Should Provide a Responsive and Concededly Relevant "Metrics Report."

**Request 21:**  Documents concerning the impact or effectiveness of any graduated response program, DMCA Policy, or Repeat Infringer Policy in stopping alleged copyright infringement through the use of Defendants' internet services.
**Answer**:  Subject to and without waiving the foregoing objections, upon entry of an appropriate protective order Bright House will produce responsive, non-privileged documents concerning Bright House's DMCA policy as a deterrent to copyright infringement during the Discovery Period, to the extent Bright House finds such documents within its possession, custody, or control after undertaking a reasonable and diligent search and to the extent not already produced in response to other requests.

Plaintiffs seek production of a single existing spreadsheet summarizing BHN's receipt and processing of, and responses to, infringement notices.  The same type of spreadsheets—so-called monthly "metrics reports"—are among the most important documents in the parallel *Charter* litigation.  The spreadsheets detail, among other things, ███████████████████████████████████ ███████████████████████████████████████.[5]  This monthly data demonstrates ███████████████████████████████████████ ███████████████████████████, and therefore is both relevant and

───────────────────

[5] ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████

directly responsive to Plaintiffs' RFP 21.[6]  BHN has conceded that its parent

company, Charter, ████████████████████████████████████████

████████████████████████████████████, but it refuses to produce it.

Ex. H.

     Though BHN concedes the spreadsheet ████████████████████████

████████████████████████████████, it objects on the grounds that (1)

similar data (though not all such data) is reflected in pieces in other documents

produced by BHN; and (2) the spreadsheet comes from the files of Charter, which

acquired BHN in May 2016.  *See id.*  Neither reason is valid.

     *First*, BHN may not withhold a relevant, responsive document simply

because it contains information reflected, in pieces, in other documents.  That

does not make the document less relevant or responsive, nor does it absolve BHN

of its obligation to produce it.  *See EEOC v. Regency Health Assocs.*, No. 1:05-cv-

2519, 2006 WL 8432578, at *3, n.4 (N.D. Ga. Sept. 6, 2006) (compelling

production of responsive documents even though defendant's productions

already reflected the same information).  Indeed, one of the reasons that the

metrics reports are central to the parallel *Charter* litigation is that ████████████

---

[6] Because the spreadsheet includes information concerning core issues in this case, it is also responsive to other RFPs that Plaintiffs have served and for which BHN has agreed to produce documents, including at least **RFP 138**, seeking "Documents concerning BHN's program of monitoring Subscribers for copyright infringement, including the list of customers to be monitored, "report[s] of monitoring" Subscribers' activity for copyright infringement (e.g., BHN_00002541), "tracking records" (e.g., BHN_00002472), and "Arbor logs" (e.g., BHN_00002305).

███████████████████████████████████████████

███████████████████████████████████████████

*Second*, that the document came from the files of BHN's parent company, Charter, is irrelevant because BHN has custody and control of it.  BHN was acquired by Charter in May 2016, it is represented by the same counsel, and the Charter in-house legal department is overseeing both this case and the *Charter* litigation.  Indeed, every document that BHN has produced in this case is possessed by Charter.  And BHN waived any right to object on this basis in any event.  Plaintiffs defined "BHN" to include the company's "parents," and BHN did not object to that portion of the definition. Exs. A–B.  *See* M.D. Fl. Discovery Handbook § III.A.6 (rev. Feb 1, 2021).

## III.  BHN Should Admit the Proportion of its Subscribers That Continued to Receive Infringement Notices Even After They Were the Subject of BHN's Graduated Response Program.

### A.  Requests for Admission 51–59[7]

<u>Request 54</u>:  Admit that at least 60% of the Subscribers who were placed in a Self-Release Quarantine between March 1, 2012 and May 17, 2016 were the subject of at least one Infringement Notice post-dating the quarantine at any time, including through the present.
<u>Answer:</u>  Bright House objects to this Request to the extent it is overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case. Bright House objects to this Request to the extent it seeks information that is not reasonably accessible because of undue burden or cost. Bright House further objects to this Request to the extent it calls for a legal conclusion regarding what constitutes an "Infringement Notice" and to the extent it seeks information beyond Plaintiffs' notices. Bright House further objects to this Request to the extent it calls for information within Plaintiffs'

---

[7] RFAs 51–59 are substantively identical, with each RFA asking BHN to admit that a certain percentage of its Subscribers who were placed in a Self-Release Quarantine later received one or more additional infringement notices.  *See* Ex. F.  These RFAs differ only with respect to the percentage that BHN is asked to admit.  BHN's response to each of these RFAs is identical.  *See* Ex. CC.

possession, custody, or control. Bright House further objects to this Request because it seeks information more properly gathered through other means of discovery. *See Demaria v. Gisbex Clearing Corp.*, S.A., 2012 WL 13008158, at *2 (S.D. Fla. Mar. 12, 2012) ("Requests to admit are not a discovery tool in the truest sense, but, rather a procedure for obtaining admissions for the record of facts already known. Their purpose is not to pin plaintiff to a particular set of facts to rely on at trial, but rather to eliminate the need to prove facts which neither party disputes.") (citation omitted). Based on the foregoing objections, denied.

Plaintiffs allege that BHN materially contributed to infringement on its network by, among other things, instituting a "hollow 'graduated response' program" that did not provide for effective actions to stop or deter known, repeat infringers.  Dkt. 96-1, ¶ 87.  Plaintiffs' RFAs 51–59 seek admissions directly related to the effectiveness of that program.  Specifically, these RFAs seek admissions that after BHN took one of the actions in the program, a "Self-Release Quarantine,"[8] a percentage of BHN's subscribers *went on to receive one or more additional infringement notices*.  Such information is squarely relevant to this case.  If, for example, a large proportion of BHN subscribers whom BHN placed in Self-Release Quarantines continued to receive infringement notices, and BHN failed to modify its graduated response program despite knowing this, that would be compelling evidence of material contribution.  Further, it would be probative of BHN's *willful* contribution to its subscribers' infringement, as it would show that BHN intentionally kept in place a program that it knew did not mitigate rampant infringement on its network.

---

[8]

In response to a separate discovery request, Interrogatory 19—which asks BHN to state the percentage of subscribers who were placed in a Self-Release Quarantine and later received one or more infringement notices—BHN also refused to answer, and instead provided Plaintiffs with instructions describing how to calculate that number.  *See* Exs. E, K.   Plaintiffs have followed these instructions and calculated the percentages.  But the instructions are complex and convoluted, and through these RFAs Plaintiffs now simply seek to narrow issues at trial by having BHN admit to the output of these calculations.  There is no reason why the parties should waste time at trial by having a witness testify to these calculations, when BHN can simply admit to them based on the step-by-step instructions it created itself.

Nevertheless, BHN continues to stand on its objections to these RFAs, contending that the RFAs (1) "seek[] information beyond Plaintiffs' notices," (2) go "beyond the Discovery Period," and (3) seek information "more properly gathered through other means of discovery."  *See* Exs. I, J.

None of these objections is valid.  BHN has already recognized the relevance of the percentages in providing Plaintiffs with instructions to calculate those numbers.  Furthermore, there is a minimal burden to answering these RFAs.  BHN need only implement the instructions it created itself, and it likely already did so to ensure that those instructions were accurate.

BHN's only remaining objection is that these RFAs seek information "more properly gathered through other means of discovery."  But that is wrong; these

RFAs are aimed at accomplishing exactly what this discovery device is meant to

do: "facilitate preparation for trial," "ease the trial process," and "reduce trial

time."  *See* Advisory Committee Notes to Fed. R. Civ. P. 36; *see also Demaria v.*

*Gisbex Clearing Corp., S.A.*, 2012 WL 13008158, at *2 (S.D. Fla. Mar. 12, 2012)

(cited in BHN's objections; stating that RFAs are properly aimed at "obtaining

admissions for the record of facts already known" and "eliminat[ing] the need to

prove facts which neither party disputes"); *Webb v. Westinghouse*, 81 F.R.D. 431,

436 (E.D. Pa. 1978) (requiring defendant to answer RFA seeking calculations

related to raw data it had already produced).

## B.   Requests for Admission 60–68[9]

<u>Request 66</u>:  Admit that at least 30% of the Subscribers who were placed in a Self-Release Quarantine between March 1, 2012 and May 17, 2016 were the subject of at least three Infringement Notices post-dating the quarantine at any time, including through the present.
<u>Answer</u>:  Bright House objects to this Request to the extent it is overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case. Bright House objects to this Request to the extent it seeks information that is not reasonably accessible because of undue burden or cost.  Bright House further objects to this Request to the extent it calls for a legal conclusion regarding what constitutes an "Infringement Notice" and to the extent it seeks information beyond Plaintiffs' notices. Bright House further objects to this Request to the extent it calls for information within Plaintiffs' possession, custody, or control. Bright House further objects to this Request because it seeks information more properly gathered through other means of discovery. See *Demaria v. Gisbex Clearing Corp.*, S.A., 2012 WL 13008158, at *2 (S.D. Fla. Mar. 12, 2012) ("Requests to admit are not a discovery tool in the truest sense, but, rather a procedure for obtaining admissions for the record of facts already known. Their purpose is not to pin plaintiff to a particular set of facts to rely on at trial, but rather to eliminate the need to prove facts which neither party disputes.") (citation omitted).
Based on the foregoing objections, denied.

---

[9] RFAs 60–68 are substantively identical, with each RFA asking BHN to admit that a certain percentage of its Subscribers who were placed in a Self-Release Quarantine later received three or more additional infringement notices. Ex. F.  These RFAs differ only with respect to the percentage that BHN is asked to admit.  BHN's response to each is identical.  Ex. CC.

Where RFAs 51–59, discussed immediately above, seek admissions that a certain percentage of BHN's subscribers received *one or more* additional infringement notices after being subject to a self-release quarantine, Plaintiffs' RFAs 60–68 seek admissions that a certain percentage received *three or more* infringement notices.  Like RFAs 51–59, the information they seek is relevant, and BHN should confirm the calculations performed by Plaintiffs in accordance with BHN's own instructions.  *See* Section III.A, *supra*.

### C.    Requests for Admission 69–77[10]

Request 76:  Admit that at least 20% of the Subscribers who were placed in a No-Release Quarantine between March 1, 2012 and May 17, 2016 were the subject of at least one Infringement Notice post-dating the quarantine at any time, including through the present.

Answer:  Bright House objects to this Request to the extent it is overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case. Bright House objects to this Request to the extent it seeks information that is not reasonably accessible because of undue burden or cost. Bright House further objects to this Request to the extent it calls for a legal conclusion regarding what constitutes an "Infringement Notice" and to the extent it seeks information beyond Plaintiffs' notices. Bright House further objects to this Request to the extent it calls for information within Plaintiffs' possession, custody, or control. Bright House further objects to this Request because it seeks information more properly gathered through other means of discovery. *See Demaria v. Gisbex Clearing Corp., S.A.*, 2012 WL 13008158, at *2 (S.D. Fla. Mar. 12, 2012) ("Requests to admit are not a discovery tool in the truest sense, but, rather a procedure for obtaining admissions for the record of facts already known. Their purpose is not to pin plaintiff to a particular set of facts to rely on at trial, but rather to eliminate the need to prove facts which neither party disputes.") (citation omitted).  Based on the foregoing objections, denied.

---

[10] RFAs 69–77 are substantively identical, with each RFA asking BHN to admit that a certain percentage of its Subscribers who were placed in a No-Release Quarantine later received one or more additional infringement notices.  Ex. F.  These RFAs differ only with respect to the percentage that BHN is asked to admit.  BHN's response to each is identical.  Ex. CC.

Plaintiffs' RFAs 69–77 seek admissions that after BHN took a different action through its graduated response program, a "No-Release Quarantine,"[11] a percentage of BHN's subscribers received one or more infringement notices. The information sought by these RFAs is relevant for the same reasons described above with respect to RFAs 50–68, and as with those RFAs, BHN has already provided Plaintiffs with instructions describing how to calculate the percentage sought by RFAs 69–77. BHN's remaining objections are identical to those lodged with respect to RFAs 51–68, and are equally meritless for the same reasons.

### D.      Requests for Admission 78–86[12]

Request 86:  Admit that at least 10% of the Subscribers who were placed in a No-Release Quarantine between March 1, 2012 and May 17, 2016 were the subject of at least three Infringement Notices post-dating the quarantine at any time, including through the present.

Answer:  Bright House objects to this Request to the extent it is overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case. Bright House objects to this Request to the extent it seeks information that is not reasonably accessible because of undue burden or cost. Bright House further objects to this Request to the extent it calls for a legal conclusion regarding what constitutes an "Infringement Notice" and to the extent it seeks information beyond Plaintiffs' notices. Bright House further objects to this Request to the extent it calls for information within Plaintiffs' possession, custody, or control. Bright House further objects to this Request because it seeks information more properly gathered through other means of discovery. *See Demaria v. Gisbex Clearing Corp.*, S.A., 2012 WL 13008158, at *2 (S.D. Fla. Mar. 12, 2012) ("Requests to admit are not a discovery tool in the truest sense, but, rather a procedure for obtaining admissions for the record of facts already known. Their purpose is not to pin plaintiff to a particular set of facts to rely on at trial, but rather to eliminate the need to prove facts which neither party disputes.") (citation omitted).  Based on the foregoing objections, denied.

---

[11] ████████████████████████████████████████████████████████████████████████████████

[12] RFAs 78–86 are substantively identical, with each RFA asking BHN to admit that a certain percentage of its Subscribers who were placed in a No-Release Quarantine later received three or more additional infringement notices. Ex. F. These RFAs differ only with respect to the percentage that BHN is asked to admit.  BHN's response to each is identical. Ex. CC.

Plaintiffs' RFAs 78–86 are identical to RFAs 69–77, discussed in the preceding sub-section, except that they ask for the percentage of subscribers who received *three or more* infringement notices after BHN placed then in a "No-Release Quarantine," as opposed to *one or more* notices.  For the same reasons as described in Sections III.A–D, the information sought by these RFAs is relevant to core issues in the case, the RFAs seek to narrow issues at trial by asking BHN to admit to the output of calculations made pursuant to instructions BHN provided, and BHN's remaining objections are without merit.

### E.    Requests for Admission 87–95[13]

Request 95:  Admit that at least 10% of the Subscribers who received a Final Warning Letter between March 1, 2012 and May 17, 2016 were the subject of at least one Infringement Notice post-dating the letter at any time, including through the present. Answer: Bright House objects to this Request to the extent it is overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case. Bright House objects to this Request to the extent it seeks information that is not reasonably accessible because of undue burden or cost. Bright House further objects to this Request to the extent it calls for a legal conclusion regarding what constitutes an "Infringement Notice" and to the extent it seeks information beyond Plaintiffs' notices. Bright House further objects to the extent Plaintiffs' Request seeks information from beyond the Discovery Period. Bright House further objects to this Request because it seeks information more properly gathered through other means of discovery. See *Demaria v. Gisbex Clearing Corp., S.A.*, 2012 WL 13008158, at *2 (S.D. Fla. Mar. 12, 2012) ("Requests to admit are not a discovery tool in the truest sense, but, rather a procedure for obtaining admissions for the record of facts already known. Their purpose is not to pin plaintiff to a particular set of facts to rely on at trial, but rather to eliminate the need to prove facts which neither party disputes.") (citation omitted). Based on the foregoing objections, denied.

---

[13] RFAs 87–95 are substantively identical, with each RFA asking BHN to admit that a certain percentage of its Subscribers who received a Final Warning letter later received one or more additional infringement notices. Ex. F.  These RFAs differ only with respect to the percentage that BHN is asked to admit.  BHN's response to each is identical.  Ex. CC.

Plaintiffs' RFAs 87–95 seek admissions that after BHN took another type of action against its Subscribers, a "Final Warning Letter,"[14] a percentage of BHN's subscribers received one or more additional infringement notices.  The information sought by these RFAs is relevant for the same reasons described above with respect to RFAs 51–86.  In addition, there is no appreciable burden to responding.  BHN sent only 272 Final Warning letters during the Discovery Period.  *See* Ex. D.  Therefore, BHN needs to assess whether, *at most*, 272 of its subscribers received additional infringement notices.

### F.      Requests for Admission 96–104[15]

Request 104:  Admit that at least 10% of the Subscribers who received a Final Warning Letter between March 1, 2012 and May 17, 2016 were the subject of at least three Infringement Notices postdating the letter at any time, including through the present. Answer:  Bright House objects to this Request to the extent it is overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case. Bright House objects to this Request to the extent it seeks information that is not reasonably accessible because of undue burden or cost. Bright House further objects to this Request to the extent it calls for a legal conclusion regarding what constitutes an "Infringement Notice" and to the extent it seeks information beyond Plaintiffs' notices. Bright House further objects to the extent Plaintiffs' Request seeks information from beyond the Discovery Period. Bright House further objects to this Request because it seeks information more properly gathered through other means of discovery. *See Demaria v. Gisbex Clearing Corp., S.A.*, 2012 WL 13008158, at *2 (S.D. Fla. Mar. 12, 2012) ("Requests to admit are not a discovery tool in the truest sense, but, rather a procedure for obtaining admissions for the record of facts already known. Their purpose is not to pin plaintiff to a particular set of facts to rely on at trial, but rather to eliminate the need to prove facts which neither party disputes.") (citation omitted). Based on the foregoing objections, denied.

---

[14] ████████████████████████████████████████████████████████
████████████████████████

[15] RFAs 87–95 are substantively identical, with each RFA asking BHN to admit that a certain percentage of its Subscribers who received a Final Warning letter later received three or more additional infringement notices.  Ex. F.  These RFAs differ only with respect to the percentage that BHN is asked to admit.  BHN's response to each of these RFAs is identical.  Ex. CC.

Plaintiffs' RFAs 96–104 are identical to RFAs 87–95, discussed in the preceding sub-section, except that they ask for the percentage of subscribers who received *three or more* infringement notices after BHN sent them a "Final Warning Letter," as opposed to *one or more* notices. For the same reasons as described in Sections III.A–E, the information sought by these RFAs is highly relevant. And as described in the preceding sub-section, BHN needs to assess the infringement histories of, *at most*, 272 subscribers.

## IV. BHN Should Admit Whether It Contacted Plaintiffs or Any Other Parties to Dispute the Accuracy of Plaintiffs' Notices Before April 15, 2016.

### A. Request for Admission 21

**Request 21:** Admit that, prior to April 15, 2016, Bright House never contacted Plaintiffs or Plaintiffs' representatives to dispute the accuracy of any Infringement Notice sent to Bright House by Plaintiffs or on behalf of Plaintiffs.

**Answer:** Bright House objects to this Request as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case. Bright House also objects because it seeks information within the Plaintiffs' control, and because to answer would require Bright House to search and investigate formal and informal, recorded and unrecorded communications involving "Bright House Networks, LLC, its parents, subsidiaries, affiliates, predecessors, officers, directors, agents, employees, and/or any other person or entity currently or previously acting or purporting to act on behalf of the defendant" and the tens of thousands of unknown individuals that constitute "Plaintiffs or Plaintiffs' representatives". Bright House further objects to this Request as overbroad and vague because Bright House does not know the identities of these thousands of individuals that constitute "Plaintiffs or Plaintiffs' representatives." Bright House further objects to this Request to the extent it seeks information beyond the Discovery Period. Bright House further objects to this Request to the extent it calls for a legal conclusion regarding "Infringement Notices." The Request is also vague as to what constitutes notices sent "on behalf of Plaintiffs". Bright House further objects to this Request to the extent the terms "dispute" and "accuracy" are vague and ambiguous. Bright House further objects this Request to the extent that it seeks information equally within Plaintiff's possession, custody, or control. Bright House further objects this Request to the extent that it seeks information already produced in response to other discovery requests. Bright House further objects as it has always maintained that notices of infringement are merely allegations, not evidence of actual infringement or liability. Based on these objections, denied.

RFA 21 asks BHN to admit that it never contacted Plaintiffs or Plaintiffs' representatives to dispute the accuracy of Plaintiffs' infringement notices prior to April 15, 2016—the date of Plaintiffs' formal notice of claims to BHN.  To justify its inaction in the face of millions of infringement notices received from Plaintiffs and other rightsholders, BHN has taken the litigation position—not supported by any contemporaneous documents—that those notices were mere "allegations" of copyright infringement and that it had no way of knowing whether they were in fact accurate.  BHN should have to tell Plaintiffs whether it contends that it ever *contemporaneously* expressed that belief to them.  If not, that fact would tend to disprove BHN's post-hoc litigation assertion that the notices were inaccurate and thus did not require any action from BHN.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████.  But it refuses to do the same for this RFA, which asks if BHN ever disputed Plaintiffs' notices *before* it was put on notice of their claims in April 2016.  There is no principled reason why it should treat these RFAs differently.

BHN contends that that "to answer would require BHN to search and investigate . . . communications" involving BHN and Plaintiffs or Plaintiffs representatives.  But the Federal Rules require that the answering party "fairly respond to the substance of the matter" and make a "reasonable inquiry."  Fed. R. Civ. P. 36(a)(4).  *See, e.g. Erie Ins. Prop. & Cas. Co. v. Johnson*, 272 F.R.D. 177, 183 (S.D. W.Va. 2010) ("[A] party's duty of reasonable inquiry in responding to

requests for admissions is similar to its duty in answering interrogatories."). If

BHN believes it communicated to Plaintiffs, prior to April 15, 2016, that it

disputed the accuracy of Plaintiffs' notices, it should deny the RFA on that basis.

If BHN does not hold that belief, including because it cannot locate any such

communications, it should admit the RFA.

### B.      Request for Admission 23

**Request 23:** Admit that, prior to April 15, 2016, Bright House never contacted any
third party to dispute the accuracy of any Infringement Notice sent to Bright House by
Plaintiffs or on behalf of Plaintiffs.
**Answer:** Bright House objects to this Request as overly broad, unduly burdensome,
irrelevant, and not proportional to the needs of the case. Bright House also objects
because to answer fully would require Bright House to search and investigate formal
and informal, recorded and unrecorded communications involving "Bright House
Networks, LLC, its parents, subsidiaries, affiliates, predecessors, officers, directors,
agents, employees, and/or any other person or entity currently or previously acting or
purporting to act on behalf of the defendant" and unlimited unidentified third parties.
The Request is also vague as to what constitutes notices sent "on behalf of Plaintiffs".
Bright House further objects to this Request to the extent it seeks information beyond
the Discovery Period. Bright House further objects to this Request to the extent it calls
for a legal conclusion regarding "Infringement Notices." Bright House further objects to
this Request to the extent the terms "dispute" and "accuracy" are vague and ambiguous.
Bright House further objects this Request to the extent that it seeks information already
produced in response to other discovery requests. Bright House further objects as it has
always maintained that notices of infringement are merely allegations, not evidence of
actual infringement or liability. Based on these objections, denied.

RFA 23 asks BHN to admit that it never contacted any *third party* to

dispute the accuracy of Plaintiffs' infringement notices prior to April 15, 2016.

This request is relevant and easily answerable for the same reasons as described

above for RFA 21.[16]

---

[16] ████████████████████████████████████████████

V.   **BHN Should Produce in Full Communications Between Non-Attorneys That It Has Improperly Withheld or Redacted As Privileged.**

A.   **Communications Between Non-Attorneys Containing No Request for or Provision of Legal Advice**

In its privilege log dated June 2, 2021, BHN logged 11 documents for which there is no attorney listed as author or recipient, and the proffered privilege description does not state that the document contains legal advice or work product.[17]  BHN's privilege log does not assert that any of these documents reflect legal advice or information requested by counsel, and therefore, the log fails to show that the elements of the privilege are satisfied.[18]

BHN instead asserts in some instances that these documents obtain information for purposes of then seeking legal advice from counsel regarding the copyright program.  A communication is not privileged, however, simply because it gathers factual information that may be provided to an unnamed attorney in a separate communication.  *See, e.g.*, *Burrow v. Forjas Taurus S.A.*, 334 F. Supp. 3d 1222, 1237 (S.D. Fla. 2018) ("[T]he fact that these items may have been sent to Defendants' attorneys does not make them privileged.").  These non-attorney emails that do not contain or reflect legal advice or work product cannot be

---

[17] *See* Ex. L at Rows 37, 90, 151, 200, 204, 270, 307, 308, 309, 310, 314.

In a final conferral today, BHN represented to Plaintiffs that it plans to produce certain documents, including the document reflected in entry 314 of the privilege log, with either no privilege redactions or fewer privilege redactions by the end of the day on September 15, 2021. *See* Ex. BB.  As of the time of filing of this motion, BHN has not yet produced this document. Consequently, Plaintiffs cannot currently evaluate whether a dispute remains with respect to this document, but the parties will continue to confer on the issue.

[18] *See* Ex. L at Rows 37, 90, 151, 200, 204, 270, 307, 308, 309, 310, 314.

privileged.  *See Poertner v. Gillette Co.*, 2013 WL 12149369, at *3–4 (M.D. Fla.

Mar. 12, 2013) (routine business and engineering discussions were not privileged

because non-lawyers merely "contemplated obtaining possible legal advice").



**Privilege Challenge Example #1**:

### B.    Operational Communications Between Non-Attorneys

In its privilege logs dated June 2 and June 25, 2021, BHN logged and

partially withheld at least seven documents that, on the basis of the unredacted

portions BHN produced, do not appear to be privileged.[19]  These communications

do not include attorneys and appear to discuss BHN's routine handling of notices

of copyright infringement by its subscribers—*i.e.*, a business and operational

---

[19] *See* Ex. L at Rows 49, 128, 129, 195, 323, 359; Ex. M at Row 1.

activity—and not any request for or discussion of legal advice.  BHN has failed to establish that any privilege applies.

**Privilege Challenge Example # 2:** 

BHN redacted part of the document, stating that it contains "legal advice of counsel regarding the copyright program."  Ex. L at Row 49.

**Privilege Challenge Example #3:**

. BHN claims privilege, stating that the message contains "the legal advice of counsel regarding customer communications."

---

[20] Reflected in privilege log at Ex. L, Row 128.

[21] Reflected in privilege log at Ex. L, Row 129.



**Privilege Challenge Example # 4:**

. BHN again asserts the attorney-client privilege, stating that the message contains "an email chain with attachment reflecting the legal advice of counsel regarding ECAT."[26]

---

[22] Reflected in privilege log at Ex. M, Row 1.

[23] Reflected in privilege log at Ex. L, Row 359.

[24] Reflected in privilege log at Ex. L, Row 195.

[25] Reflected in privilege log at Ex. L, Row 323.

[26] Ex. L at Rows 195, 323, 359; Ex. M at Row 1.

███████████████████████████████████████████

█████████████████████████████

## VI.   BHN Must Produce Documents Including Its DMCA Agent Jerry Birenz For Which it Failed to Substantiate Any Privilege.

Jerry Birenz served as BHN's "DMCA agent," the agent registered with the U.S. Copyright Office, pursuant to 17. U.S.C. § 512, to receive and forward notices of infringement from copyright holders to BHN.  This is a non-legal role.  Indeed, many ISPs do not use lawyers as DMCA agents.[27]  During the relevant time frame, Mr. Birenz also practiced at the law firm Sabin, Bermant, and Gould LLP ("Sabin"), where he apparently provided legal counsel to BHN.  Mr. Birenz's roles with BHN were separate and distinct, and yet BHN has collapsed them in claiming privilege over Mr. Birenz's communications, and refuses to explain which hat he wore with respect to any given communication.

The attorney-client privilege extends to emails with Mr. Birenz only where they reflect the provision of or request for legal advice from Mr. Birenz, acting in his capacity as counsel to BHN.  If Mr. Birenz's involvement in any communication was in connection with his role as BHN's DMCA agent or as a business advisor, the communications cannot be withheld as privileged.[28]

---

[27] For example, the major ISP Altice USA, Inc. lists its internal internet security department as its registered DMCA agent.  *See* Ex. DD.

[28] This motion addresses only whether these materials could have been subject to the attorney-client privilege in the first place.  As separately set forth in Plaintiffs' Time-Sensitive Motion to Compel Production of Documents and Further Deposition Testimony (ECF No. 338), BHN transferred the Sabin firm's files concerning BHN to Advance Publications, which previously

In its privilege logs, BHN has not disclosed which hat Mr. Birenz was wearing, nor given Plaintiffs sufficient information to determine that independently.[29]  Twelve entries on BHN's June 2, 2021 log and one entry on BHN's July 2, 2021 log include no attorneys other than Mr. Birenz and indicate either in the subject line or the privilege description that the communications concern BHN's copyright program and related subjects, which are as likely to be non-privileged business or DMCA agent communications as privileged attorney-client communications.[30]  Because it bears the burden of proving its privilege assertions, BHN's failure to articulate Mr. Birenz's role waives BHN's privilege claim as to these thirteen documents, and BHN must produce them.  In the alternative, BHN must produce a revised privilege log specifying Mr. Birenz's role as to each communication.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court issue an order compelling BHN to (1) respond to Interrogatories 17 and 24, (2) respond to RFAs 21, 23, and 51–104, (3) produce the metrics report describing BHN's handling of infringement notices, and (4) to produce, without redactions, the materials identified above that it has wrongfully withheld on the basis of privilege.

---

held a stake in BHN's parent company through various intermediaries, which waived any otherwise applicable privilege over those files.

[29] *See generally*  Exs. L, N.

[30] *See*  Ex. L at Rows 9, 10, 11, 12, 115, 120, 142, 171, 172, 175, 212, 213;  Ex. N at Row 4.

Dated: September 15, 2021

Respectfully submitted,

Matthew J. Oppenheim (*pro hac vice*)
Scott A. Zebrak (*pro hac vice*)
Jeffrey M. Gould (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
scott@oandzlaw.com
jeff@oandzlaw.com

David C. Banker
Florida Bar No. 0352977
Bryan D. Hull
Florida Bar No. 020969
BUSH ROSS, P.A.
1801 North Highland Avenue
P.O. Box 3913
Tampa, FL 33601-3913
Telephone: (813) 224-9255
dbanker@bushross.com
bhull@bushross.com

*/s/ Neema T. Sahni*
Mitchell A. Kamin (*pro hac vice*)
Neema T. Sahni (*pro hac vice*)
Hardy Ehlers (*pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
mkamin@cov.com
nsahni@cov.com
jehlers@cov.com

Jonathan M. Sperling (*pro hac vice*)
Joshua B. Picker (*pro hac vice*)
Phil Hill (*pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com
jpicker@cov.com
pahill@cov.com

Stacey K. Grigsby (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 10th St NW
Washington, DC 20001
Telephone: (202) 662-6000
sgrigsby@cov.com

*Attorneys for Plaintiffs*

**LOCAL RULE 3.01(G) CERTIFICATION**

Plaintiffs' counsel conferred by email and teleconference with BHN's counsel prior to bringing this motion, with respect to the issues raised herein and with respect to Plaintiffs' intent to file this motion.  The parties have been unable to resolve the issues in this motion.

*/s/ Neema. T. Sahni*
Neema T. Sahni

*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2021, I caused the foregoing document and all accompanying materials to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

Dated: September 15, 2021

*/s/ Neema T. Sahni*
Neema T. Sahni

*Attorney for Plaintiffs*