**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC., *et al.*,

     Plaintiffs,

*v.*

BRIGHT HOUSE NETWORKS, LLC

     Defendant.

Case No. 8:19-cv-00710-MSS-TGW

## BRIGHT HOUSE NETWORKS, LLC'S RESPONSE TO PLAINTIFFS' SEPTEMBER 15, 2021 MOTION TO COMPEL (DKT. 341)

Plaintiffs' motion to compel (Dkt. 341) is one of several filings by Plaintiffs requesting that the Court intervene to allow additional discovery on the eve of the fact discovery deadline. *See, e.g.*, Dkt. Nos. 338, 342. The instant motion seeks an order compelling, among other things, further responses to more than 50 discovery requests and production of a document produced by Charter Communications, the successor-in-interest to Bright House Networks ("BHN"), in a separate litigation. Despite the fact that BHN served its objections and responses to these requests more than seven months ago, and the fact that Plaintiffs learned of the document they now seek last year, Plaintiffs' motion was filed less than 30 minutes before the close of fact discovery and only two weeks before their opening expert reports are due—illustrative of the minimal importance of the discovery sought. Because BHN's objections to the overbroad, burdensome, and otherwise defective discovery requests are valid, and in

light of Plaintiffs' lack of diligence and inability to show a compelling need for the discovery at this late hour, the Court should deny Plaintiffs' motion to compel in full.

**ARGUMENT**

**I.      Plaintiffs' Motion Should Be Denied As To Interrogatory Nos. 17 And 24.**

**A.      Plaintiffs' Interrogatory No. 17 Is Unduly Burdensome.**

Plaintiffs' Interrogatory No. 17 requests that BHN "[i]dentify each Subscriber, by account number, whose internet service BHN terminated for non-payment" who also "received at least three" notices of alleged infringement.  BHN objected to this Interrogatory on multiple grounds more than seven months ago in February 2021. Because the burden of attributing nearly ▮▮▮▮▮▮ terminations for non-payment during the discovery period to individual account numbers and conducting an analysis of how many notices each account received is far greater than any possible probative value Plaintiffs could gain from the information, Plaintiffs' request should be denied.

Plaintiffs' suggestion that BHN has "already-identified data sets" consisting of account numbers for all accounts that were terminated for non-payment during the claims period is incorrect.  Mot. 3-5.  Plaintiffs' sole basis for this assertion is BHN's response to Interrogatory No. 12—but that request sought only the ***total number*** of subscriber terminations for non-payment per month during the claims period, and the response specifically noted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ flagging that the total number of terminations was unlikely to coincide with the total number of accounts terminated in any meaningful way.  Pl. Ex. C at 22-24; Knudsen Decl. ¶ 4 (explaining

the source for BHN's response to Interrogatory No. 12 does not contain subscriber account numbers). Now Plaintiffs request that BHN be compelled to match each of those nearly ▮▮▮▮ terminations to a specific account number and determine whether each account was the subject of three or more notices. This is a wholly different analytical task than simply identifying the total number of subscriber terminations that occurred, and would require significant time and effort to perform.[1] Knudsen Decl. ¶ 4-6.

Nor does the minimal probative value of the information sought justify Plaintiffs' burdensome request. For instance, Plaintiffs argue the information is needed to "rebut" BHN's alleged contention that "the reason it didn't terminate subscribers in response to infringement notices was because '[l]osing Internet access can have devastating consequences for a subscriber.'" Mot. 4. But Plaintiffs already have a verified Interrogatory response indicating that BHN performed nearly ▮▮▮▮ terminations during the claims period for non-payment—it is unclear why Plaintiffs now need further analysis of each subscriber's account to make the point that BHN did in fact terminate Internet when a subscriber did not pay their bill. Given the enormous amount of data that must be analyzed to do so, Plaintiffs simply cannot

---

[1] Plaintiffs' explanation of similar discovery in *Charter* is incomplete. The full explanation undercuts Plaintiffs' argument that "there is no appreciable burden" for BHN to determine this information. Mot. 3-5. In *Charter*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 9.

show that this Interrogatory will bear fruit worth this effort.  Fed. R. Civ. P. 26(b)(2)(C) ("The court must limit the frequency or extent of discovery otherwise allowed … [if] the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."); *see also Jeld-Wen, Inc. v. Nebula Glass Int'l Inc.*, 2008 WL 11333404, at *9 (S.D. Fla. Mar. 12, 2008) (denying burdensome interrogatory seeking details on thousands of complaints).

### B. Plaintiffs' Attempt to Expand the Discovery Period More Than Five Additional Years For Interrogatory No. 24 Is Unwarranted.

Plaintiffs' Interrogatory No. 24 requests that BHN "state the total number [of subscribers] who reinstated their internet service with BHN subsequent to termination."  BHN objected to this request in February 2021 as overbroad and burdensome, in part because it sought post-acquisition information outside of the established discovery period in this case.  Plaintiffs wrongly claim the information requested is necessary to determine whether BHN only "nominally" terminated subscribers, reactivating them a short time later upon request.  Mot. 6.[2]  Seeking compromise, BHN offered to respond to the Interrogatory in full for the established discovery period.  But Plaintiffs insisted that BHN search its files for any reconnections through the ***present***, meaning BHN should undertake to determine whether a

---

[2]  Plaintiffs claim "[t]his request is directly relevant to BHN's safe harbor defense."  Mot. 5.  On September 24, 2021, BHN notified Plaintiffs that it would amend its Answer to remove the safe harbor defense in an effort to streamline the case for trial.  *See* Dkt. 164.  This alone is reason to deny Plaintiffs' request to compel a response to the Interrogatory.

subscriber connected to ***Charter's*** (post-acquisition) network for a more than five-year period after the subscriber's termination ***by BHN***.   None of Plaintiffs' arguments, including the single case they cite, warrants a unilateral doubling of the discovery period for this request, or discovery into customers of another ISP.

Good reason exists for the proposition that this discovery request be limited to the discovery period that the parties agreed to years ago.   For one, Plaintiffs' chosen claims period ends the day before BHN was acquired by Charter.   This acquisition, of course, brought about changes in how the now-merged BHN network and related processes were handled, including the DMCA program.   Evidence that a subscriber formerly terminated by BHN ultimately re-joined ***Charter's*** network years after this merger simply is not probative of whether BHN carried out "real" or "nominal" terminations during the claims period, *see* Mot. 5, and has no bearing on BHN's implementation of its policies.[3]   Indeed, Plaintiffs have recently filed a lawsuit alleging claims against Charter for its handling of DMCA notices during the post-merger time period, which has not yet had a Rule 26(f) scheduling conference.[4]   Plaintiffs should not be permitted to turn this current case against BHN into a vehicle to obtain premature discovery on ***Charter's actions*** for a time period ***not at issue in this case*** to support an unrelated lawsuit.

---

[3]   Despite this, Plaintiffs' Interrogatory appears crafted to specifically target this post-merger information, broadly defining "BHN" to include "parents, subsidiaries, predecessors, successors, affiliates, officers, directors, agents, employees, and/or any other person or entity currently or previously acting or purporting to act on its behalf." Ex. B.

[4]   *See UMG Recordings, Inc., et al. v. Charter Commc'ns, Inc.*, 1:21-cv-02020-RM-KLM, Dkt. 1 (D. Colo. July 26, 2021) ("*Charter II*").

Further, information from the discovery period is sufficient for Plaintiffs' purported purpose of determining whether BHN had a "practice" of "nominally terminating subscribers and reactivating them upon request. Mot. 5-6 (citing *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 654 (E.D. Va. 2015)). As Plaintiffs point out, the Court in *BMG* found this distinction important because "imposing something short of complete termination of a subscriber" prevented the ISP from "implement[ing] the repeat infringer policy contemplated by 512(i)," the DMCA's safe harbor provision. As noted above, *supra* note 2, BHN has notified Plaintiffs that it plans to amend its Answer to withdraw the safe harbor defense, meaning the *BMG* Court's analysis cited by Plaintiffs is no longer relevant, as Plaintiffs' claimed basis for the Interrogatory has been removed from the case.

Further, Plaintiffs have already received sworn testimony from BHN's corporate representative that ████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████ Ex. C, Sept. 13, 2021 Depo. of Tim Frendberg, 276:7-11. This testimony aside, Plaintiffs do not need information post-dating the claims period by more than five years to determine whether BHN had such a practice. In *BMG*, the only case cited by Plaintiffs, emails explained that "[i]n 99% of the cases [the ISP was] going to turn the customer back on" and that the reconnections occurred immediately, including an email instructing a customer service representative to reactivate a terminated subscriber after making him "wait a day or so." 149 F. Supp. 3d at 657; *see also id*. at 656 (citing an example of a subscriber

reactivated "[o]ne month into the termination"). Here, BHN's answer to a separate

Interrogatory shows that ███████████████████████████████████

███████████████████████████████ Pl. Ex. D at 13-

15. ██████████████████████████████. Thus, ████████████████

████████████, information from the discovery period is sufficient to show

whether the reconnections at issue in *BMG* occurred in this case. *Id.* In sum: the

established discovery period provides sufficient information for Plaintiffs to determine

whether BHN had a practice of nominally terminating subscribers only to reconnect

them a short time later. Expanding this period an additional five years to the present

is disproportionate and unduly burdensome.

## II.   BHN Should Not Be Compelled To Produce A Document Never Used By BHN And Created Outside The Discovery Period By A Different ISP.

Plaintiffs' request that the Court compel production of a report used only in the

implementation of Charter's DMCA program that Plaintiffs obtained in a separate

case against Charter should be denied. The "metrics report" that Plaintiffs seek was

created by Charter *nearly one year after the discovery period in this case*. Reports of this

type were not created or used by BHN; and ████████████████████████████

████████████████████████████████████████████████████

████████, which *were used* by BHN during the discovery period.[5]

---

[5] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Plaintiffs should not be permitted to use this case as a vehicle for obtaining discovery regarding Charter during the post-merger time period—this time in the form of a document Charter created in 2017.[6] Plaintiffs claim these metrics reports "are among the most important documents in the parallel *Charter* litigation," *see* Mot. 7, but Plaintiffs received this document in *Charter* in 2020. And—despite BHN's clear communication that it would not produce a document created outside of the discovery period by another entity—Plaintiffs did not move to compel production of the document in this litigation until September 15, 2021—the final day of fact discovery and only two weeks before the deadline for Plaintiffs' disclosure of expert reports. Dkt. 314. Plaintiffs make no explanation for why they need this document now, after the completion of fact depositions and outside the time in which it could be utilized in Plaintiffs' expert submissions.

Further, Plaintiffs mischaracterize the only case they cite supposedly supporting production. While Plaintiffs claim the district court (outside of this jurisdiction) in *EEOC v. Regency Health Assocs.* "compell[ed] production of responsive documents even though defendant's productions already reflected the same information," the very footnote Plaintiffs cite explains the district court was compelling production precisely ***because*** "the documents already provided … do not necessarily establish [the issue]

---

[6] Plaintiffs sought production of the 2017 report in *Charter*, despite the report being dated outside of the discovery period, but Charter was permitted to redact information post-dating May 2016. Plaintiffs' attempt to now seek this information through the *Bright House* litigation is yet another improper attempt to conduct pre-conference discovery into Charter's post-2016 activities.

'conclusively,'" including because they appeared to be generated in anticipation of litigation. 2006 WL 8432578, at *3 n.4 (N.D. Ga. Sept. 6, 2006). Such is not the case here. Here, Plaintiffs have already been provided with Security and Abuse Reports for nearly every month of the discovery period, which are exhaustive contemporaneous reports reflecting statistics related to the DMCA program. Plaintiffs have also been provided hundreds of thousands of lines of ticket data across multiple systems from which BHN's DMCA statistics were derived. Plaintiffs simply cannot show good cause to justify production of a document created by another ISP well after the discovery period in this matter. Fed. R. Civ. P. 26(b)(2)(C); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1314 (11th Cir. 2011) (no abuse of discretion in denying motion to compel "overbroad, irrelevant, or redundant" discovery.)

## III. BHN Should Not Be Compelled To Respond To RFA Nos. 21, 23, And 51-104.

### A. Plaintiffs' Attempt To Seek Complex Calculations Through Dozens Of Intricately-Related Requests For Admission Is Improper.

Plaintiffs' motion to compel responses to 53 Requests for Admission ("RFAs") should also be denied, as these requests require complex calculations regarding the percentages of subscribers that received certain volumes of notices after the occurrence of particular events, such as the subscriber being quarantined or receiving a final warning letter.[7] In addition to demanding that BHN conduct complicated analyses in

---

[7] Plaintiffs have served 257 RFAs in this litigation. Courts routinely reject attempts to compel responses to requests for admission when the amount of requests is excessive, on the grounds of the burden imposed on the responding party. *See, e.g., Pendlebury v. Starbucks Coffee Co.*, 2007 WL 9702456, at *2 (S.D. Fla. Jan. 18, 2007) (denying motion to compel responses as to 118 requests for admission);

order to respond to scores of RFAs, Plaintiffs' requests seek post-merger information about subscriber activity on Charter's network. For example, RFA No. 51 asks BHN to "[a]dmit that at least 90% of the Subscribers who were placed in a Self-Release Quarantine between March 1, 2012 and May 17, 2016 were the subject of at least one Infringement Notice post-dating the quarantine at any time, including ***through the present***." Pl. Ex. CC at 39-40 (emphasis added). The next eight numbered RFAs ask for the same admission, but each subsequent request lowers the percentage by ten points in step-ladder fashion—a rudimentary effort to pinpoint where the cut-off percentage lies. *Id.* at 39-47. Across the 53 RFAs, Plaintiffs tweak the percentages, triggering events, and volume of notices that they ask BHN to analyze in an attempt to outsource Plaintiffs' own expert analysis of the underlying data to BHN.

BHN objected to these requests more than seven months ago on February 25, 2021, ██████████████████████████████████████████████
██████████████████████████████████████████ *Id.* Notably, on the same day Plaintiffs served these RFAs in January 2021, Plaintiffs also served four Interrogatories requesting overlapping information—namely, the percentage of subscribers receiving particular volumes of notices after being placed in either a self-release or no-release quarantine state. Pl. Ex. E at 6-12. BHN properly provided responses to these Interrogatories pursuant to Federal Rule of Civil Procedure 33(d), ██████████
██████████████████████████████████████████████

---

*Murray v. United States Dep't of Treasury*, 2010 U.S. Dist. LEXIS 90512, at *4 (E.D. Mich. Sept. 1, 2010) (finding 182 requests for admission to be "oppressive and unduly burdensome").

███████████████████████████████████████████████████

███████   *Id.*   As a courtesy and in response to Plaintiffs' inquiries, BHN produced further information explaining ████████████████████████████████

███████████████████████████████████████████████████

███   Pl. Ex. K.   Despite Plaintiffs' acknowledgement that Plaintiffs *have already successfully calculated the percentages they sought* based on the data and instructions provided by BHN in response to Plaintiffs' interrogatories, *see* Mot. 11, Plaintiffs argue that BHN should also be compelled to perform this analysis in the context of responding to Plaintiffs' RFAs.  *Id.*

As a threshold matter, RFAs "are required to be *simple and direct*, and should be limited to singular relevant facts."  *Runway TV, LLC v. De Gray*, 2020 WL 6712253, at \*2 (C.D. Cal. Sept. 15, 2020) (emphasis added).  RFAs are *not* intended to subject the answering party to difficult and complex calculations, and certainly not the mathematical obstacle course Plaintiffs have attempted to lay out for BHN in more than 50 of these requests. *See Wilson v. Jackson Nat'l Life Ins. Co.*, 2017 WL 10402569, at \*1 (M.D. Fla. Feb. 13, 2017) ("A protective order is appropriate where the requests for admission are more than an attempt to nail down the disputed core facts of the case, but rather are an attempt to pick every nit that a squad of lawyers could possibly see in it.") (quotations omitted).

Further, RFAs are not to be used as a vehicle to elicit what is more appropriately left for expert testimony or analysis.  *See Emerson v. Lab. Corp. of Am.,* 2012 WL

1564683, at *3-4 (N.D. Ga. May 1, 2012) (finding that requests for admissions that sought expert opinions were improper and expert opinions were not yet due under the case's scheduling order governing such discovery); *Williamson v Correctional Med. Servs.*, 2009 WL 1364350, at *3 (D. Del. May 14, 2009) (sustaining objections to requests for admission that called for expert analysis).  Here, answering each of the RFAs requires performing mathematical calculations across multiple data sets collectively containing well over 900,000 lines of data with disparate fields and variables, which is most appropriately deferred to expert analysis.   Indeed, Plaintiffs' own briefing acknowledges that the steps to answering these requests are "complex and convoluted," even though they apparently were able to successfully calculate these figures on their own with the data already provided.  Mot. 11.  Plaintiffs' desire to avoid having their experts "testify to these calculations" at trial does not justify the use of RFAs in this manner, a discovery device meant to "nail down," simply and directly, "[the] core facts of the case."  *Wilson*, 2017 WL 10402569, at *1.

Plaintiffs' demand that BHN perform analysis in response to  half-a-hundred RFAs with substantively minor (but analytically complex) distinctions should be denied as improper, disproportionate, harassing, and burdensome.

### B.     Plaintiffs' Request That BHN Admit That Certain Conversations "Never" Occurred Over The Span of Years Is Unduly Burdensome.

Plaintiffs' RFA No. 21 requests that BHN "[a]dmit that, prior to April 15, 2016, Bright House never contacted Plaintiffs or Plaintiffs' representatives to dispute the accuracy of any Infringement Notice sent to Bright House by Plaintiffs or on behalf of

Plaintiffs." Pl. Ex. CC at 15. Similarly, Plaintiffs' RFA No. 23 requests that BHN admit or deny whether BHN contacted any third parties to do the same. *Id.* at 18. Because answering these RFAs requires BHN to go outside of the discovery period, and well beyond the reasonable inquiry standard for responding to RFAs, Plaintiffs' request should be denied as overbroad, disproportionate, and burdensome.

The burden imposed by these requests is extremely high. For example, BHN would need to survey ***all*** of its employees (including former employees who have since left the company) regarding ***all*** of their written and oral communications with Plaintiffs pre-dating 2016 in order to attempt to admit or deny a negative—namely, that "prior to April 15, 2016, Bright House ***never*** contacted Plaintiffs or Plaintiffs' representatives to dispute the accuracy of any Infringement Notice sent to Bright House by Plaintiffs or on behalf of Plaintiffs." *Id.* at 15 (emphasis added). This burden is far more than required under the law. Courts in this Circuit have explained that Rule 36(a)(4) "requires only that the answering party make ***reasonable inquiry*** and secure such knowledge and information as are ***readily obtainable*** by him." *Pendlebury*, 2007 WL 9702456, at *2 (emphasis added). Requiring Bright House to collect "survey evidence" to respond to RFA Nos. 21 and 23 would require far more than a "reasonable inquiry." *See Milbank v. Milbank Holding Corp.*, 2006 U.S. Dist. LEXIS 114854, at *11-12 (C.D. Cal. Oct. 24, 2006) (denying motion to compel response to RFA because "[t]he Court agrees with Milbank Tweed that answering this request

would require Milbank Tweed to make more than a 'reasonable inquiry,' for example collecting survey evidence.").

Further, Plaintiffs already have testimony from BHN's corporate witness on this topic and the probative value to be gained from Plaintiffs' expansive RFAs is minimal. For example, BHN's corporate representative, Cody Harrison, was asked—when this question was properly limited to the discovery period—whether ████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. D 115:15-18. Mr. Harrison responded, ████████████████████████████ ███████████████████████████████████ *Id*. 115:20-22. To be sure, this same question and answer was repeated several times on the record. *See, e.g.*, *id*. 112:15-115:22. This testimony is a far less burdensome method for obtaining the information Plaintiffs seek (and has already occurred), and thus the Court should limit Plaintiffs' attempt to obtain the same information from a source far less convenient and far more burdensome. *See* Fed. R. Civ. P. 26(b)(2)(C). Requesting Bright House prove the negative that it "never" contacted Plaintiffs or any third parties regarding any of Plaintiffs' notices (alleged by Plaintiffs to number in the hundreds of thousands) is inconsistent with the purpose of RFAs, which "are designed to ***promote efficiency*** and preserve resources, including judicial time and resources." *Odom v. Roberts*, 337 F.R.D. 347, 351 (N.D. Fla. 2020). Nor do Plaintiffs justify their request for discovery outside of the discovery period in this case. Plaintiffs' request to use RFA Nos. 21 and 23 to

add to BHN's burden, while at the same time providing very little in terms of additional probative value, should be denied.

## IV.   BHN Properly Claimed Privilege Over Its Communications.

### A.   Communications Between Non-Attorneys Which Reflect Or Relate To The Provision Of Legal Advice Are Privileged.

The Court should also reject Plaintiffs' challenge to BHN's assertion of privilege over 11 documents on the grounds that these communications are between non-attorneys and do not directly contain legal advice or work product.[8]  These indicia alone do not indicate that the underlying documents are unprivileged.  The attorney-client privilege "applies as well to information gathered by non-attorneys for transmission to an attorney for the attorney to provide legal advice on an issue," as is the case for many of the documents Plaintiffs challenge.  *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 2017 WL 6757558, at *7 (N.D. Fla. Dec. 29, 2017).  In others, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  Such communications are appropriately deemed privileged.[9]

**Privilege Challenge Example #1**: Plaintiffs challenge Privilege Log Entry No. 37 (Pl. Ex. L at Row 37; Pl. Ex. U), in which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[8]  Plaintiffs challenge Pl. Ex. L at Rows 37, 90, 151, 200, 204, 270, 307, 308, 309, 310, 314.

[9]  Upon request, BHN will provide any of the challenged documents to the Court for *in camera* review.



an entirely accurate description.

**Additional Privilege Challenge Example**:  Privilege Log Entry No. 151 (Pl. Ex. L at Row 151) further illustrates the ill-founded assumptions underlying Plaintiffs' motion.  Plaintiffs include this log entry in the list of documents they characterize as communications between non-attorneys which cannot be privileged.  However, the only redacted portions of the document ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  BHN produced this document with appropriately-tailored redactions covering only the privileged attorney-client communication.

## B.    BHN's Privileged Communications Are Not "Operational."

Plaintiffs further challenge BHN's assertion of privilege over seven redacted documents between non-attorneys, claiming that these communications "appear to discuss BHN's routine handling of notices of copyright infringement by its

subscribers—*i.e.*, a business and operational activity—and not any request for or discussion of legal advice." Mot. at 21-22.[10] But this is exactly the result that Plaintiffs should expect; BHN appropriately left all discussion of routine handling of copyright notices unredacted and produced that material, while redacting ██████████████

██████████████   *See, e.g.*, *In re Denture Cream Prod. Liab. Litig.*, 2012 WL 5057844, at *19 (S.D. Fla. Oct. 18, 2012) (document appropriately protected by attorney-client privilege where "only those portions of the document which are 'legal' . . . have, in fact been redacted, rather than the entire document."). The fact that produced, unredacted material is unprivileged is in no way an indication that redactions are improper. Plaintiffs' complaint makes no sense.

**Privilege Challenge Example # 2:** Plaintiffs challenge to Privilege Log Entry No. 49 (Pl. Ex. L at Row 49; Pl. Ex. V), ██████████████████

████████████████, is equally unfounded. As described in the privilege log, ████████████████████████

████████████████████████

██████████████. Therefore the privilege assertion is entirely appropriate.

**Privilege Challenge Example #3:** Plaintiffs also challenge Privilege Log Entry Nos. 128 and 129 (Pl. Ex. L at Rows 128-129; Pl. Ex. W; Pl. Ex. X), ████████████

████████████████████████████████

---

[10]   Plaintiffs challenge Pl. Ex. L at Rows 49, 128, 129, 195, 323, 359; Pl. Ex. M at Row 1.



**Privilege Challenge Example # 4:** Plaintiffs' final specific challenge relates to

Privilege Log Entry Nos. 195, 323, and 359 (Pl. Ex. L at Rows 195, 323, and 359; Pl.

Exs. R, S, Y, AA),                                    BHN

asserted privilege over

. (Pl. Ex. AA at BHN_00004215,

-214.) Once again, BHN narrowly redacted only                , while

leaving unredacted all of the                          .

Plaintiffs additionally point to an attachment to this thread, in which BHN redacted

three total sentences which convey

         Here, too, BHN separated out the specific portions of the documents

containing                                    and produced

the unprivileged information.

---

11    Other redactions in these documents are not for privilege but to protect personally identifying
information associated with subscribers and Mr. Frendberg's personal mobile number. Plaintiffs do
not challenge these non-privilege redactions.

In summary, BHN stands by its privilege assertions.  If the Court deems necessary, BHN will accommodate an *in camera* review of any of the documents referenced above to demonstrate the appropriate and targeted nature of its redactions.

## V.    BHN's Communications With Its Counsel Are Privileged.

Finally, BHN respectfully requests that the Court deny Plaintiffs' motion to compel production of its privileged communications with its counsel, Jerry Birenz. Mr. Birenz, then a partner at the firm Sabin, Bermant & Gould ("Sabin"),[12] served during the discovery period both as BHN's DMCA agent and as legal counsel for BHN.  In his role as legal counsel, Mr. Birenz advised BHN on a wide variety of legal matters, including the copyright matters at issue in this litigation.  BHN withheld and logged communications involving Mr. Birenz which relate to the provision of legal advice, and the privilege log appropriately describes how each of those documents relates to the provision of legal advice.  In these communications, Mr. Birenz was acting in his role as legal counsel, which can be easily determined by the fact that these communications involve requests for or the provision of legal advice.[13]

Mr. Birenz's only duties as BHN's DMCA agent were those defined by the statute: (a) first, "to receive notifications of claimed infringement described in [DMCA § 512(c)(3)]" that were sent by copyright owners or their agents; (b) second, to receive counter-notifications provided by BHN subscribers or account holders who were the

---

[12]   Sabin was BHN's primary outside counsel during the entire relevant claim period from 2012 to 2016 until BHN was sold to Charter. Mr. Birenz's role is detailed in his recent filing.  *See* Dkt. 347.

[13]   The particular privilege log entries challenged by Plaintiffs are Pl. Ex. L at Rows 9, 10, 11, 12, 115, 120, 142, 171, 172, 175, 212, 213, and Ex. N at Row 4.

subject of § 512(c)(3) notices of claimed infringement; and (c) third, to receive notices from copyright owners or their agents stating that they had filed for a court order to restrain an allegedly infringing BHN subscriber. 17 U.S.C. § 512(c)(2); (g)(2)(C); (g)(3). Mr. Birenz performed these duties via a mailbox affiliated with the Sabin firm which was used for the receipt of copyright notices. This does not change the fact that Mr. Birenz also and *primarily* acted as a legal advisor during the relevant period, nor does it waive privilege as to any communications involving legal advice.

Plaintiffs wrongly assert that communications involving Mr. Birenz which—as stated on BHN's privilege log—involve the provision of legal advice "are as likely to be non-privileged business or DMCA agent communications as privileged attorney-client communications." Mot. at 25. This assumption is unwarranted. Communications reflecting a request for, or the provision of, legal advice are by definition made in Mr. Birenz's role as a legal advisor. BHN's privilege log appropriately describes the relationship to the legal advice and the subject matter of that legal advice on a document-by-document basis. This is more than sufficient to inform Plaintiffs that Mr. Birenz was involved in the communications as a legal advisor, and no further information is required.

## <u>CONCLUSION</u>

For the foregoing reasons, BHN respectfully requests that the Court deny Plaintiffs' motion to compel in full.

Dated: September 29, 2021

Respectfully submitted,

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
Tel: (415) 591-1506
Email: jgolinveaux@winston.com

Michael S. Elkin (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Email: melkin@winston.com

Erin R. Ranahan (*pro hac vice*)
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Tel: (213) 615-1933
Email: eranahan@winston.com

*/s/ Andrew H. Schapiro*
Andrew H. Schapiro (*pro hac vice*)
Allison Huebert (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400
Email: andrewschapiro@quinnemanuel.com
Email: nathanhamstra@quinnemanuel.com
Email: allisonhuebert@quinnemanuel.com

Todd A. Anten (*pro hac vice*)
Jessica Rose (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7192
Email: toddanten@quinnemanuel.com
Email: jessicarose@quinnemanuel.com

Charles K. Verhoeven (*pro hac vice*)
David Eiseman (*pro hac vice*)
Linda Brewer (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
Email: charlesverhoeven@quinnemanuel.com
Email: davideiseman@quinnemanuel.com
Email: lindabrewer@quinnemanuel.com
Email: michelleclark@quinnemanuel.com

William J. Schifino, Jr.
Florida Bar No. 564338
GUNSTER, YOAKLEY & STEWART, P.A.
401 E. Jackson Street, Suite 2500
Tampa, FL 33602
Tel: (813) 228-9080
Email: bschifino@gunster.com

*Counsel for Defendant*
*Bright House Networks, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 29, 2021, I caused a true and correct copy of the foregoing BRIGHT HOUSE NETWORKS, LLC'S RESPONSE TO PLAINTIFFS' SEPTEMBER 15, 2021 MOTION TO COMPEL (DKT. 341) and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Andrew H. Schapiro*
Andrew H. Schapiro
