# Exhibit B

```
 1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
     Case No. 19-cv-874-RBJ-MEH
 3   _____

 4   WARNER RECORDS, INC., et al.,

 5       Plaintiffs,

 6   vs.

 7   CHARTER COMMUNICATIONS, INC.,

 8       Defendant.
     _____
 9

10          Proceedings before MICHAEL E. HEGARTY, United

11   States Magistrate Judge, United States District Court for the

12   District of Colorado, and REGINA M. RODRIGUEZ,

13   Court-Appointed Special Master, commencing at 9:18 a.m.,

14   February 23, 2021, in the United States Courthouse, Denver,

15   Colorado.

16   _____

17   WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN
     TYPOGRAPHICALLY TRANSCRIBED. . .
18   _____

19                       APPEARANCES

20        JONATHAN M. SPERLING, JEFFREY M. GOULD, SHIRA

21   POLIAK, MATTHEW J. OPPENHEIM, ALEX KAPLAN, STACEY GRIGSBY,

22   ANDERS LIDEROT, J. HARDER EHLERS, Attorneys at Law, appearing

23   for the Plaintiffs.

24   _____

25       IN COURT HEARING: UNRESOLVED DISCOVERY DISPUTES
```

1  Charter, okay.  That process ended sometime in 2015, okay.
2         At the conclusion of that notice program -- again,
3  not a litigation program, but a notice program in which
4  MarkMonitor was serving as an antipiracy vendor, an agent --
5  at the end of that program, the attorneys, some of them in
6  the (inaudible) case --
7         THE COURT:  Hold on, Mr. Gould, let me ask you a
8  question.
9         So MarkMonitor was retained by the recording
10 industry to do this?
11        MR. GOULD:  Correct.
12        THE COURT:  Prior to them doing this, was somebody
13 else doing this for the recording industry?
14        MR. GOULD:  MarkMonitor had been doing it for
15 earlier in time.  The relative -- relevant period and
16 contracts at issue in this case pertain to 2012 to 2015.
17 MarkMonitor was operating under a different name of Detect
18 Net for some years prior, but it's the same method.
19        THE COURT:  So, but even prior to 2012, were those
20 kinds of violations notices sent out?
21        MR. GOULD:  Yes.
22        THE COURT:  Maybe on a different scale?
23        MR. GOULD:  I mean, it's sort of like one program
24 leads to the next.  So in the 2012 time frame, it was -- I
25 don't want to say it was a reset button, but it was more of a

1   continuation of what had been done previously, but with a
2   little more kind of boundary on the front and back end.
3           THE COURT:  Okay.
4           MR. GOULD:  Between 2012 and 2015 MarkMonitor had a
5   contract with RIAA; sends notice based on the detection of
6   infringing files and infringements by Charter subscribers.
7           No litigation yet.  End of 2015, the BMG trial is
8   hot.  A verdict in that case was December 2015.
9           Unsurprisingly, the record companies and publishers
10  represented in this case began to think carefully about
11  what -- what they might be able to do to enforce their rights
12  and detect -- deter piracy in a same vein and in January of
13  2016, started looking at the body of evidence generated over
14  those prior years, okay.
15          Okay, (inaudible) me about some chapters.  Chapter
16  1 is the 2012 to 2015 notice program.  That ends.  BMG case
17  goes to trial.  Summary judgment (inaudible) and a verdict
18  for BMG.
19          January 2016, the group, many of whom are
20  represented in this case, start thinking about what they can
21  do for litigation and look at the body of evidence and
22  detections of infringement from the Chapter 1 period.  And
23  based on that analysis, which was conducted by counsel and at
24  the direction of counsel, determined that there may be good
25  claims.  Those claims have arisen in the Cox case and in this

1    case and in the Bright House case.

2            THE COURT:  So all those notices listed from 2012

3    and 2015 weren't done with the idea that we're going to sue

4    somebody just in the general sense and foreseeing your rights

5    and telling people to stop?

6            MR. GOULD:  That's exactly right, Your Honor.

7    That's exactly right.

8            The nature of the notice program is that we are

9    giving you notice that you can do something about it, and had

10   you done something about it, Charter, there would have been

11   no need for litigation that.

12           That very issue, Your Honor, was teed up expressly

13   by the Court in Virginia, because the Winston attorneys, who

14   are arguing today, made arguments that MarkMonitor and

15   plaintiffs had spoliated evidence from 2012 to 2015.  And the

16   magistrate in that court, Your Honor -- and I can share the

17   opinion with you -- found that there was no work product and,

18   therefore, no requirement to retain documents in anticipation

19   of litigation during the 2012-2015 period.

20           So you don't need to take just my word for it.  You

21   can take the guidance from the Magistrate in Virginia who

22   heard all of these arguments.  Big chess meeting, a

23   spoliation from 2012 to 2015 and gave it the back of the

24   hand, because there was nothing -- there was no "there"

25   there, okay.

1  That brings us to 2016, Chapter 2. Look at the
2  body of evidence that generated over these prior years and
3  determine, Wow, they really did nothing. Charter did
4  nothing. Their recidivism was off the charts. We're going
5  to go forward with litigation.
6  In that very month, January of 2016, at direction
7  of counsel, RIAA and MarkMonitor entered the Statement of
8  Work that Mr. Rosenthal presented today. A short (inaudible)
9  that has -- asks MarkMonitor to go look for and download
10  files associated with infringing hashes. That contract, Your
11  Honor, on its face says, "anticipation of litigation."
12  Chapter 1, notice program, no litigation. Chapter
13  2, hash download program, litigation. So the notion out of
14  the gate that there is anything untoward or spoliation or
15  failure to obtain something from the notice program is simply
16  a nonstarter. It has no -- it has no merit, it's a
17  distraction, and it's contrary to the facts and prior
18  findings of other courts.
19  THE COURT: Well, okay, but you are suing for the
20  period 20-, what, '13 to '16?
21  MR. GOULD: The claim period, yes, March 2013 to
22  mid-2016.
23  THE COURT: So it is true that whatever MarkMonitor
24  was doing between 2012 and 2015 involved information that's
25  relevant to this case, correct?

PATTERSON TRANSCRIPTION COMPANY
scheduling@pattersontranscription.com

86

```
1               THE COURT:  Not the RIAA itself?  As an entity,
2    that is an organized corporate entity, the RIAA?
3               MR. SPERLING:  It's a trade association, Your
4    Honor.
5               MR. GOULD:  Yes.
6               THE COURT:  Trade association.
7               MR. GOULD:  It's a little bit of a hard question.
8    The labels and RIAA work hand-in-hand tremendously and
9    closely.  RIAA was the contractor with -- with MarkMonitor.
10   The work was done at the direction of plaintiffs' counsel.
11   RIAA serves as counsel to the labels in a variety of
12   instances.
13              SPECIAL MASTER:  Mr. Gould, just to help clarify a
14   little bit here.
15              So you are not relying on attorney-client privilege
16   for protecting the hash tag, you're relying on work product?
17              THE COURT:  Hash Report.
18              SPECIAL MASTER:  Hash Report?
19              MR. GOULD:  That's correct.
20              SPECIAL MASTER:  Okay.  So we've heard about
21   attorney-client privilege here, we've heard about different
22   issues.  You're relying on work product privilege -- or work
23   product doctrine?
24              MR. GOULD:  That's correct.  That's consistent with
25   the law, that's consistent with the prior arguments, and
```

1  that's consistent with Judge Hegarty's finding.  And --
2           SPECIAL MASTER:  I just need a yes or no.  I'm just
3  trying to make sure I'm clear.
4           And so where do we have evidence of the
5  attorney-client privilege or that there was an
6  attorney-client relationship with RIAA?
7           MR. GOULD:  I'm not -- I guess I'm not quite
8  following.
9           The RIAA is authorized by the label to conduct a
10 variety of anti-piracy efforts.  On that basis, the RIAA ran
11 the notice program during the 2012 to 2015 timeframe.  And
12 having run that program, as plaintiffs began working with
13 litigation counsel, in conjunction with the RIAA, to analyze
14 the data that was available and decide whether and against
15 who valid claims might lie, the plaintiffs and the RIAA and
16 outside litigation counsel, worked together on a work-product
17 basis.
18          SPECIAL MASTER:  And that outside litigation
19 counsel was Oppenheim & Zebrak?
20          MR. GOULD:  Correct.  RIAA has a litigation
21 department that regularly represents the labels directly and
22 other times liaises with outside litigation counsel.
23          SPECIAL MASTER:  All right.  And so you're saying
24 one separate move, though; but that this was report directed
25 and controlled by Oppenheim & Zebrak as counsel for RIAA?

1        MR. GOULD:  I'm saying that there is a contract
2   signed between RIAA and MarkMonitor entered in anticipation
3   of litigation at the direction of counsel, counsel for --
4   excuse me, counsel for RIAA, counsel for the plaintiffs, the
5   outside litigation.  And attorneys asked the plaintiffs -- I
6   mean, I'm not trying to obfuscate.
7        I think the challenge is that the labels, the RIAA
8   and Oppenheim & Zebrak were working together to figure out
9   whether there are valid claims.  And if so, what those would
10  look like and against whom.
11       SPECIAL MASTER:  All right.  Well, the thing that
12  at least I am struggling with here is that this is not our
13  first round with this conversation.
14       MR. GOULD:  Sure.
15       SPECIAL MASTER:  And it does seem to be a bit of a
16  moving target, because when we talked about this before with
17  the Hash Report, I specifically did not order that the report
18  be produced, and I ordered -- or, at least, I suggested
19  strongly that Charter seek to obtain the information from the
20  third parties, so MarkMonitor or Audible Magic, et cetera.
21       As I understand what they have represented, is they
22  have attempted to do that and they have not been able to get
23  satisfactory answers.  And I -- having heard this, I don't
24  know this as well as you all, you live this day in and day
25  out, but based on the times that I have dealt with this

255

1   April 1 for the discovery they said would be both burdensome,

2   the financial trackable to discovery.  What about the other

3   items.

4           THE COURT:  No, I said April 1 for everything.

5           FEMALE SPEAKER:  For both parties?

6           THE COURT:  No.  March 15 for you, because you told

7   me March 15.  I said April 1 for them.  And for both of you,

8   if three or four, five business days before that, you know

9   you're not going to meet those deadlines, I want you to call

10  an informal conference and tell me why you're not going to,

11  what you've been doing to meet the deadline, why you can't.

12  And then we'll talk about extended time.  And by the way, by

13  that time I will have talked to Judge Jackson and it may all

14  be a moot point anyway.

15          FEMALE SPEAKER:  Thank you, Your Honor.

16          MS. BREWER:  Yes, thank you.

17          THE COURT:  And I mean, I just -- I took you up on

18  it, so -- the date.  They didn't give me a date.  I forced it

19  on them, so -- so you said, Nothing else.  What about you?

20          UNIDENTIFIED SPEAKER:  Who won the basketball game?

21          (Discussion off the record.)

22          (Whereupon, the within hearing was then in

23  conclusion at 4:00 p.m.)

24

25

```
1                TRANSCRIBER'S CERTIFICATION
2    I certify that the foregoing is a correct transcript to the
3    best of my ability to hear and understand the audio recording
4    and based on the quality of the audio recording from the
5    above-entitled matter.
6
7    /s/ Dyann Labo                        March 1, 2021
8    Signature of Transcriber              Date
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```