### IN THE UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

|  |  |
|---|---|
| UMG RECORDINGS, INC., *et al.*, | |
| Plaintiffs, | |
| *v.* | Case No. 8:19-cv-710-MSS-TGW |
| BRIGHT HOUSE NETWORKS, LLC | |
| Defendant. | |

## DEFENDANT BRIGHT HOUSE NETWORKS, LLC'S
## MOTION FOR SUMMARY JUDGMENT

After years of discovery and motion practice—all at a staggering cost to the parties and the judicial system—there is no evidence to support a finding of liability against Bright House Networks, LLC ("Bright House") for contributory copyright infringement. Under binding Supreme Court precedent, Plaintiffs must prove that Bright House's *objective* in providing Internet service to allegedly offending subscribers was to cause copyright infringement. There is no evidence to support that conclusion.

In the event Plaintiffs' contributory infringement claim is not dismissed in its entirety, Bright House is still entitled to summary judgment on a large portion of the alleged infringements, because nearly half of the notices upon which Plaintiffs' claims are premised were erroneously sent by Plaintiffs' agent to email addresses not maintained by Bright House. Bright House could not have had knowledge of alleged infringements identified in notices it did not receive.

1

Finally, Plaintiffs are not entitled to statutory damages for a substantial portion of the copyrighted works asserted in the First Amended Complaint ("FAC").  Dkts. 94, 116-1, & 116-2.  Summary judgment in Bright House's favor on these damages-related issues will greatly reduce the scope and complexity of the case for trial.

## UNDISPUTED FACTS

Between 2013 and 2016, Bright House was a cable company that provided customers with a connection to the Internet for a monthly fee.  Declaration of Timothy Frendberg ("Frendberg Decl.") ¶ 3.  From March 24, 2013 to May 17, 2016 (the "Claim Period"), Bright House provided Internet access to between 1.8 and 2.2 million residential subscribers.  *Id.* ¶ 4.  Although Bright House provided a connection to the Internet, it could not control what subscribers did online.  *Id.* ¶¶ 6-8.

### Bright House's Anti-Copyright Infringement Program

Each month, Bright House would receive tens of thousands of emails—sometimes, hundreds of thousands—from copyright owners, alleging that their copyrights had been infringed by Bright House's customers online.  *Id.* ¶ 7.  Although Bright House could not verify the allegations in these notices, it took them seriously.  *Id.* ¶¶ 9-25.  Bright House implemented an anti-infringement program to inform customers about the allegations contained in the notices and educate them about the consequences of copyright infringement.  *Id.* ¶¶ 10-25; Declaration of Cody Harrison ("Harrison Decl.") ¶ 3.  The goal of Bright House's program was to discourage and prevent copyright infringement online.  Harrison Decl. ¶¶ 3-4; Frendberg Decl. ¶ 9, Ex. A.

2

Bright House's anti-infringement program was modeled after and closely tracked the industry-standard anti-infringement program that was touted by Plaintiffs as a set of "best practices" for ISPs—the Copyright Alert System, or "CAS." Harrison Decl. ¶¶ 3, 7; Frendberg Decl. ¶ 10, Ex. A; November 15, 2021 Affidavit of Duncan Hall ("Nov. 15 Hall Aff.") Ex. A. Anti-infringement programs modeled after CAS were employed by many major ISPs in the country, Harrison Decl. ¶ 8; Frendberg Decl. Ex. A, and the CAS program was expressly endorsed by rightsholders—including the Plaintiffs in this case, Harrison Decl. ¶¶ 3-4. The CAS program identified a series of steps for educating consumers with the goal of discouraging infringement and was based on research showing that consumer education was an effective means to combat online infringement. *Id.* ¶¶ 5-6. Because the CAS program was premised on customer education, the program did not require ISPs to terminate customers who received notices of infringement. Declaration of Andrew H. Schapiro ("Schapiro Decl.") Exs. A (termination "wasn't required by CAS"), B ("There was no termination requirement under the CAS for any ISP."), C ("this agreement does not require an ISP to terminate"), E (CAS "did not require termination"); Harrison Decl. ¶ 5; Nov. 15 Hall Aff. Ex. A. In addition, under the CAS program, it was well known that ISPs were not required to process all the notices they received from rightsholders. Schapiro Decl. Exs. F ("there were issues about ISPs having limits on the number of notices under this program that they were going to process"), C (acknowledging that ISPs may reduce the number of notices processed), G (acknowledging limits on the

number of notices that ISPs would send to subscribers); Nov. 15 Hall Aff. Ex. A; Harrison Decl. ¶ 6.

The six-step graduated response program adopted by Bright House was very similar to the CAS program in key respects. Frendberg Decl. ¶¶ 10-23, Ex. A; Harrison Decl. ¶¶ 7, 9; January 10, 2022 Affidavit of Duncan Hall ("Jan. 10 Hall Aff.") Ex. A. Just like the CAS model, Bright House's anti-infringement program was a six-step graduated response program designed to repeatedly alert subscribers of the notices, educate them about copyright infringement, and deter any future alleged infringement. Frendberg Decl. ¶¶ 9-23, Ex. A; Harrison Decl. ¶ 9; Jan. 10 Hall Aff. Ex. A.

- At Steps One and Two, Bright House sent the subscriber an educational email alerting the subscriber that Bright House had received a notice of alleged infringement directed to the subscriber. Frendberg Decl. ¶¶ 15-17.

- At Steps Three and Four, Bright House sent the subscriber additional educational emails that were paired with a Self-Release Quarantine preventing the subscriber from accessing the Internet until clicking to acknowledge they had received the message. *Id.* ¶ 18.

- At Step Five, Bright House once again placed the subscriber into a Self-Release Quarantine and also sent a Warning Email, which notified the subscriber that their service would be suspended unless they contacted Bright House within 10 days. *Id.* ¶ 19.

4

- At <u>Step Six</u>, Bright House made good on the warning of Step Five, temporarily terminating the subscriber's access to the Internet and placing the subscriber into a No-Release Quarantine.  The No-Release Quarantine re-directed the subscriber's browser to a static webpage which prevented the subscriber from accessing the Internet until that subscriber contacted Bright House by phone.  *Id.* ¶ 20.  On this call, the Security and Abuse Team would educate the subscriber about copyright infringement, answer questions about the notices, and work with the subscriber to troubleshoot the problem.  Only Security and Abuse Team employees were able to remove a subscriber from a No-Release Quarantine.  *Id.* ¶ 21.

Bright House devoted substantial resources to developing and executing this program to address and discourage online infringement.  *Id.* ¶¶ 9-35.  In addition to the costs associated with creating the program, Bright House employed staff in the Security and Abuse Group to handle calls and emails from subscribers, answer their questions, and educate them about infringement.  *Id.* ¶¶ 21, 26-30.  Bright House also maintained a portion of its website devoted to educating consumers about its anti-infringement program and copyright infringement in general.  *Id.* ¶ 25.

## Bright House Customers Would Often Dispute The Allegations In The Notices

As part of its regular business operations, Bright House would receive and record customer feedback about the notices.  Frendberg Decl. ¶¶ 26-30, Exs. B, C. Bright House's internal records reflect that subscribers would tell Bright House that they disputed the allegations in the notices or state that they were unaware of the

alleged infringement. *Id.* ¶¶ 28-29, Exs. B, C. In these cases, Bright House employees would work with the subscriber to educate them about the possible origin of the notices, including by resolving issues such as unsecured WiFi. *Id.* ¶¶ 28-30. Although Bright House itself lacked the technical means to verify the allegations of infringement in the notices, it took these allegations seriously and made significant and good faith efforts to address them. *Id.* ¶¶ 9-35.

**Plaintiffs Mistakenly Sent Notices To Time Warner Cable Instead Of Bright House**

During the Claim Period, Bright House's website directed rightsholders to send notices of infringement to copyright@sabinfirm.com. Frendberg Decl. ¶ 11; Jan. 10 Hall Aff. Ex. A. In addition, email addresses used in the past by Bright House to receive copyright complaints (specifically, copyrightagent@sbandg.com and copyright@sbandg.com) remained active and redirected to Bright House's copyright intake inbox. Frendberg Decl. ¶ 11.

From approximately August 1, 2013 to February 16, 2015, however, Plaintiffs' agent, MarkMonitor, mistakenly sent notices of alleged infringement meant for Bright House to a *different* email address—abuse@rr.com—which was owned and controlled by Time Warner Cable (a separate and independent ISP), not Bright House. *Id.* ¶ 36; Declaration of Karl N. Snow ("Snow Decl.") ¶ 5; Schapiro Decl. Exs. D, H, I, L, M, N. From February 17, 2015 to February 18, 2015, MarkMonitor sent notices of alleged infringement meant for Bright House to the email addresses copyright@twcable.com

and dmcaagent@wmg.com, which were also controlled by Time Warner Cable, not Bright House.[1]  Frendberg Decl. ¶ 36; Snow Decl. ¶ 5.

As a result, 51,895 of the 109,458 notices Plaintiffs claim they sent to Bright House were actually sent to Time Warner Cable.  Snow Decl. ¶ 5; Frendberg Decl. ¶ 36; Schapiro Decl. Exs. D, K, L, M, N.  Of those notices, a small number—67 notices—appear to have been forwarded by Time Warner Cable to Bright House. Frendberg Decl. ¶ 37; Snow Decl. ¶ 7.  There is no evidence that Bright House ever received any of the remaining 51,828 notices erroneously sent to Time Warner Cable. Frendberg Decl. ¶ 37; Snow Decl. ¶ 5.  To the contrary, documents produced in discovery by third-party Recording Industry Association of America ("RIAA") show that at least 34,442 of the notices erroneously sent to Time Warner Cable were "bounced back" to the sender by Time Warner Cable's servers.  Schapiro Decl. ¶ 12, Exs. K, D (acknowledging undelivered notices sent to abuse@rr.com).

Moreover, it is undisputed that most of the notices correctly addressed to Bright House were *sent before the Claim Period started*.  Indeed, only 15,539 of Plaintiffs notices were sent to Bright House during the Claim Period to a correct address.  Snow Decl. ¶ 6.  These notices allege infringement by 4,518 of Bright House's approximately 2 million subscribers.  *Id*.; Frendberg Decl. ¶ 38, Ex. D.

---

[1]  By at least April 4, 2013, Time Warner Cable informed MarkMonitor that it was receiving notices that should be directed to Bright House.  Schapiro Decl. Exs. D, L, M, N.  Yet MarkMonitor continued sending notices meant for Bright House to Time Warner Cable email addresses.

## LEGAL STANDARD

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009). A moving party discharges its burden on a motion for summary judgment by showing the Court that there is an absence of evidence supporting the non-moving party's case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). When a moving party has discharged its burden, the non-moving party must then designate specific facts that demonstrate there is a genuine issue for trial. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). The party opposing a motion for summary judgment cannot rely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

## ARGUMENT

Bright House moves for summary judgment on Plaintiffs' contributory infringement claim, which is the only claim remaining in this case. That claim should be dismissed in its entirety. If it is not, Bright House seeks summary judgment that: (1) Plaintiffs have failed to prove that Bright House had knowledge of alleged infringement for a substantial portion of works alleged; and (2) Plaintiffs may seek an award of statutory damages on only a limited number of works asserted.

## I.   PLAINTIFFS CANNOT PROVE CONTRIBUTORY INFRINGEMENT

Plaintiffs contend that Bright House is liable for contributory copyright infringement because Bright House did not terminate the Internet connections of

8

customers accused by Plaintiffs of infringement.  But under binding Supreme Court precedent, Plaintiffs must prove that Bright House provided service to these customers *with the object of fostering infringement*.  Plaintiffs cannot do so.

### A.    To Establish Contributory Infringement, Plaintiffs Must Show That Bright House Acted With The Object Of Fostering Infringement

Under the traditional formulation, a defendant is liable for contributory infringement if with knowledge of the infringing activity, it "induces, causes or materially contributes to the infringing conduct of another."  *GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*, 131 F. Supp. 3d 1291, 1299 (M.D. Fla. 2015) (quotations omitted).  The Supreme Court's rulings in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ("*Grokster*") and *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*"), however, limited the circumstances under which a claim of contributory infringement can lie against a party selling a product or service capable of substantial noninfringing use.  *Grokster* held that the mere sale of a product or service "capable of both lawful and unlawful use" does not constitute contributory infringement unless there is additional evidence that the defendant acted "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement."  545 U.S. at 918-19.  It is insufficient to premise a contributory liability claim on a defendant's "mere knowledge of infringing potential or of actual infringing uses."  *Id.* at 937.  Rather, to prevail on a claim for contributory infringement, a plaintiff must prove the defendant distributed a device or service with the intent of fostering infringement:

> [O]ne who distributes a device [or service] with the ***object*** of promoting its use to infringe copyright, as shown by ***clear expression or other affirmative steps taken to foster infringement***, is liable for the resulting acts of infringement by third parties. We are, of course, mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential. Accordingly, just as *Sony* did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, 464 U.S., at 439, n. 19, 104 S.Ct. 774, ***mere knowledge of infringing potential or of actual infringing uses would not be enough*** here to subject a distributor to liability. ***Nor would ordinary acts incident to product distribution,*** such as offering customers technical support or product updates, support liability in themselves. The inducement rule, instead, premises liability on ***purposeful, culpable expression and conduct***, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise.

*Id.* at 936-37 (emphases added).

When considering a contributory liability claim against Sony based on the allegation that "some individuals had used [Sony's] Betamax video tape recorders (VTR's) to record some of respondents' copyrighted works which had been exhibited on commercially sponsored television," the Supreme Court ruled that "the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses." *Sony*, 464 U.S. at 420, 442.

The defendants in *Grokster*, who distributed free computer software, presented a different scenario: their "business models … confirm[ed] that ***their principal object*** was use of their software to download copyrighted works." *Grokster*, 545 U.S. at 926 (emphasis added). Each defendant "showed itself to be aiming to satisfy a known source of demand for copyright infringement, the market comprising former Napster users," and, indeed, brazenly designed their entire products and customer outreach

around attracting these known infringers.  *Id.* at 939.  In fashioning a rule for such circumstances, the Court made clear that "in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses."  *Id.* at 939 n.12.

Summarizing the Court's holding in her concurrence, Justice Ginsburg described the two bases on which a defendant who offers a product or service can be found liable for contributory infringement: (1) "actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops)" or (2) "distributing a product distributees use to infringe copyrights, if the product is ***not*** capable of 'substantial' or 'commercially significant' noninfringing uses."  *Id.* at 942 (emphasis added).

District courts in the Eleventh Circuit have correctly applied *Grokster* to require proof of the defendant's objective to cause infringement.  *See, e.g.*, *Millennium Funding, Inc. v 1701 Mgmt. LLC*, 2021 WL 5882999, at *12-13 (S.D. Fla. Dec. 13, 2021) (dismissing contributory infringement claim because Plaintiffs failed to allege that Defendant "acted with culpable intent" under *Grokster*); *Cambridge Univ. Press v. Becker*, 2010 WL 11507617 at *12 (N.D. Ga. Sept. 30, 2010) (no judgment of contributory infringement because "there is no indication in the record of a 'clear expression or other affirmative steps taken to foster infringement' by Defendants" (quoting *Grokster*, 545 U.S. at 919)); *Space Coast Bus., LLC v. Coastal Media Assocs., LLC*, 2011 WL

13299573, at *2 (M.D. Fla. July 6, 2011) (dismissing claim where plaintiff failed to allege "what steps [defendant] took to induce or encourage [the] infringements"). Decisions from other courts are in accord. *See, e.g.*, *Cobbler Nev., LLC v. Gonzales*, 901 F.3d 1142, 1147-49 (9th Cir. 2018) (affirming dismissal of contributory copyright claim under *Grokster* and holding that "a failure to take affirmative steps to prevent infringement alone cannot trigger liability") (quotations omitted); *Greer v. Moon*, 2021 WL 4291197, at *3 (D. Utah Sept. 21, 2021) ("It is not enough for contributory liability for a defendant to have merely 'permitted' the infringing material to remain on the website, without having 'induced or encouraged' the initial infringement." (quoting *Grokster*, 545 U.S. at 930) (brackets omitted)); *Dallas Buyers Club, LLC v. Doughty*, 2016 WL 1690090, at *9 (D. Or. Apr. 27, 2016) ("[Defendant] did not promote the use of his Internet service to infringe [plaintiff's] copyright and is therefore not liable for contributory infringement. … [Plaintiff's] theory of contributory infringement is precluded by the Supreme Court's holding in *Grokster*.").

Some courts outside of the Eleventh Circuit have incorrectly applied *Grokster* in cases involving ISPs that, like Bright House, merely provide a connection to the Internet, finding that a failure to terminate the Internet access of specific customer accounts accused of infringement could be evidence of the ISP's intent to promote infringement. *See, e.g.*, *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns Inc.*, 881 F.3d 293, 307-08 (4th Cir. 2018); *UMG Recs., Inc. v. RCN Telecomm. Servs., LLC*, 2020 WL 5204067, at *8-9 (D.N.J. Aug. 31, 2020); *UMG Recs., Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 767 (W.D. Tex. 2019). These decisions, however, cannot

be reconciled with *Grokster's* holding that contributory liability exists only where there is evidence that it was a defendant's intended purpose—*its objective*—to cause infringement, ***as shown by clear expression or affirmative acts***.   Indeed, *Grokster* distinguished such a situation from *Sony*, which had "barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement."  545 U.S. at 933; *see also id.* at 937 (liability cannot be premised on "mere knowledge of infringing potential or of actual infringing uses"). *Grokster* also cautions that liability may not be based on a failure to prevent infringement.  *Id*. at 939 n.12 ("[I]n the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement … Such a holding would tread too close to the *Sony* safe harbor.").

*Grokster* requires something more.  And that something more must be evidence of "affirmative steps" or "clear expression" showing a specific intent to cause infringement.  *Id*. at 919.  A correct application of *Grokster* forecloses the possibility that an ISP's policy not to terminate Internet access for customers accused of infringement can establish liability.

### B.    Plaintiffs Cannot Prove That Bright House Acted With The Object Of Fostering Infringement

The record contains no evidence that Bright House supplied Internet service to subscribers or otherwise handled infringement notices with the object of fostering

copyright infringement. To the contrary, Bright House adopted and employed a robust anti-infringement program to ensure that subscribers were informed of infringement accusations by rightsholders and educated about copyright infringement on the Internet—all in an effort to discourage and prevent future infringement. Frendberg Decl. ¶¶ 9-35. Bright House's program to curb infringement tracked the CAS, a framework touted as "best practices" for handling allegations of copyright infringement endorsed by members of the movie, television, and music industries— including the Plaintiffs in this case—and major ISPs. Schapiro Decl. Exs. B, C, E, F, G; Harrison Decl. ¶¶ 3, 7; Frendberg Decl. ¶¶ 10-23; Jan. 10 Hall Aff. Ex. A.

As detailed above, Bright House employed a six-step graduated response system, which closely tracked the industry standard set by CAS. Frendberg Decl. ¶¶ 10-23; Harrison Decl. ¶ 9; Schapiro Decl. Exs. B, C, E, F, G; Jan. 10 Hall Aff. Ex A. Like the CAS program, the cornerstone of Bright House's anti-infringement efforts was customer education, not termination. Schapiro Decl. Exs. A, B, C, E, F; Harrison Decl. ¶ 5; Frendberg Decl. ¶¶ 31-35; Nov. 15 Hall Aff. Ex A.

Following the protocols adopted in CAS, Bright House did not process every infringement notice it receive from rightsholders. *See* Schapiro Decl. Ex. J at -259 (the Memorandum of Understanding implementing the CAS system provided that an ISP may "reduce the number of ISP Notices being processed if, in the sole discretion of the Participating ISP, (i) the Participating ISP receives more ISP Notices than its business processes and systems can reasonably address"); *id.* Exs. C, F, G; Harrison Decl. ¶ 6; Frendberg Decl. ¶¶ 23-24. Although Plaintiffs will argue that Bright House's failure

14

to process all notices is evidence of an intent to cause infringement—the record cannot support that conclusion. To the contrary, Bright House modeled anti-infringement protocol after the prevailing industry standard, and it consulted with other ISPs that participated in CAS to ensure the limits it adopted on processing notices were in line with best practices. Harrison Decl. ¶ 6. Specifically, Bright House set its monthly notice processing limit to be in line with the proportion of notices processed by Time Warner Cable, a participant in CAS. Frendberg Decl. ¶ 23; Harrison Decl. ¶ 6.

Nor is Bright House's policy to educate subscribers, but not terminate their Internet connections, evidence of an objective to foster infringement. At the time, the prevailing industry standard, CAS, explicitly did not require ISPs to terminate customers based only on the receipt of notices. Harrison Decl. ¶ 5; Frendberg Decl. ¶ 31; Nov. 15 Hall Aff. Ex A.; Schapiro Decl. Exs. A, B, C, E, F. In addition, Bright House's policy to refrain from permanently terminating an entire household's or business's access to the Internet existed against a backdrop of Bright House receiving direct feedback from customers that caused Bright House to question the accuracy of accusations in notices. Frendberg Decl. ¶ 28.[2] And Bright House *did* temporarily terminate service at Step Six of its process, cutting subscribers off from the Internet

---

[2]  To be clear, Bright House does not rely on such feedback from notice recipients to establish that customers in fact were not aware of or did not engage of copyright infringement—as noted above, Bright House had no way of knowing. Rather, Bright House relies on the *fact* that such feedback was sent to show its *effect* on Bright House. *See, e.g.*, *Kornacki v. S. Farm Bureau Life Ins. Co.*, 2015 WL 6445504, at *8 (M.D. Fla. Oct. 23, 2015) (citing cases).

until they contacted Bright House by phone and spoke to the Security and Abuse Group.  Frendberg Decl. ¶¶ 20-21; Harrison Decl. ¶ 9.

In short, there is no evidence that Bright House's policy to inform and educate—but not permanently terminate—customers who received infringement notices was adopted with the object to foster infringement, and no reasonable juror could conclude that it was.  There is no proof that Bright House had the culpable intent required to be liable under *Grokster* "as shown by clear expression or other affirmative steps taken to foster infringement" and thus summary judgment is warranted.  545 U.S. at 918-19.

## C.    Plaintiffs Cannot Prove That Bright House Had Requisite Knowledge Of The Alleged Infringement

Although the Court need not reach the issue once it determines that Plaintiffs cannot satisfy *Grokster*, Plaintiffs' contributory infringement claim independently fails because Plaintiffs cannot prove that Bright House had knowledge of the alleged infringement for vast swaths of the infringement alleged.  Because Plaintiffs are unable as a matter of law to satisfy an element of their claim, *see Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990) (non-moving party bears burden of proving each element), the Court should grant summary judgment on the alleged infringements for which Plaintiffs are unable to establish this element.

### 1.    Plaintiffs Cannot Prove Knowledge Based On Notices Not Sent To Or Received By Bright House

Plaintiffs' theory of contributory infringement rests on the premise that once Bright House received multiple notices alleging that a subscriber had infringed, Bright House should have terminated the subscriber's Internet service because Bright House

16

"knew" that the subscriber would infringe again in the future.  Thus, Plaintiffs argue, Bright House should be held liable for the subsequent infringing acts which Bright House "knew" would be coming.  The only evidence of Bright House's "knowledge" of the alleged acts of infringements are the notices Plaintiffs claim to have sent Bright House.  Schapiro Decl. Ex. O at Supp. Resp. No. 20.  However, it is undisputed that nearly half of Plaintiffs' notices (51,895 of 109,458) *were not actually sent to Bright House*, and that, of the 57,563 notices actually addressed to Bright House, only 15,539 were sent to Bright House during the Claim Period in this case.  Snow Decl. ¶¶ 5-6.  The vast majority of the notices were erroneously sent to email addresses owned and controlled by Time Warner Cable—a separate and independent ISP at the time.  Frendberg Decl. ¶ 36.  Except for 67 notices that were forwarded by Time Warner Cable to Bright House, there is no evidence in the record that *any* of the remaining 51,828 notices mistakenly sent to Time Warner Cable were received by Bright House.  *Id.* ¶ 37.  Moreover, the undisputed evidence establishes that Plaintiffs were aware that they were sending notices to the wrong address, because Time Warner Cable told them as much, and at least 34,442 of these notices were "bounced back" to the sender by Time Warner Cable's servers.  Schapiro Decl. Exs. D, K, L, M, N.

Plaintiffs bear the burden of proving that Bright House was aware of the infringement alleged in the notices, and in the absence of evidence that Bright House actually received these notices, Plaintiffs cannot carry this burden.  Accordingly, claims arising from the acts of infringement alleged in the notices not received by Bright House must be dismissed.

Specifically, under Plaintiffs' theory of the case, a total of 2,698 Bright House subscribers are alleged to be "repeat infringers" that Bright House failed to terminate. Snow Decl. ¶ 9. However, when the notices are re-counted to exclude those never received by Bright House, the number of "repeat infringers" under Plaintiffs' theory drops to 885. *Id*. Thus, Bright House is entitled to summary judgment on all claims of infringement arising out of subscriber accounts other than the 885 who Plaintiffs contend are "repeat infringers" and for whom Bright House actually received multiple notices alleging infringement.[3]

### 2. Notices Received By Bright House Cannot Establish Knowledge Of Future Infringement

As for the remaining notices that Bright House *did* receive, the Court should grant summary judgment as to those acts of alleged infringement too, because no reasonable juror could find that those notices conferred knowledge that subscribers had, in fact, infringed in the past, let alone that they would do so in the future.

Plaintiffs' theory of liability is that once Bright House received multiple notices alleging that a subscriber had infringed Plaintiffs' copyright in the past, Bright House "knew" that the subscriber would do so again in the future. Schapiro Decl. Ex. O at Supp. Resp. No. 20. Plaintiffs' position is that Bright House should have therefore preemptively terminated the Internet access of these subscribers to prevent potential future infringements, and because it did not, Bright House is liable for their post-notice

---

[3]   2,104 sound recordings and 1,230 musical compositions are exclusively associated with alleged infringement by subscribers *other than* the 885 alleged "repeat infringers," Snow Decl. ¶ 9, and thus Bright House is entitled to summary judgment of no infringement for these works.

acts.  For the reasons discussed below, the record does not support a finding that Bright House had knowledge that the subscribers would infringe in the future.

As an initial matter, the notices themselves did not even definitively assert that Bright House's subscribers were liable for copyright infringement.  Rather, the portion of the notices directed at Bright House state that the subscriber "may be" (and hence may not be) liable for infringing activity.  Frendberg Decl. ¶ 38, Ex. D. ("This letter constitutes notice to you that this user *may* be liable for infringing activity occurring on your network.") (emphasis added).  This equivocal language cannot confer knowledge upon Bright House of an act that Plaintiffs now say *did* occur.

Moreover, notices on their own are not sufficient to prove knowledge of infringement, just notice of an allegation of infringement.  *See, e.g.*, *Millennium Funding*, 2021 WL 5882999 at *13 (S.D. Fla. Dec. 13, 2021) (the number of copyright notices "is legally irrelevant" because they do not give notice of any specific acts of infringement that are actually occurring) (citing *ALS Scan, Inc. v. Steadfast Networks, LLC*, 819 F. App'x 522, 524 (9th Cir. 2020)).  The receipt of a notice by a cable company like Bright House—which merely provides a connection to the Internet and does not itself host the allegedly infringing content—cannot be the basis of knowledge of infringement because Bright House has no ability to verify the allegation.  Frendberg Decl. ¶¶ 7-8.  Bright House cannot, for example, confirm that a particular file was downloaded from a particular IP address on a particular date in the past, nor does it have access to files saved on a subscriber's computer.  *Id*.  Thus, Bright House has no

means by which to determine whether any of the facts stated in the notice are accurate. *See Millennium Funding*, 2021 WL 5882999 at *13.

Moreover, at the same time Bright House was receiving notices from Plaintiffs alleging that its customers "may be liable" for infringement, Bright House also was receiving direct feedback from customers stating that they did *not* know of, or were *not* responsible for, the acts complained of in the notices. Frendberg Decl. ¶ 28, Exs. B, C. Customers, for example, would routinely tell Bright House they were unaware of the alleged infringement, or that someone other than a member of their household was using their unsecured WiFi without permission. *Id.* ¶¶ 28-30, Exs. B, C. Regardless of the truth of those statements from customers, there is no dispute that the statements had the effect on Bright House of raising questions as to whether the subscriber had committed an infringing act. Given this record, as a matter of law no jury could reasonably conclude that Bright House "knew" that infringement had occurred—let alone that it would occur in the future. *See* Knowledge, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact.").

Plaintiffs may respond that if a particular subscriber had received a notice in the past, Bright House had reason to know the subscriber would receive more notices in the future. But that conclusion is not supported by the record. Given Bright House's robust program for informing and educating notice recipients about copyright infringement—*the entire point of which was to educate subscribers to prevent further notices of infringement from issuing in the future*—Bright House had every reason to expect the

notice-generating behavior would cease once customers were informed of and educated about the problem, given that the industry's best practices at the time were premised on this principle.  Frendberg Decl. ¶¶ 10, 14; Schapiro Decl. Exs. B, C; Nov. 15 Hall Aff. Ex. A ("Data suggest that, once informed about the alleged content theft and its possible consequences, most Internet subscribers will quickly take steps to ensure that the theft doesn't happen again.").  And the data on Plaintiffs' infringement notices show that the vast majority (75.5%) of subscribers stopped receiving notices from Plaintiffs within 30 days of receiving their first notice, and that a similar percentage (76.81%) received four or fewer notices from Plaintiffs in total.  Snow Decl. ¶¶ 7-8.  At minimum, under these circumstances, given the undisputed fact that the vast majority of subscribers who received Plaintiffs' notices quickly ceased receiving future ones, no reasonable jury could conclude that Bright House had "knowledge" that these customers would infringe in the future.

*     *     *

Because Plaintiffs cannot prove that Bright House had either the object of fostering infringement or "knowledge" of the alleged infringement, the Court should enter summary judgment for Bright House on Plaintiffs' contributory liability claim, and enter a final judgment in favor of Bright House.

## II.   PLAINTIFFS ARE LIMITED AS A MATTER OF LAW IN THE NUMBER OF WORKS ELIGIBLE FOR A STATUTORY DAMAGES AWARD

As their sole form of monetary damages, Plaintiffs have elected to seek "an award of statutory damages for all infringements involved in the action[] with respect

to any one work." 17 U.S.C. § 504(c)(1).[4]   Schapiro Decl. Ex. P at Resp. No. 6.   While

Plaintiffs list 4,582 sound recordings and 2,689 musical compositions in the exhibits

to the operative Complaint (totaling 7,271 asserted works-in-suit), *see* Dkts. 116-1 &

116-2, there are legal limitations on how to count the number of "works" eligible for

statutory damages.   Resolution of those legal issues will greatly reduce the number of

such works for which Plaintiffs may obtain statutory damages, should they establish

liability.

> ### A. The Copyright Act Limits Plaintiffs To One Award Of Statutory Damages Per Sound Recording/Musical Composition Pair

The Copyright Act instructs that "all the parts of a … derivative work constitute

one work." 17 U.S.C. § 504(c)(1).   A derivative work is defined as "a work based upon

one or more preexisting works, *such as a … sound recording*."   *Id*. § 101 (emphasis

added).   That is, a recording is derivative of the composition (*e.g.*, the score and/or

lyrics) on which it is based.   For example, Whitney Houston's sound recording of "I

Will Always Love You" is a derivative work in relation to the musical composition of

"I Will Always Love You" by Dolly Parton.

The text of § 504(c)(1) and § 101 requires that where Plaintiffs assert

infringement of a sound recording that is derivative of an asserted musical

composition, that pair must be counted as a single "work" for the purposes of a

statutory damages award.   *See, e.g., Capitol Rec., Inc. v. MP3tunes, LLC*, 28 F. Supp. 3d

---

[4] Plaintiffs' election of statutory damages is irrevocable. *See, e.g., Jordan v. Time, Inc.*, 111 F.3d 102, 104 (11th Cir. 1997); 6 PATRY ON COPYRIGHT § 22:173 (an election of statutory damages "may not be revoked").

190, 192 (S.D.N.Y. 2014) ("when [infringers] infringed the copyright covering a sound recording and musical composition for the same song, they infringed only one work because the infringement was directed at the sound recording and the musical composition was not exploited separately"); *Spooner v EEN, Inc.,* 2010 WL 1930239, at *4 (D. Me. May 11, 2010) (musical composition and sound recording "one work" for statutory damages); 6 PATRY ON COPYRIGHT § 22:186 ("[s]ound recordings are defined in section 101 as species of derivative work of the underlying musical composition, and, as such, both fall within the one work, one award rule for statutory damages that only award[s] for infringement of both works"); 4 NIMMER ON COPYRIGHT § 14.04[E][1][b] (2021) (similar).

It makes no difference whether the copyrights for a recording and a composition are owned by different plaintiffs; only one award per "work" is permitted. *See EMI Christian Music Grp., Inc. v. MP3tunes*, LLC, 844 F.3d 79, 94 (2d Cir. 2016) (affirming that "plaintiffs could recover only one statutory damages award for a musical composition and its corresponding sound recording, even where the composition and the recording were owned by separate plaintiffs" because "a plain reading of the Copyright Act's text supports [that] conclusion").

Based on Plaintiffs' verified responses to discovery served on this issue, there are 1,977 derivative sound recordings-in-suit; that is, sound recordings Plaintiffs assert for which there are corresponding musical compositions-in suit. Declaration of George G. Strong, Jr. ("Strong Decl.") ¶ 4; Schapiro Decl. ¶ 18, Ex. Q at Resp. No.

13.  Resolution of this legal issue in Bright House's favor will reduce the number of "works" in the case from 7,271 to 5,294.  *Id.*

### B.    The Copyright Act Limits Plaintiffs To One Award Of Statutory Damages For Sound Recordings Issued On A Registered Album

There is no dispute that many of the asserted sound recordings were registered and issued as albums.  The Copyright Act instructs that, for the purposes of a statutory damages award, "all the parts of a compilation … constitute one work."  17 U.S.C. § 504(c)(1).  This definition includes works "in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole."  *Id.* § 101 ("compilation" includes "collective works").  An album fits squarely within the definition of a compilation.  Thus, where multiple recordings appear on a single album, Plaintiffs are limited to a single award of statutory damages per album and cannot seek statutory damages for individual songs that were issued on an album.  The Copyright Act provides for no exception.

Although the Eleventh Circuit has suggested that a judicially created "independent economic value" test may create an exception to the statutory rule in limited circumstances, *see, e.g.*, *Yellow Pages Photos, Inc. v. Ziplocal LP*, 795 F.3d 1255, 1282 (11th Cir. 2015) (applying test and affirming "decision to treat each collection as a compilation, subject to only one award of statutory damages"), this test cannot be squared with the statutory text.  *Star Athletica, L.L.C. v. Varsity Brands, Inc.,* 137 S. Ct. 1002, 1010 (2017) ("[w]e … begin and end our inquiry with the text").  Resolution of this legal issue in Bright House's favor will reduce the number of "works" in the case

24

from 7,271 to 3,901.  Strong Decl. ¶ 5; Schapiro Decl. ¶ 19, Ex. R.

Resolution of both legal issues identified in Parts II.A-B in Bright House's favor will reduce the number of "works" identified in the Complaint that qualify for a statutory damages award from 7,271 to 1,924.  Strong Decl. ¶ 6; Schapiro Decl. ¶ 20.

### C. Plaintiffs Cannot Recover For Works That Were Not Timely Registered

Finally, the Court should preclude Plaintiffs from recovering statutory damages for works that were not timely registered with the Copyright Office—a precondition for such an award.  A copyright holder may seek statutory damages for infringement that occurs after (1) it registers the work; or (2) after the work is first published, so long as the plaintiff registers the work within three months of first publication.  17 U.S.C. § 412(2); *see also Pronman v. Styles*, 676 F. App'x 846, 848 (11th Cir. 2017) (affirming plaintiffs "were clearly not entitled to these [statutory] damages" on such grounds); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990) (statutory damages not available).  Here, it is undisputed that Plaintiffs do not have any evidence of 52 works being infringed after they were registered or within the 3-month window after first publication.  Schapiro Decl. ¶¶ 21-22, Exs. R, S, T, U.  Thus, those 52 works are not eligible for statutory damages.

## CONCLUSION

For the foregoing reasons, Bright House respectfully requests that the Court grant its motion for summary judgment.

Dated: January 14, 2022

Charles K. Verhoeven (*pro hac vice*)
David Eiseman (*pro hac vice*)
Linda Brewer (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
charlesverhoeven@quinnemanuel.com
davideiseman@quinnemanuel.com
lindabrewer@quinnemanuel.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
Tel: (415) 591-1000
jgolinveaux@winston.com

Michael S. Elkin (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
melkin@winston.com

Respectfully submitted,

*/s/ Andrew H. Schapiro*
Andrew H. Schapiro (*pro hac vice*)
Nathan A. Hamstra (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400
andrewschapiro@quinnemanuel.com
nathanhamstra@quinnemanuel.com

Todd Anten (*pro hac vice*)
Jessica Rose (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
toddanten@quinnemanuel.com
jessicarose@quinnemanuel.com

William J. Schifino, Jr.
Florida Bar No. 564338
GUNSTER, YOAKLEY &
STEWART, P.A.
401 E. Jackson Street, Suite 1500
Tampa, FL 33602
Tel: (813) 228-9080
wschifino@gunster.com

*Counsel for Bright House Networks, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 14, 2021, I caused a true and correct copy of the foregoing Defendant Bright House Networks, LLC's Motion For Summary Judgment and all supporting materials thereto to be sent via email to all counsel of record.

*/s/ Andrew H. Schapiro*
Andrew H. Schapiro
