**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UMG RECORDINGS, INC. *et al.*,

      Plaintiffs,

                        **Case No. 8:19-cv-710-MSS-TGW**

  v.

BRIGHT HOUSE NETWORKS, LLC,

      Defendant.

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

For years, Bright House Networks ("BHN") systematically and knowingly helped its subscribers engage in massive copyright infringement. BHN knew that its network was rife with repeat infringers. It had received millions of infringement notices from copyright owners, but literally threw away the vast majority without even looking at them. Rather than take any meaningful steps to stop the infringement on its network, BHN continued, with full knowledge of its subscribers' conduct, to provide them with the means to continue infringing Plaintiffs' copyrighted works. In fact, BHN even tracked its subscribers' illegal activities. BHN's inaction can be easily explained: it pocketed millions of dollars a month in subscription fees from those repeat infringing subscribers.

Plaintiffs, the world's leading record companies and music publishers, seek redress for the infringement of over 7,000 of their copyrights. Between March 24, 2013 and May 17, 2016 (the "Claim Period"), thousands of BHN subscribers illegally downloaded and distributed Plaintiffs' music through online file-sharing programs like

BitTorrent.  Pursuant to the Digital Millennium Copyright Act ("DMCA"), Plaintiffs sent BHN over 100,000 detailed notices of this illegal activity, identifying the specific IP addresses from which BHN could identify subscriber accounts that were infringing. Despite knowing of this infringement, as well as infringement identified by other copyright owners, BHN continued facilitating it by providing these known repeat infringing subscribers ongoing access to BHN's high-speed internet service, which those subscribers used to continue infringing Plaintiffs' works.

For years, BHN chose not to even look at the overwhelming majority of infringement notices it received—willfully blinding itself to the bulk of infringement occurring on its network.  For the limited notices BHN bothered to accept and process, it did as little as possible in response.  For example, in March 2013, Plaintiffs sent BHN 5,838 notices.  BHN took "action" on just *one*, sending a single notification to a single subscriber.  Despite failing even to look at millions of notices, BHN was aware that specific subscribers had been the subject of thousands of notices.  For example, BHN actively tracked its "worst offenders," a group including 262 subscribers that together were associated with at least 120,000 notices.

Knowing that its network was being used by thousands of its subscribers to commit ongoing, massive infringement, BHN had an obligation to take steps to stop, reduce, or address in some meaningful way its subscribers' misconduct.  But BHN did not.  Until 2016, when a federal district court in Virginia found that another Internet Service Provider ("ISP"), Cox Communications, was not entitled to the DMCA safe harbor, BHN never terminated, nor even slowed, the internet service of *any* infringing

subscribers—irrespective of the number of notices any subscriber received, and including those who freely admitted they were infringing.

BHN easily could have avoided all liability for copyright infringement had it simply complied with the DMCA safe harbor that Congress enacted to protect ISPs. It merely needed to adopt and reasonably implement a repeat infringer policy that provided for termination in appropriate circumstances, and communicate that policy to its subscribers.  17 U.S.C. § 512(i).  Instead, BHN did the opposite, implementing a policy and practice of ignoring repeat infringers and never terminating their service. Only at the very end of the Claim Period did BHN terminate a mere handful of repeat infringers.  As a result of its deliberate choices, BHN withdrew its safe harbor defense following the close of fact discovery (ECF No. 384) and forfeited any possible immunity under the DMCA from Plaintiffs' copyright infringement claims.

Against that backdrop, the purpose of this motion is to narrow the issues for trial and streamline the presentation of the evidence to the jury in two significant areas:

*First*, this motion seeks to resolve two foundational issues not subject to any reasonable dispute: (1) Plaintiffs own or control the copyright in each work identified in their accompanying declarations, each of which has been validly registered; and (2) the files that Plaintiffs contend BHN's subscribers distributed and are infringing do indeed contain copies of Plaintiffs' copyrighted works.  Resolving these issues now will streamline trial, sparing the jury from days of tedious, unrefuted evidence concerning each of the 7,000-plus Plaintiffs' works.

*Second*, Plaintiffs seek summary judgment finding that they have established

both the knowledge and material contribution elements necessary to hold BHN liable for contributory infringement.  Plaintiffs leave for trial proving that BHN's subscribers distributed or reproduced the infringing files, which will establish direct infringement.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

### A.   Ownership of Plaintiffs' Works

1.    Plaintiffs own, or have an exclusive license to, the rights under the Copyright Act to reproduce and distribute each of the copyrighted works identified in the Appendices to their respective declarations ("Plaintiffs' Works").  *See generally* Blietz Declaration ("Decl."); Kokakis Decl.; Leak Decl.; McMullan Decl.; Patel Decl.; Parry Decl.

2.    Plaintiffs' Works are validly registered with the Copyright Office, as evidenced by a certificate of registration or recordation, or a print-out of the registration information from the Copyright Office's official public catalog for each of Plaintiffs' Works.  Blietz Decl. ¶ 6; Kokakis Decl. ¶ 6; Leak Decl. ¶ 6; McMullan Decl. ¶ 6; Patel Decl. ¶ 5; Parry Decl. ¶ 6; *see also* Request for Judicial Notice, filed herewith.

### B.   Plaintiffs Provided Notice of Infringement to BHN

3.    BHN is an ISP that provided high-speed internet services over its network to approximately two million customers during the Claim Period.  Kaplan Decl. ("Kaplan") Ex. 1 (Interrog. 11).

4.    Plaintiffs have not authorized BHN or its subscribers to make the copies or distributions of Plaintiffs' Works at issue here.  Blietz Decl. ¶ 10; Kokakis Decl. ¶ 9; Leak Decl. ¶ 10; McMullan Decl. ¶ 10; Patel Decl. ¶ 8; Parry Decl. ¶ 10.

5.      In an effort to combat online piracy, the record company Plaintiffs authorized their trade association, the Recording Industry Association of America ("RIAA"), to conduct certain anti-piracy activities as to infringement on BitTorrent, Gnutella, eDonkey, and Ares peer-to-peer ("P2P") networks.   Leak Decl. ¶ 5; McMullan Decl. ¶ 5; Parry Decl. ¶ 5.

6.      The RIAA retained a company called MarkMonitor to scan P2P networks for unauthorized distribution of Plaintiffs' Works and send notices to ISPs. For over a decade, MarkMonitor has been verifying infringement of works for RIAA, as well as for many other well-known content companies.  Bahun Decl. ¶¶ 2–3, 7, 15.

7.      MarkMonitor's process was as follows: upon first encountering a potentially infringing file, it downloaded the full file.  It then used Audible Magic's content recognition service to determine whether the file included any of Plaintiffs' copyrighted works in Audible Magic's database.  For each file matched to one of Plaintiffs' works, MarkMonitor logged the file's cryptographic hash value in a database of known infringing files.  Bahun Decl. ¶ 15.

8.      A cryptographic hash value is a unique alphanumerical representation of the contents of a digital file.  Frederiksen-Cross Decl. ¶ 5.  Identical files will have the same hash value, as BHN's expert Kevin Almeroth has agreed.  Kaplan Ex. 6 (Tr. 145:7–9 ("If you have two different files and they are identical, they have the same hash values, so one is essentially a copy of the other . . . .")).  *See also* Bahun Decl. ¶¶ 10–11; Frederiksen-Cross Decl. ¶¶ 5–11.

9.      MarkMonitor's system would connect with BHN subscribers using P2P

software and confirm, in each instance, that the subscriber was online, running a file sharing program, and that the subscriber told MarkMonitor that it possessed and would begin to distribute a confirmed infringing file, identified by its hash value. MarkMonitor then sent an infringement notice to BHN.  Bahun Decl. ¶¶ 12–17.

10.    The infringement notices contained, *inter alia*, (i) an identification of the BHN subscriber by IP address, (ii) the date and time of the infringing act, (iii) the name of the infringing file, (iv) a cryptographic hash value identifying the infringing file, (v) a representative sample of what was infringed by song title, and (vi) the P2P network on which the infringement was detected.  Bahun Decl. ¶¶ 21–22; Kaplan Ex. 36.

11.    From August 22, 2012 through March 31, 2015, MarkMonitor sent 109,332 infringement notices to BHN or the agent designated to receive complaints for the corresponding BHN IP address.  Bahun Decl. ¶ 18; Kaplan Exs. 7 (Frendberg Tr. 220:21–222:7); 18; 19 at BHN_00002444.

12.    In early 2016, MarkMonitor downloaded from the P2P networks at issue in this case copies of digital files, identified by hash value and containing digital audio recordings (*e.g.*, MP3s), that included files referenced in notices MarkMonitor sent to BHN.  Bahun Decl. ¶¶ 20, 23.

13.    The files MarkMonitor downloaded often contain multiple individual song files, for each of which another unique hash value was calculated.  Frederiksen-Cross Decl. ¶¶ 12–14.

14.    For this case, seven expert audio engineers conducted a critical listening analysis comparing the audio recordings at issue, *i.e.*, comparing copies of Plaintiffs'

Works (SUMF ¶ 1) to files downloaded by MarkMonitor (*id.* ¶¶ 12–13).  They confirmed that each of Plaintiffs' Works was copied, in whole or substantial part, in files MarkMonitor downloaded.  Burst Decl. ¶ 21; Cass Decl. ¶ 20; Cheriff Decl. ¶ 20; Gilchrest Decl. ¶ 21; Lai-Tremewan Decl. ¶ 20; Maltas Decl. ¶ 20; Wineman Decl. ¶ 21; *see also* Buchan Decl. ¶¶ 10–12 & Exs. 2A–2B; Epiq Decl. ¶¶ 8–10 & Exs. 1–2.

15.    Prof. Paul Geluso, an expert audio engineer and Director of Music Technology at New York University, also conducted waveform and spectrogram analyses comparing Plaintiffs' Works (SUMF ¶ 1) to files the MarkMonitor downloaded (*id.* ¶¶ 12–13), as well as critical listening.  He likewise concluded that files downloaded by MarkMonitor contained, in whole or substantial part, copies of Plaintiffs' Works.  Geluso Decl. ¶ 65; *see also* Buchan Decl. ¶¶ 10–12 & Exs. 2A–2B; Epiq Decl. ¶¶ 8–10 & Exs. 1–2.

### C.    BHN's Receipt and Tracking of Plaintiffs' Notices

16.    BHN knew that peer-to-peer activity on its network was associated with copyright infringement.  Michael Tomasullo, the supervisor of BHN's security and abuse team, admitted that peer-to-peer networks are the "forum" where "most" copyright infringement occurred.  Kaplan Ex. 10 (Tomasullo Tr. 38:1–39:1).  BHN also knew that significant peer-to-peer activity took place on its network.  For example, in a September 2012 report, ████████████████████████████████████████ ████████████████████████████████████████████████████████ent.  Kaplan Ex. 20 at BHN_00005368, –72.  A November 2013 BHN presentation identified "File Sharing" as consuming ████ of BHN's bandwidth.  Kaplan Ex. 21 at BHN_00005623.

A similar presentation in March 2014 stated that "File Sharing" makes up ███ of usage on BHN's network.  Kaplan Ex. 22 at BHN_00005633.

17.    During the Claim Period, BHN received nearly six million copyright infringement notices, including those from Plaintiffs.  Kaplan Ex. 2 (Interrog. 13).

18.    BHN's system was designed, in BHN's own words, to "ignore" almost all of these notices.  *See, e.g.*, Kaplan Ex. 23 at "No Action Taken Reason Categories" tables in Apr. 2013 Report (BHN_00002184), May 2013 Report (BHN_00002769), June 2013 Report (BHN_00004904), Aug. 2013 Report (BHN_00002227), Sept. 2013 Report (BHN_00002243).

19.    BHN had an automated process that generally identified the particular subscriber whose IP address was contained in a notice.  Kaplan Exs. 11 (Droessler Tr. 51:9–16); 12 (Ferrar Tr. 124:17–125:17); 13 (Hughes Tr. 104:19–105:8).

20.    From February 2013 to February 2015, however, BHN imposed a cap whereby it would ingest and process only 10,000 notices a month, though it received an average of 129,900 notices a month during that time period.  *See* Kaplan Ex. 2 (Interrog. 13).  It simply deleted the rest without even identifying the responsible subscriber.  Kaplan Ex. 7 (Frendberg Tr. 128:4–16, 131:13–132:2).

21.    Because it deleted the notices that it did not process each month, BHN has no basis to dispute that it received all of Plaintiffs' infringement notices.  Kaplan Exs. 7 (Frendberg Tr. 128:4–129:5, 131:13–132:2); 8 (Frendberg Tr. 11:13–12:22).

22.    BHN primarily used its Enterprise Copyright Action Tool ("ECAT") to track the infringement notices it did process.  Kaplan Exs. 7 (Frendberg Tr. 116:19–

117:1); 23 at Mar. 2013 Report (BHN_00002159).

23.     For the subset of notices that it did "process," *i.e.*, that it ingested into ECAT and associated with a subscriber, BHN claimed to employ a graduated response program consisting of six steps, five of which were notifications, and the sixth being a "hard" quarantine (*i.e.*, a block on the user's access to the internet) that would be released upon a phone call between BHN and the subscriber. *See* Kaplan Ex. 7 (Frendberg Tr. 100:1–102:16, 114:7–15).

24.     Though BHN had a six-step program, it was constructed such that the vast majority of notices were not counted in the six steps. As BHN described in monthly reports, BHN "ignored": (i) the first notice it received for a given IP address; (ii) all notices received in the seven days following the last notification sent to a subscriber; and (iii) any DMCA notices that were more than three days old by the time BHN's system processed them. Kaplan Ex. 23 at "No Action Taken Reason Categories" tables in Apr. 2013 Report (BHN_00002184), May 2013 Report (BHN_00002769), June 2013 Report (BHN_00004904), Aug. 2013 Report (BHN_00002227), Sept. 2013 Report (BHN_00002243). BHN also would not take action on notices received more than two weeks after the last notice was received for a given subscriber. Kaplan Exs. 7 (Frendberg Tr. 65:3–18); 24 at BHN_00001643.

25.     For subscribers who reached step 6, BHN also "ignored" *all* notices received *for the next six months*—no matter how often the subscribers continued to infringe. Kaplan Exs. 7 (Frendberg Tr. 188:9–189:25, 192:23–193:13); 23 at Apr. 2013 Report (BHN_00002184).

26.     As a result of these "no action" categories, BHN routinely ignored 80%–90% of even the limited notices that it processed each month.  *See, e.g.*, Kaplan Ex. 23 at June 2013 Report (BHN_0004903–04) (reporting that BHN received 69,035 copyright notices that month, but only 10,416 of those were processed and 9,225 were ignored due to the "no action" categories).  Between the cap on the number of notices processed and various categories of notices that BHN's system "ignored," BHN took action on fewer than 1.2% of the notices it received from the start of the Claim Period through November 2015, acting on fewer than 1% of notices received in 12 of those months, and fewer than 0.5% in eight of those months.  Buchan Decl. ¶¶ 15–16 & Ex. 3.  Ultimately, a subscriber could be the subject of hundreds or even thousands of notices without those notices resulting in an additional "step."

27.     As just one example, in March 2013, Plaintiffs sent BHN 5,838 notices.  Of those, BHN took "action" on *one* notice, sending one notification to a single subscriber.  Kaplan Exs. 7 (Frendberg Tr. 169:7–172:8); 23 at Mar. 2013 Report (BHN_00002167).  Similarly, BHN's internal documents admit that "one customer had 9800 plus complaints that we were not aware of because [BHN's automated copyright tool] had not processed them."  Kaplan Ex. 25 at BHN_00007444.

28.     BHN understood and believed that the subscribers that were the subject of multiple notices were repeat infringers.  For example, BHN identified and tracked subscribers that, in BHN's own words, were the "worst offenders" who "continue[d] to infringe."  Kaplan Exs. 23 at monthly reports for Aug. 2013 (BHN_00002219), Mar. 2014 (BHN_00003230), Apr. 2014 (BHN_00001781), Feb. 2015 (BHN_00001882),

10

June 2015 (BHN_00001922), July 2015 (BHN_00001937), Aug. 2015 (BHN_00003081); 26 at BHN_00008427. Among these was a group of 262 subscribers that together were associated with at least 120,000 notices, or, on average, more than 450 notices each. Kaplan Ex. 23 at Mar. 2016 Report (BHN_00004865).

29.   Other subscribers admitted to the infringement detailed in the notices: "Yes, I was downloading copyrighted material, I was a bad boy. :-)" Kaplan Ex. 27.

30.   And BHN personnel responsible for managing infringement notices acknowledged in internal communications that subscribers who were the subject of multiple notices were actually infringing. In an email discussing "customers with a high volume of copyright complaints," Tim Frendberg, Senior Director of BHN's Security and Abuse Department, wrote "what could [the subscribers] possibly tell us that would be convincing enough that they are doing nothing wrong?" Kaplan Ex. 28.

31.   In late 2015, after the court in *BMG v. Cox* denied the defendant ISP (Cox) the DMCA safe harbor, BHN made changes to supposedly "toughen up" its program. *See* Kaplan Exs. 9 (Frendberg Tr. 99:24–100:19, 101:13–17, 139:1–140:20); 14 (Harrison Tr. 198:5–199:18, 206:2–207:5). While BHN increased the number of notices it processed monthly, Kaplan Exs. 9 (Frendberg Tr. 102:1–103:9, 140:21–141:6); 23 at Mar. 2016 Report (BHN_00004872–73), it still ignored infringement notices after the change, Kaplan Ex. 23 at Mar. 2016 Report (BHN_00004872–73).

32.   By processing additional notices, BHN expected it would identify more notices directed to customers previously identified as notice recipients, and additional subscribers that had not been previously identified as the subject of notices. Kaplan

Exs. 9 (Frendberg Tr. 103:13–24); 23 at Nov. 2015 Report (BHN_00004820); 29.

### D.   BHN's Policy Not to Terminate Repeat Infringing Subscribers

33.     BHN's User Agreement, to which all subscribers agreed as a condition to using BHN's internet service, prohibited subscribers from using the service to infringe copyrights and stated that "[i]t is our policy to terminate the access of repeat infringers."  Kaplan Ex. 30.  BHN's Acceptable Use Policy ("AUP") also reserved to BHN the right to "limit[] the number of peer-to-peer sessions a user can conduct at the same time [and] limit[] the aggregate bandwidth available for certain usage protocols such as peer-to-peer."  Kaplan Ex. 31.

34.     BHN, however, did neither of those things.  *See* Kaplan Ex. 3 (Interrog. 14).  BHN also did not terminate a subscriber or otherwise treat them any differently if the subscriber admitted to infringement.  Kaplan Ex. 13 (Hughes Tr. 58:24–59:9).

35.     Only in 2016, after a plaintiffs' verdict in *BMG v. Cox*, did BHN start terminating subscribers—only 17 in total—who had reached the end of the graduated response program, yet continued to infringe.  Kaplan Exs. 3 (Interrog. 14); 7 (Frendberg Tr. 213:2–22).  Of these 17 subscribers, seven had their internet service reconnected by BHN.  Kaplan Exs. 4 (Interrog. 24); 7 (Frendberg Tr. 275:22–276:16); 9 (Frendberg Tr. 182:8–183:16).

36.     In contrast, BHN terminated *over a million* subscriber accounts for non-payment of BHN subscription invoices during the Claim Period—an average of 26,985 per month.  Kaplan Ex. 1 (Interrog. 12).  Of those subscribers terminated for non-payment, at least 7,348 were also the subject of three or more infringement notices, for

which BHN had imposed no sanction.  Kaplan Ex. 5 (Interrog. 17).

37.     BHN also "throttled," or slowed, the internet speeds of subscribers who failed to pay, and could have done the same for subscribers who repeatedly infringed, but BHN did not.  Kaplan Ex. 16 (Sutterby Tr. 241:24–243:12).

38.     When deciding what, if any, action to take with its repeat infringing subscribers, BHN's security and abuse team tracked information concerning their length of service, monthly payment amounts, and payment history.  *See* Kaplan Exs. 32 at Sheet 1, Column E; 33 (BHN supervisor asking for the service level and payment history of a subscriber who had progressed to step six and whom BHN determined to call before quarantining).

39.     Despite having been notified of Plaintiffs' claims in April 2016, BHN failed to preserve emails from the Claim Period for 12 of the 15 BHN employees whose emails BHN reviewed and produced.  Kaplan Exs. 15 (Harrison Tr. 361:7–363:15, 391:17–392:16, 403:17–404:21); 17 (Vasey Tr. 100:18–101:2, 103:6–17, 105:5–107:11, 132:21–133:6).  Plaintiffs will address this issue in a separate, forthcoming motion pursuant to Fed. R. Civ. P. 37.

## LEGAL STANDARD

A party may move for summary judgment as to a "part of each claim or defense."  Fed. R. Civ. P. 56(a).  A court may also grant summary judgment on a discrete factual issue over which no material dispute exists.  *See, e.g.*, *Comprehensive Care Corp. v. Katzman*, 2010 WL 3190136, at *4 (M.D. Fla. July 30, 2010); *Blue v. Hill*, 2020 WL 2441417, at *3–4 (E.D.N.C. May 12, 2020).  "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## ARGUMENT

## I.  PLAINTIFFS OWN OR CONTROL EXCLUSIVE RIGHTS IN EACH OF THE WORKS IN SUIT.

A plaintiff may sue for copyright infringement if it is the "legal or beneficial owner" of the exclusive right(s) in the work alleged to have been infringed.  17 U.S.C. § 501(b).  A copyright registration "constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate," including ownership.  *See Pohl v. MH Sub I LLC*, 770 F. App'x 482, 486 (11th Cir. 2019) (citing 17 U.S.C. § 410(c)).  "In addition to evidence of the copyright registrations, courts consider other indicia of ownership . . . [including] 'the parties' intent and the terms of transfer agreements and other documents establishing a chain of title.'"  *Sony Music Ent. v. Cox Commc'ns, Inc.*, 426 F. Supp. 3d 217, 224 (E.D. Va. 2019) ("*Sony v. Cox*") ("'chain[s] of title' include acquisitions of ownership as well as exclusive licenses") (citing cases).

Plaintiffs have proven that they own or control exclusive rights under copyright for each of Plaintiffs' Works.  Plaintiffs have either produced the registration certificate itself or a printout of the registration information from the Copyright Office's official public catalog.  SUMF ¶ 2.  For the majority of Plaintiffs' Works, the registration lists a Plaintiff as a named claimant.  *Id.*  As to the remainder, the registration lists a predecessor of a named Plaintiff as the claimant, or Plaintiffs acquired their rights from a third party or foreign affiliate, as evidenced by Plaintiffs' declarations and exhibits

thereto in support of this motion.  *Id.* ¶¶ 1–2.  Accordingly, Plaintiffs' prima facie ownership of Plaintiffs' Works has been established.  *See BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 644–53 (E.D. Va. 2015); *Sony v. Cox*, 426 F. Supp. 3d at 223–29.  It is now BHN's burden to overcome that presumption and submit evidence sufficient to raise a genuine triable issue.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II.   THE FILES THAT PLAINTIFFS CONTEND BHN SUBSCRIBERS UNLAWFULLY DISTRIBUTED CONTAIN COPIES OF PLAINTIFFS' WORKS.

Downloading and/or distributing copyrighted music via P2P networks without authorization constitute direct copyright infringement, violating the exclusive rights of reproduction and distribution, respectively.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 920 (2005) ("*Grokster*") ("although [P2P] networks . . . can be used to share any type of digital file, [users] have prominently employed those networks in sharing copyrighted music and video files without authorization"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 645 (7th Cir. 2003) ("Teenagers and young adults who have access to the Internet like to swap computer files containing popular music.  If the music is copyrighted, such swapping, which involves making and transmitting a digital copy of the music, infringes copyright."); *Thompsons Film, LLC v. Doe 119*, 2013 WL 1787807, at \*2 (M.D. Fla. Apr. 26, 2013) ("the use of [P2P] programs to download copyrighted music infringes copyright").  Thus, to establish direct infringement, Plaintiffs need only to show that (i) BHN subscribers downloaded or distributed files, and (ii) those files contain unauthorized copies of Plaintiffs' Works.

*In re Aimster*, 334 F.3d at 645.

At trial, Plaintiffs will prove the first component—that BHN subscribers copied or distributed the files that MarkMonitor downloaded from P2P networks and produced in this case.  For now, Plaintiffs seek partial summary judgment only regarding the second component: that each of Plaintiffs' Works is included in one or more of those files.  This important factual issue is ripe for determination by the Court, which will streamline the presentation of evidence and issues for the jury, and avoid the need to offer voluminous evidence showing the identity between thousands of works and the corresponding files that Plaintiffs contend BHN subscribers copied and distributed.  At trial, BHN may still dispute whether its subscribers distributed these files.  But there can be no dispute that the files contain copies of Plaintiffs' Works.

Each infringement notice that MarkMonitor sent to BHN detailed the infringement at issue.  That information included the name of the file and its cryptographic hash value.  SUMF ¶ 10.  The cryptographic hash value for a file is unique.  What that means is that any two files with the same cryptographic hash value are identical, down to the very last bit in the file.  *Id.* ¶ 8.

In 2016, MarkMonitor downloaded files from P2P networks with the same hash values listed in notices that Plaintiffs sent to BHN.  *Id.* ¶ 12.  These downloaded files are precisely the same files identified in the infringement notices sent to BHN.  Each of the downloaded files may contain multiple individual digital audio files (*e.g.*, MP3s), each of which can be individually identified by its own unique hash value.  *Id.* ¶ 13.  In discovery, MarkMonitor produced a hard drive containing all the downloaded files,

organized by P2P protocol and identified by their hash values.  *Id.* ¶ 12.

The undisputed evidence establishes that these files contain Plaintiffs' Works.

*First*, Plaintiffs produced in discovery, and have identified here by Bates number, authentic digital copies of Plaintiffs' Works.  *Id.* ¶¶ 1, 14–15.  *Second*, two different types of experts—seven audio engineers who engaged in critical listening, and one who performed both critical listening and waveform and spectrogram analysis—compared each of those authentic copies of Plaintiffs' Works to an individual digital audio file on the MarkMonitor hard drive (identified by the file's hash value).  They concluded in each instance that the files on the MarkMonitor hard drive contain, in whole or substantial part, copies of Plaintiffs' Works.  *Id.* ¶¶ 1, 12–15.

BHN brought forward no contrary evidence—either in the form of rebuttal expert testimony, documentary evidence, or lay testimony.  Thus, the uncontroverted evidence shows that each of Plaintiffs' Works is contained in the files that MarkMonitor downloaded and produced on the MarkMonitor hard drive. Accordingly, the Court should grant summary judgment to Plaintiffs finding that each of Plaintiffs' Works is copied in the corresponding file on the MarkMonitor hard drive set forth in Exs. 2A and 2B to the accompanying Declaration of Kristofer Buchan.

## III.   PLAINTIFFS HAVE ESTABLISHED BOTH ELEMENTS OF CONTRIBUTORY INFRINGEMENT.

A contributory copyright infringer is "'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'"  *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th

Cir. 1990) (quoting *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987)).  It is undisputed that BHN had actual knowledge of the identities of specific subscribers who were infringing Plaintiffs' Works.  BHN also cannot dispute that it continued to provide them the internet service required for their continued infringement, rather than doing something to curtail it.  While Plaintiffs do not seek summary judgment on the underlying direct infringement claims for which BHN is contributorily liable, the Court can nevertheless find that there are no disputed material facts on the elements that establish contributory liability.  *See, e.g.*, *Sony v. Cox*, 426 F. Supp. 3d at 233 (denying summary judgment on direct infringement and holding, nevertheless, that "Plaintiffs have established the knowledge element of contributory liability by showing knowledge of specific conduct which allegedly infringed all sound recordings and musical compositions identified in suit.  No genuine issue of material fact remains.").

### A.      BHN Had Requisite Knowledge of Infringement.

In the Eleventh Circuit, the standard of knowledge for contributory copyright liability is "[k]now, or have reason to know." *Cable/Home Commc'n*, 902 F.2d at 845.  In light of the nearly 110,000 infringement notices Plaintiffs sent to BHN (SUMF ¶ 11), there is no question that BHN knew—and, at a minimum, had "reason to know"— that specific subscribers were infringing Plaintiffs' Works.  *See Venus Fashions, Inc. v. ContextLogic, Inc.*, 2017 WL 2901695, at *23 (M.D. Fla. Jan. 17, 2017) (finding website operator had "reason to know" of copyrighted images on its site based on communications alerting the operator of the unauthorized display of the images).

In a materially identical case against another ISP (applying a heightened *actual*

knowledge standard, rather than this Circuit's "reason to know" standard), the Fourth Circuit held that the standard "requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it." *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 311–12 (4th Cir. 2018) ("*BMG*"). The court went on to hold that an ISP's knowledge that a subscriber repeatedly infringed gives rise to a presumption of knowledge that they will infringe again. *Id.* at 307–08.

In *Sony v. Cox*, applying the *BMG* standard to nearly identical facts and based on the very same notice program Plaintiffs used here, the court granted summary judgment on knowledge, concluding that,

> [Plaintiffs'] notices accomplished far more than telling Cox that *some number* of subscribers were infringing. They told Cox *which ones* [were infringing]. The standard is focused on the subscriber, not the particular works infringed, and the specific instance of infringement guides service providers to the source.

426 F. Supp. 3d at 233.

Precisely as in *Sony v. Cox*, to the extent Plaintiffs establish direct infringement, their notices informed BHN of specific instances of specific subscribers using its internet service to infringe Plaintiffs' Works. SUMF ¶ 10. Upon receipt of these DMCA-compliant infringement notices, BHN was able to identify the particular subscriber at issue (and did so for the small fraction of notices it bothered to process), and whether the subscriber had been the subject of additional notices. *Id.* ¶¶ 19–20, 22, 29–31. BHN thus knew, for example, that among the "worst offenders" who "continue[d] to infringe" was a group of 262 subscribers that were together associated with at least 120,000 notices or, on average, more than 450 notices each. *Id.* ¶ 28.

Accordingly, BHN had *actual* knowledge—let alone reason to know—of such ongoing infringement by specific BHN subscribers such that it "could *do* something about it," *i.e.*, throttle, suspend, or terminate the infringing subscribers' service pursuant to BHN's AUP (*Id.* ¶¶ 33–37). *BMG*, 881 F.3d at 311–12; *Sony v. Cox*, 426 F. Supp. 3d at 232 ("[B]ecause [the ISP] maintained the ability to suspend or terminate these infringing accounts, this was 'specific enough knowledge of infringement that the defendants could do something about it."). Indeed, after a plaintiffs' verdict in *BMG v. Cox*, BHN did terminate (at least temporarily) 17 subscribers. SUMF ¶ 35. This Court, applying the more lenient constructive knowledge standard, should similarly rule that, to the extent Plaintiffs establish the direct infringements described in their notices, BHN had knowledge of them.

In the alternative, and certainly with respect to notices BHN ignored, Plaintiffs have established knowledge under the standard of willful blindness, *i.e.*, that BHN was aware of a high probability of the infringements identified in Plaintiffs' notices and consciously avoided confirming the acts of infringement. *See BMG*, 881 F.3d at 308 ("the law recognizes willful blindness as *equivalent* to actual knowledge") (citing *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)); *In re Aimster*, 334 F.3d at 650 ("Willful blindness is knowledge, in copyright law … as it is in the law generally."). Indeed, BHN's conduct was paradigmatic willful blindness.

As described above, BHN knew that its subscribers were infringing and even tracked those it knew "continue[d] to infringe." SUMF ¶ 28. Yet, BHN intentionally designed its system to limit the number of notices it processed and to "ignore" broad

categories of notices. *Id.* ¶¶ 18, 20, 23–26. Specifically, BHN discarded the vast majority of notices it received each month, without ever processing them in ECAT or associating them with a subscriber. *Id.* ¶ 20. For example, in June 2013, BHN received 69,035 copyright notices but processed only 10,416. *Id.* ¶ 26. BHN thus "consciously avoided learning about specific instances of infringement" and willfully blinded itself to its subscribers' infringement of Plaintiffs' Works. *See BMG*, 881 F.3d at 312; *Alper Auto., Inc. v. Day to Day Imps., Inc.*, 2021 WL 5893161, at *16 (S.D. Fla. Nov. 3, 2021) ("decision to not pursue information that would have helped confirm whether [a party] was infringing on a protected copyright constituted willful blindness").

### B.   BHN Materially Contributed to its Subscribers' Infringement.

"There can be no question that the provision of high-speed internet service materially contributes to infringement via BitTorrent and that [an ISP] had the means to withhold that assistance upon learning of specific infringing activity." *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 979 (E.D. Va. 2016) (reversed in part and remanded for new trial on other grounds). This ruling follows the widely accepted principle that "providing the site and facilities for known infringing activity is sufficient to establish contributory liability." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996).

The Ninth Circuit has articulated a specific test for determining liability in the context of computer system operators, and held in an analogous context that:

> Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials . . . [Thus, it] could be held contributorily

> liable if it had knowledge that infringing . . . images were available using
> its search engine, could take simple measures to prevent further damage
> to [plaintiffs'] copyrighted works, and failed to take such steps.

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007). *See also BMG*, 881 F.3d at 306–08, 311–12 (Cox could be found contributorily liable for continuing to provide internet service to subscribers to whom infringement notices were directed if Cox had specific enough knowledge of infringement that it could do something about it; remanding on other grounds).

District Courts within the Eleventh Circuit have adopted the *Perfect 10* test. *See, e,g.*, *Venus Fashions*, 2017 WL 2901695, at *24 (applying *Perfect 10* and holding that plaintiff established likelihood of success on contributory claim in light of evidence that the defendant website operator could implement a system that would identify copyrighted images but resisted implementing it); *Michael Grecco Prods., Inc. v. RGB Ventures, LLC*, 2017 WL 4077045, at *8 (M.D. Fla. Sept. 14, 2017) (holding that plaintiff stated a contributory infringement claim based on allegations that defendant continued to provide third parties access to copyrighted images after its license to the images expired, and failed to act to prevent further infringement when it was in a position to do so).

Here, BHN had notice that specific subscribers were repeatedly infringing Plaintiffs' Works—some, hundres of times. Until 2016, BHN maintained a policy not to terminate any of them for infringement, although it had the contractual right and ability to do so; nor did it throttle the internet speed of those subscribers to impede their continued infringement. SUMF ¶¶ 33–37. All that BHN did was to very

occasionally notify its subscribers that they were the subject of copyright notices, knowing its minimal action did not change subscriber behavior.  *Id.* ¶¶ 18–30.

Even worse, as a result of BHN's design of its system, fewer than 1.2% of the notices it received for the first 32 of the 38 months of the Claim Period resulted in any form of action taken against the customer.  *Id.* ¶ 26.  Most egregiously, for subscribers who had reached step 6 of BHN's graduated response program—those BHN considered repeat offenders—BHN's system *ignored all notices directed to them for a period of six months*, yet BHN continued to provide them with high-speed internet service enabling them to keep infringing.  *Id.* ¶ 25.  BHN thus did not *do* anything to stop its subscribers from using its service to infringe Plaintiffs' Works.  *BMG*, 881 F.3d at 311–12.  As another court recently held in the same context, "it is beyond debate that [an ISP's] continuing provision of internet services to customers who engage in repeated copyright infringement substantially facilitates access to and the distribution of infringing materials."  *UMG Recordings, Inc. v. Grande Commc'ns Networks, Inc.*, 384 F. Supp. 3d 743, 768 (W.D. Tex. 2019).  On this record, it is indisputable that BHN materially contributed to its subscribers' infringement of Plaintiffs' Works.

BHN may argue that because its service is capable of substantial non-infringing uses, under *Grokster*, Plaintiffs must prove that it *intended* that its customers engage in copyright infringement.  Although some courts have assumed otherwise, properly analyzed, intent is required only for an inducement claim (which was the claim at issue in *Grokster*), not for a material contribution claim, as Plaintiffs assert here.

But even accepting *arguendo* that Plaintiffs must prove intent, *Grokster* instructs

that intent is determined "in light of 'rules of fault-based liability derived from the common law[.]'" *Perfect 10*, 508 F.3d at 1170 (quoting *Grokster*, 545 U.S. at 934–35); *BMG*, 881 F.3d at 307 (same). Critically, "common law principles establish that intent may be imputed." *Perfect 10*, 508 F.3d at 1171. "The most relevant of these common law rules is that if a person 'knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.'" *BMG*, 881 F.3d at 307 (quoting Restatement (Second) of Torts § 8A cmt. B); *see also Perfect 10*, 508 F.3d at 1171 ("Tort law ordinarily imputes to an actor the intention to cause the natural and probable consequences of his conduct.").

Accordingly, as another court in this district has held:

> [W]here the defendant knows of specific infringing content available on its system yet fails to remove it—that defendant may be liable, by operation of law, just as if he had actually intended to infringe under *Grokster* … [C]ontributory infringement may be found based on a material contribution theory in instances where a defendant did not express an intention to foster infringement but provided the means for infringement . . . .

*Michael Grecco Prods.*, 2017 WL 4077045, at *8 (quoting *Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *35 (S.D. Fla. Sept. 20, 2013)). Considering virtually identical facts to this case, the Fourth Circuit provided the following apt analogy:

> Consider a company that leases VCRs, learns that specific customers use their VCRs to infringe, but nonetheless renews the lease to those infringing customers. Given those facts, the company knows that its action—renewing the lease of the VCR to these specific customers—is substantially certain to result in infringement, *and so an intent to cause infringement may be presumed.*

*BMG*, 881 F.3d. at 308 (emphasis added).

In light of these principles, every court to consider the matter has held that intent under *Grokster* is established when an ISP, like BHN here, continues to provide service to known infringing subscribers.  *See BMG*, 881 F.3d at 307–08; *UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067, at *9 (D.N.J. Aug. 31, 2020) ("ISP's failure to take remedial action against repeat copyright infringers is tantamount to encouraging infringement"); *Grande Commc'ns,* 384 F. Supp. at 767–68 (following *BMG*'s analysis).  Because BHN learned that specific subscribers were using its high-speed internet service to infringe, but nonetheless continued to provide that service to those subscribers, BHN's intent to cause infringement is established.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment in Plaintiffs' favor that: (1) Plaintiffs own or control exclusive rights under 17 U.S.C. § 106 to Plaintiffs' Works and each is validly registered; (2) each of Plaintiffs' Works is copied in the corresponding file on the MarkMonitor hard drive set forth in Exs. 2A and 2B to the Buchan Declaration; and (3) BHN had knowledge of, and materially contributed to, its subscribers' direct infringement.

Dated:  January 14, 2022                    Respectfully submitted,

Jonathan M. Sperling                         */s/ Matthew J. Oppenheim*
COVINGTON & BURLING LLP            Matthew J. Oppenheim
The New York Times Building             Jeffrey M. Gould
620 Eighth Avenue                            Alexander Kaplan
New York, NY 10018-1405               OPPENHEIM + ZEBRAK, LLP
Telephone: (212) 841-1000              4530 Wisconsin Ave. NW, 5th Fl.
jsperling@cov.com                            Washington, DC 20016
                                                     Telephone: (202) 621-9027

Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
nsahni@cov.com

matt@oandzlaw.com
jeff@oandzlaw.com
alex@oandzlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 14, 2022, the foregoing document and supporting

materials thereto were served by email on counsel of record for defendant.

*/s/ Matthew J. Oppenheim*