UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UMG RECORDINGS, INC., *et al.*,

    Plaintiffs,

v.

BRIGHT HOUSE NETWORKS, LLC,

    Defendant.

Case No. 8:19-cv-710-MSS-TGW

## PLAINTIFFS' OMNIBUS MOTION *IN LIMINE*

**1. BHN should be precluded from offering evidence or argument concerning Plaintiffs' post-Claim Period revenues and financial performance.**

Pursuant to FRE 401 and 403, the Court should preclude evidence or argument concerning revenues or profits that Plaintiffs earned after the Claim Period as irrelevant, unduly prejudicial, and misleading.[1] BHN seeks to rely on this information to argue that Plaintiffs' financial performance after the Claim Period belies Plaintiffs' claims about piracy's harms, or that deterrence is not needed because Plaintiffs are already benefitting from a decline in piracy. But Plaintiffs' post-Claim Period revenues from legitimate sales and streaming have no bearing on damages. To be sure, a jury considering statutory damages is entitled to consider lost profits associated with any alleged *infringement*. But the revenue Plaintiffs collected for *authorized* distributions of any given work is not probative of the revenue they did *not* collect as a result of

---

[1] The documents that should be excluded are identified as DX698, DX1070, DX1077, and DX1081 on BHN's exhibit list.

infringement on BHN's network. Moreover, because Plaintiffs' improved financial performance after the Claim Period neither contradicts nor offsets the harms from infringement they suffered during the Claim Period, such information would serve only to mislead the jury and unfairly prejudice Plaintiffs.

2. **BHN should be precluded from offering live testimony from a key witness it refuses to make available for Plaintiffs' case in chief.**

The Court should preclude BHN from presenting live testimony from Timothy Frendberg—a key witness that BHN controls and expects to call live at trial, but refuses to make available during Plaintiffs' case in chief. Sahni Decl. Ex. 1 at 2.

At all relevant times, Mr. Frendberg was Senior Director of BHN's Security and Abuse team, the team responsible for implementing BHN's copyright program. *See* Dkt. 576-1 at 1. Confirming his central role, BHN designated Mr. Frendberg on *thirty-eight* 30(b)(6) topics, and he was deposed for two days. *See* Dkt. 325 at 2-3, Dkt. 326. Mr. Frendberg is a current employee of BHN's successor, Charter Communications, Inc., and testified that he would attend trial if asked. Sahni Decl. ¶ 3. He is beyond the Court's Rule 45 subpoena power but plainly under BHN's control; he is the sole fact witness that BHN "expects" to call. Plaintiffs requested that BHN make him available to testify during Plaintiffs' case in chief, but BHN refused.

BHN's refusal is unwarranted and undermines a fair, efficient, and sensible trial. *See Maran Coal Corp. v. Societe Generale De Surveillance S.A.*, 1996 WL 11230, at *2 (S.D.N.Y. Jan. 10, 1996) (footnote omitted) (ordering defendants to produce key witnesses for plaintiff's case or be precluded from calling them live in their own case,

and describing the position BHN has adopted here as "gamesmanship"). District courts in the Eleventh Circuit reject this type of "gamesmanship." *Vera v. Berkshire Life Ins. Co. of Am.*, 2021 WL 7542934, at *1-2 (S.D. Fla. June 28, 2021) (holding "it was 'elementary that a witness that will appear at trial for defendant cannot refuse to appear during plaintiff's case in chief'") (quoting *Chiles v. Novartis Pharms. Corp.*, 2013 WL 12157928, at *1 (M.D. Fla. Feb. 15, 2013)).[2]

This Court should do the same. The parties have each listed over 30 witnesses they will or may call, many of which overlap. Efficiency and fairness strongly favor having witnesses take the stand once, with both sides conducting their full examinations at that time, rather than having Plaintiffs present lengthy deposition testimony from a key witness who will later appear in person. Forcing Plaintiffs to rely on deposition testimony while BHN presents the same witness live may also be confusing, and the jury may draw inappropriate conclusions from the disparity.

---

[2] Courts routinely hold "that a party may not limit a witness that the party intends to call at trial from testifying only during its own case in chief." *Buchwald v. Renco Grp., Inc.,* 2014 WL 4207113, at *1 (S.D.N.Y. Aug. 25, 2014) (citing cases); *see also R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.*, 945 F.2d 269, 273 (9th Cir. 1991) ("By denying RBM's requests to produce Reed and White as live witnesses, TTS engaged in gamesmanship, forcing RBM to rely on depositions. The district court did not abuse its discretion when it forced TTS to rely on deposition testimony as well."); Order, Sony Music Ent., v. Cox Commc'ns, Inc., No. 18-cv-00959 (E.D. Va. Oct. 21, 2019), Dkt. 590, at 9 (granting identical motion to this one); *CGC Holding Co., LLC v. Hutchens*, 2016 WL 6778853, at *2 (D. Colo. Nov. 16, 2016) ("[D]efendants can't have it both ways. If these individuals will appear live, then they must appear live during plaintiffs' case in chief so that they can be called by the plaintiffs if they so desire."); *Iorio v. Allianz Life Ins. Co. of N. Am.*, 2009 WL 3415689 at *6 (S.D. Cal. Oct. 21, 2009) ("[I]f Plaintiffs are forced to show the videotaped depositions or read the transcript into the record of any of the movants in this action because Defendants have failed to produce them, Defendants will thereafter be precluded from producing the same witnesses in person.").

**3.     BHN should be precluded from offering evidence or argument that terminating subscribers in response to repeated notices of copyright infringement is disproportionate.**

BHN intends to offer testimony that "termination is an unnecessary and disproportionate response to allegations of infringement." Ex. 1 at 7. Such testimony, and any similar argument or testimony that termination is appropriate only for "adjudicated" infringers, is contrary to law and likely to confuse the jury.

*First*, courts have held that an ISP may be held liable for contributory infringement for *not* terminating subscribers on the basis of "the number of notices it received about them." *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 768 (W.D. Tex. 2019). And BHN itself terminated 17 subscribers based only on its receipt of notices of alleged infringement. Dkt. 592 at ¶ 6.

*Second*, the DMCA *requires* termination in response to allegations of infringement, in appropriate circumstances, for an ISP to qualify for the statutory safe harbor. 17 U.S.C. 512(i)(1)(A) (requiring ISPs to adopt a "policy that provides for the termination in *appropriate circumstances* of subscribers . . . who are *repeat infringers*") (italics added). The Copyright Office confirms that "repeat infringer means repeat *alleged* infringer, not repeat *adjudicated* infringer." U.S. Copyright Office, *Section 512 Report* (May 2020) (italics original). Accordingly, no court has held that adjudications, rather than *allegations*, of repeat infringement are necessary to give rise to "appropriate circumstances" for termination. Just the opposite. *See BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 302-03 (4th Cir. 2018) ("we reject [ISP's] argument that the term 'repeat infringers' in § 512(i) is limited to adjudicated infringers").

That BHN withdrew and is no longer relying on the DMCA safe harbor here is irrelevant. BHN's contemplated testimony is at odds with that statutory framework, as well as the law of contributory infringement. Allowing such testimony and argument would permit BHN to supplant a statutory defense, for which it could not qualify, with a fictional defense that directly contradicts the law. The testimony should therefore be excluded under this Court's prior concern that it would be an "attack on the [DMCA] statute" and improper for BHN to argue, "wink wink, nod nod, termination is overreach or disproportionate" when the law says something else. Dkt. 641 (May 25, 2022 Hr'g Tr.) at 95:23-96:14.[3]

**4.    BHN should be precluded from arguing that it is not liable for infringement over its network by users of a BHN account other than the account holder.**

BHN should be precluded from arguing that it should not be held liable for its subscribers' infringements because persons other than the named account holder may access the account and "[y]ou can't actually determine which human being" infringed Plaintiffs' copyrighted music. Dkt. 642 (May 26, 2022 Hr'g Tr.) at 72:1-2, 5-6. This argument is irrelevant and likely to mislead the jury. *See* Fed. R. Evid. 403.

*First*, "it is typical for each member of a multimember household to access the internet" under an agreement between the ISP and the account holder. *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 664 (E.D. Va. 2015)

---

[3] Plaintiffs acknowledge the Court's June 6 Order permitting Dr. Sinnreich to testify that termination "would be disproportionate to *allegations of possible* infringement" while barring such testimony about "demonstrated infringement." Dkt. 638 at 3 (italics original). That Order is, respectfully, not consistent with the law just described or the Court's prior stated concern.

(holding that "evidence that any one of those users infringed would be sufficient, notwithstanding the fact that the individual's name does not appear on the bill."); *see also BMG Rights Mgmt. (US) LLC v. Cox Commc'n, Inc.*, No. 14-cv-01611, Dkt. 691 at 3 (granting motion *in limine* to preclude ISP from arguing it is not liable for infringement by users other than the named account holders).

*Second*, the infringer's identity is irrelevant in any event, because BHN's agreements with its subscribers provide that subscribers are responsible for all use on their accounts. BHN's Residential Services Agreement provides that all internet services "whether or not authorized by [the account holder], will be deemed [the account holder's] use and [the account holder] will be responsible in all respects for all such use." Ex. 2 at 2. And under its Residential Services Agreement, if an account holder's passwords or security measures are "acquired by any other person . . . BHN may assume that [the account holder] [has] authorized such person's use." *Id*. at 5.

**5.     BHN should be precluded from offering evidence or argument concerning Plaintiffs' treatment of or relationships with artists and songwriters.**

Pursuant to FRE 401 and 403, BHN should be precluded from offering evidence and argument concerning (1) Plaintiffs' treatment of or relationships with artists and songwriters, including the proffered testimony of Wayne Coleman[4] and Aram Sinnreich regarding the financial terms of agreements between Plaintiffs and artists or songwriters, royalty audits, and potential disputes with those artists and songwriters,

---

[4] Such testimony should also be excluded for the reasons stated in Plaintiffs' pending motion to exclude the testimony and opinions of Wayne Coleman. *See* Dkt. 584.

and (2) artist and songwriter agreements pertaining to works for which there is no dispute about Plaintiffs' ownership of exclusive rights.

*First*, BHN seeks to present irrelevant but inflammatory testimony that Plaintiffs allegedly are "exploitative of creative labor" and treat artists and songwriters "inequitab[ly]," or treat less commercially successful artists and songwriters "less favorab[ly]." *See* Dkt. 584-2 (Coleman Rep.) at 16-17, 20; Dkt. 590-2 (Sinnreich Rep.) at 18-22. As examples of this purported exploitation, BHN seeks to introduce exhibits and testimony regarding unrelated lawsuits brought against certain Plaintiffs, and even other non-party record labels, regarding financial and contractual disputes dating back close to 20 years.[5] But Plaintiffs' contractual relations with their artists and songwriters, and aged disputes about those contracts, are not relevant to any claim or defense, nor to any statutory damages factor. *See Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *20 (S.D.N.Y. May 2, 2011) (finding, in copyright infringement case, that "[a]ny relevance of the nature of the relations between recording companies and artists is likely to be substantially outweighed by the danger of unfair prejudice to Plaintiffs").

*Second*, BHN should likewise be precluded from admitting over 180 agreements with artists and songwriters pertaining to works that BHN has already stipulated Plaintiffs own or control. *See* Dkt. 561 (stipulating as to 6,818 works in suit). Having

---

[5] *See, e.g.*, DX0891 and DX0975 (2012 article regarding lawsuit against Warner Music Group); DX1129 (2013 article regarding lawsuit against non-party eOne); DX1210 (2005 article about a contract dispute involving Sony).

7

conceded that Plaintiffs own these works—the sole reason for which the agreements were sought—BHN now seeks to use them for a different purpose: to argue their terms are unfair to artists. That is improper, irrelevant (just as evidence regarding ISPs treating their customers poorly would be), and intended solely to disparage Plaintiffs in front of the jury. The agreements should be excluded.

6. **BHN should be precluded from offering evidence or argument concerning alleged price-fixing by the Plaintiff record companies in the 1990s.**

BHN should be precluded from presenting evidence or argument that Plaintiffs ever engaged in price-fixing. This includes testimony from Dr. Sinnreich, whose sole basis for the assertion that Plaintiffs engaged in "illegal price-fixing" is a statement by the "then-New York Attorney General." *See* Dkt. 590-2 (Sinnreich Rep.) at 11. This unadjudicated claim has no foundation and is irrelevant. Dr. Sinnreich cites no sources to support it, and no court or administrative body ever found that "price-fixing" occurred. To allow BHN to claim that Plaintiffs were engaged in illegal activity, based on unsubstantiated allegations, would mislead the jury and unfairly prejudice Plaintiffs. *See, e.g.*, *Swoope v. CSX Transp., Inc.*, 2015 WL 12564948, at *12 (N.D. Ga. July 29, 2015) (excluding "accusations or innuendo of tax evasion" on relevance and Rule 403 grounds).

7. **In the event Plaintiffs are precluded from offering evidence related to notices from other rights holders, BHN should be precluded from offering statements by BHN subscribers who were not the subject of Plaintiffs' infringement notices.**

BHN has informed Plaintiffs it plans to move to exclude notices from rights holders other than the RIAA, and any evidence, argument, or testimony relating to

8

the number, counting, or tabulation of such notices. Any such exclusion would be improper, for reasons Plaintiffs will explain in their forthcoming opposition, including because it would essentially require a redaction of BHN's own documents. But to the extent Plaintiffs *are* precluded from presenting evidence, testimony, or argument about non-RIAA notices, BHN cannot be permitted to introduce statements by BHN subscribers that pertain to those non-RIAA notices. BHN presumably would like to do so to argue that some subscribers denied the allegations of infringement made by other rights holders, but it would be highly misleading and confusing for the jury to permit BHN to introduce such evidence, while precluding Plaintiffs from putting that evidence in context. For instance, Plaintiffs should be able to explain that BHN received *millions* of notices from other rights holders, such that any BHN-proffered sample of subscriber statements fails to paint a complete picture of the infringement occurring on BHN's network and BHN's knowledge thereof. Moreover, BHN should not be permitted to proffer a self-serving sample of denials, while precluding Plaintiffs from showing the many subscriber admissions confirming the infringements alleged in the notices received by BHN—whether from RIAA or other rights holders. The resulting disparity would be highly misleading to the jury and prejudicial to Plaintiffs.

**8.   BHN should be precluded from using "spying" or similar terminology to describe network monitoring tools.**

Pursuant to FRE 401 and 403, BHN should be precluded from presenting testimony or argument that uses "spying," "surveillance," or "snooping" terminology to characterize measures that BHN could have used (or did use) to monitor infringers'

9

activity. These inflammatory terms are not relevant to any element of liability and would only confuse, mislead, and unduly prejudice the jury.

BHN used network monitoring tools to monitor the volume of peer-to-peer traffic on its network in the aggregate and, in some cases, by subscriber. Against this background, Plaintiffs have argued that BHN could have taken additional steps to corroborate allegations of peer-to-peer infringement using network management or other technology.[6] In response, BHN has characterized such network monitoring as "surveillance" or "spying," and wants to argue an ISP should not be required to spy on its subscribers[7]—even though BHN used these very tools, and any such monitoring would involve identifying only the *type* of network traffic and not its *content*. Because the probative value of such inflammatory language is substantially outweighed by the danger of unfair prejudice and misleading the jury at trial, it should be precluded.

**9.     BHN should be precluded from offering evidence or arguing that terminating subscribers' internet service is a human rights violation.**

BHN should not be permitted to claim that termination of internet service is a human rights violation. *See, e.g.*, Dkt. 590-2 (Sinnreich Rep.) at 28. This assertion is irrelevant because "human rights" (and international law generally) have absolutely

---

[6] *See, e.g.*, Dkt. 587-2 at ¶ 40-44) (McGarty Rep.); Dkt. 589-21, -22, -23 (BHN's network management reports); Dkt. 589-32 (BHN policy permitting BHN to use "Network Management Tools" to ensure compliance with the Acceptable Use Policy, to include "limiting the number of peer-to-peer sessions a user can conduct at the same time" and "limiting the aggregate bandwidth available for certain usage protocols such as peer-to-peer").

[7] *See, e.g.*, Dkt. 641 (May 25, 2022 Hr'g Tr.) at 41:20-42:9 (BHN expert describing Plaintiffs' position as a claim that network management "could and should be used for the purposes of *surveilling* individual internet subscribers…").

no bearing on this case, and it would confuse the jury as to the legal standards at issue. This is especially true given that (1) BHN offers no support for this claim other than two news articles, and (2) the DMCA (*i.e.*, United States law) specifically contemplates termination of internet service by ISPs in certain circumstances. Finally, the prejudice caused by allowing BHN to argue that Plaintiffs seek to violate the "human rights" of BHN subscribers would substantially outweigh any probative value. *See* Dkt. 642 (May 26, 2022 Hr'g Tr.) at 239:6-13 (ruling that Dr. Almeroth would not be allowed "to testify about or raise implications of human rights violations or human rights implications . . . because I think that would tend to be overly prejudicial and not really probative").

**10.  BHN should be precluded from offering evidence or argument regarding the copyright practices of other ISPs, including that the Copyright Alert System constitutes an "industry standard" or set of "best practices."**

At trial, BHN wants to admit evidence relating to the copyright practices of other ISPs, including those that participated in the Copyright Alert System ("CAS"), which BHN mislabels as the "industry standard." *See, e.g.*, Dkt. 576 at 14; Dkt. 576-1 ¶ 14. CAS was a *private*, negotiated compromise between rights holders and certain ISPs (not including BHN), and thus cannot be proffered by BHN as an "industry standard" or "best practice." Accordingly, how BHN compares to other ISPs, or the requirements of CAS, is irrelevant to the legal issues in this case and likely to mislead the jury, for at least two reasons.

*First*, BHN cannot deflect from its misconduct by claiming that it was not alone, or that there were worse actors. *See Dun & Bradstreet Software Servs., Inc. v. Grace*

11

*Consulting, Inc.*, 307 F.3d 197, 211 (3d Cir. 2002) ("A defense of industry custom and practice in the face of the protective provisions of the Copyright Act could undermine the purposes and objectives of the statute and reduce it to rubble.").

*Second*, BHN did not participate in CAS. It would unfairly prejudice Plaintiffs to allow BHN to claim that what some Plaintiffs and other ISPs agreed to in the context of a negotiated compromise supersedes BHN's obligations under U.S. copyright law. Accordingly, the Court in *Charter* observed that "[t]he CAS agreements were negotiated compromises. It is difficult for me to see how what plaintiffs were willing to accept from those providers in that context is relevant to [an ISP's] legal obligations in this case." Dkt. 603-25 at 7. Moreover, CAS itself expressly "acknowledges [] that the limitations on ISP liability under the DMCA are conditioned on an ISP's adoption and reasonable implementation of a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers." Dkt. 576-17 at 9 n.1.

11. **BHN should be precluded from arguing that Torrent Manager and File Hash Manager code was "unavailable," "missing," "not preserved," or that BHN's expert did not have the opportunity to review it.**

The MarkMonitor System includes, principally, two steps, typically referred to as (1) infringement detection, and (2) file verification. *See, e.g.*, Dkt. 589-81 ¶¶ 12–16. During file verification, MarkMonitor downloads a file it suspects might contain content it has been hired to protect and submits it to Audible Magic for identification. *Id.* at ¶ 15; *see also* Dkt. 641 (May 25, 2022 Hr'g Tr.) at 186:2-16. To interact with Audible Magic, MarkMonitor created two relatively simple programs, File Hash

Manager and Torrent Manager. As more fully described in Plaintiffs' opposition to BHN's Rule 37(c) Motion (Dkt. 610), MarkMonitor was initially unable to locate source code from the Claim Period for these two programs. Earlier this year, however, MarkMonitor informed the parties that it had discovered the relevant code, and MarkMonitor made it available to the parties for inspection. BHN's expert, Dr. Chatterjee, has now reviewed the code. Ex. 3.[8] In light of this, BHN should not be permitted to argue, or introduce evidence or testimony, that this code is missing, inoperable, or destroyed.[9]

12. **BHN should be precluded from arguing or testifying that the hard drive created by MarkMonitor in 2016 was a "recreation" of evidence.**

During discovery, Plaintiffs produced a hard drive containing files downloaded from P2P networks, along with "packet capture" files containing records of the peers from which the files were downloaded. As described more fully in Plaintiffs' Opposition to BHN's Motion for Sanctions (Dkt. 472), as demonstrated by their unique hash value, the files are copies of those distributed, made available, or downloaded by BHN subscribers, on which Plaintiffs sent notices to BHN. They were

---

[8] Charter may claim that Dr. Chatterjee's review was for purposes of *Charter*. But all MarkMonitor discovery occurred once for both this case and that one, subject to a cross-use agreement.

[9] To be clear, Plaintiffs understand and are not challenging the Court's ruling on BHN's Rule 37(c) motion. Plaintiffs will not attempt to affirmatively rely on the Torrent Manager of File Hash Manager source code. But nor should BHN be permitted to present false or misleading testimony to the jury. To the extent that the Court permits Dr. Chatterjee to testify that MarkMonitor source code was "missing," "inoperable," or otherwise unavailable, Plaintiffs respectfully request in the alternative that they be permitted to cross-examine Dr. Chatterjee regarding his review of the source code in the *Charter* matter.

13

downloaded by MarkMonitor pursuant to a January 2016 Statement of Work ("SOW"), executed so counsel could consider how best to assert Plaintiffs' claims.

BHN has repeatedly asserted, contrary to the evidence, that the 2016 SOW was an attempt to "recreate . . . destroyed evidence." *See, e.g.*, Dkt. 447 at 9. The probative value of such misleading and inflammatory language is substantially outweighed by the prejudice to Plaintiffs. A juror might improperly discount evidence that the files on the hard drive have hashes that match those in Plaintiffs' notices because she is told that the evidence was "recreated." Or a juror might improperly discount analysis on the hard drive as a whole based on the erroneous characterization of that drive as "recreated," despite crediting testimony that the hard drive files have the same content as those referenced in Plaintiffs' notices because they have the same hash value.

### 13. BHN should be precluded from offering evidence or argument concerning Plaintiffs' track-level revenues from works in suit.[10]

Track-level revenue information from legitimate sources for the works in suit is not relevant to any element of liability or damages. *See* Section 1, *supra* (revenues collected from legitimate sources not probative of what Plaintiffs would have earned absent infringement). Notably, none of BHN's experts has relied on this information. Indeed, the fact that even BHN's damages expert did not use track-level revenue for his analysis demonstrates that it is not relevant and would not be helpful to the jury. And even if it were somehow relevant, the information BHN seeks to admit is

---

[10] The documents that should be excluded are identified as DX788, DX818-19, DX842-47, DX1137, DX1243, and DX1207-8 on BHN's exhibit list.

14

incomplete and thus misleading: for instance, it does not capture revenue from physical sales (*e.g.*, records or CDs), it does not cover the full time period at issue, and it does not include any revenues received as part of a sale that included multiple works (*e.g.*, LPs, Eps, digital or video bundles). *See* Ex. 4 (Gallien Dep. Tr.) at 118:18-124:1.

### 14. BHN should be precluded from introducing Plaintiffs' Licensing Agreements with Digital Service Providers, including any terms thereof.

Under FRE 401 and 403, BHN should be precluded from offering evidence and argument concerning the terms of Plaintiffs' agreements with non-party digital service providers, including, *e.g.*, Spotify, Apple, Amazon, through which Plaintiffs provide their music on a catalog-wide basis to authorized and legitimate streaming and download platforms.[11]

Although BHN may argue that it seeks to admit these agreements to assess the relative value of, and thus damages associated with, each work, the agreements have no bearing on that analysis. *See* Section 13, *supra*. Tellingly, BHN's damages expert, Mr. Strong, did not even list these documents among the materials he considered, let alone actually utilize them in his analyses.[12] They should therefore be excluded.

---

[11] Plaintiffs' agreements with digital service providers are highly confidential and competitively sensitive—Plaintiffs do not share this information publicly or with each other. Moreover, the First Stipulated Amendment to the Protective Order was entered into this case specifically to provide additional requirements and protections against disclosure given the highly confidential nature of these agreements and concerns of the counterparties to these agreements. *See* Dkt. 226.

[12] To the extent that BHN intends to use these agreements to speculate about whether revenue collected from these digital partners are shared with artists or songwriters, that too is irrelevant, and, for the reasons discussed in Section 5 only serves to prejudice Plaintiffs.

**15. BHN should be precluded from offering evidence or argument about litigations other than this one as a purported source of Plaintiffs' revenue.**

BHN should not be permitted to claim that lawsuits against other ISPs are part of Plaintiffs' business model for generating revenue. There is no foundation for such a claim. And other than *BMG Rights Mgmt. (US) LLC v. Cox Communications, Inc.*, No. 14-cv-1611 (E.D. Va.), which BHN has indicated led it to change its approach to infringement notices, evidence or testimony concerning Plaintiffs' lawsuits against other ISPs is irrelevant. Additionally, because of its irrelevance, allowing BHN to infect the jury with evidence regarding Plaintiffs' disputes with other ISPs would be misleading and confusing, and the prejudice therefrom would outweigh any minimal probative value. *See, e.g.*, *Irving v. Dish Network L.L.C.*, 2013 WL 12317058, at *3 (N.D. Ga. July 22, 2013) (excluding evidence of other lawsuits filed by plaintiff as irrelevant and unfairly prejudicial); *N.A.S. v. Morada-Haute Furniture Boutique LLC*, 2022 WL 845013, at *5 (S.D. Fla. Mar. 21, 2022) (excluding evidence of prior litigation involving defendant and his business as irrelevant and prejudicial).

**16. BHN should be precluded from offering evidence or argument concerning a purported "deterrence multiplier."**

BHN should be precluded from presenting argument or testimony about awards in other cases in order to determine the "appropriate level" of statutory damages. Such testimony is misleading and amounts to an improper jury instruction.

BHN intends to argue and proffer testimony, including through its damages expert George Strong, that the jury should use a "deterrence multiplier" of two to three times actual harm to account for adequate deterrence, based on other cases in which

16

courts have awarded statutory damages equal to three times the estimated actual damages.[13] Especially by referring to court decisions, this approach amounts to an implicit instruction that there is a proper range of statutory damages relative to actual damages. As such, it would usurp this Court's role in instructing the jury on the law. Moreover, under the law, amounts awarded in other cases are irrelevant, and the deterrence factor is not tied to Plaintiffs' actual damages.[14]

Plaintiffs would also be unfairly prejudiced by this opinion because they cannot effectively cross-examine Mr. Strong about it without introducing and distinguishing the case law on which he relies. Accordingly, testimony or argument about statutory damages awards in other cases should be precluded because their sole basis is inadmissible case law, and their probative value, if any, is substantially outweighed by the danger of unfair prejudice and misleading the jury at trial.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion *in limine*.

Dated: February 28, 2022

Matthew J. Oppenheim
Jeffrey M. Gould
OPPENHEIM + ZEBRAK, LLP

/s/ *Neema T. Sahni*
Neema T. Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643

---

[13] *See* Dkt. 643 (June 1, 2022 H'rg. Tr.) 58:12-18 ([Plaintiffs' counsel]: ". . . So your understanding of two to three times multiplier for deterrence is based on the Florida cases cited in footnotes 201, 202 and 204 of your report, right?" [Mr. Strong]: "Yeah, I believe so.").

[14] *See, e.g., Broad. Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1261 (11th Cir. 2014) ("[C]ourts generally consider: (1) the infringers' blameworthiness . . . (2) the expenses saved and the profits reaped . . . (3) the revenues lost by the plaintiffs due to the defendants' conduct; and (4) the deterrent value of the damages imposed.").

17

4530 Wisconsin Ave. NW, 5th Fl.
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
jeff@oandzlaw.com

David C. Banker
Florida Bar No. 0352977
Bryan D. Hull
Florida Bar No. 020969
BUSH ROSS, P.A.
1801 North Highland Avenue
P.O. Box 3913
Tampa, FL 33601-3913
Telephone: (813) 224-9255
dbanker@bushross.com
bhull@bushross.com

Telephone: (424) 332-4800
nsahni@cov.com

Jonathan M. Sperling
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
jsperling@cov.com

*Attorneys for Plaintiffs*

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), Plaintiffs certify that they conferred with Bright House regarding this motion. Plaintiffs advised Bright House of the evidence they seek to exclude on July 1, 2022. The parties conferred telephonically on July 6, 2022, and could not reach agreement on the issues detailed herein.

*/s/ Neema T. Sahni*
Neema T. Sahni

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 8, 2022, I caused the foregoing document and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

*/s/ Neema T. Sahni*
Neema T. Sahni
