**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| UMG RECORDINGS, INC., *et al.*, | |
| Plaintiffs, | |
| *v.* | Case No. 8:19-cv-710-MSS-TGW |
| BRIGHT HOUSE NETWORKS, LLC, | **REDACTED PURSUANT** |
| Defendant. | **TO L.R. 1.11(d)** |

**BRIGHT HOUSE NETWORKS, LLC'S RESPONSE TO PLAINTIFFS'**
**OMNIBUS MOTION *IN LIMINE***

1. **Post-Claim Period Finances:** Evidence of the revenues and profits Plaintiffs earned following the Claim Period is relevant and not prejudicial, and it is necessary to rebut Plaintiff's argument that peer-to-peer ("P2P") file-sharing negatively impacted the music industry. Specifically, it appears that Plaintiffs intend to argue that P2P file-sharing "devastated" the music industry, and will support that claim by pointing to revenue trends prior to the commencement of the Claim Period. *See, e.g.*, Dkt. 96-1 (FAC) ¶¶ 81, 89; Dkt. 583-2 (Furchtgott-Roth Rep.) ¶ 34 (referring to the change in the "trajectory" of sales as probative of harm by P2P); *cf.* Ex. A (opening statement from *Sony Music Ent. v. Cox Commc'ns, Inc.*, No. 1:18-cv-950, Dkt. 628 (E.D. Va. Dec. 4, 2019)) at 39:5-8.[1] Plaintiffs' finances in the years immediately following the Claim Period are required to refute that position, as it is the evidence that shows that

---

[1] Exhibits cited as "Ex." are attached to the Declaration of Andrew Schapiro.

Plaintiffs' revenues and profits began rising during the Claim Period and continued rising right after it, supporting a reasonable conclusion that: (i) factors other than P2P were primarily responsible for any purported losses; and (ii) any alleged "harm" caused by P2P was trivial.  *See, e.g.*, Dkt. 590-2 (Sinnreich Rep.) at 13-14, 41.

For example, the rise in Plaintiffs' streaming revenues during and after the Claim Period supports BHN's position that the cause of Plaintiffs' alleged harm was not P2P, but a failure to timely adapt to new trends in music consumption.  This is supported by Dr. Sinnreich's opinion that the music industry was in a "period of revitalization" during and after the Claim Period.  *Id.* at 10.  The jury is entitled to understand this broader context in order to evaluate Plaintiffs' claims as to the financial impact of P2P file-sharing.  U.S. music revenues outside the Claim Period will already be before the jury, as Plaintiffs' own exhibits include that information. BHN should be permitted the same latitude so that the jury is not provided with one-sided and misleading information.  *E.g.*, Ex. B (2000-2016 revenues).

**2. Live Testimony Of Timothy Frendberg:** Plaintiffs present no persuasive argument for why the Court should depart from the normal practice of trial presentation whereby a key defense witness (and corporate representative), who will testify live in a defendant's case-in-chief, is presented by deposition (if at all) in the plaintiffs' case-in-chief.  *See, e.g.*, *Air Turbine Tech., Inc. v. Atlas Copco AB*, 217 F.R.D. 545, 546 (S.D. Fla. 2003) ("[P]laintiff's argument that Defendants will gain some tactical advantage if Plaintiffs are left to read a deposition of a witness who Defendants th[e]n call in their own case is rejected. This circumstance occurs all the time[.]").

Instead, Plaintiffs seek to circumvent Rule 45 so that they can compel Mr. Frendberg, who they have already deposed at length and admit is "beyond the Court's Rule 45 subpoena power,"[2] to appear live in their case at a time of their choosing, to gain a strategic advantage over BHN in terms of trial presentation.  This is despite the fact that Plaintiffs made a purposeful decision not to list Mr. Frendberg in their Rule 26(a)(1) disclosures as an individual that Plaintiffs intended to rely upon at trial to support their claims, even after amending their disclosures only weeks before the close of discovery.  Ex. C.[3]  *Bowers v. Am. Heart Ass'n, Inc.*, 2008 WL 11407360, at *1 (N.D. Ga. Dec. 2, 2008) (precluding testimony from four witnesses that the defendants failed to identify in Rule 26 disclosures).

Plaintiffs' failure to timely disclose Mr. Frendberg as a necessary witness under Rule 26(a)(1) and subsequent (belated) insistence that they are entitled to nevertheless call him live in their case-in-chief is unduly prejudicial to BHN.  It would allow Plaintiffs to introduce an important BHN corporate witness to the jury through a slanted, adverse examination, and force BHN to present its own witness only through

---

[2]  Because Mr. Frendberg is beyond the reach of Rule 45, and because BHN is not refusing to call him live but instead has listed Mr. Frendberg as a live witness at trial for its case (consistent with BHN's Rule 26(a)(1) disclosures), Plaintiffs' cited cases are inapposite. *See, e.g., Vera v. Berkshire Life Ins. Co. of Am.*, 2021 WL 7542934, at *1-2 (S.D. Fla. June 28, 2021) (holding that witnesses were under Rule 45 subpoena power); *Chiles v. Novartis Pharms. Corp.*, 2013 WL 12157928, at *1 (M.D. Fla. Feb. 15, 2013) (same).

[3]  Although Plaintiffs did "reserve the right" to purportedly "rely" on any persons identified in BHN's disclosures, BHN respectfully submits that this is insufficient to create an exception to Rule 45, particularly when the exception is solely to provide Plaintiffs with a tactical trial advantage to BHN's prejudice.

cross-examination.   BHN would also be unfairly required to anticipate all the testimony it may need from Mr. Frendberg to address issues that may arise later in trial.   On the other hand, Plaintiffs would not be prejudiced if their motion is denied because their Rule 26(a)(1) disclosures concede he is not necessary to prove their case and Plaintiffs can play the deposition testimony they have designated (if deemed relevant and admissible) and cross-examine Mr. Frendberg live in BHN's case.

**3.** **Termination In Response To Allegations Of Infringement:** Plaintiffs' motion seeks to preclude BHN from offering the exact testimony from Dr. Sinnreich the Court has already expressly permitted.   Dkt. 638 at 3 (holding Dr. Sinnreich "may testify that it [termination] would be disproportionate to *allegations of possible infringement*").[4]   Indeed, the only evidence identified for exclusion by Plaintiffs is Dr. Sinnreich's testimony (as described in BHN's witness list).   Because Plaintiffs simply recycle arguments this Court has already considered and rejected, there is no basis for the Court to reconsider its prior ruling.   Contrary to Plaintiffs' suggestion, Dr. Sinnreich does not offer any opinions about when (or even whether) the law requires termination.   Instead, he opines about the impact of termination and the industry's view of termination.   *See, e.g.*, 5/25/22 Hr'g Tr. at 37:7-13 ("My opinion is that the internet in this era has become so central to our civic lives, our cultural lives, our intimate and personal lives and our professional lives, that to prevent somebody from

---

[4]  The Court's ruling was conditioned upon that opinion being set forth in Dr. Sinnreich's report, which it was.  *See, e.g.*, Dkt. 590-2 (Sinnreich Rep.) at 28.

accessing it would have a toll that's far greater than the harm that would be prevented …"); *id.* at 75:7-10 ("the Copyright Alert System … is an indication of what standards and practices in the industry were").  As to the DMCA safe harbor, BHN is not relying upon it (Dkt. 384), so the requirements for that defense, and cases cited by Plaintiffs involving ISPs asserting that defense, are not applicable (and should be excluded as addressed in BHN's pending motion *in limine*).

**4. <u>Actions By Users Other Than The Account Holder</u>:** It is a non-controversial fact that more than one person can use an Internet connection, either with or without authorization, and therefore any allegedly infringing activity that resulted in the notices sent to BHN could have been conducted by any person in the household, or by persons outside a household using the Internet connection (such as guests, neighbors, or a hacker).  Because the jurors in this case will be required to evaluate the reasonableness of the actions BHN took in response to copyright notices, which includes BHN's discussions with its account holders, BHN should be permitted to introduce evidence that individuals other than an account holder accessed an Internet connection.  Specifically, in determining whether BHN's program was a sufficient and reasonable response to copyright notices, the jury should be permitted to take into account the fact that certain activity may have been conducted without the knowledge or consent of the account holder.  That BHN's services agreement provides that the account holder "will be responsible in all respects" for all use of the account does not change the fact that a reasonable juror may consider whether the account holder was a willing participant in any alleged conduct in determining whether BHN should have

terminated that account.   Rule 403 does not support exclusion of this evidence. Average jurors are fully capable of understanding that an Internet account may be used by multiple individuals without any risk of undue confusion, and such evidence is highly probative of the central issues in this case.

5. **Plaintiffs' Treatment Of And Relationships With Artists:** In their *Daubert* motions, Plaintiffs previously sought to exclude testimony concerning Plaintiffs' treatment of artists and relationships with creative labor.   *See* Dkt. 584 at 9-11 (Mr. Coleman); Dkt. 590 at 5-8 (Dr. Sinnreich).   In the context of the *Daubert* against Dr. Sinnreich, the Court ruled that such testimony is admissible if Plaintiffs choose to argue at trial that they are acting to protect the interests of creative labor.   Once Plaintiffs open this door, under the Court's ruling, BHN may present evidence and testimony of the music industry's exploitation of artists.   This is necessary to refute Plaintiffs' narrative that they are driven by altruistic motives that seek to protect the interests of creative labor.   *See, e.g.*, Dkt. 599 at 2-6 (detailing arguments).[5]   Plaintiffs' counsel confirmed at the *Daubert* hearing that they intend to make such arguments to the jury.   5/25/22 Hr'g Tr. at 64:18-66:7, 78:23-85:4.   The artist agreements on BHN's exhibit list are admissible for the same reason.   These agreements are necessary to show the true terms and conditions of Plaintiffs' financial arrangements with artists

---

[5]   Plaintiffs' reliance on *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) is misplaced.   That case: (1) presented different facts and positions; (2) did not implicate the plaintiffs' concession that they intend to argue that they protect the interests of artists through the lawsuit; and (3) did not exclude such testimony but instead reserved judgment.   *See* Dkt. 598 at 8; Dkt. 599 at 6.

and creative labor. BHN would be unfairly prejudiced if it is precluded from offering testimony and evidence that is necessary to put Plaintiffs' misleading narrative in proper perspective for the jury.

6. **Allegations of "Price-Fixing":** The Court has already considered and denied Plaintiffs' motion to exclude Dr. Sinnreich's testimony regarding Plaintiffs' historical pricing tactics. 5/25/22 Hr'g Tr. at 59:19-60:15, 95:8-17; *see also* Dkt. 638 at 2. Plaintiffs present no valid basis for requesting reconsideration. Although Plaintiffs re-argue that no court found that price-fixing occurred, Dr. Sinnreich does not contend otherwise. Rather, in discussing the structural shift in music consumption that gave rise to the growth of a digital music market, Dr. Sinnreich observes (and Plaintiffs do not dispute) that: (1) state attorneys general and the FTC found major record labels engaged in certain pricing tactics; and (2) that strategy was halted as a result of settlements. Dkt. 599 at 13. Moreover, as Dr. Sinnreich has explained, Plaintiffs' own business strategies provide important context for understanding why the music industry fell behind the curve of technological innovation—failures they intend to blame on P2P at trial. Plaintiffs remain free to cross-examine Dr. Sinnreich on this point, but there is no basis for exclusion under Rule 403. Indeed, the sole case cited by Plaintiffs is irrelevant. That non-binding district court case turned on the question of whether an individual plaintiff could be questioned about tax returns he did not prepare, and the court determined it was not relevant to credibility. *Swoope v. CSX Transp., Inc.*, 2015 WL 12564948, at *12 (N.D. Ga. July 29, 2015). Here, Plaintiffs

seek to exclude testimony about their own conduct and the evidence goes not to credibility, but to a fair evaluation of their claimed harm.

### 7. <u>Statements By BHN Subscribers Who Did Not Receive An RIAA Notice</u>:

Plaintiffs improperly attempt to tie their request to exclude comments from BHN customers in response to copyright notices—which go directly to BHN's state of mind and the reasonableness of its approach to notices—to BHN's separate motion seeking to exclude evidence "relating to the number, counting, or tabulation" of non-RIAA notices. There is no parallel between prejudicial tabulations of copyright notices not involved in this case and evidence of subscriber statements in response to investigations of alleged infringement that goes to BHN's state of mind and the reasonableness of its policies.

Plaintiffs claim that the number of notices provides "context"—arguing that they need to tell the jury that BHN received "millions" of notices each time a statement from a single subscriber who received a non-RIAA notice is referenced. *Id.* That claim is nonsensical. The number of notices sent by entities unaffiliated with Plaintiffs has nothing to do with BHN's interactions with individual subscribers. Plaintiffs' anticipated reference to "millions" of notices is designed to prejudicially paint BHN as a "serial infringer" and legitimize Plaintiffs' claims by misleading the jury into believing that there is some importance that they must give to unproven (hearsay) allegations made by non-parties, due only to the sheer volume of the notices.

To the extent Plaintiffs truly believe BHN's subscriber statements "fail[] to paint a complete picture," the appropriate remedy is for Plaintiffs to introduce other

subscriber statements, not make the non-sequitur claim that BHN received "millions" of infringement notices. Importantly, BHN's MIL No. 9 does not seek to broadly preclude Plaintiffs from using subscriber statements related to other rightsholder copyright notices, as Plaintiffs suggest—it seeks to preclude Plaintiffs from offering evidence, testimony, or argument that certain subscriber communications constitute "admissions" of infringement (*i.e.*, establish the ultimate question of infringement). Dkt. 657 at 11. There is no basis for linking individual subscriber statements to the highly prejudicial total number of unadjudicated notices received by BHN. Plaintiffs' request should be denied.

8. <u>**Terminology to Describe Network Monitoring Tools:**</u> Plaintiffs seek to exclude from trial any argument, testimony, or evidence involving terms such as "surveillance" or "spying," but these terms were used in contemporaneous evidence to describe BHN's state of mind and concerns during the relevant time period, and are referenced in documents that Plaintiffs put on their own exhibit list. The terms also accurately describe what Plaintiffs argue that BHN could (or should) have done to track the online activities of its subscribers.[6] Thus, contrary to Plaintiffs' argument, the terms are not misleading or prejudicial, but instead are terms put squarely at issue in the case by Plaintiffs' own trial narrative. Although Plaintiffs argue that their

---

[6] Specifically, Plaintiffs intend to argue that "BHN could have taken additional steps to corroborate allegations of peer-to-peer infringement" through tools that "monitor the volume of peer-to-peer traffic on its network in the aggregate and, in some cases, by subscriber." *See* Mot. 10.

narrative concerns only the identification of the "*type* of network traffic and not its *content*," monitoring a particular subscriber's traffic by type or content is fairly characterized as surveillance of that subscriber. In reality, Plaintiffs seek to sanitize unfavorable testimony and evidence in order to present a misleading picture to the jury, which is not a proper use of Rule 403. *See Action Nissan, Inc. v. Hyundai Motor Am.*, 2021 WL 2633820, at *2 (M.D. Fla. June 25, 2021) (rejecting request to exclude evidence under Rule 403 where party "fail[ed] to state how Plaintiffs' use of a specific term … would be unfairly prejudicial or in what way it would confuse the jury, and … fail[ed] to cite any legal authority in support of prohibition").

**9. <u>Termination Of Subscribers' Internet Service Violates Human Rights</u>:** Plaintiffs again ask the Court to reconsider its prior *Daubert* ruling permitting Dr. Sinnreich to opine on the importance of Internet access and the impact of terminating a subscriber's notice in response to copyright notices (which is recast as "termination is a human rights violation" as a result of Plaintiffs' selective phrasing). The Court has already addressed these arguments and its rulings should not be disturbed.[7]

Plaintiffs have made termination a central issue in this case and have asserted that BHN is liable for willful contributory infringement. BHN must be able to respond to these allegations by contextualizing the impact of a subscriber termination and the

---

[7] During the *Daubert* hearing, BHN's counsel confirmed that Dr. Almeroth would not be offering any opinion about the human rights impact of termination which was referenced in a single footnote and part of a broader opinion about the importance of Internet access (which the Court has permitted). 5/26/22 Hr'g Tr. at 235:11-14.

importance of evaluating infringement allegations and communicating with a subscriber before termination.  It would be unduly prejudicial to allow Plaintiffs to make this argument, but deprive BHN of its ability to meaningfully respond.  *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1072 (11th Cir. 2014) (finding that "even if the evidence was prejudicial, it was not unfairly prejudicial" and noting "probative value is greater as evidence becomes more essential").  If Plaintiffs truly believe this evidence is prejudicial, then they may elect to withdraw the argument that BHN should have taken a more aggressive approach to termination.

**10. Copyright Alert System:** Plaintiffs ask the Court to prohibit BHN from introducing evidence about the Copyright Alert System ("CAS"), a well-publicized joint initiative between major rightsholders (including Plaintiffs) and large ISPs such as Comcast, Verizon, and TWC, which was publicly described as a set of "best practices" for curbing online infringement.  Dkt. 576-33.  BHN intends to introduce evidence that BHN designed its own copyright notice processing system to closely track the CAS protocol because it understood CAS to be the prevailing industry standard at the time, an effective way to reduce online infringement, and an approach that was endorsed by rightsholders.

This evidence goes to BHN's intent, which is relevant to both legal formulations of the contributory infringement standard articulated in the parties' dispositive submissions.  *See* Dkt 649 at 8.  Under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 918-19 (2005), the standard cited by BHN, Plaintiffs must prove that BHN's policy not to terminate customer's Internet access was adopted "with the

object of promoting … infringe[ment of] copyright, as shown by clear expression or other affirmative steps taken to foster infringement."  That BHN modeled its own system after CAS—which did not require termination, but instead favored education—is evidence that BHN did not intend to promote infringement.  And under *Perfect 10 v. Amazon*, 508 F.3d 1146 (9th Cir. 2007), the standard cited by Plaintiffs, Plaintiffs seek to impute intent to cause infringement to BHN from its failure to terminate customers.  Evidence that the CAS protocol (approved by rightsholders) did not culminate in customer termination and that BHN adopted a protocol tracking CAS because it believed it was industry best practice to reduce infringement is essential to rebutting that argument.

Contrary to Plaintiffs' suggestion, BHN does not intend to use this evidence to argue that "there were worse actors" than BHN.  In any event, the cases Plaintiffs cite about "industry custom and practice" are inapposite; nothing in these cases precludes use of industry custom and practice as evidence of BHN's intent to deter infringement.  Nor does it matter that BHN was not a formal participant in CAS.  What matters is that BHN believed that adopting the CAS protocols would result in a reduction of infringement.  To avoid the undue prejudice to BHN that would result from the exclusion of this evidence, BHN should be permitted to present evidence that it modeled its own program after CAS because it reasonably believed CAS was the rightsholder-approved industry standard at the time that was effective at curbing alleged infringement through customer education, not termination.

    **11. <u>Torrent Manager And File Hash Manager Code</u>:** Despite Plaintiffs' claim that MarkMonitor has now "discovered the relevant code," the code made available for review remains incomplete, and code for the Torrent Manager and File Hash Manager programs is still missing.  Ex. D (5/23/22 Castricone Email).  As a result, Dr. Chatterjee will testify—consistent with his previously disclosed opinions and any supplemental opinions to be served pursuant to the Court's Order on BHN's Motion for Sanctions (Dkt. 660)—that source code that is relevant to the operation of MarkMonitor's system is missing.  Dr. Chatterjee's testimony is supported by the record and has already been evaluated by the Court on *Daubert* and permitted.  To the extent Plaintiffs believe it should be challenged, they can do so on cross examination and through their own expert (if she has proper foundation for her opinions and is permitted to testify).  There is no basis to exclude his testimony.

    **12. <u>Description Of Hard Drive Created By MarkMonitor In 2016</u>:** The Court should deny Plaintiffs' request to preclude BHN from describing the hard drive created by MarkMonitor in 2016 as a "recreation" of evidence.  This description conforms with documents and witness testimony.  To the extent Plaintiffs claim prejudice from this description, it is due to Plaintiffs' and MarkMonitor's failure to retain evidence. If the Court permits the hard drive to be introduced into evidence, it is anticipated that Plaintiffs will rely upon it to attempt to establish direct infringement, so it is essential that the jury understand the timing and creation of that evidence.  The prejudice Plaintiffs' claim is not undue—it flows directly from decisions made by Plaintiffs and

MarkMonitor (formerly their vendor and currently Plaintiffs' counsel's litigation consultant).

It is undisputed that MarkMonitor—acting at Plaintiffs' direction—did not retain any original evidence of the song files associated with the copyright notices sent during the 2012-2015 Notice Program. *See* Dkt. 447. In 2016, the RIAA (Plaintiffs' agent) retained MarkMonitor "to search for and attempt to download the [song] files" associated with the hashes that were subject to notices during the Notice Program. Dkt 595-21 at 90. This project was described by RIAA's corporate representative as

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████ Dkt. 447-10 (Marks Tr.) 221:17-222:4. The 2016 hard drive produced in discovery contains only those song files that MarkMonitor was able to find in 2016. In these circumstances, it is accurate for BHN to describe the 2016 hard drive as a "recreation" of evidence. Any perceived prejudice from this term is substantially outweighed by the probative value of the circumstances surrounding the creation of that evidence and the fact that MarkMonitor did not preserve the original evidence that Plaintiffs intended to use to prove direct infringement.

**13. Track-Level Revenues:** The Court should deny Plaintiffs' motion to preclude BHN from offering evidence or argument about Plaintiffs' track-level revenues because Plaintiffs are seeking statutory damages on a track-by-track basis and the Eleventh Circuit pattern instruction for statutory damages directs consideration of

any "revenues that [Plaintiffs] lost because of the infringement."  11th Cir. Pattern Jury Inst. § 9.32.  Plaintiffs seek statutory damages under 17 U.S.C. § 504(c)(1) and are limited to a single award for "each 'work' infringed."  *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1276 (11th Cir. 2015).  Here, Plaintiffs seek the maximum $150,000 for each work-in-suit.  In conducting this work-by-work inquiry, Plaintiffs' revenues for each work-in-suit informs its value and how much revenue Plaintiffs lost (if any) will be relevant to the jury's analysis, as the pattern instructions make clear.  If Plaintiffs made almost no revenue from a particular track, a jury could reasonably conclude that a minimal statutory damages award is appropriate.  Such evidence is not only relevant, but guards against a "windfall recovery."  *Clever Covers, Inc. v. Sw. Fla. Storm Def., LLC*, 554 F. Supp. 2d 1303, 1313 (M.D. Fla. 2008) (considering historical sales figures); *see also Warner Bros. Recs. Inc. v. Charter Commc'ns, Inc.,* 2020 WL 1892506, at *2 (D. Colo. Apr. 16, 2020) (track-level revenue data may provide jury with "understanding of the level of actual losses plaintiffs allegedly incurred").[8] Plaintiffs' complaint that *their own* track-level revenue data is "incomplete" is an argument Plaintiffs may make (if permitted by the Court) about the weight; not a reason to exclude evidence expressly called for by the law governing statutory damages analysis.

---

[8]  It makes no difference that BHN's damages expert, George Strong, did not incorporate such data into his model for calculating Plaintiffs' lost revenue.  These track-level revenues provide a separate measure of value of the works-in-suit the jury may independently use to guide their awards.

**14.   <u>Licensing Agreements With Digital Service Providers</u>:** Plaintiffs'
Licensing Agreements with Digital Service Providers ("DSPs") regarding payment
agreements for online streaming of the works-in-suit are highly relevant.  Plaintiffs are
asking the jury to award $150,000 per work-in-suit and BHN is entitled to show that
Plaintiffs make the same songs available on a catalog-wide basis for a fraction of that
amount, to demonstrate that an award of up to $150,000 would be a windfall to
Plaintiffs.  Plaintiffs' per-work revenues, including from licenses with DSPs, will
enable the jury to evaluate the revenues purportedly lost to the alleged infringement to
reach a fair award, in the event liability is established.[9]

Independently, Plaintiffs' agreements with DSPs are relevant evidence of
Plaintiffs' exploitation of creative labor.  *See* Dkt. 584-2 (Coleman Rep.) at 15-16.  The
Court has already held that BHN may introduce such evidence and argument if
Plaintiffs choose to argue that they "are altruistic, paternalistic entities seeking to
protect the interests of creative labor."  Dkt. 638 at 2.  The terms of Plaintiffs' License
Agreements with DSPs—including how such agreements allocate funds between
creative labor and Plaintiffs—serve to counter Plaintiffs' chosen narrative that they are
fighting to protect creative labor in this case.

---

[9]   Plaintiffs' reference to the Protective Order (Mot. 15 n.11) further undermines their
position that these agreements should not come into evidence—that amendment expressly
contemplates using the licensing agreements at trial and provides special procedures for
allowing the non-party DSPs to request that they not be disclosed publicly "or be disclosed
only in a specified restricted manner at trial."  Dkt. 226 at 9.  BHN will comply with all
applicable procedures.

15. __Revenue From Plaintiffs' Other Litigations__: Plaintiffs seek to prohibit BHN from using the same evidence that Plaintiffs themselves intend to rely upon: evidence of Plaintiffs' other litigations. *See* 5/25/22 Hr'g. Tr. at 144:13-23 (asking expert to compare opinions in *BMG v. Cox* to this case). The Court should reject this one-sided treatment and preclude both parties from introducing evidence of other litigations or verdicts, as BHN has requested. *See* Dkt. 657 at 5-6 (No. 3). But if the Court denies BHN's motion, Plaintiffs certainly should not be permitted to selectively use evidence of their prior litigations to their advantage, while prejudicially denying BHN the ability to respond to such evidence and argument. *See, e.g.*, *Bahr v. NCL (Bahamas) Ltd.*, 2021 WL 4898218, at *7 (S.D. Fla. Oct. 20, 2021) (where Plaintiff put its finances at issue, "both parties will be permitted to submit evidence" about Plaintiff's finances). For example, if Plaintiffs are permitted (over BHN's objection) to tell the jury about the $1 billion verdict they obtained in *Sony v. Cox*, or that "any recovery [here] would be shared with Plaintiffs' artists and songwriters," Dkt. 584 at 10; 6/1/22 Hr'g. Tr. at 59:18-19 (invoking amount), then BHN should be allowed to counter this self-serving narrative with evidence that Plaintiffs earned revenues from similar litigations that they did *not* meaningfully "share" with artists. *See Key W. Ass'n of Realtors, Inc. v. Allen*, 2013 WL 12094688, at *7 (S.D. Fla. May 22, 2013) ("the conduct and attitude of the parties" relevant to statutory damages); 5/25/22 Hr'g Tr. at 95:18-22 (such narrative opens the door).[10]

---

[10] Plaintiffs' cases are inapposite. *See N.A.S. v. Morada-Haute Furniture Boutique LLC*, 2022 WL 845013, at *5 (S.D. Fla. Mar. 21, 2022) (nonmoving party did not oppose exclusion

16. **<u>"Deterrence Multiplier"</u>:** Plaintiffs seek to preclude Mr. Strong from referencing decisions of other courts on damages or identifying an amount as an "appropriate level" of statutory damages.  This is a strawman argument, because these are two things Mr. Strong will not do.  Plaintiffs' real complaint appears to be that Mr. Strong offers an opinion about a "deterrence multiplier."  That opinion does not depend on decisions in other cases nor does it involve opining on a specific amount of damages.

Mr. Strong's use of a "deterrence multiplier" addresses a factor in the statutory damages analysis: "deterrence of future infringement."  11th Cir. Pattern Jury Inst. § 9.32.  As Mr. Strong explained in his report, support for his opinion is based on "his years of "experience as a damages expert" that "it is not unusual to have such a multiplier." Dkt. 581-2 (Strong Rep.) at ¶ 118.  At trial, Mr. Strong will not specifically identify any decisions or awards from other courts.  Plaintiffs offer no argument that his use of such a multiplier is unsound, nor is a motion *in limine* the place for such a challenge.[11]  The outcome Plaintiffs seek here, through this motion, is a universe in which the jury has no guideposts whatsoever about how to evaluate deterrence—a clear recipe for error.

---

of other litigations); *Irving v. Dish Network L.L.C.*, 2013 WL 12317058, at \*3 (N.D. Ga. July 22, 2013) (excluding evidence of other lawsuits because there was no evidence "the lawsuits were fraudulent … [or made] for extort[ion]").

[11]  Plaintiffs' complaint that they "cannot effectively cross-examine" Mr. Strong without "introducing" the case law is baseless.  Experts rely on legal frameworks all the time for their opinions.  *See* Dkt. 601 at 5-6 (citing cases).

Moreover, such testimony does not "usurp" the Court's role or suggest an appropriate damages award; it merely provides the jury with context on how to assess deterrence of future infringement.  To the extent the Court determines the jury's evaluation of a "deterrence multiplier" presents a legal question, the Court may issue a jury instruction that the jury may (but is not required to) use such a multiplier as a guidepost to ensure that the jury understands how it must decide the ultimate question of what, if any, amount to award.  The use of guideposts for juries is routine.  *See, e.g.*, *Marketquest Grp., Inc. v. BIC Corp.*, 2018 WL 1756116, at *3 (S.D. Cal. Apr. 12, 2018) (expert testimony to "assist the jury in understanding the *Sleekcraft* factors" is "entirely proper and relevant").  Moreover, there is no dispute as to the accuracy of Mr. Strong's guideposts.  Even Plaintiffs do not dispute that courts in this District recognize that a two- to three-times multiplier is generally appropriate.  *See* Dkt. 601 at 8.  There is thus no reason to exclude this testimony.

17. **MovieLabs Document:** Plaintiffs' two arguments that the "MovieLabs Memo" ("Memo") should be excluded both fail.  First, the Memo does not purport to set out "legal and evidentiary standards."  Dkt. 656 at 1.  It simply ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Dkt. 579-4 (Memo) at ML00001, -04, -09.  None of these statements set forth any legal standard, and therefore they do not "invade[] the province of the Court."  Dkt. 656 at 1.  And even if that were not the case, BHN does not use the Memo to provide a

statement of the law.   BHN's expert, Dr. Chatterjee, relies on the Memo for █

███████████████████████████████████████████.  Dkt. 585-2 (Chatterjee Rep.) ¶¶ 342-

43.  This information is essential because MarkMonitor used MovieLabs' terms when

selling services to Plaintiffs and Plaintiffs' expert, Ms. Frederiksen-Cross, uses those

same terms to describe MarkMonitor's services.  Ex. E (Bahun Tr.) 57:21-24; 5/25/22

Hr'g Tr. at 169:24-170:13.  Dr. Chatterjee also uses the Memo to show that ████████

██████████████████████████████████████.  Dkt. 585-2 (Chatterjee

Rep.) ¶¶ 342-43.  Likewise, Ms. Frederiksen-Cross will be cross-examined on th██████

███████████████████████████████████████.  *See, e.g.*, 5/25/22

Hr'g Tr. at 170:16-173:7 (*Daubert* cross-exam).

Second, Plaintiffs argue that the Memo could not set out an industry standard,

and therefore is not probative of such standards, because the Memo was "a

confidential internal document" and ███████████   Dkt. 656 at 2.  But Plaintiffs'

argument rests on a false premise, as Plaintiffs concede that the Memo ███████████

█████████████████████████████████████████████.

*Id.*  Regardless, these are proper points for cross examination regarding whether the

jury should give the Memo weight, and not a reason to exclude it.   More

fundamentally, Plaintiffs' supposition that BHN will argue that the Memo sets out an

industry standard is unsupported.  *Id.* (not providing support for Plaintiffs' assertion).

As described above, the Memo will be used to articulate the services MarkMonitor

provided to Plaintiffs and ████████████████████████████████████

█and higher services offered by MarkMonitor for a slightly higher charge.

Dated: July 15, 2022

Respectfully submitted,

*/s/ Andrew H. Schapiro*

Charles K. Verhoeven (*pro hac vice*)
David Eiseman (*pro hac vice*)
Linda Brewer (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
charlesverhoeven@quinnemanuel.com
davideiseman@quinnemanuel.com
lindabrewer@quinnemanuel.com

Andrew H. Schapiro (*pro hac vice*)
Nathan A. Hamstra (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400
andrewschapiro@quinnemanuel.com
nathanhamstra@quinnemanuel.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
Tel: (415) 591-1000
jgolinveaux@winston.com

Todd Anten (*pro hac vice*)
Jessica Rose (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
toddanten@quinnemanuel.com
jessicarose@quinnemanuel.com

Michael S. Elkin (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
melkin@winston.com

William J. Schifino, Jr.
Florida Bar No. 564338
GUNSTER, YOAKLEY &
STEWART, P.A.
401 E. Jackson Street, Suite 1500
Tampa, FL 33602
Tel: (813) 228-9080
wschifino@gunster.com

*Counsel for Bright House Networks, LLC*

21

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 15, 2022, I caused a true and correct copy of the foregoing and all supporting materials thereto to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Andrew H. Schapiro*
Andrew H. Schapiro