1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                      TAMPA DIVISION

3

4  UMG RECORDINGS, INC., et al.,   )
                                   )
5              Plaintiffs,         )
                                   )
6                                  )  CASE NO.
          VS.                      )  8:19-CV-00710-MSS-TGW
7                                  )
                                   )
8  BRIGHT HOUSE NETWORKS, LLC.,    )
                                   )
9              Defendant.          )

10

11

12  _____

13              MISCELLANEOUS HEARING (REDACTED)
                 *(taken via Zoom videoconference)*

14          BEFORE THE HONORABLE MARY S. SCRIVEN
                UNITED STATES DISTRICT JUDGE
15
                       JULY 12, 2022
16                      11:01 A.M.
                      TAMPA, FLORIDA
17  _____

18

19

20

21         Proceedings transcribed via courtroom digital audio
    recording by transcriptionist using computer-aided
22  transcription.
    _____
23
                 DAVID J. COLLIER, RMR, CRR
24              FEDERAL OFFICIAL COURT REPORTER
              801 NORTH FLORIDA AVENUE, 7TH FLOOR
25                 TAMPA, FLORIDA  33602

1  **APPEARANCES:**

2

3  **FOR THE PLAINTIFFS:**

4

5          *Matthew J. Oppenheim*
           *Jeffrey M. Gould*
6          *Alex Kaplan*
           Oppenheim & Zebrak, LLP
7          4530 Wisconsin Avenue, NW
           5th Floor
8          Washington, D.C.  20016
           (202) 450-3958

9

10         *David Christopher Banker*
           *Bryan D. Hull*
11         Bush Ross, P.A.
           1801 North Highland Avenue
12         Tampa, Florida  33602-2656
           (813) 224-9255

13

14         *Jonathan M. Sperling*
           Covington & Burling, LLP
15         620 Eighth Avenue, 43rd Floor
           New York, New York  10018-1405
16         (212) 841-1000

17

18         *Neema T. Sahni*
           Covington & Burling, LLP
19         1999 Avenue of the Stars, Suite 3500
           Los Angeles, California  90067-4343
20         (424) 332-4800

21

22

23

24

25

1    **FOR THE DEFENDANTS:**

2            *Charles K. Verhoeven*
             *Linda Brewer*
3            *Gracie Chang*
             Quinn Emanuel Urquhart & Sullivan, LLP
4            50 California Street, 22nd Floor
             San Francisco, California  94111
5            (415) 875-6600

6
             *Justine Young*
7            Quinn Emanuel Urquhart & Sullivan, LLP
             51 Madison Avenue, 22nd Floor
8            New York, New York  10010
             (270) 227-2996

9
10           *Andrew H. Schapiro*
             *Nathan Hamstra*
11           Quinn Emanuel Urquhart & Sullivan, LLP
             191 Norther Upper Wacker Drive, Suite 2700
12           Chicago, Illinois  60606
             (312) 705-7400

13
14           *John A. Schifino*
             Gunster, Yoakley & Stewart, PA
15           401 East Jackson Street, Suite 2500
             Tampa, Florida  33602-5226
16           (813) 228-9080

17

18

19

20

21

22

23

24

25

```
 1                     P R O C E E D I N G S
 2                     – – – o0o – – –
 3          THE COURT:  Good morning.  Call the case, please.
 4          COURTROOM DEPUTY:  Yes, Your Honor.
 5          Case Number 8:19-CV-710-MSS-TGW, UMG Recordings, Inc.
 6   et al. versus Bright House Networks, LLC.
 7          Counsel, please state your appearances, please.
 8          MR. OPPENHEIM:  Good morning, Your Honor.  This is
 9   Matt Oppenheim on behalf of the plaintiffs.  With me today is
10   my colleague Jeff Gould and Alex Kaplan.  Also on the line
11   today is counsel from Covington & Burling that includes
12   Jonathan Sperling, Neema Sahni and others, Your Honor.
13          THE COURT:  All right.  And you will, Mr. Oppenheim,
14   be principally speaking on behalf of the plaintiffs?
15          MR. OPPENHEIM:  I will, Your Honor.
16          THE COURT:  And for the defense?
17          MR. VERHOEVEN:  Good morning, Your Honor.  This is
18   Charles Verhoeven.  With me are my partners Andrew Schapiro and
19   Linda Brewer, as well as several other attorneys that will be
20   part of our trial team, and Ms. Brewer is going to be
21   presenting argument today.
22          THE COURT:  All right.  And are there any client
23   representatives present or is it all just lawyers?
24          MR. OPPENHEIM:  Plaintiffs do not have any client
25   representatives on the line today.
```

 1          MR. VERHOEVEN:  And I don't think we do either,

 2    Linda; is that right?

 3          MS. BREWER:  I don't see any.  No, I don't believe we

 4    do.

 5          THE COURT:  All right.  I called this hearing because

 6    I am working on the sanctions motions principally and have

 7    generally concluded that I do not intend to impose any

 8    sanctions against either party.  I don't believe the plaintiffs

 9    have shown any prejudice, their principal contentions being

10    that they wish they could delve into nonexistent e-mails to

11    draw some sort of inference about what might be there, or they

12    might be able to assess what notice Bright House had of

13    whatever disclosures plaintiffs claim to have made to

14    Bright House.  As to the former, I don't believe that we can

15    discern that there might have been bad e-mails because e-mails

16    didn't get preserved; and as to the notices, I think plaintiffs

17    are in just as good a position to know what they sent and to

18    whom they sent it, and to the extent they didn't preserve it,

19    then both parties are in the same position.

20          With respect to Bright House, I don't believe

21    Bright House can rely on the hold letter in the RightsCorp case

22    without disclosing its contents under the sort of notion of the

23    sword and shield doctrine, and so it can't say we did anything

24    valuable in response to the hold letter, and so I don't think

25    there can be any argument that Bright House preserved what it

1  was supposed to preserve.

2        In terms of the source code information that is at

3  issue, I guess I want to know a little bit more about what,

4  if any, control plaintiffs had over MarkMonitor in connection

5  with its search for these documents, because barring any

6  control, I'm not sure I can sanction the plaintiffs for

7  MarkMonitor's failure to look for documents it should have

8  looked for.

9        Judge Wilson made it clear that he didn't want to see

10  a motion to compel in response to a response that we don't have

11  anything, and so I don't really fault Bright House for not

12  moving to compel over that directive from the magistrate judge,

13  but then I'm kind of left -- if I decide that plaintiffs didn't

14  have any control over MarkMonitor and I decide that MarkMonitor

15  didn't disclose what it was supposed to disclose within the

16  discovery period and within the expert discovery period, then

17  we're left with a what do we do about it, because as I

18  understand it, the plaintiff -- the plaintiffs want to argue

19  that they have source code available to assist them in

20  validating their confirmation process, and the defendants want

21  to be able -- the defendant wants to be able to say there is no

22  real way to test this because we don't have any source code

23  original material, and if the defendant makes that argument,

24  I'm not sure how the plaintiff responds without producing and

25  using the source code, and if the defendant isn't able to use

1    the source code to counter that argument -- I'm sorry.  If the

2    plaintiff isn't able to use the source code to counter that

3    argument, should I allow the defense to make the argument.

4    But then if I don't allow the defense to make the argument, am

5    I cutting off a defensive argument.

6            And I also want to know -- because I believe it is

7    the case that the judge in the *Charter* case rejected the

8    sanctions motion, and I would like to know if after the

9    rejection of the sanctions motion the source code was actually

10   produced and reviewed by Charter, which is sort of

11   Bright House, and how we aren't now fine to review that

12   material in connection with this case without any additional

13   pretrial litigation.

14           So that's where I am.  I'm principally calling about

15   the source code information, and I guess since it's

16   Bright House's motion with respect to it, Bright House should

17   first be allowed to tell me what information it has, if any,

18   that UMG or the plaintiffs control MarkMonitor in the search

19   for this material and somehow should be responsible for

20   MarkMonitor's abject failure to locate, identify and produce

21   the material in a timely way.

22           MS. BREWER:  Certainly.  May I proceed?  This is

23   Linda Brewer for Bright House, Your Honor.

24           THE COURT:  Yes.

25           MS. BREWER:  And, with your permission, I have a few

1    slides to display to go with argument.

2              THE COURT:  That's fine.

3              MS. BREWER:  Okay.  Mr. Figuera, could you pull up

4    Claim Number 1.

5              So we start with the premise, Your Honor, that under

6    Rule 26 plaintiffs were obligated to and did disclose the

7    witnesses that they would rely upon to prove up their claims in

8    this case.

9              If you could turn to the next slide.

10             This is an excerpt of plaintiffs' Rule 26

11   disclosures.  It clearly discloses that MarkMonitor is the

12   entity and the sole entity the plaintiffs intend to rely upon

13   in this case to prove their direct infringement claims that are

14   the predicate basis to the contrib -- to the secondary

15   liability claims asserted against Bright House.  I think that

16   there's no question in that point.

17             In addition to serving in the role that MarkMonitor

18   did -- and Your Honor reviewed the evidence in the context of

19   the spoliation motions that there is a master statement of work

20   that was put in place by the RIAA with MarkMonitor, and

21   MarkMonitor worked as the agent to send notices during the

22   notice time period.

23             The additional wrinkle in this case -- if you could

24   go to the next slide, please -- is that in addition to

25   MarkMonitor serving in that agency role during the claim

1    period, MarkMonitor was then retained by outside litigation

2    counsel for plaintiffs prior to the initiation of this lawsuit.

3              This is the letter in which -- displayed on the

4    slide, in which MarkMonitor was retained by plaintiffs'

5    counsel.  It clearly indicates that MarkMonitor is to assist

6    with litigation support.  MarkMonitor is in fact paid for this

7    work.  This agreement that was entered into and subsequently

8    amended to specifically include the Bright House litigation

9    obligated MarkMonitor to support the litigation and provide

10   evidence in support of the litigation, it put MarkMonitor in

11   privity not just with plaintiffs but with plaintiffs' counsel,

12   and it paid MarkMonitor to do so.

13             On that record, we believe that there is clearly an

14   agency relationship, not just between MarkMonitor and the

15   plaintiffs, but between plaintiffs' counsel, and an important

16   wrinkle to that is that this agency relationship, this

17   litigation consultant relationship that was created in the 2018

18   time period before the litigation was filed against

19   Bright House is what plaintiffs' counsel have used to cloak all

20   of their communications with MarkMonitor related to discovery,

21   related to searches for evidence, related to the exhaustion of

22   search efforts, all of that work that was done to produce

23   evidence that plaintiffs intend to rely upon, by their own

24   admission, as the predicate basis for this lawsuit, all of that

25   was done between plaintiffs' litigation counsel and MarkMonitor

```
 1   and is cloaked in privilege and work product protections that
 2   we are not entitled to see.
 3              If you could go to the next --
 4              THE COURT:  What is the exhibit number for the
 5   document you just showed the Court?
 6              MS. BREWER:  So the exhibit number -- this is --
 7   I have it as 471-2.  I believe that it is --
 8              THE COURT:  Exhibit A?
 9              MS. BREWER:  Yes.
10              THE COURT:  All right.  Go ahead.
11              MS. BREWER:  Yes, it's Exhibit A to the refiled
12   document at docket 591.
13              And so we believe this is an unusual situation, it's
14   not one that's typically presented.  Typically you could
15   disclose on your Rule 26 disclosures that you have a
16   third-party witness that might support your claims, right,
17   that's a fact witness.  You might also decide as litigation
18   counsel to have experts that you retain.  Those experts have
19   their own disclosure obligations.
20              This is an unusual situation where a fact third-party
21   was converted to a litigation consultant in privity with
22   plaintiffs' counsel, where plaintiffs' counsel had full control
23   by token of that agreement over what MarkMonitor did in this
24   litigation, and in fact consistently, consistently through this
25   litigation, you saw plaintiffs' counsel hand-in-hand with
```

```
1   MarkMonitor.  Plaintiffs' counsel intervened in every briefing
2   with respect to motions to compel that were filed against
3   MarkMonitor.  Plaintiffs' counsel participated in every hearing
4   related to MarkMonitor, in Charter as well as in Bright House.
5   Plaintiffs' counsel participated in the depositions of
6   MarkMonitor's witnesses and lodged objections, including
7   privilege objections, to questions asked by Bright House's
8   attorneys.  There can be no question that plaintiffs' counsel
9   and plaintiffs are the sponsor of the evidence that MarkMonitor
10  is providing in this litigation.  In fact, in both the Charter
11  and the Bright House cases we often saw them producing evidence
12  through -- so instead of getting evidence from MarkMonitor,
13  large bodies of evidence were produced through plaintiffs'
14  counsel instead of MarkMonitor.
15          THE COURT:  Large volumes of MarkMonitor documents?
16          MS. BREWER:  Yes.  So, for example, the evidence
17  packages or the like, we would in both litigations get that
18  through plaintiffs' counsel produced on behalf of MarkMonitor.
19          Mr. Figuera, if you could pull up -- this isn't on
20  the fly, but if you could pull up plaintiffs' response to
21  Bright House's motion to compel in the MarkMonitor action.
22          So as Your Honor is aware, as Your Honor has read the
23  transcript of the hearing before Judge Wilson, there was a
24  motion to compel that was filed against MarkMonitor by
25  Bright House, and if you could turn to page -- so this is
```

1    the -- what we see on this page is the plaintiffs' brief that

2    plaintiffs filed intervening in that motion to compel, and if

3    you turn to page 11, the bottom paragraph of this document,

4    which is again plaintiffs' own brief, it says Bright House is

5    seeking confidential proprietary information owned by

6    plaintiffs, and then the case that's cited there refers to a

7    case where the protected interest is proprietary software code.

8          Plaintiffs go on to say that the master agreement

9    between MarkMonitor and the RIAA assigned ownership to RIAA of

10   all evidence, which then inures -- if you could go to the next

11   page -- inures to the benefit of its member companies, which

12   are the plaintiffs.

13         Again, on this record I think there can be no dispute

14   that plaintiffs have control over, act in privity with

15   MarkMonitor with respect to the evidence that plaintiffs

16   intended to rely upon in this case.

17         THE COURT:  In regard to the means by which the

18   plaintiff worked with or corresponded with MarkMonitor to

19   ensure MarkMonitor would produce the material that was

20   requested, does the defense have any of that communication?

21         MS. BREWER:  No, Your Honor.

22         THE COURT:  And can you take the share screen down so

23   I can see you back again.

24         MS. BREWER:  Take the share screen down.  Thank you.

25         No, Your Honor.  So that was -- and I think you have

1    really honed in on where the prejudice stems from with respect

2    to this late disclosure.  So it was not -- and this also feeds

3    into what I was saying.  It was not MarkMonitor who brought to

4    Bright House's counsel's attention that this source code had

5    allegedly been detected, it was plaintiffs' counsel.

6    Plaintiffs' counsel, a day after learning that we were going to

7    file a motion for spoliation against plaintiffs which would

8    include as a basis MarkMonitor's loss of evidence, including

9    the source code, the very next day we received an e-mail from

10   plaintiffs' counsel saying, guess what --

11           THE COURT:  Well, the implications of that allegation

12   are horrible, and I'm urging caution in making allegations that

13   counsel not only lost material through its agent MarkMonitor,

14   but that counsel secreted evidence from the plaintiffs and

15   misrepresented to the Court that it had only been recently

16   discovered, and if you don't have any evidence of that other

17   than supposition and circumstance, you have to be really

18   cautious when you cast those kinds of aspersions against

19   counsel and ask the Court to respond in a way that accepts that

20   as truth.

21           MS. BREWER:  Understood.

22           THE COURT:  Do you have any evidence other than your

23   suspicion that this disclosure was anything other than

24   coincidental?

25           MS. BREWER:  No, Your Honor, and I take your

1    admonition to heart.  We just have the timeline and we're just

2    trying to lay out the facts, Your Honor, of the timing of it.

3                THE COURT:  All right.

4                MS. BREWER:  To Your Honor's point, when we asked for

5    more information so that we could understand the coincidence,

6    so that we could understand how this could have happened, we

7    were foreclosed from receiving any further information.  We

8    were told at the time that we would get the information from

9    declarations from MarkMonitor.  A few days later we received

10   those declarations.  They provided very little information that

11   we felt satisfied us with respect to how this could have

12   occurred.

13               THE COURT:  All right.  Mr. Oppenheim, let me hear

14   why it is that with this agreement in place between plaintiffs

15   and MarkMonitor, hiring MarkMonitor as your sort of consulting

16   partner in discovery and such, you're not responsible for their

17   failure to locate this locateable source code which now comes

18   to everyone's attention after the closure of all meaningful

19   discovery.

20               MR. OPPENHEIM:  Yes, Your Honor.  Thank you for the

21   opportunity to respond.

22               The plaintiffs have never had any right, access,

23   possession, custody or control over MarkMonitor's source code,

24   never.

25               THE COURT:  In your memo that Ms. Brewer just read

from in which the plaintiffs claim sort of proprietary
ownership of materials, you would exclude from that ownership
source code?  And is there an express exclusion of source code
in that litany?

MR. OPPENHEIM:  So, Your Honor, absolutely.
So Ms. Brewer selectively quoted from various documents and
didn't give you the full picture, so let me do that.

First she quoted from the Master Services Agreement
between the plaintiffs and MarkMonitor.  That Master Services
Agreement contains a provision that provides that MarkMonitor
reserves all rights and control of its source code, Your Honor.
It says, quote, all rights in and control over MarkMonitor's
technology, including software, quote, remain exclusively with
MarkMonitor.  And that's, I believe, paragraphs 8.1 and 8.2 of
the agreement.

Secondly, the consulting agreement that Ms. Brewer
used as a basis to claim that we're -- that we are in cahoots
on hiding the software with MarkMonitor actually expressly sets
forth three things that Mark -- the consulting agreement
covers.  One, that MarkMonitor will provide data, not code,
data, that is notice data, evidence packages, the like; two,
that MarkMonitor will provide affidavits in support of that
evidence; and three, that MarkMonitor will provide court or
deposition appearances as needed.  And that's a -- you know, so
we entered into an agreement to make sure that this outside

```
 1   third-party would continue, notwithstanding the significant
 2   investment of time it was going to take for them to provide the
 3   information needed in this case, that we would reimburse them
 4   for their time in doing these things.
 5           There's nothing in that consultancy agreement that
 6   says anything about source code, nothing in that consultancy
 7   agreement that creates any kind of general agency, as
 8   Ms. Brewer has suggested.  The reference in the brief that
 9   Ms. Brewer referred to is a reference to data.  And what's
10   really critical --
11           THE COURT:  So let me ask you this question.
12           The communication that UMG had with MarkMonitor in
13   which MarkMonitor first disclosed that it had located the
14   source code that is now at issue and then the subsequent source
15   code, does plaintiff claim any sort of privilege over that
16   communication?
17           MR. OPPENHEIM:  I don't know that there's any
18   privilege to claim.
19           THE COURT:  Yes or no, Mr. Oppenheim.
20           MR. OPPENHEIM:  Do we assert a privilege?  No,
21   because we immediately disclosed it, Your Honor.  If I may,
22   I was present and involved in it.  Nobody was more frustrated
23   at MarkMonitor's --
24           THE COURT:  I just -- I want to know if that
25   communication that you had is something that you're willing to
```

1    produce to the defendant, when MarkMonitor first said, oh, my

2    gosh, we just looked at this defunct server and found the

3    source code.  Is that communication available to be shown to

4    the defendant?

5            MR. OPPENHEIM:  It was a telephone call, Your Honor.

6    It happened on January 5th.  It was a phone call that

7    Jeff Gould, my partner, received.  He immediately -- he was

8    told that an engineer in Lithuania had found this small piece

9    of code in an unexpected location, and literally, Your Honor,

10   within hours of receiving that phone call we sent an e-mail,

11   this law firm sent an e-mail to counsel for Bright House

12   informing them that this piece of code had been found, so we

13   told them not only the same day, but within hours, and that a

14   piece of code could be made available for their inspection.

15           A week later, or actually eight days later,

16   MarkMonitor then clarified that they too were willing to make

17   it available, because originally the offer for inspection had

18   come from plaintiffs, and so MarkMonitor wanted to make sure

19   that they made it clear.  Now, this was, what, seven months

20   before trial.  So on January 13th MarkMonitor said, should you

21   or your experts wish to inspect the source code, MarkMonitor

22   has already prepared a computer for your immediate review at

23   its secure facility in Boise.

24           THE COURT:  Is there any other correspondence that

25   confirms that discovery other than that telephone call between

```
 1   plaintiff and MarkMonitor?

 2            MR. OPPENHEIM:  I do not believe so, Your Honor.

 3   There -- in the declaration --

 4            THE COURT:  No e-mails, no letters, no any discussion

 5   between plaintiff and MarkMonitor concerning this late

 6   disclosure, like, guys, how did this happen, were you out to

 7   lunch, what's your problem, you ought to pay us?  What was the

 8   correspondence?

 9            MR. OPPENHEIM:  So, Your Honor, in the declaration

10   attached to our opposition, the declaration of Jeff Gould, in

11   paragraph 4 he lays out exactly what happened.  I do not

12   believe that there's any e-mail correspondence about it.  It

13   was entirely phone calls.  And we didn't wait for follow-up

14   from MarkMonitor about the source code.  Immediately upon

15   learning that they had found it, we communicated that to

16   counsel for Bright House.

17            THE COURT:  This is a January discovery?

18            MR. OPPENHEIM:  This was in January.  And,

19   Your Honor, I could go through the timeline, there were

20   communications constantly from January, February, March, April

21   about the availability of the code to be reviewed.

22            THE COURT:  I know the point you're trying to make.

23   I am trying to get to a different point, and so the whole

24   business about they should have looked at it before now is

25   another issue.  I am just trying to understand how there is no
```

1  documentation around this very late discovery that would

2  elucidate the Court and the issues around it so that I can

3  understand how MarkMonitor just missed this and then apparently

4  found some more TorrentManager code in February.

5          MR. OPPENHEIM:  Yes, Your Honor.  These were -- these

6  were all communications by telephone calls.  It's all laid out

7  in the declaration.

8          And to get to the other question you asked earlier,

9  both counsel for Bright House and their expert have already

10  reviewed this code.  They did so, I believe, on January 7th and

11  8th.

12         MS. BREWER:  Can I correct that?

13         THE COURT:  Yes.

14         MR. OPPENHEIM:  I'm sorry.  I said January.  I meant

15  June.  Apologies, Your Honor.

16         THE COURT:  So they did that after the ruling in

17  *Charter*?

18         MR. OPPENHEIM:  That's correct.  Their counsel may

19  have looked at it earlier, but their expert, Mr. Chatterjee --

20  excuse me, Dr. Chatterjee, I believe, reviewed it on June 7th

21  and 8th.  Now, what I'm sure Bright House will tell you is, oh,

22  he reviewed it in his capacity as an expert in the *Charter*

23  case, but all of the MarkMonitor discovery in this case has

24  been subject to a cross-use agreement, that is, Your Honor,

25  rather than do the exact same discovery twice for the two

1   cases, there was an agreement that it would be done once and it

2   would apply to both cases.  And what Bright House has said is,

3   we're not going to extend that agreement for purposes of this

4   one piece, so we're reviewing this one -- this source code now

5   exclusively for *Charter,* so that they can -- they want to then

6   be able to take the stand and say that they don't -- they

7   didn't have it for purposes of this case and because of that

8   the MarkMonitor system is fallible.

9          Your Honor, so the two key points here are -- one is

10  plaintiffs had no control of this, we shouldn't be held

11  responsible for it, and we acted responsibly when we became

12  aware of it.  But, secondly, the code should either be in

13  because we should get to the truth on this case or it should be

14  out for good and they can't say that they didn't have it and

15  they didn't review it and that somehow it undermined their

16  ability to assess the credibility of MarkMonitor's system.

17  What they want to do is kind of have it both ways, they want to

18  be able to say that they didn't have it, they didn't review it,

19  and so the MarkMonitor system doesn't work, but that's not

20  truthful, Your Honor.

21          THE COURT:  Ms. Brewer.

22          MS. BREWER:  So, as Your Honor recalls, this was an

23  issue that came up in the Daubert hearing, so -- specifically

24  during the direct examination of Ms. Frederiksen-Cross,

25  plaintiffs' counsel attempted to elicit opinions from

1    Ms. Frederiksen-Cross regarding this source code module that

2    was disclosed after the close of discovery, specifically the

3    TorrentManager and the FileHashManager.  Your Honor stopped the

4    exam at that point and asked Mr. Gould if that opinion had been

5    disclosed in a supplemental report served on Bright House.

6    Mr. Gould and Ms. Frederiksen-Cross confirmed it had not.  At

7    that point there was a clear admonition from the Court that

8    that would not be permitted in the case and that no late

9    discovery would be tolerated.

10          The very next day, during the examination of

11   Dr. Chatterjee by Mr. Gould, which is Bright House's technical

12   expert, Mr. Gould attempted again to elicit admissions from

13   Dr. Chatterjee, or to challenge his opinion, once again using

14   this late-disclosed source code.  In our view those two

15   attempts to rely upon the source code are in and of themselves

16   violations of Rule 37(c).

17          As Your Honor knows --

18          THE COURT:  Let me ask you this, Ms. Brewer.  You're

19   in a case completely out of the context of this case, and there

20   is a substantial question about whether, let's say, the

21   officer's gun fired before the decedent's gun fired.  The

22   plaintiffs are saying, no, the officer fired first; the officer

23   is saying, no, the decedent fired first; and all throughout the

24   case it's hotly contested about who fired first, and there's no

25   evidence that anyone has been able to discover as to the answer

1    to that question, and all the neighboring video cameras have

2    been scoured, no one can find any video that would answer that

3    question.  And then, two weeks before trial, a gas station

4    nearby that had been subpoenaed before suddenly realizes they

5    had not looked at camera number 2, and they look at camera

6    number 2 and, lo and behold, camera number 2 clearly shows that

7    the decedent fired first and not the officer.

8              MS. BREWER:  Um-hum.

9              THE COURT:  Does the Court allow the case to go to

10   trial on the theory that the officer fired first because the

11   decedent was denied that discovery up through a week or so

12   before trial, and does the Court allow the decedent

13   representative to argue that the officer fired first and there

14   is no evidence of who fired first, contrary to what we now

15   know, because we now have this late-discovered material from

16   the third-party who had previously been directed to provide the

17   discovery?

18             MS. BREWER:  So I'd like to respond to that in

19   multiple ways.  First, to directly answer your question,

20   I think in the instance -- in the hypothetical that Your Honor

21   has described, I think that the Court and the litigants would

22   need to take a very close look at the reasons why that evidence

23   wasn't produced before, and I would assume that the litigants

24   would have done what Bright House in fact did here, which was

25   to file a motion to exclude the evidence; but in the

1  alternative, which is what we did here, in the alternative, to

2  ask for relief from the Court schedule to enable us to take the

3  discovery that we need and that we had asked for but were

4  foreclosed from having during the discovery period.

5          We did do that in this instance.  We did not say

6  we're turning a blind eye to this.  Our correspondence with

7  plaintiffs, as favorably as they want to spin it for

8  themselves, was always very clear about that.  They said we

9  respect the Court's scheduling order, we respect the Court's

10  docket, we understand loud and clear from the Court's

11  scheduling order that the Court needs summary judgment motions

12  five months ahead of the trial date.  We are now at that date.

13  We are concerned as to how we will accommodate this at this

14  juncture.  We need to seek relief because we don't want to

15  engage in self-help at this point in time.

16          What also complicated the story then, which I believe

17  Mr. Oppenheim conceded, is that the original disclosure that

18  was provided to us by plaintiffs and then seconded by

19  MarkMonitor in early January ended up to be inaccurate.  We

20  were told to hurry up and inspect the code, and then we were

21  told in February that a mistake had been made and that there

22  was potentially additional code made available, then that

23  disclosure was corrected again.

24          THE COURT:  So in answer to my hypothetical, your

25  response is if you're going to allow this new camera evidence

1  to be admitted into evidence, the representative of the estate

2  of the decedent should have an additional period of time to

3  evaluate this new video, have its experts evaluate the new

4  video in order to defend against the video, or concede its

5  accuracy?

6          MS. BREWER:  That -- yes.  I think in that

7  hypothetical that that would be a reasonable argument to be

8  made and that is the argument that we made here as of February.

9          Now, I would like to address Your Honor's other

10 question.  So we did recognize that as this was unfolding in

11 Bright House, in very, you know, kind of close proximity to the

12 Daubert hearing that we held before Your Honor, we received a

13 ruling from the *Charter* Court where the *Charter* Court said, my

14 trial is later, I think that you should go ahead and take a

15 look at this evidence and just make it happen, make it work.

16 Those were the marching orders from that Court, and when we're

17 given those instructions, we follow them.  So once we had had

18 the Court's blessing to engage in this source code review and

19 it was -- the source code was made available to us, yes, we had

20 that expert look at the source code.

21         Two points there, however.  It turns out that the

22 source code that was made available to us and inspected in June

23 is in fact missing key functionality, it is missing significant

24 portions that go to the heart of what we have said all along is

25 a concern about the integrity of this code and the preservation

efforts, which is that it's missing the core functionality that
would show how it interfaced with Audible Magic.  So, in fact,
after all of this discussion about the source code and whether
it should come in, it does not in fact help plaintiffs' case,
it supports the opinions that we provided all along about the
fact that the source code is missing this functionality.

So we do -- we came prepared for Your Honor to ask
that.  We do know that plaintiffs have most recently, in their
motion in limine, said they've looked at this code so therefore
it comes in, and we fully acknowledge that, but it in fact does
not change the case or support plaintiffs' opinion, and we have
serious concerns about the fact that we aren't even the
sponsors of this evidence, right?

So plaintiffs are saying we can prove there was
direct infringement.  How can we prove it?  We're relying on
MarkMonitor, MarkMonitor's notices.  Well, how can you trust
those notices?  Because MarkMonitor had the system that was the
gold standard and it had integrity and it's infallible.

Now, as defendants we then get an opportunity to say,
are you sure?  We're going to look at it and see if it does
what you say it does.  And in fact when we did, we realized it
doesn't.  And that has not changed, even in light of the June
inspection.

THE COURT:  Mr. Oppenheim, is the late-discovered
code a complete functional code and is it in the same condition

1  it was in when MarkMonitor was serving as the consultant in the

2  initial pre-litigation investigation?

3  MR. OPPENHEIM:  Your Honor, I understand that it is

4  complete.  The term "functional" I believe may be a little

5  beyond my abilities here.  As I understand it, they're binary

6  files that need to be decompiled.  Whether or not that would be

7  functional I'll leave to the experts, Your Honor, but certainly

8  can be reviewed --

9  THE COURT:  I don't even understand what that means.

10  "They're binary files that need to be decompiled."  What does

11  that mean?

12  MR. OPPENHEIM:  So, Your Honor, that -- so that's the

13  kind of thing that I think the experts need to weigh in on,

14  that the source code when it's preserved is not necessarily

15  preserved -- let me see if I can explain this in lay terms

16  without running afoul of the experts.

17  Is not necessarily preserved in an operating state,

18  it's preserved in a non-operating state, so when you're asking

19  whether its functional, I can't really answer that question.

20  I think the experts could weigh in on that.  But we understand

21  that it is complete, Your Honor, it answers the questions that

22  Dr. Chatterjee said were unanswered.

23  I would like to add --

24  THE COURT:  Does Ms. Frederiksen -- Dr. or Ms. --

25  I guess she's not a doctor, Ms. Frederiksen-Cross have to amend

1   her expert report to incorporate this newly-reviewed source

2   code in its binary or decompiled state in order to have a

3   complete expert opinion?

4      MR. OPPENHEIM:  I believe both experts would probably

5   want to either amend or have short supplemental reports,

6   either -- and that's a process that we're happy to go through,

7   Your Honor, and frankly would have gone through much earlier.

8      Your Honor in March, at one of the hearings we had,

9   said the following, you know, that there's nothing in the Rules

10  that prevents any party from looking at any discovery the party

11  wants to look at that's been handed to it after the close of

12  discovery.  So you almost -- you anticipated this, being here,

13  Your Honor.

14     Ms. Brewer's argument is, well, discovery was closed,

15  we couldn't do anything, we wanted to abide by the Court's

16  order, but I think you advised us we should go through this

17  process and we shouldn't be stuck here in a couple weeks before

18  trial now discussing this, and unfortunately we are.

19     But we're prepared to issue a short supplemental

20  report or amend the report, whichever is easier, and have

21  Dr. Chatterjee do likewise, Your Honor.

22     THE COURT:  Well, my statement, if you read it

23  accurately, isn't advice, it's just a fact.  You can look at

24  whatever you want to look at whenever you feel like looking at

25  it.  That doesn't necessarily mean you have to, and it doesn't

1    necessarily mean it's advisable, and it doesn't necessarily

2    mean that the party who produced it late gets to use it.

3           It is very problematic that MarkMonitor did not

4    produce this material in this very extended discovery, and it's

5    very problematic that no amendments of any expert reports have

6    been made pursuant to it before the hearing we just recently

7    had, because by the same token the experts on the plaintiffs'

8    side could have reviewed it and supplemented their reports

9    based on -- or at least attempted to, and they didn't, and now

10   I'm told that this stuff has to be decompiled and evaluated in

11   a different format than it exists.  Unlike my hypothetical,

12   where you just look at a videotape and see Figure 8 doing XYZ,

13   I am now understanding -- and maybe someone else has some more

14   technologically articulate way to explain it, but I'm

15   understanding that this has to be sort of deconstructed and

16   presented in a way that experts can talk about it and laypeople

17   can understand it.

18           MR. OPPENHEIM:  Your Honor, I may -- so I may have

19   confused the Court, and that would be on me, Your Honor.

20           The review has been done.  No further review needs to

21   be done.  All that needs to be done is the supplementing of the

22   report, both -- and in fact plaintiffs -- excuse me, counsel

23   for Bright House in fact reviewed it before the *Charter*

24   decision came down, then Charter's -- the Bright House --

25   Dr. Chatterjee, I'll just say, reviewed it after the *Charter*

1   decision came down on June 7th and 8th, and

2   Ms. Frederiksen-Cross has also now reviewed it.  So all we need

3   to do now is either amend or supplement the reports.

4           MS. BREWER:  May I clarify for Your Honor?

5           THE COURT:  Yes.

6           MS. BREWER:  Mr. Figuera, if you could pull up

7   slide 7.  I would just like to have this and then provide some

8   context.

9           The source code that we're referring to -- if you'd

10  go to slide 7 -- in an argument before the Special Master in

11  Colorado, when MarkMonitor was describing its source code, it

12  was described to the Court as the crown jewel of MarkMonitor's

13  business.  So to tie this back to the hypothetical that

14  Your Honor provided, it's one thing if there's a camera that

15  goes missing, it's camera number 2, people didn't realize it

16  was there.  If that camera is considered the gas station's

17  crown jewel of its business, questions, I think, deserve to be

18  raised as to how --

19          THE COURT:  Take the screen share down, please.

20          MS. BREWER:  How it could have gone missing.

21          Setting that aside --

22          THE COURT:  Let's just assume that MarkMonitor had

23  it, MarkMonitor knew it had it, and it put it in a drawer

24  hoping it would never see the light of day.  If that is not

25  behavior of UMG, I can't sanction UMG for MarkMonitor's bad

1  behavior.

2          MS. BREWER:  Understood.

3          THE COURT:  What its motives are or were isn't

4  pertinent to the Court's consideration here.

5          Now we are sort of past that, since there's no proof

6  that UMG was a party to the behavior.  We are now trying to

7  figure out what do we do without allowing the source code to

8  come in and what do we do if the Court is intending to allow

9  the source code to come in.

10          MS. BREWER:  So to answer --

11          THE COURT:  In the hypothetical that the Court would

12  not allow the source code to be introduced into evidence

13  because it was produced far late in the discovery, past the

14  discovery cutoff, and no reasonable explanation has been

15  offered to the Court for why MarkMonitor didn't discover this,

16  what would Bright House say in this case that you know that UMG

17  would like to counter with respect to the source code?

18          MS. BREWER:  So what we would like to say in the case

19  is consistent with what is in Dr. Chatterjee's report, which is

20  the source code lacks the functionality that shows how it would

21  have operated and interacted with Audible Magic, and that is

22  still true even with these additional pieces of information

23  that were put on the source code computer for review.

24          With Your Honor's permission, Mr. Hamstra, one of my

25  partners at Quinn Emanuel, was the individual who can read code

1   and reviewed the code and could explain probably in clearer,

2   crisper terms exactly what is missing in that functionality and

3   how it does not change the opinions that we proffered in this

4   case through Dr. Chatterjee.

5           THE COURT:  Yes, sir.  Mr. Hamstra.

6           MR. HAMSTRA:  Thank you, Your Honor.  Nathan Hamstra

7   on behalf of Bright House.

8           Yeah.  So you could think of these -- the

9   TorrentManager as consisting of a number of different layers,

10  and really all that -- all that MarkMonitor has produced is the

11  very top layer, and all the logic about, you know, the most

12  important piece is really the logic and how it takes that

13  response from Audible Magic and decides what to actually ingest

14  and how to ingest it and where to put it in MarkMonitor's

15  database, that is -- that is still missing.

16          When Mr. Oppenheim was referencing decompiling,

17  you know, he wasn't referring to source code at all, he was

18  referring to a sort of highly technical and difficult process

19  of taking a already compiled piece of software like you have on

20  your desktop, Word.exe, and trying to go back to the source

21  code from some piece of executable.  So we're kind of talking

22  about two different things here.

23          When we're speaking of the actual source code, really

24  all the key Audible Magic interfacing pieces are still gone,

25  and in that regard Dr. Chatterjee's opinions would remain

1  fundamentally the same.

2          THE COURT:  What is the layer that exists, this top

3  layer?  What does it purport to show?

4          MR. HAMSTRA:  **(REDACTED)**

5          **(REDACTED)**

6          **(REDACTED)**

7          **(REDACTED)**

8          **(REDACTED)**

9  others that are somewhat relevant, but those are the main two,

10 and we can see that there are calls to those things but we

11 don't have source code for them.  So those are -- those are

12 just some examples of what we found that was missing.

13         MR. OPPENHEIM:  Your Honor --

14         THE COURT:  One second.  One second.

15         I still don't understand what it is the plaintiff

16 says -- I'm sorry, the defendant says it has when it has

17 reviewed the source code that has been produced.  Are you

18 saying that all you have is what would be essentially the final

19 cover of the source code and that every piece of functionality

20 under it is still missing?

21         MR. HAMSTRA:  There are -- there are a couple,

22 you know, sort of unimportant, non-strategic pieces that are --

23 that are there in source code.  Just the piece that actually

24 constructs the query to Audible Magic, the request to

25 Audible Magic, and actually processes those results, that is

1   what is missing -- or the pieces, rather.

2          THE COURT:  So what is present?

3          MR. HAMSTRA:  This top layer module that basically

4   kicks off the process, that takes -- I'm doing this from

5   memory, Your Honor -- that takes a -- basically is pointed to a

6   file that it wants to -- that MarkMonitor wants to submit to

7   Audible Magic and sort of just starts the process of looking at

8   that file, but, you know, when it gets to the -- you know, what

9   it actually sends to Audible Magic, that -- it sort of shifts

10  its execution, it moves to some different modules that are not

11  present.

12         THE COURT:  Are the hash texts obvious from the part

13  of the module that is produced?

14         MR. HAMSTRA:  No.  And that's kind of the key thing.

15         **(REDACTED)**

16         **(REDACTED)**

17         **(REDACTED)**

18         **(REDACTED)**

19         **(REDACTED)**

20         **(REDACTED)**

21         **(REDACTED)**

22         THE COURT:  Mr. Oppenheim, you wanted to say

23  something?

24         MR. OPPENHEIM:  Your Honor, yes.  I mean, so now

25  we're debating what the experts will say, and I suspect that

1  our expert will disagree with the opinion Mr. Hamstra has just

2  put forth.  The suggestion that what was newly discovered is

3  just this top layer little thing is belied by the fact that it

4  took them two days -- their expert two days to review it, and

5  as I understand it is the very thing that he was complaining

6  before that he didn't have.  But I'll defer to my colleague,

7  Mr. Gould here, who can speak, I think, more specifically to

8  the individual pieces, if that's all right, Your Honor.

9         THE COURT:  Did the expert produce an amended report

10  in *Charter*?

11         MS. BREWER:  No.

12         MR. OPPENHEIM:  Not yet, Your Honor.

13         I'm sorry, Your Honor.

14         THE COURT:  Did either expert produce an amended

15  report in *Charter*?

16         MS. BREWER:  No.

17         MR. OPPENHEIM:  They're forthcoming, Your Honor,

18  I'm sorry.

19         MS. BREWER:  We have not received a report from

20  Ms. Frederiksen-Cross, who is the expert for the side that

21  bears the burden of proof on this issue.  So in both cases the

22  sequencing would be Ms. Frederiksen-Cross --

23         THE COURT:  What's the deadline for her to produce

24  her report in *Charter*?

25         MS. BREWER:  There is no deadline.  We've had a

1  discussion, but no commitment.

2          THE COURT:  All right.  Mr. Gould, you wanted to add

3  something?

4          MR. GOULD:  I wanted to provide Your Honor just a bit

5  of clarification.  I think all understand this difference

6  between source code and executable.  We can think of source

7  code as black and white, dry writing on a page, think of it as

8  an analogue to the sheet music in the music context; and the

9  executable binary code, think of it as the executable piece of

10 functional software.

11         What MarkMonitor has provided here is source code for

12 several pieces as well as the binary executable code for what

13 I think Mr. Hamstra claims to be missing.  The binary

14 executable was provided with a decompiling tool that allows

15 Dr. Chatterjee to convert it to written source code.

16         So I think, harkening back to Mr. Oppenheim's

17 statement, the experts will have different opinions on the

18 completeness and their ability to assess the functionality of

19 it, but that shouldn't be a question that's resolved by

20 representations from Mr. Hamstra or me.

21         THE COURT:  All right.

22         MS. BREWER:  Your Honor, if I -- if I may.

23         THE COURT:  Yes.

24         MS. BREWER:  If Your Honor's inclination is to allow

25 the new source code in, which we certainly understand because

1    we believe that we are -- the manner in which plaintiffs are

2    spinning this unfortunate series of events continues to be

3    prejudicial to Bright House in that we're now being foreclosed

4    from making arguments because of this 37 -- Rule 37

5    technicality, what we would submit is that, as both sides have

6    conceded, the experts have looked at what MarkMonitor made

7    available, it is not complete, it does not change our expert's

8    opinions.  They have conceded their expert looked at it earlier

9    in May, so it has now been likely two months since their expert

10   conducted that review, and their expert should be prepared then

11   to submit a supplemental expert report, if not today, then

12   tomorrow, and we would respond by the end of the week with our

13   supplemental report, because we would like to proceed to trial.

14            We have done an enormous amount of work, as has

15   Your Honor and Your Honor's chambers, to prepare this case for

16   trial.  We were not responsible on our end for this late

17   disclosure of code.  We have done everything we can to

18   accommodate it and to abide by the Court's rules.  We'd like to

19   move forward, with Your Honor's permission.

20            THE COURT:  Counsel?

21            MR. OPPENHEIM:  So, Your Honor, I have two issues.

22   One is who bears responsibility here, and the suggestion that

23   it is plaintiffs, again, I just push back on.  Nobody wanted

24   this code to be found initially more than us.  This has been

25   a -- this has undermined what we're trying to put forward and

1    consumed way too many resources.  So we were unhappy that it

2    wasn't present in the first instance and we were pleased when

3    it was ultimately found, and we are disappointed that we

4    couldn't reach agreement on a review process prior to now.

5          I have no idea what Ms. Frederiksen-Cross's schedule

6    is in the next few days and whether she's available to turn a

7    report on that timeframe.  I'd have to confer with her.  We can

8    do our best to meet a quick deadline.  I expect that

9    Dr. Chatterjee would want to be subject to the exact same

10   deadline, and there's no reason not to, so that we both get

11   each of their expert reports simultaneously.  We can confer

12   with Ms. Frederiksen-Cross and we can confer with counsel for

13   Bright House, if that's what the Court would like, to figure

14   out what the appropriate schedule should be.

15         THE COURT:  Well, Mr. Oppenheim, to your point

16   earlier, you've had the material for the whole time since it

17   was produced, discovered in January, so if your experts didn't

18   look at it or chose not to review it or anything, I don't

19   understand why that would have been.  It's one thing to demand

20   that the defendant look at it, but there wasn't anything that

21   would have prevented UMG from looking at it and

22   Ms. Frederiksen-Cross from looking at it and MarkMonitor from

23   looking at it and decompiling its binary state.  I mean, what

24   stopped plaintiffs from looking at it at their leisure from

25   January until now?

```
 1            MR. OPPENHEIM:  So, Your Honor, initially our

 2    thinking was we wanted to make sure that Ms. Frederiksen-Cross

 3    was really in the same position as Dr. Chatterjee and didn't

 4    want her to necessarily have a different information set than

 5    him for purposes of this.  We ultimately though came to the

 6    conclusion, as Your Honor has, that she should review it, and

 7    she did review it in May and prepared to do a supplemental or

 8    amended report.  I just -- as I sit here, Your Honor, I don't

 9    know whether she's on vacation in the mountains or where she

10    is, so I'm just not in a position to speak to availabilities

11    until we reach out to her, but happy to do that, Your Honor.

12            MS. BREWER:  May I respond?

13            THE COURT:  No.

14            Are the parties ready to go to trial on the first

15    trial date in August?

16            MS. BREWER:  Yes, Your Honor.

17            THE COURT:  What's the first day, Ms. Carreon?

18            MS. BREWER:  Yes, Your Honor.

19            MR. OPPENHEIM:  So, Your Honor --

20            THE COURT:  One second.

21            What's that date?

22            COURTROOM DEPUTY:  The date is a Monday, the 1st.

23            THE COURT:  It is a Monday.

24            COURTROOM DEPUTY:  Correct.

25            THE COURT:  August 1st.
```

1    MR. OPPENHEIM:  So, Your Honor, you told us to be

2    ready and we're working to be ready.  I believe there are

3    several issues that we should discuss in order to be ready.

4    Some of them are substantive and some of them are really kind

5    of process, and I'm happy to go through those issues if you'd

6    like, Your Honor.

7        THE COURT:  Yes, sir.

8        MR. OPPENHEIM:  So really there are -- I'd like to

9    talk about COVID procedures, but I'll come back to that later.

10   There are really four substantive issues, Your Honor.

11       One is we need some guidance, Your Honor, on

12   witnesses who are outside the subpoena range, and in particular

13   here how the Court wants to deal with witnesses who both

14   parties seek to call.  There are several Bright House employees

15   and current Charter employees as well as former employees that

16   plaintiffs intend to call in their case-in-chief that

17   Bright House has indicated it either intends to call or may

18   call.  Bright House has objected to plaintiffs' calling

19   Bright House witnesses in their case, including, most

20   importantly, Mr. Tim Frendberg.

21       THE COURT:  Has his deposition been taken?

22       MR. OPPENHEIM:  Yes, Your Honor.  He's a key witness.

23   His deposition was taken for multiple days.  He was designated

24   by Bright House on, I believe, 38 different 30(b)(6) topics,

25   and he's the key witness who will speak to what Bright House

1    was or, frankly, was not doing in response to millions of

2    infringement notices that it was receiving.  He's a current

3    Charter employee, and when he was deposed he did testify that

4    he would attend trial if asked.  He is beyond a Rule 45

5    subpoena reach but is clearly within Bright House's control,

6    and he is the only witness that Bright House has listed as an

7    "expect to call."  They have not listed any other witnesses.

8         So Mr. Frendberg, who is obviously key to plaintiffs'

9    case, Bright House should be required, we believe, to make the

10   witness available during the plaintiffs' case-in-chief.

11   Bright House then can decide whether it wants to --

12        THE COURT:  What is the legal authority for what

13   you're asking for?

14        MR. OPPENHEIM:  Well, Your Honor, as I'm sure

15   Your Honor knows, the Federal Rules of Civil Procedure kind of

16   end at trials and then pick up after trials, and so Courts

17   often conduct trials as they have found judges and juries want

18   to see them, and I will tell you we've cited dozens of cases in

19   our motion in limine on this issue, Your Honor, which is not

20   the Rules but case law.  The jury doesn't want to hear

21   deposition excerpts up front of a witness and then --

22        THE COURT:  My question is:  Is there any legal

23   authority that compels Bright House to bring this witness to

24   court if he is beyond subpoena power?

25        MR. OPPENHEIM:  Yes, Your Honor, and there are many

```
1    cases --
2              THE COURT:  Is that in your motion in limine?
3              MR. OPPENHEIM:  Yes, Your Honor, it is.
4              THE COURT:  All right.  What's your next substantive
5    issue?
6              MR. OPPENHEIM:  Okay.  So in addition to
7    Mr. Frendberg, Your Honor, there's a slightly varied issue with
8    respect to Messers Kuszmar, Tomasullo and Ms. Hughes, who
9    Bright House has listed as "may call," and they've all been
10   subpoenaed by plaintiffs to appear, they're all local, and
11   Bright House has objected to our calling them in our
12   case-in-chief but has offered that they're okay to do it if we
13   agree to stand down on Mr. Frendberg.  So that issue is also
14   teed up in our motion in limine.
15             MS. BREWER:  Your Honor, may I --
16             THE COURT:  Just let him go through his issues and
17   I'll come back to you in a minute.
18             MS. BREWER:  Okay.
19             MR. OPPENHEIM:  And then on the witness issue, it
20   also extends to the issue of designations.
21             So, as I understand it, Bright House is seeking to
22   put up two of their own witnesses by designations, they're both
23   within the district, they were both represented by
24   Bright House's counsel at their depositions, and seek to use
25   their testimony, deposition testimony, at trial instead of
```

1  calling the witnesses live, which we think is improper.

2       So that's -- those are the -- that's the witness

3  issue.  There are other issues.  Do you want me to turn to the

4  other issues or do you want to deal with those issues first,

5  Your Honor?

6            THE COURT:  Ms. Brewer, would you like to respond?

7            MS. BREWER:  Yes.  We object to the fact that

8  Mr. Oppenheim has attempted to, mid-conferral efforts and

9  mid-briefing, raise to the Court issues in what we believe to

10  be a misleading manner.

11       Yes, the parties have ongoing discussions with

12  respect --

13            THE COURT:  The question is are you going to present

14  this witness as a witness in trial or not.

15            MS. BREWER:  Mr. Frendberg, as we've communicated to

16  Mr. Oppenheim, we intend to present at trial live.  The dispute

17  concerns their insistence that Mr. Frendberg testify only as

18  part of plaintiffs' case-in-chief.  We'd like an opportunity to

19  brief -- complete the briefing on that, Your Honor, because all

20  that the Court has currently is Mr. Oppenheim's statements as

21  well as their brief.

22            THE COURT:  Well, they can't limit you in calling

23  this witness in your case, they can only ask you if you're

24  going to allow him to be called in their case-in-chief first,

25  and if you say no, I'd like to know why, and if you say yes,

```
 1    they can't stop you from calling him in your case.
 2              MS. BREWER:  Right.  So the answer is yes, we intend
 3    to call him in our case, and no, we don't agree that he should
 4    be presented first as part of plaintiffs' case, but we'd like
 5    an opportunity to brief that, Your Honor, with authorities that
 6    set forth that position.
 7              THE COURT:  All right.  And what about the other
 8    witness?
 9              MS. BREWER:  With respect to the former abuse team
10    members, so these are former employees that were referenced by
11    Mr. Oppenheim, I'm unaware of any official communication or
12    conditions that were placed on those witnesses and tied to
13    Mr. Frendberg, so I'd like to correct that.  I'd also like to
14    correct the fact that our witness list did not include
15    Mr. Tomasullo or Mr. Kuszmar, so Mr. Oppenheim misspoke when he
16    said that to the Court.  We have listed Mr. Hughes in our
17    witness list as a "may call" and we intend to bring him live,
18    as I communicated to Mr. Gould in our meet and confer on the
19    witness list.
20              There are -- I'm surprised to hear -- so moving to
21    the third issue that Mr. Oppenheim raised about whether
22    individuals could testify by deposition, because we have two
23    plaintiff witnesses that plaintiffs are attempting to submit by
24    deposition only, one of whom is a current Sony employee and was
25    the very employee mentioned during Ms. Frederiksen-Cross's
```

1   examination as a bases for some of her opinions and Your Honor

2   very clearly stated to plaintiffs' counsel that that was

3   hearsay and Ms. Frederiksen-Cross could not support her

4   opinions with Mr. Jang's out-of-court statements, he needed to

5   be brought live.  Nevertheless, they are refusing to bring

6   Mr. Jang live and arguing that he can testify by deposition.

7           Setting that aside, the individuals that we proposed,

8   who are former employees, to testify by deposition are Mr. Doda

9   and Mr. Dressler.  In Mr. Doda's case, as I explained to

10  Mr. Gould on a meet and confer call, Mr. Doda is critically

11  ill, he has severe health conditions that are life-limiting and

12  chronic.  He cannot stand or sit comfortably.  He cannot walk.

13  He was in fact very ill during his deposition, which I defended

14  and which Mr. Oppenheim took, and it could not have been

15  clearer in that deposition that this individual had a severe,

16  life-limiting, chronic health issue.  He nevertheless sat for

17  deposition for a full 7 hours, and Mr. Oppenheim had every

18  opportunity to ask him every question that he needed to ask

19  him.  It was communicated to plaintiffs we're communicating

20  it's an unavailability due to illness situation with respect to

21  Dr. Doda.

22          THE COURT:  Is he within the Court's subpoena power?

23          MS. BREWER:  Yes, he is located in the Tampa area.

24  He is just critically ill.

25          THE COURT:  And does he have medical documentation of

1    his illness?

2         MS. BREWER:  If Your Honor would like it, we will

3    work with him to submit that.

4         THE COURT:  Well, if you submit it to Mr. Oppenheim,

5    I'm sure you all can work that out.  If it's not clear that

6    he's ill then you'll need to submit something more to the

7    Court.

8         MS. BREWER:  Understood.

9         MR. OPPENHEIM:  Your Honor, on Mr. Doda, we're happy

10   to -- we're happy to agree that he can appear by designation so

11   long as plaintiffs get to designate with respect to him as

12   well.  We didn't put him on our -- we didn't subpoena him

13   because of the illness issue, Your Honor, and so if he is going

14   to come in by designation then we should be permitted to use

15   the designations as well, Your Honor, that's all.

16        MS. BREWER:  So I think -- and, respectfully,

17   Your Honor, this is the danger when -- as Your Honor very

18   patiently said, is there anything, you know, we should discuss

19   in terms of trial readiness, and now the parties are airing

20   unresolved, still-in-conferral type issues to Your Honor in an

21   incomplete and an inaccurate manner.

22        There's other issues with respect to Mr. Doda, which

23   is that the plaintiffs never put him on their initial

24   disclosures as a witness that they needed to rely on, nor did

25   they with Mr. Frendberg, and when witness lists were exchanged

 1    they did not put Mr. Doda on their list.  They only scrambled

 2    at the last minute to designate deposition testimony, much of

 3    which I think our objections to those have made clear is

 4    completely inappropriate questioning, and they claim that it's

 5    because they didn't know he was ill, when we have a transcript

 6    that went for seven hours where it was said multiple times,

 7    very clearly, that this individual had a chronic condition and

 8    was in pain and very ill.

 9            THE COURT:  All right.  I don't know what I said

10    about Mr. Jang's out-of-court statement in regards to his

11    needing to be brought live.  I don't know that I said that, but

12    if I did, I misspoke.  I think he would have to be presented in

13    a way that would not be hearsay, and if his deposition was

14    taken with an opportunity to cross, and if he is for some

15    reason either not subject to the Court's subpoena power or is

16    otherwise unavailable, the hearsay aspect of his testimony

17    might be curable by his deposition.  I just don't know his

18    status.  So I just want to make that clear, that if I said

19    "live," I didn't mean live, I meant in a way that would cure

20    the hearsay problem of Ms. Frederiksen-Cross's reliance.

21            MS. BREWER:  Understood.

22            THE COURT:  There were some people apparently that

23    she talked to on a side conversation that was not part of a

24    deposition, which was what the Court's concern was.

25            MS. BREWER:  Right.  That was --

```
 1              THE COURT:  We don't have to go through tit for tat
 2    your witness problems.  I'll deal with them on the paper.
 3              Is there any other issue the Court needs to address
 4    the parties to that keeps them from being ready for trial on
 5    the 1st?
 6              MR. OPPENHEIM:  Yes.  Thank you, Your Honor.
 7              So the key issue is really -- on the witnesses, and
 8    I'll move to the other issues in a second, is really
 9    Mr. Frendberg, because it's so fundamental to how plaintiffs
10    will present their case.  Understanding whether or not we'll be
11    allowed to call him in our case-in-chief impacts really what
12    we're putting forward and how we're putting it forward.
13              We have no objection if Bright House wants to call
14    them in their case as well, we never objected to that, if the
15    Court wants to handle it that way.  I have had other judges say
16    they prefer to only have witnesses take the stand once, but
17    that's entirely up to the Court's discretion.  So the real
18    issue is getting resolution on Mr. Frendberg; the others
19    obviously we need to work through, but that could happen at a
20    later date.
21              Would you like me, Your Honor, to turn to the next
22    issue?
23              THE COURT:  Yes, sir.
24              MR. OPPENHEIM:  So, Your Honor, there is --
25              THE COURT:  One second.  One second.
```

 1          MR. OPPENHEIM:  Yes.

 2          THE COURT:  Yes, sir.

 3          MR. OPPENHEIM:  So there -- I know at some point

 4  we're going to have a discussion with the Court about what the

 5  preliminary jury instructions will be, but understanding the

 6  law that the Court intends to apply on really three critical

 7  issues is important to what we're presenting and how we're

 8  presenting it, it will impact, you know, not only the witnesses

 9  we present but how we present the witnesses, the questions we

10  ask, and our opening statements, and those three issues are --

11  the three issues are the making available instruction -- so

12  it's clear from the Daubert hearing that Bright House tends to

13  argue against what is what we think is the clear law of this

14  district, and that is that making a copyrighted work available

15  for distribution constitutes a violation of the distribution

16  right.  The majority of the Courts in this district have so

17  held.  In fact, I'm only aware of one Court in the district

18  that has not adopted that, and that one Court said even if that

19  wasn't the case, that making available constitutes

20  circumstantial evidence of distribution.  This is very -- this

21  is fundamental to the plaintiffs' case, and we need to

22  understand whether this instruction will be given to the jury.

23          The second legal issue is what are the elements of

24  contributory infringement that the Court intends to instruct

25  the jury on.  In summary judgment briefing, Your Honor, the

```
 1   parties disagreed on what those elements are.  At a very, very

 2   high level, without repeating the --

 3            THE COURT:  I know what the issue is.  You don't have

 4   to high level, mid level, low level.

 5            MR. OPPENHEIM:  Okay.

 6            THE COURT:  To answer the question, because I need to

 7   know what the case is, I don't intend to give a preliminary

 8   legal instruction to the jury.  I'll give a charge conference

 9   at the end of the case, and the parties put on the best case

10   they can and prove what they think they need to prove, and

11   we'll ferret it all out at the charge conference.

12            MR. OPPENHEIM:  Your Honor --

13            THE COURT:  I know that's tough, but that's how the

14   case operates.  We present the evidence in the case, and at the

15   charge conference the parties say, Judge, here is where we are

16   with respect to what was proven and we believe you should

17   instruct the jury in this way.  I rarely pre-instruct my juries

18   on anything other than behave, listen, don't fall asleep,

19   you know, don't talk about the case, and at the end of the

20   case, after a charge conference, in the context of evidence,

21   I instruct them on the law.

22            I will tell you that the Supreme Court sets the law

23   of the land, if that helps you at all, the Supreme Court and

24   then, barring the Supreme Court, and subject to interpretation,

25   the Eleventh Circuit.  So if you all can find some fair,
```

1   reasonable guidance in all of that, that's the guidance you

2   should follow.

3        MR. OPPENHEIM:  So, Your Honor --

4        THE COURT:  I know what your question is,

5   Mr. Oppenheim, but you can ask it for the record.

6        MR. OPPENHEIM:  It's hard to understand how we know

7   what it is we're trying to prove or how the jury is supposed to

8   know what they're supposed to be listening for if they aren't

9   given some preliminary guidance on these issues.  You know --

10       THE COURT:  Well, I'm sure you've tried lots and lots

11  and lots of cases, and you know how infrequently the

12  instructions on the law are given to the jury at the inception

13  of the case.

14       MR. OPPENHEIM:  So, Your Honor, I practice in the

15  copyright and trademark arena, and I have litigated, as you

16  have said, tried many cases.  I can't recall a copyright case,

17  Your Honor, where a Court has not given guidance to the jury in

18  advance on what constitutes contributory infringement.  And the

19  reason I think that Courts have universally done it is because,

20  unlike --

21       THE COURT:  Universally?  Universally?

22       MR. OPPENHEIM:  Well, in my experience, Your Honor,

23  and I've tried a lot of these cases.  And the reason is because

24  copyright infringement is not intuitive to jurors necessarily

25  in the same way that other legal issues might be.

```
 1          THE COURT:  Did you submit some of those preliminary
 2   instructions for the Court's consideration?
 3          MR. OPPENHEIM:  We have, Your Honor.  We have or we
 4   are.  I don't actually know whether they're in yet.  I think
 5   they're due Friday, Your Honor.
 6          THE COURT:  All right.  Well, I'll look at them when
 7   they come in.
 8          Anything else?  You want to know the answer to the --
 9          MR. OPPENHEIM:  Yes, Your Honor.
10          THE COURT:  -- riddling question, and you want all
11   your witnesses to come in in the order that you want them, and
12   what's your other substantive issue?
13          MR. OPPENHEIM:  You're making me feel greedy,
14   Your Honor, but I really don't feel like I am.
15          There is a pure legal issue that really does not need
16   to be put in front of the jury that I think we should be able
17   to resolve up front.  There are -- in this -- in the mass of
18   summary judgment briefing this issue is in there but may have
19   been lost in the midst of many other things.
20          So Bright House has challenged plaintiffs' ownership
21   on 142 works on the grounds that the plaintiffs' ownership is
22   based on contracts with a songwriter named as an author on the
23   copyright registration and not the claimant.  Put aside whether
24   the number 142 is right or not.  We think it's wrong, but we
25   can come back to that.  It's a pure legal issue of whether or
```

1  not an agreement with a songwriter not listed as a claimant on

2  the registration grants exclusive rights to the compositions

3  that are the subject of the agreement.  We think the law is

4  very clear on this, the answer is yes, but there's no issue

5  here for the jury to decide.  It's a yes/no proposition.  If

6  it's yes, as we think it is, then these works are in the case.

7  If it's a no, the works are out of the case.  And we think that

8  resolving that will at least reduce the number of disputed

9  works for the jury to have to deal with.

10         The legal issue -- if we presented this to the jury,

11  the Court would have to resolve that legal issue at the end,

12  which would be fully dispositive on these -- I'll call it 142

13  works, we actually think it's less, and we can work through

14  that later.

15         THE COURT:  Ms. Brewer, as to the last point?

16         MS. BREWER:  So --

17         THE COURT:  The purely legal issue.

18         MS. BREWER:  This is -- this is, I think, the danger

19  of plaintiffs' counsel not completing a conferral process

20  and --

21         THE COURT:  Do you think it's a purely legal issue?

22         MS. BREWER:  The ownership issue?

23         THE COURT:  Yes.

24         MS. BREWER:  I don't believe -- I think it may in

25  this instance be a mix of some law and factual dispute, so

1    I don't know --

2            THE COURT:  What's the factual issue?

3            MS. BREWER:  With respect to the --

4            THE COURT:  142 works that are based on songwriter

5    contracts.

6            MS. BREWER:  I'm sorry, I just -- this wasn't

7    something I was prepared to speak on.  I don't know that I can

8    say definitively for my client if we agree or disagree with

9    Mr. Oppenheim, because there are separate people on the team

10   who are literally in this conferral effort.

11           THE COURT:  Is there somebody else on this call who

12   knows the answer to that question whose job that has been

13   handed to?

14           MS. BREWER:  I think that those individuals are in

15   the -- are not on this call and have been with separate

16   individuals from plaintiffs and have been trying to confer to

17   narrow this week what would be teed up to the Court, so I would

18   respectfully ask that we have an opportunity --

19           THE COURT:  Are there any other issues besides those,

20   Mr. Oppenheim?

21           MR. OPPENHEIM:  Yes.  Does Your Honor intend to have

22   a prehearing -- a pretrial conference on the motions in limine

23   or just rule on the papers?

24           THE COURT:  I haven't read them yet.  It kind of

25   depends.  I was -- I saved myself, I guess, 120 pages or

 1   something crazy, I don't know what they're going to look like,

 2   I haven't opened them, because I was really trying to get to

 3   the bottom of the question that we presented on this hearing.

 4           MR. OPPENHEIM:  Okay, Your Honor.

 5           THE COURT:  I will -- I can tell you I won't hold a

 6   hearing on every single issue.  What I typically will do is

 7   look at them and issue one-sentence rulings on

 8   motions in limine that either say this is clearly something

 9   outside of admissible evidence or this is something that the

10   parties can reserve on and make a timely objection during the

11   course of trial.  Sometimes the parties surprise me and come up

12   with something that's really narrow and resolvable, but most of

13   the time you're just either making a summary judgment motion or

14   you're making a general objection that needs to be resolved in

15   the context of the evidence.  But I will look at it and I will

16   ferret out that that I can, and we may have to address

17   something at the first day of trial, but generally they don't

18   get very far.

19           MR. OPPENHEIM:  So, Your Honor, let me -- let me turn

20   then to my questions about COVID procedures.

21           At our last --

22           THE COURT:  Let me ask the defendants if you all have

23   any substantive issues that the parties want the Court to look

24   at today.

25           MS. BREWER:  So, no, we have not understood this to

1    be a platform --

2              MR. VERHOEVEN:  Hold on.

3              MS. BREWER:  Okay.

4              MR. VERHOEVEN:  Sorry.  This is Mr. Verhoeven.  I did

5    have one -- since we're going through substantive issues and I

6    thought we were just doing trial readiness, on substantive

7    issues there is one that I would like an opportunity to speak

8    to the Court about, doesn't have to be now, could be in the

9    future, but on the motion in limine we filed with respect to

10   Frederiksen-Cross, the technical expert, during the hearing --

11   we had the evidentiary hearing, Your Honor said that you were

12   carrying the portion of the motion related to Level 4.  I don't

13   know if you remember that discussion, Your Honor.

14             THE COURT:  I do.

15             MR. VERHOEVEN:  And you were going to wait to see

16   what the evidence was with respect to MarkMonitor, and you made

17   the comment that Mr. Oppenheim's characterization of what

18   MarkMonitor did is inconsistent with what Ms. Cross said.

19             I didn't see anything in the written order, and I'm

20   just inquiring, can we follow up on that, Your Honor, because

21   in fact what Ms. Cross testified to in response to Your Honor's

22   questioning as well as mine is consistent, not inconsistent,

23   with what MarkMonitor did, and is inconsistent with what

24   Mr. Oppenheim stated.  And so, you know, we've got a situation

25   where after the cross-examination Counsel stood up and

```
 1  represented something different from what the witness
 2  testified, Your Honor carried it to see what MarkMonitor
 3  actual -- what the evidence was, and my impression from that,
 4  Your Honor, was that we would be able to at some point in the
 5  future reurge the Daubert as to Level 4 once the Court became
 6  apprized of the MarkMonitor evidence.
 7            So I just wanted to inquire about that.  I don't want
 8  to take a lot of time, your Honor, but I don't know how much
 9  more opportunity before trial begins I'll have to speak to you,
10  so I wanted to raise that.
11            THE COURT:  And has this MarkMonitor evidence
12  disclosed anything beyond Level 4?
13            MR. VERHOEVEN:  Yeah, it's exactly what your -- what
14  the cross-examination elicited, Your Honor, exactly.
15            THE COURT:  Mr. Oppenheim, do you disagree with that?
16            MR. OPPENHEIM:  So, Your Honor --
17            THE COURT:  Do you disagree with that?
18            MR. OPPENHEIM:  So I can't agree or disagree because
19  the question and Mr. Verhoeven's statement of the issues
20  creates an entirely misleading situation.  So --
21            THE COURT:  Did MarkMonitor --
22            MR. OPPENHEIM:  And let me explain.  So --
23            THE COURT:  -- move beyond Level 4 in its review?
24            MR. OPPENHEIM:  Level 4 -- I'm sorry, Your Honor.
25            Level 4 is not a specific set of requirements.  So
```

1    they -- what -- what Bright House is attempting to do here is

2    to use this concept of levels to suggest that there's specific

3    criteria that different levels are at, one is higher than the

4    other, and in fact the levels issue, which comes out of

5    a MovieLabs document which we've got a motion in limine on,

6    Your Honor -- the witness who authenticated that document, by

7    the way, who said it was a confidential internal MovieLabs

8    document, the witness said there are a lot of gradations within

9    what is Level 4 and what is Level 5, and sometimes the way

10   Level 4 is implemented is in fact stronger than other

11   implementations of Level 5, and so you can't simply answer it

12   yes or no.

13          What Ms. Frederiksen-Cross's testimony was -- and we

14   went back after the hearing, Your Honor, and we've looked at

15   her -- the transcript.  She testified precisely as I said, but

16   the problem here, Your Honor, is you held a Daubert hearing on

17   expert witnesses without hearing what MarkMonitor does, because

18   they're not an expert.  They will describe exactly what they

19   do, and it will be consistent with what I said and what

20   Ms. Frederiksen-Cross said.  And so the idea that Mark -- that

21   Bright House is putting forward here is because in level --

22   Bright House is attempting to argue that there were no

23   downloads in Level 4.  That is incorrect, and it's -- what

24   happened was -- and it was set forth by Ms. Frederiksen-Cross

25   and will be set forth by MarkMonitor --

1           THE COURT:  Do we have those downloads?

2           MR. VERHOEVEN:  Those are false statements,

3    Your Honor.  You heard from the witness, the expert witness

4    herself, not only in response to my questioning but your own,

5    that no downloads were made under Level 4, that she didn't look

6    at any.  I mean, I can cite -- that's the whole reason we had

7    the evidentiary hearing, is to find out what the expert was

8    going to say, and Your Honor found out what the expert was

9    going to say, and it's -- there was no comparison, there was no

10   download of the accused BHN file in comparison to the

11   rightsholder's file, zero.

12           MR. OPPENHEIM:  That is entirely incorrect.

13           MR. VERHOEVEN:  And what Mr. Oppenheim -- who is

14   interrupting me right now -- would like to say is to confuse

15   the jury by pointing to this first step in the two-step process

16   where they did download non-BHN subscriber files that had a

17   hash that matched the hash that they had done, and they want to

18   confuse the jury into thinking that those were BHN files that

19   they downloaded and compared.  They were not.  In fact, they

20   lost all of those files and had to recreate them later,

21   Your Honor.

22           I'm talking about step two, step two of their

23   analysis, which you heard from Ms. Cross was simply Level 4,

24   they simply searched out to see if there was an advertised hash

25   on a -- on a subscriber site, subscriber IP site, and that's

 1   it.  They didn't bother to confirm it.  They didn't bother to
 2   download it to check it.
 3             We all know that the record industry itself engaged
 4   in massive spoofing of fake files to try and dissuade people
 5   from engaging in piracy, so if anybody should have known they
 6   need to download these files to make sure they're accurate,
 7   it's the plaintiffs, and they didn't, and the only explanation
 8   we got for why they didn't is they didn't want to pay for it.
 9             As I said during the cross-examination, Your Honor,
10   you know, it's one thing to send a notice to somebody based on
11   Level 4, it's quite another thing to go into Federal Court and
12   ask for a billion dollars in damages when you didn't even
13   download the accused files and look at them, Your Honor.  That
14   doesn't rise to the level of proof needed to show copying here.
15   And the plaintiffs' expert should not be allowed to say that in
16   my opinion they copied -- this is copying, when she didn't even
17   look at the files, and she admitted so.  She admitted to you
18   repeatedly, Your Honor, if you look back at that transcript.
19   This is junk, and it --
20             THE COURT:  Thank you.
21             MR. VERHOEVEN:  -- shouldn't be in front of the jury.
22             MR. OPPENHEIM:  This is -- this is --
23             THE COURT:  Any other substantive issues the parties
24   want to raise with the Court?
25             MS. BREWER:  So, Your Honor, if I may, I would just

1   like to, since we were the moving party on the Rule 37 motion,

2   in light of Your Honor's inclinations as expressed, make a

3   specific ask that if this code is coming in, that

4   Ms. Frederiksen-Cross be held to submitting a supplemental

5   report tomorrow, that the supplemental report clearly indicate

6   the dates on which she reviewed the code, and that we have an

7   opportunity to submit our report on Friday, which we believe we

8   could make happen.

9         Respectfully, I know that Mr. Oppenheim said it

10   should be simultaneous submissions, but this is a case where

11   the plaintiff bears the burden of proof in a court where the

12   expert reports are sequenced plaintiffs first, then defendant,

13   and we respectfully ask that that sequence be -- sequencing be

14   followed for this supplement.

15         THE COURT:  Anything else?

16         MR. OPPENHEIM:  No, Your Honor.  Would you -- well,

17   I'll turn to the COVID issue when you're ready.

18         MR. VERHOEVEN:  No, Your Honor.

19         THE COURT:  Something else about the code issue you

20   want to turn to?

21         MR. OPPENHEIM:  No, other than the COVID issues --

22         THE COURT:  Oh, the COVID issues.  I thought you said

23   the code issues.

24         MR. OPPENHEIM:  Sorry.

25         THE COURT:  What's the COVID issue?

1          MR. OPPENHEIM:  So, Your Honor, we're trying to think

2     through what the process is going to be here, what the Court's

3     expectation is that's going to happen if during the course of

4     the trial a juror tests positive or a counsel tests positive,

5     having obviously been in less contact with other jurors, other

6     counsel, the Court, and what the Court's expectation in terms

7     of quarantining is.

8          I ask this because we're now seeing again another

9     upswing in the COVID rates and we're all taking it very

10    seriously.  A number of my colleagues in the firm have recently

11    been infected.  So I'm trying to figure out how we're going to

12    deal with this over the course of a three week trial when we're

13    all going to be in very close quarters and need to kind of

14    think through in advance how this is going to impact this

15    trial.

16          Does the Court have thoughts on that?  I will say

17    I am concerned.

18          THE COURT:  One second.

19          Ms. Carreon, do we have 17 for this trial or do we

20    have my courtroom?  Can you tell?

21          All right.  We have the ceremonial courtroom sort of

22    on backup, but one of my colleagues has it as the principal

23    courtroom for her trial, given the length of our trial.

24          So we'll be in my courtroom.  We'll be masked, like

25    we were at the hearing, witnesses will be masked, jurors will

 1   be masked, and we will hold the trial.  If someone tests

 2   positive, we're not going to quarantine the entire panel, that

 3   person will be quarantined and therefore excused.  We'll need

 4   to have enough alternates so that hopefully that doesn't impede

 5   our ability to try this case.  If it does, we'll have to

 6   recess.  I had a colleague who had to recess his trial for

 7   several weeks and then he restarted and they finished the

 8   trial.  I'm hoping that that won't happen, but I don't know

 9   that we have any choice but to consider that as a possibility.

10          You're right that the numbers are going up with the

11   variant, B5 I think it is, but the hospitalizations and serious

12   illnesses are not tracking at the level of the growth of the

13   virus, and so we'll be watching it.  We have an epidemiologist

14   on our Court -- at our fingertips, and she's giving us advice

15   every week about what the numbers are in the various divisions,

16   and I'll be watching that, and we will see.  If it looks like

17   something really bad is happening or we're going south really

18   fast, we'll have to reevaluate whether to go forward, but based

19   on where we are now, we'll be like we are right now and we'll

20   hold the trial and we'll hopefully get through it, and we'll

21   have to deal with those issues for jury excusals, people who

22   are vulnerable, people who are as of yet still unvaccinated.

23          In that regard, do the parties object to my inquiring

24   of the panel in a jury questionnaire whether they are

25   vaccinated or not and then giving the parties that information?

```
 1            MR. OPPENHEIM:  From plaintiffs' perspective, we
 2    agree wholeheartedly that that's appropriate and maybe even
 3    necessary.
 4            THE COURT:  Ms. Brewer, any objection from the
 5    defense?
 6            MS. BREWER:  No objection.
 7            THE COURT:  So we'll have that information, we'll
 8    make our decisions, parties will make their normal jury
 9    inquiries, and we'll excuse as we need to, listen to the
10    people's excuses and make decisions.
11            But in terms of how the trial will proceed, it will
12    proceed in the normal course.  We'll try to space the jurors
13    out as much as we can, we'll use the big jury deliberation area
14    outside my courtroom, on the other side, because it's larger,
15    to give them more breathing room, and do the best we can under
16    the circumstances.
17            MR. OPPENHEIM:  Your Honor -- I'm sorry.
18            MR. VERHOEVEN:  This is Mr. Verhoeven.  Just -- I've
19    done several trials since COVID, and I'm just wondering if
20    Your Honor has ever considered -- rather than masks, for some
21    of the players in the bar, beyond the bar, some Courts have
22    used, so you can see the expressions, the -- I'm not sure what
23    they call it, the screen.
24            THE COURT:  The shields?
25            MR. VERHOEVEN:  Shields, yes.
```

```
 1              THE COURT:  Our epidemiologist says there's no COVID
 2    efficacy for shields, they don't do anything other than spread
 3    the virus up in the air.
 4              MR. VERHOEVEN:  Okay.
 5              THE COURT:  The witnesses will be far enough from the
 6    box and from the lawyers, we might want to evaluate whether to
 7    allow them to testify unmasked or to remove their masks so the
 8    juries can see them, initially, but the screens don't serve
 9    any -- the face screens don't serve any purpose to protect
10    against COVID spread, according to our --
11              MR. VERHOEVEN:  I did not know that, Your Honor.
12    Good to know.
13              THE COURT:  Yeah, they don't do anything.
14              We might bring in a ventilator fan, I'll see if we
15    have one available, because venting is as important as
16    anything, and we'll keep the doors open during the course of
17    the trial.  And of course if the lawyers didn't talk so much,
18    that might also keep the spread of COVID virus down.
19              MR. OPPENHEIM:  Your Honor, do you -- and I apologize
20    for not knowing the answer to these questions.  Do you
21    typically hold trial five days a week and go 9:00 to 5:00, or
22    is there a different trial schedule that Your Honor proceeds
23    on?
24              THE COURT:  I typically go Monday through Thursday
25    and we're off on Friday, but because this is a three week trial
```

```
 1   we're going to go -- I mean, I guess you all are still saying
 2   15 days, and if you're still saying 15 days then we're going to
 3   go straight through, including Fridays, and we'll be 9:00 to
 4   4:30, just to give you some time to go home and eat and go into
 5   your war rooms and do whatever you do, but we're going to need
 6   to go straight through the week so that we don't have a down
 7   day.
 8              MR. OPPENHEIM:  Does Your Honor have any objection --
 9   and I raise this because of the Barbara Frederiksen-Cross
10   MarkMonitor issue that came up earlier -- have any view on the
11   conditional admission of evidence?  In other words, if one
12   witness can testify on a piece of evidence, that there's a
13   proffer it will be admitted by the next witness.
14              THE COURT:  I don't know what you mean.
15              MR. OPPENHEIM:  That often happens in a case, that
16   the evidence doesn't necessarily come in sequentially, but if
17   you know that a piece of evidence is going to come in later,
18   that you could conditionally -- one of the earlier witnesses
19   could testify about it, without, obviously, showing it to the
20   jury.
21              THE COURT:  If the parties stipulate that the exhibit
22   is not objectionable and the witness can testify to it, even
23   though it needs to be admitted through someone else
24   technically, I don't have any objection to it, but if there's a
25   dispute about its admissibility, there's a danger in
```

1    provisionally admitting it and allowing testimony on it then to

2    only have to go back and strike it, but if it's just, you know,

3    Mr. Smith is going to later come on, and everyone knows he's

4    going to authenticate the document, I would hope that the

5    parties could stipulate to its admissibility without that

6    necessity, and then you can move your exhibits en masse at the

7    beginning of the trial and not have to go through the rigmarole

8    of, you know, showing the exhibits one at a time and so forth.

9            MR. OPPENHEIM:  And would that -- how would that

10   view, Your Honor, apply to testimony that a subsequent witness

11   will give that will provide foundation for an expert?

12           THE COURT:  This is deposition testimony or live

13   testimony?

14           MR. OPPENHEIM:  Live testimony, that the witness will

15   come and provide the live testimony subsequently, but the

16   expert can testify about it before it actually comes into

17   evidence.

18           THE COURT:  That's hard to answer in the abstract.

19   I would think you would want to sequence your evidence in a way

20   that the foundational basis for the testimony is already laid

21   before the witness testifies, except in, you know, a

22   circumstance where someone might be sick or can't travel

23   quickly or something, something happens, but in the normal

24   course I think a foundational basis should be laid, unless the

25   parties don't dispute that the foundational basis will be laid.

1          MR. OPPENHEIM:  Understood, Your Honor.

2          We understand, Your Honor, that your standard

3    practice is for trial exhibits to have an exhibit tag stapled

4    to the upper right-hand corner.  Given the number of exhibits

5    at issue, is it all right, Your Honor, if we electronically

6    stamp exhibits, and do you care whether it's stamped on the

7    exhibit itself or on a cover page?

8          THE COURT:  Ms. Carreon, do I care?

9          COURTROOM DEPUTY:  For the Court's copies we don't

10   mind.  For the Clerk's Office we would need the tags for --

11   I mean, I can talk to them, you know, on my own about that, we

12   don't need to do it all here, if you want to.

13         THE COURT:  Why do they need tags in the Clerk's

14   Office?

15         COURTROOM DEPUTY:  For whenever we give them back to

16   the jury, just to easily identify them.

17         THE COURT:  I'll have to check with my staff and get

18   back with you on that.  That's their practice, but I don't know

19   that that practice is immutable.

20         MR. OPPENHEIM:  And, Your Honor, in terms of hard

21   copies for the Court, do you, Your Honor, want a full set of

22   all of the exhibits in a hard copy, or do you prefer -- do you

23   want witness binders for each witness, or do you want both?

24   I recall Your Honor at one point felt overwhelmed by binders at

25   a prior hearing.  We don't want to kill more trees than we have

1   to, Your Honor.

2            THE COURT:  I think you should plan to provide the

3   Court electronic copies of your exhibits, not binder copies,

4   the only exception being key documents.  If there is a handful,

5   say 20 or 30, in this case maybe even 50, repeat exhibits, you

6   can put those in a key document binder and I can have those at

7   hand; but in the main I'll be looking at your evidence

8   presented on these four computer screens I have in front of me

9   and will likely not be able to tag back to the paper, given the

10  nature of this case, how document intensive it is.

11           You can have one for the clerk, one for the official

12  and then for each other, and then if there is a set of key

13  documents you'd like the Court to have, that's fine.  I don't

14  need 17, 18 binders of exhibits up here.  I won't even be able

15  to get to them.

16           MR. OPPENHEIM:  Thank you for indulging my questions,

17  Your Honor.  I know they're logistical, but it will make it

18  easier for us.

19           I have nothing else, Your Honor.

20           THE COURT:  Anything from the defense?

21           MS. BREWER:  This is, I think, a joint inquiry, so

22  Mr. Gould will correct me if not, but the parties have been

23  conferring to come up with a mutually agreeable process for

24  streamlining disputes that are currently pretty voluminous with

25  respect to deposition designations, and we want to have a

1    controlled process for disputes regarding witnesses and
2    demonstratives, so we have that in place, but it depends -- or
3    at least nearly in place, but it does depend on what the
4    Court's preferences are for those disputes that -- in the event
5    we cannot resolve them and we need Court resolution, because
6    Courts do vary in terms of the timing and manner in which
7    that's presented.  Some want limited briefing, argument in the
8    morning, some want more advanced notice, and we certainly don't
9    want to put together a process that we agree on that does not
10   work for Your Honor.
11            So the central question to Your Honor being, if there
12   are disputes that require resolution, for example, before a
13   witness takes the stand or deposition testimony is played,
14   what's your preference, Your Honor's preference for the timing
15   and manner of resolving that?
16            THE COURT:  I assume the parties intend to submit
17   their designations to the Court.  I will have those in front of
18   me and review them as they are presented.  Sometimes at night,
19   when I don't have anything else to do, I'll be looking at them
20   at home and hopefully get them all reviewed.  And then at the
21   end of each day I'll say, who is going to be your witness --
22   what's your witness list for tomorrow?  You'll tell me what
23   your witness list is for tomorrow, and that will be your
24   witness list and in that order, and then absent someone falling
25   down a flight of steps that will be your order.  And then

1    I will say, do you all have any issues you can anticipate with

2    respect to any of these witnesses the plaintiff intends to call

3    or the defense intends to call, and then you'll say, Judge, we

4    don't have any issue, and then we'll come to court and the very

5    first time the person opens their mouth they'll say, I want a

6    sidebar, and I'll say, no sidebar, I asked you if you had any

7    issues and you said you didn't, so call your witness.

8              If you have an issue with respect to a witness that

9    you haven't been able to resolve, then you should say that at

10   the close of business at the end of the day so that we can try

11   to work through them before the witness hits the stand.

12             Now, obviously there are issues that we can't really

13   anticipate all the time, but in the main the parties would know

14   what those issues are and would be able to resolve them among

15   yourselves principally and then, if necessary, with the Court's

16   involvement.

17             Is that clear enough?

18             MR. GOULD:  Your Honor, if I might respond briefly.

19   That does make sense, so I appreciate your guidance.

20             With designations in particular, the Court -- the

21   parties have been working amicably together to try and,

22   frankly, streamline the requests and burden on Your Honor.

23   You'll be perhaps unsurprised to know that both parties have

24   designated I suspect quite a bit more than they will actually

25   use at trial, and so the parties are working towards an

1   agreement to be set forth in the pretrial proposed order this

2   Friday which would set forth the process where those

3   designations and objections are preserved in the first

4   instance, we would not ask Your Honor to spend her late nights

5   reviewing them, but some number of days ahead of the intention

6   of playing those designations the parties would really laser in

7   on what, if any, disputes persist and present any disputes that

8   need resolution a day or two before they would be played.

9            THE COURT:  That's fine, but keep in mind, guys, that

10  your case, even though it's the one I am presiding over, is not

11  the only case I'm managing.  Even when I'm sitting in court

12  with you, I'll be managing other cases.  So it could be that

13  I have a preliminary injunction to deal with on the evening of

14  your trial, so you can't always count on my availability the

15  two or three days before your witness.  So if you have a

16  designation and a designation issue, you should at least,

17  you know, make sure the Court is aware of it in advance so that

18  I can spend down time, although we won't have much, given the

19  shortness of time between now and August 1st, to address it.

20           MR. GOULD:  Understood, Your Honor.

21           MS. BREWER:  Understood.

22           MR. GOULD:  Could I just circle back to clarify the

23  last point you made about exhibits?  You said you wanted a key

24  document binder, and then did I understand you to say for

25  exhibits used with the witness you wanted a copy for the

1    witness, a copy for the other side and a copy for the Clerk?

2            THE COURT:  Yes.

3            MR. GOULD:  Got it.  Thank you.

4            THE COURT:  Any chance that the parties are going to

5    settle this case, short of a ruling from the Fourth Circuit

6    before August the 1st?

7            MR. SCHAPIRO:  Unlikely.

8            THE COURT:  All right.  Well, I will see you all

9    here.  I hope this is a pleasant experience for you to try this

10   case, and we'll get through it and let the jury make a

11   decision.

12           MR. OPPENHEIM:  Your Honor -- I'm sorry, go ahead.

13           THE COURT:  I will endeavor to get a resolution to

14   you of this source code material by the end of the day

15   tomorrow.

16           MR. OPPENHEIM:  That was what I was going to ask.

17   Thank you, Your Honor.

18           THE COURT:  All right.

19           MR. OPPENHEIM:  Have a good day.

20           MR. VERHOEVEN:  Thank you, Your Honor.

21           THE COURT:  Thank you.

22           Anything else -- I'm sorry.  Mr. Paslavsky, anything

23   else I forgot to inquire?

24           MR. PASLAVSKY:  No, Judge.

25           THE COURT:  All right.  Thank you.  We're dismissed.

1                           - - - - -

2               (Proceedings concluded at 12:56 p.m.)

3                           - - - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4    proceedings taken in a miscellaneous hearing in the United

5    States District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand and transcribed by

7    computer under my supervision, this the 15th day of July, 2022.

8

9

10                                    /S/ DAVID J. COLLIER

11

12                                    DAVID J. COLLIER

13                                    OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25